**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SHAUN GRAY, an individual,

                Plaintiff,

       v.

PARAMOUNT GLOBAL, a Delaware
corporation; PARAMOUNT PICTURES
CORPORATION, a Delaware corporation;
PARAMOUNT STREAMING SERVICES
INC., a Delaware corporation; and DOES 1-10,

                Defendants.

Case No. 1:25-cv-03484-JSR

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFF'S COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................................... 2

III. LEGAL STANDARD ............................................................................................... 4

IV. ARGUMENT ............................................................................................................ 4

    A. The Joint Authorship/Ownership Claims Fail Because PPC And Gray Had No
    Mutual Intent To Be Joint Authors Of Either Maverick Or Its Screenplay. ................. 4

        1. Joint Authorship Principles ................................................................................. 5

        2. Joint Authorship Analysis ................................................................................... 6

            (i) Decisionmaking Authority ................................................................... 6

            (ii) Billing ..................................................................................................... 9

            (iii) Written Agreements With Third Parties ............................................ 10

    B. The Infringement Claim Fails For At Least Two Independent, Threshold
    Reasons. ........................................................................................................................ 14

        1. Gray's Contributions Are Inseparable From Maverick And Not Entitled
        To Independent Copyright Protection. .......................................................... 14

        2. The Infringement Claim Alternatively Fails Because Gray Implied A
        License To Use The "Gray Scenes" In Maverick And Its Screenplay. ........... 20

    V. CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015)................................................................................ passim

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ............................................................................. passim

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) ................................................................................. 20, 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................... 4, 8, 12

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884).................................................................................................... 8

*Carell v. Shubert Org., Inc.*,
104 F. Supp. 2d 236 (S.D.N.Y. 2000)........................................................................ 4

*Childress v. Taylor*,
945 F.2d 500 (2d Cir. 1991)................................................................................ 5, 12

*Cuoco v. Moritsugu*,
222 F.3d 99 (2d Cir. 2000)..................................................................................... 23

*Dynamic Sols., Inc. v. Plan. & Control, Inc.*,
646 F. Supp. 1329 (S.D.N.Y. 1986)......................................................................... 23

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
697 F.2d 27 (2d Cir. 1982)..................................................................................... 23

*Farkas v. Rich Coast Corp.*,
2017 WL 10299097 (M.D. Pa. June 7, 2017), *report and recommendation
adopted*, 2017 WL 10299211 (M.D. Pa. Sept. 12, 2017) ................................ 17, 18

*Fennell v. TLB Kent Co.*,
865 F.2d 498 (2d Cir. 1989).................................................................................... 14

*Fontana v. Harra*,
2013 WL 990014 (C.D. Cal. Mar. 12, 2013) ........................................................... 21

*Ford v. Ray*,
130 F. Supp. 3d 1358 (W.D. Wash. 2015)............................................................... 10

*Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*,
713 F. Supp. 2d 215 (S.D.N.Y. 2010)...................................................................... 15

*Gil v. Sea Shepherd Conservation Soc'y*,
2015 WL 11387765 (C.D. Cal. Jan. 22, 2015) ........................................................ 13

*Graham v. James*,
144 F.3d 229 (2d Cir. 1998).................................................................................... 20

*Heger v. Kiki Tree Pictures, Inc.*,
2017 WL 5714517 (C.D. Cal. July 24, 2017)....................................................... 9, 10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Heller v. NBCUniversal, Inc.*,
2018 WL 11354835 (C.D. Cal. Dec. 21, 2018) ...................................................... 9

*Hudson & Broad, Inc. v. J.C. Penney Corp*.,
2013 WL 3203742 (S.D.N.Y. June 18, 2013), *aff'd*, 553 F. App'x 37 (2d Cir.
2014) ...................................................................................................................... 13

*Island Software & Computer Serv., Inc. v. Microsoft Corp*.,
413 F.3d 257 (2d Cir. 2005) .................................................................................. 10

*Latour v. Columbia Univ*.,
12 F. Supp. 3d 658 (S.D.N.Y. 2014) ..................................................................... 20

*Lively v. WAFRA Inv. Advisory Grp., Inc*.,
6 F.4th 293 (2d Cir. 2021) ................................................................................. 4, 7

*MidlevelU, Inc. v. ACI Info. Grp*.,
989 F.3d 1205 (11th Cir. 2021) ............................................................................. 21

*N.L.R.B. v. Fluid Transp., Inc*.,
77 F.3d (9th Cir. 1996) .......................................................................................... 14

*Psihoyos v. Pearson Educ., Inc*.,
855 F. Supp. 2d 103 (S.D.N.Y. 2012) .................................................................... 21

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc*.,
531 F.3d 962 (9th Cir. 2008) ....................................................................... 8, 9, 10

*Sobhani v. @Radical.Media Inc*.,
257 F. Supp. 2d 1234 (C.D. Cal. 2003) ................................................................ 23

*TCA Television Corp. v. McCollum*,
839 F.3d 168 (2d Cir. 2016) .................................................................................. 10

*Thomson v. Larson*,
147 F.3d 195 (2d Cir. 1998) ............................................................................ passim

*Wozniak v. Warner Bros. Ent. Inc*.,
726 F. Supp. 3d 213 (S.D.N.Y. 2024) ................................................................... 23

**Statutes**

17 U.S.C. § 101 ............................................................................................................ 5, 16

17 U.S.C. § 102 ............................................................................................................... 15

17 U.S.C. § 201 ......................................................................................................... 11, 15

**Other Authorities**

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ........................ 16

Restatement (Third) of Agency § 2.02 .......................................................................... 13

Restatement (Third) of Agency § 2.03 .......................................................................... 14

U.S. Copyright Office, Circular 34: Multiple Works (Mar. 2021),
https://www.copyright.gov/circs/circ34.pdf ........................................................ 16

# I. INTRODUCTION

Plaintiff Shaun Gray, who alleges he spent six months in 2017 working for screenwriter Eric Singer, asks this Court for the extraordinary relief of declaring him a joint author and equal owner with Paramount Pictures Corporation ("PPC") of the 2022 blockbuster film *Top Gun: Maverick* ("*Maverick*"). In the alternative (and inconsistently), he urges that PPC infringed on his (non-existent) copyright in fifteen "scenes" he allegedly drafted with the intent that they be incorporated into Singer's screenplay draft (the "Singer Draft") and, in turn, *Maverick*. Gray's claims are detached from reality—and, not surprisingly, fail as a matter of law.

*Maverick*—PPC's long-anticipated sequel to its 1986 film *Top Gun*—was the product of years of development and the creative labor of hundreds of contributors. Those contributors include three waves of screenwriters. Singer (and, allegedly by association, Gray) landed in the middle of the screenwriting process. Two screenwriters prepared draft screenplays before the Singer Draft, and two other screenwriters prepared drafts after it. As Gray concedes, every single screenwriter (including Singer) and every other creative contributor to *Maverick* made their contributions as works made for hire for PPC, making PPC their sole author and owner.

Gray alleges no direct contacts with PPC, and he never received a credit of any kind on *Maverick* or on any screenplay draft—in contrast to *Maverick*'s actual screenwriters. Yet Gray implausibly contends that PPC intended him to be its one and only co-author and co-owner of *Maverick*, all based on Gray's alleged limited contributions at the direction of a work-made-for-hire screenwriter on an interim draft of the screenplay. That is a delusion. Gray's Complaint fails every factor of the Second Circuit's joint authorship test: Gray lacked decisionmaking authority over the works to which he lays claim; he received no billing on them, let alone as a joint author; and he had no agreements with third parties suggesting his authorship, in contrast to PPC's many work-made-for-hire agreements showing its clear intent to be sole author.

1

Gray's infringement claim likewise fails as a matter of law under settled Second Circuit authority. Gray himself alleges that he contributed to the Singer Draft, knowing and intending that the Singer Draft would be delivered to PPC for use in *Maverick*. Gray does not (and cannot) allege that he *ever* told anyone at PPC about his purported contributions—much less informed anyone at PPC that its use of the Singer Draft would somehow infringe *Gray's* purported copyrights—until long after *Maverick* was released. For two independent reasons, no infringement claim can lie in these circumstances. First, the scenes Gray ostensibly drafted are not entitled to independent copyright protection, as they are inseparable from and merged with the screenplay and broader film. Were the rule otherwise, a unitary screenplay would be broken up into hundreds of discrete copyrights—one for each of its hundreds of scenes—not to mention the hundreds if not thousands more pieces comprising the overall film. Second, even if Gray did have a copyright in those scenes, Gray at minimum implied a license for their use in *Maverick* and its screenplay.

Neither of Gray's theories states a plausible claim for relief—to the contrary, his Complaint demonstrates that he has no viable claim for relief against PPC. The Complaint should be dismissed with prejudice in its entirety.

## II. FACTUAL BACKGROUND

After many years of development, in 2022, PPC released the film *Top Gun: Maverick*, the sequel to its 1986 film *Top Gun*. Compl. ¶¶ 2, 20, 25. PPC hired Joseph Kosinski to be the film's director, and it hired three waves of screenwriters to draft the screenplay for the film. *Id.* ¶¶ 4, 25-26. PPC first hired Peter Craig and then Justin Marks to develop the earliest drafts of the screenplay. *Id.* ¶ 25. PPC next hired Eric Singer to develop further drafts of the screenplay, working off the Craig and Marks drafts. *Id.* ¶¶ 4, 20, 25. Third, and finally, PPC hired Ehren Kruger and Christopher McQuarrie to develop yet further drafts of the screenplay, building on the material furnished by Singer. *Id.* ¶ 26. PPC entered into work-made-for-hire agreements with

every screenwriter, whereby PPC would be the sole author and owner of their contributions. *Id.* ¶ 7. More broadly, PPC entered into work-made-for-hire agreements with *every single creative contributor* to *Maverick*—allegedly, with the exception of Gray. *Id.* ¶¶ 7, 27.

In June 2017, Singer allegedly approached Gray to help write Singer's draft of the screenplay, to which Gray agreed. *Id.* ¶¶ 4, 22. Gray alleges that, unlike every other contributor to *Maverick,* he had no written contract with PPC or any other person or entity concerning this project.[1] *Id.* ¶¶ 27-28. Gray alleges that he contributed creative material to the Singer Draft, including writing fifteen scenes for the screenplay (which he dubs the "Gray Scenes"). *Id.* ¶ 30 & Ex. 2. Copies of those scenes, which are incorporated by reference in and integral to the Complaint, are attached to the accompanying Declaration of Molly Lens ("Lens Decl.") as Exhibits G to U. Gray alleges he worked on the Singer Draft from June 2017 to November 2017. Compl. ¶¶ 24, 57.

After Singer delivered the Singer Draft to PPC, further drafts were developed by Kruger and McQuarrie. *Id.* ¶¶ 26, 60. Kruger and McQuarrie's drafts culminated in the final screenplay for *Maverick*, with this *final* version being the "Screenplay" referred to in Gray's Complaint. *Id.* ¶ 7. The film later moved into production, and it was released on May 27, 2022, more than four and a half years after Gray alleges he finished working on the Singer Draft. *Id.* ¶¶ 2, 24, 57.

Gray filed this action on April 27, 2025, bringing claims for: (1) a declaration of joint authorship and joint equal ownership with PPC of *Maverick* and its Screenplay; (2) copyright

---

[1] Gray *did* have an agreement with Singer as his writer's assistant, though he misleadingly omits mention of it from his Complaint. For this motion, however, Paramount does not rely on that contract, but rather accepts all of Gray's allegations as true, as it must—although Paramount vehemently denies the misleading and often altogether-fabricated narrative Gray presents with his allegations.

infringement of the "Gray Scenes" due to their use in *Maverick*; and (3) an accounting, premised on his other claims. For the reasons discussed below, each claim fails as a matter of law.

### III. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* For this analysis, the "well-pleaded factual allegations" of the complaint are assumed to be true, but legal conclusions are not entitled to an assumption of truth. *Id.* at 678-79. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In addition to the complaint itself, the court may "consider extrinsic material that the complaint incorporates by reference, that is integral to the complaint, or of which courts can take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) (cleaned up).

### IV. ARGUMENT

#### A. The Joint Authorship/Ownership Claims Fail Because PPC And Gray Had No Mutual Intent To Be Joint Authors Of Either *Maverick* Or Its Screenplay.

Gray fails to state a claim for joint authorship or ownership of *Maverick* or its Screenplay, because he cannot plausibly allege that PPC regarded him as a joint author. That missing element is a prerequisite to joint authorship and, in turn, joint ownership, and it thus forecloses Gray's First and Third Claims for Relief (Declaratory Judgment and Accounting[2]).

---

[2] "A claim for accounting is a remedy premised on a determination of co-ownership because the duty to account for profits 'presupposes a relationship as co-owners of the copyright.'" *Carell v. Shubert Org.*, Inc., 104 F. Supp. 2d 236, 246 n.6 (S.D.N.Y. 2000).

### 1. Joint Authorship Principles

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Inseparability/interdependence is a *necessary* condition for joint authorship, but not a *sufficient* one on its own. *Thomson v. Larson*, 147 F.3d 195, 199-200 (2d Cir. 1998). "The potential danger of allowing anyone who makes even a minimal contribution to the writing of a work to be deemed a statutory co-author—as long as the two parties intended the contributions to merge—motivated the [Second Circuit] to set forth a two-pronged test." *Id.* at 200. Under this settled test, each putative joint author must have "(1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Id.* The latter prong is the focus of Paramount's motion.[3]

A work of authorship is not a joint work absent "intent of both participants in the venture to regard themselves as joint authors." *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991). "A co-authorship claimant bears the burden of establishing that each of the putative co-authors . . . fully intended to be co-authors." *Thomson*, 147 F.3d at 200. "Focusing on whether the putative joint authors regarded themselves as joint authors is especially important in circumstances, such as the instant case, where one person [] is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another [] are joint authors." *Childress*, 945 F.2d at 508.

---

[3] For the avoidance of doubt, Paramount does not agree that Gray made any independently copyrightable contributions to either *Maverick* or its Screenplay but does not seek dismissal on this ground as to the first claim.

Because of the extensive rights accorded to joint authors—they enjoy "equal undivided interests in the work"—the Second Circuit has repeatedly cautioned against extending the doctrine too broadly:

> That equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors. The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright[.]

*Id.* at 508-09; *see also Thomson*, 147 F.3d at 201-02.

### 2. Joint Authorship Analysis

To evaluate the mutual intent prong of a joint authorship claim in the absence of a contract, courts examine the putative joint authors' (i) decisionmaking authority, (ii) billing, and (iii) written agreements with third parties, along with any other indicia of the parties' intent. *Thomson*, 147 F.3d at 201-05. Gray's Complaint shows each factor cuts decisively against joint authorship here.

### (i) Decisionmaking Authority

Examining the putative joint authors' decisionmaking authority and control over the work helps differentiate bona fide joint authors from those with other, lesser relationships. "[A]bsence of control is strong evidence of the absence of co-authorship." *Aalmuhammed v. Lee*, 202 F.3d 1227, 1235 (9th Cir. 2000); *see also Thomson*, 147 F.3d at 202-03.

Gray's own pleading concedes that he was brought onto *Maverick* after the film was already conceptualized and initial drafts of its screenplay prepared. Compl. ¶¶ 22, 25 ("PPC had employed other writers, including Peter Craig and Justin Marks, under work-made-for-hire contracts to develop earlier screenplay drafts for a *Top Gun* sequel"). Likewise, *after* Gray alleges he and Singer completed the Singer Draft, PPC employed two additional writers "under work-made-for-hire contracts to further develop the Screenplay." *Id.* ¶ 26. Thus, the screenplay draft

on which Gray alleges he worked was merely an *interim* draft.  Nor does Gray allege any involvement in any other aspect of producing *Maverick*.  To the contrary, he alleges that the full scope of his involvement spanned June to November 2017, *id.* ¶¶ 22, 24, 57 & Ex. 2, with *Maverick* then not released until May 27, 2022, *i.e.* more than four and a half years after Gray alleges he and Singer completed their draft, *id.* ¶¶ 2, 24, 57.

Accordingly, by his own allegations, Gray did not have and could not plausibly have had decisionmaking authority over *Maverick* or the Screenplay to which he lays claim, defined as "the Film's final screenplay."  *Id.* ¶ 7.  Two screenwriters came on for rewrites *after* Gray completed his work in November 2017, *id.* ¶ 25, and Gray also was not involved with the actual shooting or post-production process for *Maverick*, *see generally id.* ¶¶ 22-31 (describing scope of Gray's alleged work on *Maverick*).  Gray thus could not have had "decisionmaking authority over what changes [we]re made and what [wa]s included" in the works as to which he claims joint authorship. *Thomson*, 147 F.3d at 202-03.  Nor could Gray have had a contractual right to control; he admits he had no contract at all.  Compl. ¶ 28.[4]

Indeed, Gray alleges only that, in addition to drafting scenes, he "exercised decision-making and editorial authority over revisions to other scenes in the screenplay suggested by Singer and/or Kosinski."  *Id.* ¶ 31.  This allegation is notable for what it does *not* say—(i) that he exercised control as to the interim screenplay draft on the whole, not just as to discrete revisions of others' revisions of it; and, more importantly, (ii) that he had *any* decisionmaking authority as to *Maverick*

---

[4] While not necessary to dismiss Gray's facially deficient claims, the extensive differences between the final Screenplay (Lens Decl., Ex. E) and the scenes Gray claims to have authored (*id.*, Exs. G-U) confirm his lack of decisionmaking authority and control over the Screenplay and *Maverick*.  *E.g.*, *compare* Ex. G *with* Ex. E at 7-8; Ex. H *with* Ex. E at 8-20; Ex. I *with* Ex. E *generally* (no comparable scene); Ex. J *with* Ex. E at 44-63; Ex. K *with* Ex. E *generally* (no comparable scene).  These documents can be considered on a motion to dismiss because they are both incorporated by reference in the Complaint and integral to it.  *Lively*, 6 F.4th at 305.

or the final Screenplay, rather than the interim draft he allegedly prepared with Singer. Such an allegation would be implausible—and indeed would run counter to admissions in his Complaint about the substantive and temporal scope of his work.

For these reasons, Gray alleges only that he "superintended *his* work" and exercised control over "elements" of the screenplay. *Id.* ¶ 32 (emphasis added). As an initial matter, that conclusory allegation is not entitled to an assumption of truth. *Iqbal*, 556 U.S. at 678. But even if it were, the operative question is whether Gray superintended "*the* work." *Aalmuhammed*, 202 F.3d at 1235 (emphasis added); *see also id.* at 1233 (citing *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884), for the proposition that authorship refers to "the person to whom the work owes its origin and who superintended the whole work"). Gray advances no allegation to that effect—nor could he plausibly (or in good faith) do so. In contrast to Gray's limited role, one who "superintends the work" is "a person 'who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be—the man who is the effective cause of that,' or 'the inventive or master mind' who 'creates, or gives effect to the idea.'" *Id.* at 1234. That describes PPC, which stood at the helm of *Maverick*'s development and production from start to finish and for whom "all other creative contributions to the Screenplay and Film" (allegedly beside Gray's) were made as "works-made-for-hire." Compl. ¶ 42. It by no means describes Gray.

Illustrating this principle, the Ninth Circuit rejected the joint authorship claim of a screenwriter who wrote the treatment that later became *The Pink Panther*, because even though he "had control over the Treatment as originally written, he had no control over how the Treatment was incorporated into the Motion Picture." *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 970 (9th Cir. 2008). Similarly, it found that "[a]ny control that [the screenwriter] may have had over the *screenplay* does not lend support to his claim that he exercised any control over

the creation of the *Motion Picture*." *Id.* (emphases added).  Other courts have likewise rejected

joint authorship claims—including at the pleading stage—where a putative joint author alleged

control (even "total control") over *aspects* of a film or script but not the film or script overall.  *See*

*Heger v. Kiki Tree Pictures, Inc.*, 2017 WL 5714517, at *5 (C.D. Cal. July 24, 2017) (granting

motion to dismiss joint authorship claim because "[h]owever significant [plaintiff's] contributions

may have been over [select] areas of production . . . , absent factual allegations that he had

'supervisory powers over the [film],' the Court cannot plausibly infer that [he] was the 'inventive

or master mind' of the film"); *Thomson*, 147 F.3d at 202-04 (contribution of "significant language"

to script did not support joint authorship claim where whether these contributions made it into the

final script was committed to another person's discretion); *Heller v. NBCUniversal, Inc.*, 2018 WL

11354835, at *4 (C.D. Cal. Dec. 21, 2018) (granting motion to dismiss claim premised on joint

authorship because even though "Plaintiff alleges that [he] made '*proposed* revisions' to the

Screenplay, . . . this in no way establishes that [plaintiff] controlled the work").

### *(ii)  Billing*

Billing is another crucial factor in the intent analysis: "[A] writer's attribution of the work

to herself alone is persuasive proof that she intended this particular piece to represent her own

individual authorship and is *prima facie* proof that the work was not intended to be joint."

*Thomson*, 147 F.3d at 203 (cleaned up).

Gray was not billed or credited *at all* on *Maverick*, let alone as a joint author.  Compl. ¶¶

34, 50.  Rather, as to writing roles, the film's credits state: "Screenplay by Eric Kruger, Eric Warren

Singer and Christopher McQuarrie" and "Story by Peter Craig and Justin Marks"—all of whom

worked for hire for PPC.  *Id.* ¶¶ 7, 20, 25-26, 34.  That is, of the six people Gray alleges worked

on a draft of the screenplay, Gray was *the only one* not listed in the credits.  *Id.*  The Screenplay

itself confirms the same; it does not mention Gray at all, and its cover page instead lists the

following credits: "Written by Peter Craig[,] Justin Marks[,] Eric Warren Singer[,] Ehren Kruger" with "Current Revisions by Christopher McQuarrie." Lens Decl., Ex. E at 1.[5]

In addition, the copyright registration for *Maverick* lists PPC as its sole author, as an employer for hire.[6] *Id.*, Exs. A & B. The film's April 30, 2019 preregistration states the same, confirming PPC has long regarded itself as a sole author. *Id.*, Exs. C & D. These billings are wholly inconsistent with joint authorship and clearly evidence PPC's contrary intent. *See, e.g.*, *Richlin*, 531 F.3d at 969 (no mutual intent for joint authorship where "[b]oth the initial- and renewal-term statutory copyright registrations list [production company] and its successors-in-interest as authors of the Motion Picture, not [plaintiff]"); *Heger*, 2017 WL 5714517, at *6 ("[T]he fact that [plaintiff's] name is not listed in the copyright registration for the film (as alleged in the FAC) nor the film credits (as the Court judicially noticed) negate[s] any suggestion that [defendant] intended to share authorship credits with plaintiff.") (cleaned up); *Ford v. Ray*, 130 F. Supp. 3d 1358, 1363-64 (W.D. Wash. 2015) (no joint authorship where Defendant "registered copyrights for the works, identifying himself as the sole author and negating any suggestion that he intended to share authorship credits with plaintiff").

### (iii) Written Agreements With Third Parties

Putative joint authors' agreements with third parties likewise are probative of intent. *Thomson*, 147 F.3d at 204; *Aalmuhammed*, 202 F.3d at 1235. As Gray admits, PPC had a work-

---

[5] As explained above, *supra* note 4, the Screenplay may be considered because it is incorporated by reference in the Complaint and integral to it.

[6] The copyright registration and preregistration are judicially noticeable under Federal Rule of Evidence 201 and therefore may be considered on Paramount's motion to dismiss. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 172 (2d Cir. 2016); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005); *see also* Defendants' Request for Judicial Notice at 2-3.

made-for-hire agreement with *every other writer*—including Singer, the writer who allegedly brought Gray on to work with him on a screenplay draft, Compl. ¶¶ 4, 20, 22—such that PPC would not have to share authorship or ownership with them. *Id*. ¶¶ 7, 20, 22, 25-27; 17 U.S.C. § 201(b). As Gray similarly admits, PPC employed *Maverick*'s director Joseph Kosinski on a work-made-for-hire basis, such that PPC would be deemed the author of his contributions too and likewise not share in authorship or ownership. Compl. ¶¶ 4, 21. In fact, Gray admits that "*all* other persons rendering creative services or contributing creative content of *any* kind in connection with the Screenplay and the Film did so pursuant to explicit work-made-for-hire contracts with PPC." *Id.* ¶ 27 (emphases added).

The only plausible conclusion from these allegations is that PPC had every intention of being the *sole* author and owner of *Maverick* and its Screenplay. Indeed, in *Casa Duse*, the Second Circuit held on virtually identical facts to those here that this factor "points decisively in [a production company's] favor" where it "obtained written work-for-hire agreements from every cast and crew member other than" the plaintiff, and the plaintiff "did not, so far as the record shows, enter into any third party agreements." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015). The Ninth Circuit's discussion on work-made-for-hire arrangements in *Aalmuhammed* confirms this result. There, Warner Brother had entered into a work-made-for-hire agreement with director Spike Lee, "so that even Lee would not be a co-author and co-owner with Warner Brothers." 202 F.3d at 1235. The Ninth Circuit found that fact anathema to joint authorship: "It would be illogical to conclude that Warner Brothers, while not wanting to permit Lee to own the copyright, intended to share ownership with individuals like Aalmuhammed who worked under Lee's control, especially ones who at the time had made known no claim to the role of co-author." *Id.*

\*    \*    \*

In sum, each factor of the Second Circuit's test for mutual intent weighs against Gray, rendering any pleading of joint authorship implausible—and, indeed, outright foreclosed by Gray's admissions. Gray lacked decisionmaking authority over *Maverick* or its Screenplay; he was not credited *at all* in the film credits, on the Screenplay itself, or in copyright registrations, much less as a joint author; and PPC had work-made-for-hire agreements with all contributors other than Gray, while Gray had none.

Moreover, Gray never alleges (and could not in good faith) that he told PPC he believed himself to be a joint author of either *Maverick* or its Screenplay—or for that matter, that he held himself out to *anyone* as such—before bringing this lawsuit.[7] *See Aalmuhammed*, 202 F.3d at 1235 (rejecting joint authorship claim where "[n]o one, including [plaintiff], made any indication to anyone prior to litigation that [plaintiff] was intended to be a co-author and co-owner" of the subject film). Gray's own allegations expose his joint authorship claim as patently implausible— all the more so when coupled with this Court's "judicial experience and common sense," *Iqbal*, 556 U.S. at 679.

Gray's joint authorship claim is all the more implausible because he does not allege he had *any* direct contacts with PPC. That stands in contrast to, for example, the dramaturg in *Thomson* or the actress in *Childress*, both of whom fell short of proving joint authorship *even with* extensive direct contacts with their putative joint authors. *See Thomson*, 147 F.3d at 197 (dramaturg was hired to assist playwright "in clarifying the storyline of the musical" and the two "worked extremely intensively together on the show"); *Childress*, 945 F.2d at 502 (actress approached

---

[7] Because intent must be *mutual* to give rise to joint authorship, such an allegation would not breathe life into his claim regardless. *Thomson*, 147 F.3d at 201.

playwright with idea for play, "sift[ed] through facts and select[ed] pivotal and key elements to include in [the] play," "discussed with [playwright] the inclusion of certain general scenes and characters in the play," and "spoke [with playwright] on a regular basis about the progress of the play"). Gray alleges no such relationship with PPC, his putative joint author.

Gray relies instead on his conclusory allegation that "Singer and Kosinski represented themselves to Gray as having the authority and the approval of PPC and/or had the apparent authority of PPC to involve Gray in the project." Compl. ¶ 22. But apparent authority to "involve" Gray in *Maverick*—encompassing Gray's actual, lesser role assisting Singer—is a different thing entirely from authority to *enlist him as a co-author*.[8] Gray makes no allegation to that effect, which in any event, would fail as a matter of law. After all, it is axiomatic that:

> [a]pparent authority will only be found where words or conduct of the principal— *not the agent*—are communicated to a third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue.

*Hudson & Broad, Inc. v. J.C. Penney Corp.*, 2013 WL 3203742, at *4 (S.D.N.Y. June 18, 2013) (emphasis added), *aff'd*, 553 F. App'x 37 (2d Cir. 2014); *see also, e.g.*, *Gil v. Sea Shepherd Conservation Soc'y*, 2015 WL 11387765, at *3 (C.D. Cal. Jan. 22, 2015) ("apparent, or ostensible, authority, stems from conduct of *the principal* which leads the third party *reasonably to believe* that the agent is authorized to bind the principal") (quotation marks omitted); *N.L.R.B. v. Fluid*

---

[8] Of course, Kosinski and Singer did not have *actual authority* to enlist Gray as a co-author either, and Gray's pleading does not assert as much. "Lack of actual authority is established by showing either that the agent did not believe, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question." Restatement (Third) of Agency § 2.02. Given Kosinski's and Singer's work-made-for-hire arrangements with PPC, Compl. ¶¶ 20-21, they could not have reasonably believed that they had authority to enlist Gray or anyone else as a joint author with PPC (nor are they even alleged to have *subjectively* believed as much). This is reinforced by Singer's contract, incorporated by reference in the Complaint, *see id*. ¶¶ 7, 20, 27, 42, whereby Singer had to represent and warrant to PPC that his draft would be "solely written by [Singer]" and "wholly original with [Singer]." Lens Decl., Ex. F at 35 (Schedule I, ¶ G(ii)).

*Transp., Inc.*, 77 F.3d 489 (9th Cir. 1996); *Fennell v. TLB Kent Co*., 865 F.2d 498, 502 (2d Cir. 1989); Restatement (Third) of Agency § 2.03.  Gray does not, and cannot, point to any words or conduct *on the part of PPC* suggesting that Singer or Kosinski had authority to engage Gray to co-write the Singer Draft—much less to make Gray a joint author of *Maverick* or its Screenplay with an undivided equal interest in the whole and broader rights than *any other contributor* (themselves included).  Nor would it be objectively reasonable for Gray to believe that Singer and Kosinski—who, as Gray alleges, had work-made-for-hire arrangements with PPC, Compl. ¶¶ 20-21—had the authority to do so.

For all these reasons, Gray has not adequately alleged that he and PPC shared the mutual intent that he be a joint author of *Maverick* or its Screenplay.  Because "a specific finding of mutual intent" is a necessary element of a joint authorship claim even where the putative joint author has allegedly contributed "significant language to a work," *Thomson*, 147 F.3d at 202, Gray's joint authorship claims fail as a matter of law.  This failure cannot be remedied by amendment—it is grounded in Gray's own judicial admissions and the basic relationship between the parties—so the First and Third Claims for Relief should be dismissed with prejudice.

### B.  The Infringement Claim Fails For At Least Two Independent, Threshold Reasons.

#### 1.  Gray's Contributions Are Inseparable From *Maverick* And Not Entitled To Independent Copyright Protection.

Gray also fails to state a claim for infringement of the so-called "Gray Scenes," because they are not standalone works entitled to independent copyright protection.  This forecloses Gray's Second Claim for Relief (Copyright Infringement).[9]

---

[9] To any extent copyright infringement could supply a foundation for Gray's accounting claim, it too falls with Gray's infringement claim.  Regardless, the subset of Gray's accounting "claim" that relates to infringement merely seeks a *remedy* as to the infringement claim; it is not a standalone *cause of action*.  Moreover, "accounting claims based primarily on copyright infringement" are

Under Second Circuit law, an individual's "creative contributions to a work in which copyright protection subsists, such as a film," are not themselves within "the subject matter of copyright," when those "contributions are inseparable from the work and the individual is neither the sole nor a joint author of the work and is not a party to a work-for-hire arrangement." *Casa Duse*, 791 F.3d at 256. In so holding, the Second Circuit declined to "mak[e] Swiss cheese of copyrights" in unitary works of authorship that happen to involve many discrete contributors. *Id.* at 258 (cleaned up). Filmmaking is a prime example—and the one that motivated the Second Circuit's decision in *Casa Duse*.

As the Second Circuit explained:

> Filmmaking is a collaborative process typically involving artistic contributions from large numbers of people, including—in addition to producers, directors, and screenwriters—actors, designers, cinematographers, camera operators, and a host of skilled technical contributors. If copyright subsisted separately in each of their contributions to the completed film, the copyright in the film itself, which is recognized by statute as a work of authorship, could be undermined by any number of individual claims. These various contributors may make original artistic expressions, which are arguably fixed in the medium of film footage. But while originality and fixation are necessary prerequisites to obtaining copyright protection, *see* 17 U.S.C. § 102(a), they are not alone sufficient: Authors are not entitled to copyright protection except for the "works of authorship" they create and fix.

*Id.*

Separate copyrights "may subsist in contributions to a collective work," so long as "such contributions constitute 'separate and independent' works." *Id.* at 257; 17 U.S.C. § 201(c). But a motion picture like *Maverick* is not a collective work, nor are its hundreds of constituent scenes "separate and independent" from it. The Copyright Act defines a collective work as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting

---

preempted by the Copyright Act and cannot proceed for that independent reason. *Gary Friedrich Enters., LLC v. Marvel Enters., Inc*., 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2010).

separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C.

§ 101. What sets apart collective works is that "individuals' contributions 'remain unintegrated

and disparate'" rather than part of "a unified whole." *Casa Duse*, 791 F.3d at 257. In fact, the

U.S. Copyright Office cites motion pictures as an example of what "[a] collective work is not": it

is not "[a] unified work created by multiple authors, such as . . . a motion picture with screenplay,

soundtrack, directing, acting, cinematography, costume design, visual effects, or other production

elements contributed by multiple authors." U.S. Copyright Office, Circular 34: Multiple Works

(Mar. 2021), accessible at https://www.copyright.gov/circs/circ34.pdf. Nor is a collective work

"[a] single unified work that contains separate parts or elements, such as a novel consisting of

multiple chapters," or by analogy, a screenplay consisting of multiple scenes. *Id.*

The Second Circuit reasoned that "[t]he requirement that contributions be 'separate and

independent' in order to obtain their own copyright protection also indicates that inseparable

contributions integrated into a single work cannot separately obtain such protection." *Casa Duse*,

791 F.3d at 257. That interpretation is bolstered by legislative history:

> [A] motion picture would normally be a joint rather than a collective work with
> respect to those authors who actually work on the film, although their usual status
> as employees for hire would keep the question of coownership from coming up.
> On the other hand, although a novelist, playwright, or songwriter may write a work
> with the hope or expectation that it will be used in a motion picture, this is clearly
> a case of separate or independent authorship rather than one where the basic
> intention behind the writing of the work was for motion picture use.

*Id.* (quoting H.R. Rep. No. 94-1476, at 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736).

And it accords with the U.S. Copyright Office's position, which the Second Circuit found

persuasive, that "an individual who lacks a work-for-hire agreement but who intends her

contribution or performance to be merged into inseparable or interdependent parts of a unitary

whole, may assert a claim in joint authorship in the motion picture, but not sole authorship of her performance in a portion of the work." *Id.* at 257-58 (cleaned up).

Thus, while a screenwriter who wrote scenes for inclusion in a film may advance a claim for joint authorship (*if* its other elements are satisfied), he cannot receive copyright protection for those scenes as discrete works of authorship—and in turn, cannot claim infringement based on them. Individual scenes written for a film are not "freestanding," "separate," and "independent" from the broader film; they are merged with it. *Id.* at 259. That outcome makes good sense: As the Second Circuit explained, any contrary conclusion would accord such contributors "greater rights than joint authors," who "have no right to interfere with a co-author's use of the copyrighted work." *Id.* Congress would not have "intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works," or to layer "thousands of standalone copyrights" atop each other in a single work. *Id.*; *see also Farkas v. Rich Coast Corp.*, 2017 WL 10299097, at *9 (M.D. Pa. June 7, 2017), *report and recommendation adopted*, 2017 WL 10299211 (M.D. Pa. Sept. 12, 2017) ("[L]ike a director's role, a film editor's contribution to a film is not a separate distinct work of authorship subject to copyright protection which can be segregated from the film as a whole. Indeed, to hold otherwise would require courts to arbitrarily segment a single creative work, a motion picture, into a host of creative—and often combative—sub-parts. Such an approach would convert a unitary film work into a ragtag coalition of copyrights . . . .").

This case falls squarely within the framework of *Casa Duse*. *Maverick* is an integrated, unitary work of authorship, as Gray himself acknowledges. Compl. ¶¶ 44-45. Per Gray's own allegations, he wrote his contributions with the intent that they be "merged into inseparable or interdependent parts of a unitary whole," i.e., the Screenplay and ultimately *Maverick*. Compl. ¶

45; *see also id.* ¶ 44 (alleging that the Screenplay and *Maverick* use his contributions "to form a unitary whole"). He alleges he did so at the behest of Singer and Kosinski, who asked him specifically to contribute to the Screenplay for *Maverick*. *Id.* ¶¶ 4, 22. What the Complaint dubs the "Gray Scenes" were never intended to exist as independent works of authorship, separate from the Screenplay and *Maverick*. Rather, "the basic intention behind the writing of the [scenes] was for motion picture use." *Casa Duse*, 791 F.3d at 257. Gray is therefore not entitled to independent copyright protection for the "Gray Scenes."

If the rule were otherwise, there would be hundreds of discrete copyrights in a screenplay alone, just as there are hundreds of scenes in one, with different scenes attributable to different screenwriters, some jointly and some individually. A separate copyright authorship and ownership analysis would be required for *each individual scene*—which screenwriter wrote which scene, whether scenes with multiple contributors satisfy the criteria for joint authorship, and so forth. The final film's copyright would be even more piecemeal, divided up not only by written scenes, but also parsed among other constituent elements of expression. The result would be an unwieldy collective work with hundreds if not thousands of constituent interlocking copyrights—exactly what a film is *not*. As the *Farkas* court observed, that approach "would convert a unitary film work into a ragtag coalition of copyrights in a fashion which would wholly undermine the purposes of copyright protection, and create a chaos out of the orderly process of protecting intellectual property." 2017 WL 10299097, at *9.

Finally, reviewing the "Gray Scenes" themselves—which are incorporated by reference in and integral to the Complaint, *supra* note 4—confirms what Gray already admitted in his pleading: The "Gray Scenes" are inseparable from and interdependent with *Maverick*. Lens Decl., Exs. G-U. Take Gray Scene 1 as an example. *Id.*, Ex. G. The claimed scene spans less than two pages.

It lacks any context about what Maverick is doing and why (Maverick is test pilot working on the Navy's hypersonic scramjet program who takes one last flight to try to meet the program's goal of reaching Mach 10 before it gets shut down in favor of drone technology). It flows from the previous scene (the scene begins: "we hear the sound of breathing again"), and it flows into the next one (ending with "I'll take the rotation on the left engine," before the engines ignite and Maverick takes flight). It is inextricable from *Maverick*'s broader plot and virtually meaningless on its own. Nothing about this "scene" suggests it could be—or ever was intended to be—a standalone work.

In sum, because Gray is not entitled to independent copyright protection in the "Gray Scenes," his infringement claim necessarily fails.

\* \* \*

Notwithstanding the legal infirmities in Gray's claims, the undercurrent of his Complaint is that, one way or another, he must have a protectable copyright interest because he made creative contributions. But not every creative contribution gives rise to a copyright interest, as the Second Circuit confirmed in *Case Duse*. There, the Second Circuit held that a film director had made significant creative contributions to the film, but did not hold copyright rights in them: the director was neither a sole author nor a joint author of the film on the whole (nor did he work on a work-made-for-hire basis), and his discrete creative contributions to the film were not entitled to independent copyright protection either. *See Casa Duse*, 791 F.3d at 256. It is thus no novel proposition—but rather demanded by Second Circuit precedent—that Gray cannot succeed on either of the alternative theories he advances in this case, even if he did (as he alleges) make material creative contributions to *Maverick* and its Screenplay.[10]

---

[10] While beyond the purview of this motion, this does not necessarily mean Gray has no rights. To the contrary, Gray has whatever rights, if any, he negotiated in his agreement with Singer.

### 2. The Infringement Claim Alternatively Fails Because Gray Implied A License To Use The "Gray Scenes" In *Maverick* And Its Screenplay.

Gray's infringement claim should be dismissed on the independent, dispositive grounds addressed above. But there is yet another independent basis for dismissal: Gray fails to state a claim for infringement because, at minimum, he gave Singer (and in turn PPC) an implied license to use the "Gray Scenes" in Singer's interim screenplay draft and in PPC's ultimate Screenplay and *Maverick*.

"A license is a complete defense to a claim for copyright infringement." *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 661 (S.D.N.Y. 2014). Unlike other transfers of copyright interests, a non-exclusive license can be implied through conduct without any requirement that it be memorialized in writing. *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998). The Second Circuit has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," but it has pointed to two possible tests. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (cleaned up). One is a "narrow test," whereby courts will "find[] an implied license only where [i] one party created a work at the other's request and [ii] handed it over, [iii] intending that the other copy and distribute it." *Id.* (cleaned up). The other is a "more permissive test" whereby "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id.* (cleaned up).

Gray's own allegations demonstrate an implied license on even the narrower of these two tests. First, Gray admits that, after PPC hired Singer as a screenwriter, Singer asked Gray to "contribute his talents as a writer to the Screenplay" and "join [Singer]" in writing it. Compl. ¶¶ 4, 22. Thus, by Gray's admissions, Gray's contributions to the screenplay for *Maverick*, including

---

But any such claim would sound in contract (not copyright), and would lie against Singer (not PPC).

the "Gray Scenes," were created as Singer's request, satisfying the test's first element. *ABKCO Music*, 50 F.4th at 320. Second, Gray admits that he emailed the "Gray Scenes" to Singer, Compl. ¶ 60, thereby "hand[ing] [them] over" and satisfying the test's second element. *ABKCO Music*, 50 F.4th at 320. Third, Gray admits that he "inten[ded] for [his] contributions to be merged into inseparable or interdependent parts" of the Screenplay and *Maverick*. Compl. ¶ 45. Indeed, it is the only logical conclusion that Gray, who wrote the "Gray Scenes" *specifically for inclusion* in the Singer Draft, "intend[ed] that [Singer] copy and distribute" the "Gray Scenes" to PPC—and, in turn, to commercial audiences upon *Maverick*'s release. *ABKCO Music*, 50 F.4th at 320; *see Fontana v. Harra*, 2013 WL 990014, at *8 (C.D. Cal. Mar. 12, 2013) (finding implied license on motion to dismiss; "[P]laintiff's intent is apparent from the fact that he was hired to write a screenplay . . . . Screenplays are written to be made into movies, and it would be unusual if plaintiff created the screenplay believing that it was going to be used for some other purpose."). After all, Gray alleges that he was working on the Singer Draft *with Singer*, so it would have come as no surprise that the "Gray Scenes" were incorporated in it; it is exactly what they set out to do.

Because the "narrow test" is satisfied, the "more permissive test" is necessarily satisfied too. *Id.* That test recognizes that "[c]reating material at another's request is not the essence of a license; an owner's grant of permission to use the material is." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021). Thus, "[w]hen an owner's conduct clearly manifests a consent to use of copyrighted material, the owner impliedly grants a nonexclusive license." *Id.* (cleaned up). Silence in the face of an otherwise-infringing use can suffice to manifest consent. *ABKCO Music*, 50 F.4th at 320; *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 121 (S.D.N.Y. 2012) (collecting cases). Per his own allegations, Gray wrote the so-called "Gray Scenes" specifically for inclusion in the screenplay he worked on with Singer, and with the intent

that they later be incorporated into *Maverick* and its ultimate Screenplay.  *See* Compl. ¶¶ 4, 22, 30, 45.  Gray consented to the use of those scenes in the ultimate work product—it was his entire purpose in creating them.  And when aspects of the "Gray Scenes" (allegedly) made it into the Singer Draft and then into *Maverick*, Gray did not protest that use, thereby manifesting his consent for their use.  Indeed, Gray does not (and cannot) allege that he *ever* told anyone at PPC that use of the Singer Draft would somehow infringe Gray's purported copyright until long after *Maverick* was released.

In sum, no matter what test is employed, Gray gave Singer an implied license to use the "Gray Scenes" in the Singer Draft and, later, in *Maverick* and its Screenplay—to any extent those scenes are entitled to independent copyright protection in the first place.  Because an implied license is a complete defense to infringement, the infringement claim fails for this reason too.

In fact, if Gray had not at minimum impliedly licensed Singer (and in turn PPC) to use the "Gray Scenes" in *Maverick* and its Screenplay, then the "Gray Scenes" would *themselves* be an uncopyrightable, unauthorized derivative work—not only dooming Gray's infringement claim but giving rise to an infringement claim *against Gray*.  That it because the "Gray Scenes" borrow heavily from PPC's original 1986 *Top Gun* film, of which *Maverick* is a sequel.[11]  Among other key content, *Maverick*'s titular protagonist comes from that 1986 film and is *PPC*'s intellectual property.  Likewise, *Maverick* focuses on the relationship between Maverick and trainee Bradley Bradshaw—the son of Maverick's doomed best friend from the 1986 film (and who himself appears in the 1986 film as a child).

---

[11] To illustrate this issue, Paramount focuses on the Gray Scenes' derivative nature of the 1986 film, though the same analysis would apply to the earlier versions of the *Maverick* screenplay prepared for PPC as works-made-for-hire by Craig and Marks, Compl. ¶ 25, from which Singer (and Gray) worked, as well as earlier treatments and drafts by Kosinski and Singer, which predate the earliest of the purported Gray Scenes.

Gray alleges that he had no "written contract with PPC . . . or any other person or entity concerning his written contributions to the Screenplay," Compl. ¶ 28, which confirms PPC did not directly grant Gray the right to make a derivative work from its copyrighted material. So, the only way the "Gray Scenes" would themselves not be infringing is if Gray were acting as an employee of Singer, subject to Singer's agreement with PPC. PPC certainly never authorized Gray to use its *Top Gun* copyright rights (free of charge, no less) to create his own standalone derivative works, and then turn around and sue PPC for infringement. Unless his work was impliedly performed under and subject to Singer's agreement with PPC—and thus, unless PPC was authorized to use the "Gray Scenes"—the "Gray Scenes" would lack copyright protection *altogether*, because where "pre-existing material used without permission 'tends to pervade the entire derivative work' copyright protection is denied to the derivative work entirely." *Wozniak v. Warner Bros. Ent. Inc*., 726 F. Supp. 3d 213, 237 (S.D.N.Y. 2024) (quoting *Dynamic Sols., Inc. v. Plan. & Control, Inc*., 646 F. Supp. 1329, 1340 (S.D.N.Y. 1986)); *see also Eden Toys, Inc. v. Florelee Undergarment Co*., 697 F.2d 27, 34 n.6 (2d Cir. 1982); *Sobhani v. @Radical.Media Inc*., 257 F. Supp. 2d 1234, 1239-40 (C.D. Cal. 2003). That result would foreclose Gray's infringement claim and give rise to PPC's own infringement cause of action against Gray for infringing its *Top Gun* copyright. Surely that is not the result Gray contemplated in allegedly authoring the "Gray Scenes."

## V. CONCLUSION

Plaintiff's Complaint should be dismissed. Because these defects go to the heart of Gray's claims rather than the way in which they are pleaded, dismissal should be with prejudice. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("a futile request to replead should be denied," where "[t]he problem with [plaintiff's] causes of action is substantive" and cannot be cured by "better pleading").

Dated: June 9, 2025                    By: */s/ Molly M. Lens* _____


O'MELVENY & MYERS LLP
Molly M. Lens
mlens@omm.com
Matthew Kaiser (admitted *pro hac vice*)
mkaiser@omm.com
1999 Avenue of the Stars, 8th Fl
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Danielle Feuer
dfeuer@omm.com
1301 Avenue of the Americas, Ste 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendants Paramount Global,
Paramount Pictures Corporation, and
Paramount Streaming Services, Inc.*

## **CERTIFICATE OF WORD COUNT (L.R. 7.1(C))**

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law contains 7,926 words, counted using the Microsoft Word program used to prepare it. It therefore complies with the word-count limitation of Local Rule 7.1(c). The foregoing Memorandum of Law is also 23 double-spaced pages, and it therefore complies with Rule 2(e) of this Court's Individual Rules of Practice.

Dated:   June 9, 2025

                                                        */s/ Molly M. Lens*
                                                          Molly M. Lens