# EXHIBIT F

## Part 1 of 2

## MEMORANDUM OF AGREEMENT
(Writing Services – Loanout)

A.    DATE.            As of June 6, 2017.

B.    PRODUCER.        PARAMOUNT PICTURES CORPORATION ("Company").

C.    LENDER.          BULLSH!T ARTISTS, INC. ("Lender"), a California corporation (Federal ID No. 95-4549081), furnishing the writing services of Writer.

D.    WRITER.          ERIC WARREN SINGER ("Writer"), a citizen of the United States of America, with a principal place of residence in Los Angeles, California.

E.    PICTURE.         "TOP GUN 2" ("Picture").

The work to be done by Writer under this Agreement is based upon the theatrical motion picture entitled "TOP GUN" owned by Company (the "Original Picture") and screenplay material based thereon written by Peter Craig and by Justin Marks, which shall be deemed to be assigned material ("Assigned Material"). The parties acknowledge that: (i) prior writers (other than Peter Craig and Justin Marks) have written screenplay material in connection with a prior, different sequel project based upon the Original Picture, and (ii) neither Lender nor Writer have been provided a copy of the writing done by such prior writers.

1.    CONDITIONS PRECEDENT.    Company shall have no obligation under this Agreement unless and until Company has obtained:

    1.1    A fully signed copy of this Agreement and all exhibits thereto, including, without limitation, the Certificate of Authorship attached to this Agreement, in form and substance satisfactory to Company.

    1.2    A completed Form W-9 confirming both Writer's social security number and Lender's Federal ID number and any other documentation required for Company to pay Lender.

    1.3    All chain-of-title documentation for the Picture and has approved such chain-of-title documentation in its sole discretion.

1

CONFIDENTIAL                                                              PPC-GRAY-0000174

1.4 A fully signed copy of the Memorandum of Agreement between Company and Joseph Kosinski for his services as director in connection with the Picture, in form and substance satisfactory to Company.

2. SERVICES AND COMPENSATION. Lender shall furnish the services of Writer who shall render for Company all services customarily rendered by writers in the motion picture industry and as reasonably required by Company for the Picture. During all writing periods, Writer's services shall be exclusive to Company (it being understood that Company's instructions regarding matters of artistic taste and judgment are, per se, reasonable). During all reading periods, Writer's services may be non-exclusive, provided that Writer's services for third parties or on Lender's or Writer's own behalf shall not materially interfere with Writer's services under this Agreement.

2.1 Guaranteed Step(s). Lender shall furnish the services of Writer who shall be engaged by Company to write a first rewrite based on the Assigned Material ("First Rewrite") for [redacted] which sum shall accrue and be payable upon satisfaction of the Conditions Precedent, as follows:

2.1.1 [redacted] on start of writing services.

2.1.2 [redacted] on delivery to Company of the completed First Rewrite.

2.2 First Optional Step. Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a second rewrite ("Second Rewrite"), exercisable within four (4) weeks following delivery of the prior writing step. If Company exercises the option for Writer's services, Lender shall be entitled to [redacted] which sum shall accrue and be payable as follows:

2.2.1 [redacted] on start of the Second Rewrite.

2.2.2 [redacted] on delivery to Company of the completed Second Rewrite.

2.3    Second Optional Step.    Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a third rewrite ("Third Rewrite"), exercisable within four (4) weeks following delivery of the prior writing step. If Company exercises the option for Writer's services, Lender shall be entitled to ███████████ ███████████████ which sum shall accrue and be payable as follows:

> 2.3.1 ████████████████████████ on start of the Third Rewrite.

> 2.3.2 ███ ████████████ ███████ ██████ on delivery to Company of the completed Third Rewrite.

2.4    Third Optional Step. Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a polish ("Polish"), exercisable within four (4) weeks following delivery of the prior writing step. If Company exercises the option for Writer's services, Lender shall be entitled to ██████████████████████ which sum shall accrue and be payable as follows:

> 2.4.1 ████████████████████ on start of the Polish.

> 2.4.2 ██████████████████ on delivery to Company of the completed Polish.

2.5    Bonus and Contingent Compensation. If the Picture is produced as a feature-length, English-language, theatrical motion picture, and Writer receives "screenplay by" or "written by" credit as determined by the Writers Guild of America ("WGA") under the Writer's Guild of America - Alliance of Motion Picture and Television Producers Theatrical and Television Basic Agreement ("WGA Agreement"), but not Article 7 of Theatrical Schedule A thereto ("Final Credit Determination"), Lender shall be entitled to:

> 2.5.1    Bonus Compensation.

>> 2.5.1.1 Sole Credit Bonus.  If sole "screenplay by" or sole "written by" credit, ████████████████████████ ██████ ███████ less all sums paid pursuant to Paragraphs 2.1 through 2.4 above; or

>> 2.5.1.2 Shared Credit Bonus.  If shared "screenplay by" or shared "written by" credit, the flat sum of ████████

3

CONFIDENTIAL

PPC-GRAY-0000176

Said bonus shall be payable promptly following Company's receipt of Final Credit Determination. Lender shall not be entitled to any bonus payment if Writer does not receive any screenplay credit.

2.5.2   Contingent Compensation.

2.5.2.1 If sole "screenplay by" or sole "written by" credit upon Final Credit Determination, a sum equal to 
of the Defined Proceeds, if any, of the Picture; or

2.5.2.2 If shared "screenplay by" or shared "written by" credit upon Final Credit Determination, a sum equal to 

of the Defined Proceeds, if any, of the Picture.

Lender shall not be entitled to any sums measured by the Defined Proceeds of the Picture if Writer does not receive any "screenplay by" or "written by" credit. "Defined Proceeds" shall be defined, computed, and reported in accordance with Company's Exhibit "DP" and the Rider thereto, both of which are attached hereto and incorporated herein by this reference.

2.5.3 No Crediting. Overscale payments for writing services and/or any Contingent Compensation paid to Lender shall not be credited against residuals that may become due.

3.   DELIVERY SCHEDULE.

3.1   Delivery schedule.

3.1.1   First Rewrite.

| | |
|---|---|
| Start of Services: | As designated by Company, but no sooner than satisfaction of the Conditions Precedent. |
| Writing Period: | 6 weeks |
| Reading Period: | 4 weeks |

4

CONFIDENTIAL                                                    PPC-GRAY-0000177

3.1.2  Second Rewrite.

Writing Period:            6 weeks
Reading Period:            4 weeks

3.1.3  Third Rewrite.

Writing Period:            6 weeks
Reading Period:            4 weeks

3.1.4  Polish.

Writing Period:            3 weeks

Time is of the essence with respect to the aforesaid writing/delivery periods.

3.2    Exercise of Optional Steps.  Company shall have the right to exercise any optional writing step only in the order set forth above, the option for such writing step to be exercisable within four (4) weeks following delivery of the prior writing step.

3.3    Postponement of Services.  Company may postpone Writer's services on any guaranteed or optional writing step to any time up to the start of principal photography and may postpone the Polish to any time up to completion of principal photography; provided, that if Company elects to postpone Writer's services and thereafter Writer is not available on the date designated by Company for commencement of the postponed writing step due to Writer's professional commitments, the Writing Period for the applicable postponed step shall commence on Writer's first professional availability thereafter (provided further that Writer shall use reasonable, good faith efforts to be available to render such services as, when and where requested by Company). If Company postpones any services in accordance with the foregoing, the applicable payments specified above for such postponed services shall be made to Lender as if such services were timely ordered and the applicable literary material was timely delivered. Any and all postponements pursuant to this Paragraph 3.3 shall not exceed eighteen (18) months in the aggregate.

3.4    Delivery.  Delivery of all literary material under this Agreement by Writer shall be made only to Marc Evans and/or Elizabeth Raposo and/or their designee at 5555 Melrose Avenue, Hollywood, California 90038. Marc Evans and/or Elizabeth Raposo and/or their designee shall be authorized to commence Writer and request any additional writing steps as required under

5

CONFIDENTIAL                                                          PPC-GRAY-0000178

this Agreement. All literary material delivered to Company under this Agreement shall comply with the terms of Company's Schedule "S" Script Formatting Policy, attached hereto and incorporated herein by this reference.

4. CREDIT. Credit shall be accorded pursuant to the terms of the WGA Agreement.

5. NOVELIZATION (if applicable). Novelization terms shall be as set forth in the WGA Agreement. If monies are paid to Writer or Lender under this Agreement by the publisher of the novelization of the Picture or Company, then no publication monies derived by Company shall be included in the Gross Receipts of the Picture for purposes of computing any deferred or contingent compensation which may be due or payable to Lender pursuant to this Agreement.

6. TRANSPORTATION AND EXPENSES. If Writer is required by Company to render services at an overnight location away from any place where Writer maintains a residence ("Location"), Lender shall receive the following:

    6.1    Expenses and Transportation.

        6.1.1    Living Expenses. An all-inclusive allowance, in lieu of all living and incidental expenses, of  in major metropolitan cities such as Los Angeles, New York and London (to the extent such city is a Location for purposes of this Agreement), in other metropolitan cities, and elsewhere (the foregoing pro-rated at 1/7th thereof per day). If Lender demonstrates that the foregoing expenses are insufficient to meet Writer's reasonable, actual, out-of-pocket expenses, then Company shall give good faith consideration to increasing the amounts provided, with Company's decision final.

        6.1.2    Transportation. One (1) business-class (if available) round-trip transportation (by air, if appropriate), if used for this purpose.

        6.1.3    Ground Transportation. Company shall provide Writer with non-exclusive ground transportation (shared only with above-the-line personnel) between airport and hotel accommodations or Writer's residence, as applicable, and between hotel accommodations and the set; provided, such ground transportation between Writer's residence and the airport shall be exclusive.

6

CONFIDENTIAL

PPC-GRAY-0000179

6.1.4    Additional Transportation.    If Writer is required under this Agreement to render services on Location during principal photography for more than fourteen (14) consecutive days, then with respect to one (1) such Location Lender shall be entitled, on a one-time only basis, to one (1) additional business-class (if available) round-trip transportation for use by Writer's non-business related companion, if used for this purpose.

6.1.5    Rental Car.    While Writer is rendering services under this Agreement at a Location (other than New York City, London, Tokyo, Mexico City, or other locations at which Company deems a rental car economically unfeasible or otherwise inadvisable), Company shall provide Writer with a mid-sized insured domestic rental car.

6.2    Travel Arrangements.    All travel arrangements, including, without limitation, the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department unless prior written approval is obtained from a Company Business Affairs executive.

6.3    Other Expenses.    Company shall not be responsible for any other expenses or perquisites of Lender or Writer.

7.    SEQUEL, PREQUEL, REMAKE, TV SERIES, MINI-SERIES, DTHE MOVIE, MOW.    If, but only if, Writer becomes entitled to sole separation of rights pursuant to the WGA Agreement, it being recognized and acknowledged by Writer that Writer's work hereunder, as aforesaid, is based upon the Assigned Material described above, and if Writer is not engaged to write for any of the Productions described below, and provided that neither Lender nor Writer is in material default under this Agreement, then Lender shall be entitled to the payments set forth below; provided, however, that if Writer is entitled to shared separation of rights under the WGA Agreement, Lender shall be entitled to ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ for the applicable use. The payments under this Agreement shall be deemed in lieu of any minimum compensation to which Lender or Writer may be entitled under the WGA Agreement.

7.1    Theatrical Sequel (including Prequel).    ▮▮▮▮▮▮▮▮▮ of the cash compensation actually paid to Lender pursuant to Paragraphs 2.1 through 2.5.1 above (payable on commencement of principal photography); plus, as contingent compensation, a percentage of Defined Proceeds (if any) of such sequel or prequel, which percentage shall be equal to ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ for screenplay credit on the Picture pursuant to Paragraph 2.5.2 above.

7

CONFIDENTIAL                                                                                    PPC-GRAY-0000180

7.2   Theatrical Remake. ▮▮▮▮▮ ▮▮ of the cash compensation actually
paid to Lender pursuant to Paragraphs 2.1 through 2.5.1 above (payable on
commencement of principal photography); plus, as contingent
compensation, a percentage of Defined Proceeds (if any) of such remake,
which percentage shall be equal to ▮▮▮▮ ▮▮

▮▮▮▮▮▮▮▮▮ for screenplay credit on the
Picture pursuant to Paragraph 2.5.2 above.

7.3   Television Network Series Royalties.   The following royalties are
payable for each episode of a U.S. primetime network television series based
upon the Picture:

   30 minutes or less:            ▮▮▮▮

   31-60 minutes:                 ▮▮▮▮

   61 minutes or more:            ▮▮▮▮

7.4   U.S. Network Reruns. A sum equal to ▮▮▮▮▮▮▮▮ of the
applicable series royalty shall be payable not later than thirty (30) days after
telecast for each of the first five (5) U.S. network reruns. No further sums
shall be payable for any other runs of such episode.

7.5   DTHE Movie/MOW.   For a DTHE Movie or U.S. MOW, ▮▮▮▮
▮▮▮▮▮▮ for the first two (2) hours; ▮▮▮▮▮
▮▮▮▮ for each additional hour thereafter; pro rata for a partial
hour.

7.6   Mini-Series.   For a U.S. mini-series, ▮▮▮▮▮▮▮
▮▮▮ for the first two (2) hours; ▮▮▮▮▮▮ for
each additional hour thereafter; pro rata for a partial hour; up to an
aggregate of ▮▮▮▮▮▮▮ for the entire mini-series.

7.7   Pay TV Series Royalties. If initially produced for a premium level cable
service, then a one-time only royalty (i.e., no payments for reruns) equal to
▮▮▮▮ of the applicable royalty for network series in
Paragraph 7.3 above.

7.8   "Spinoff" TV Series Royalties. ▮▮▮▮▮▮ of the royalties
specified in Paragraph 7.3 above for the applicable length of the network
"spinoff" series (or alternatively for non-network "spinoff" series, ▮▮▮
▮▮▮▮▮▮ if the "spinoff" series is "generic" (i.e., such "spinoff"

8

CONFIDENTIAL                                               PPC-GRAY-0000181

series uses a character created by Writer in the Picture as a main character); or ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ of the royalties specified in Paragraph 7.3 above for network "spinoff" series (or alternatively for non-network "spinoff" series, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ if the "spinoff" series is "planted" (i.e., such "spinoff" series does not use a character created by Writer as a main character but does use, as a main character, a character that appeared in the first TV series).

7.9   Non-Primetime Network TV Series and Non-Network Primetime TV Series and Basic Cable TV Series. If initially produced for syndication (i.e., non-network primetime U.S. television), U.S. basic cable, or non-primetime U.S. network television, then a one-time only royalty (i.e., no payments for reruns) equal to ▮▮▮▮▮▮▮▮▮▮▮▮ of the royalties specified in Paragraph 7.3 above for the applicable episode length.

7.10   Internet Series. If initially produced for (i) a made for subscription video on demand service ("MFSVOD") with comparable budgetary parameters as a U.S. primetime television network or pay cable series (e.g., Netflix, Amazon), then a one-time only royalty equal to ▮▮▮▮ ▮▮▮▮ of the applicable television network royalty, which royalty shall be further pro-rated if the running time of such MFSVOD production is less than thirty (30) minutes; (ii) MFSVOD with comparable budgetary parameters as a non-network U.S. television, U.S. basic cable, or non-primetime U.S. network television series (e.g., Hulu), then a one-time only royalty equal to ▮▮▮▮ ▮▮▮▮▮▮▮▮ of the applicable television network royalty, which royalty shall be further pro-rated if the running time of such MFSVOD production is less than thirty (30) minutes; or (iii) internet/online distribution or other method of distribution not otherwise specified herein, then ▮▮▮▮ ▮▮▮▮▮▮▮of the applicable network royalty, which royalty shall be further pro-rated if the running time of such internet or other production is less than thirty (30) minutes.

7.11   ▮▮▮▮▮▮ With respect to Paragraphs 7.5 and 7.6 above, if the applicable Production is placed in general theatrical release in the United States and/or abroad after its initial television broadcast, then Writer shall be entitled to an additional one-time only royalty equal to ▮▮▮▮▮▮ ▮▮▮▮ of the royalty originally paid for such Production if such Production is so released in Company's customary domestic territory, and an additional one-time only royalty equal to ▮▮▮▮▮▮▮▮▮▮ of the royalty originally paid for such Production if such Production is so released outside Company's customary domestic territory.   If the applicable Production is theatrically released in Company's customary domestic territory prior to telecast, then Writer shall be entitled to a ▮▮▮▮▮▮▮▮▮▮▮

9

CONFIDENTIAL                                                PPC-GRAY-0000182

████████████ of the applicable royalty otherwise payable pursuant to Paragraphs 7.5 and 7.6, as applicable, for such Production. However, in no event shall Writer be entitled to more than a sum equal to ████████████ ████████████ of the applicable royalty for the theatrical release, if any, of the applicable Production.

7.12 Payment of Above Obligations. Payment pursuant to Paragraphs 7.3 and 7.5 through 7.10 shall be made not later than thirty (30) days following the completion of post-production of each such Production or individual episode thereof.

8. PREMIERE. Provided neither Lender nor Writer is in material default, and Writer receives sole or shared "screenplay by" or "written by" credit for the Picture on Final Credit Determination, Company shall invite Writer and Writer's non-business related companion to attend one (1) United States celebrity premiere, if any, of the Picture, at a location selected by Company. If Writer attends such premiere and such premiere is at a Location (as defined in Paragraph 6 above), Lender shall be entitled to an expense allowance for Writer in accordance with Paragraph 6.1 above and to reasonable round-trip transportation and to ground transportation to and from airports for Writer and Writer's non-business-related companion.

9. DVD. Subject to Writer's full performance of all material services hereunder and Writer receives sole or shared "screenplay by" or "written by" credit for the Picture on Final Credit Determination, then, upon Writer's written request, if and when DVDs of the Picture are commercially available for release to the general public, Company shall furnish one (1) DVD (or, if DVDs are no longer generally available, whatever format is the basic home entertainment technology at the time) to Writer for Writer's personal home use only.

10. OTHER PROVISIONS.

10.1 Standard Terms. The balance of the terms of this Agreement shall be Company's Schedule "I" Additional Terms and Conditions and the Rider thereto, both of which are attached hereto and incorporated herein by this reference.

10.2 Notices. Notices under this Agreement shall be in writing and shall be addressed:

10

CONFIDENTIAL

PPC-GRAY-0000183

| To Company: | 5555 Melrose Avenue<br>Hollywood, CA 90038<br>Attn: Motion Picture Group, Legal |
| --- | --- |
| To Lender and Writer: | c/o CAA<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: John Campisi |
| With a courtesy copy to: | c/o Gochman Law Group, PC<br>9100 Wilshire Blvd., Suite 312E<br>Beverly Hills, CA 90212<br>Attn: Mark Gochman |

or to such other address subsequently provided by notice.

Any notice under this Agreement shall be given by personal delivery, express mail courier or certified mail with written receipt confirming delivery. The date of the giving of such notice shall be the date of such personal delivery, one (1) business day after mailing by express mail courier, or three (3) business days after mailing by certified mail; provided that in the event of conflict with the date of the written receipt, then the date that the receipt was signed shall control.

For purposes of this Agreement, "business day" shall mean any day other than a Saturday, Sunday, national holiday, the period between Christmas and New Year's Day, or any other day on which either party is closed for business.

10.3   Payments.   Any statements and payments required under this Agreement shall be sent to Company at the address listed in the immediately preceding subparagraph. Any payments required under this Agreement shall be sent to Lender at the physical address listed below. Any statements required under this Agreement shall be sent to Lender (via e-mail or U.S. mail, at Company's election) at the applicable physical or e-mail address as follows:

| To Lender: | c/o CAA<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: John Campisi |
| --- | --- |

jcampisi@caa.com

11

CONFIDENTIAL

PPC-GRAY-0000184

(E-mail address for delivery of
statements)

10.4 Confidentiality/Non-Disclosure. Lender and Writer shall keep
confidential all matters relating to the Picture including, without limitation,
the script, the plot, or any elements thereof, any set design, props and
effects, activities of the cast and crew, and Company's business and
production activities. Neither Writer nor Lender shall disclose or disseminate
any material written or prepared by Writer under this Agreement to any
person or entity other than the individuals authorized to accept delivery
under Paragraph 3.4 above.

10.5 Dispute Resolution. All claims, controversies or disputes arising out
of, in connection with, or relating to this Agreement, the performance or
breach thereof or default under this Agreement, whether based on contract,
tort or statute, including, without limitation, any claim that this Agreement
was induced by fraud ("Covered Claims"), shall be resolved by binding
arbitration in Los Angeles, California, in accordance with Exhibit "ARB" and
the Rider thereto, both of which are attached hereto and incorporated herein
by this reference.

10.6 Cross Breach. Any breach of this Agreement by Lender and/or
Writer shall be deemed, at Company's sole election, a breach of any other
agreement between Lender and/or Writer and Company relating to the
Picture. A breach by Lender and/or Writer of such other agreement may be
deemed, in Company's sole election, a breach of this Agreement. The failure
by Company and Lender and/or Writer to consummate any agreement for
Writer's other services in connection with the Picture shall not in any way
affect Company's ownership of the results and proceeds of Writer's services
under this Agreement.

10.7 No Duplication of Benefits. For the avoidance of doubt, there shall
be no duplication of the rights or benefits provided under this Agreement
(e.g., invitations to premieres, DVDs, transportation, travel expenses and
other perquisites), and those provided under any other agreement between
Company and Lender and/or Writer in connection with the Picture.

10.8 Annotation Guide. To the extent any material written under this
Agreement is based in whole or in part on any actual individual, whether
living or dead, or on any "real life" incident, Writer shall annotate the
material written under this Agreement in accordance with the guidelines
provided in Exhibit "AG" Annotation Guide attached hereto and incorporated
herein by this reference and shall provide such annotations concurrently with

12

CONFIDENTIAL                                                                    PPC-GRAY-0000185

Writer's delivery of material to Company.    Writer shall also accurately provide such other information as may be reasonably required by Company for the purpose of permitting Company to evaluate the utilization of the materials supplied by Writer.

//

//

[Remainder of page intentionally blank. Signature page follows.]

13

CONFIDENTIAL

PPC-GRAY-0000186

IN WITNESS WHEREOF, the parties hereto have signed and delivered this Agreement as of the date first above written.

**PARAMOUNT PICTURES CORPORATION**

By: _____

Title: _____
Karen Magid
Executive Vice President

ACCEPTED AND AGREED TO, including, without limitation, Exhibit "ARB":

**BULLSH!T ARTISTS, INC.,**
a California corporation

By: _____

Title: President

By countersigning this Agreement, Writer confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and Writer will look solely to Lender for any and all compensation under this Agreement.

_____
**ERIC WARREN SINGER**

14

CONFIDENTIAL

PPC-GRAY-0000187

## CERTIFICATE OF AUTHORSHIP

### "TOP GUN 2"

I hereby certify that I am writing (or collaborating in the writing of) the Work (as defined below) as an employee of BULLSH!T ARTISTS, INC., a California corporation ("Lender"), pursuant to a valid employment agreement ("Employment Agreement") with Lender and an agreement between Lender and PARAMOUNT PICTURES CORPORATION ("Company"), dated as of June 6, 2017 ("Agreement"), pursuant to which Lender has loaned my services to Company in connection with the proposed feature-length theatrical motion picture now entitled "TOP GUN 2" ("Picture"), in performance of my duties under the Agreement and in the regular course of my employment; that any and all literary or other materials, works, writings and ideas written, submitted, furnished and/or contributed by me pursuant to the Employment Agreement with Lender in connection with the Picture and/or the Agreement and all other results and proceeds of my services under the Agreement, together with all other materials of every kind whatsoever created by me at any time relating to the Picture (collectively, "Work") were created by me as a "work made for hire" and thereafter assigned to Company with Company as the sole author of the Work and the owner of all rights of every kind or nature in and to the Work (including, but not limited to, all copyrights and all extensions and renewals of copyrights, and the right to make such changes in the Work and such uses thereof as Company may determine as such author and owner), throughout the universe (including France) in perpetuity.

IN WITNESS WHEREOF, I have hereto set my hand this 6th day of June, 2017.

ERIC WARREN SINGER

The undersigned confirms that it has assigned and by these presents does hereby assign to PARAMOUNT PICTURES CORPORATION all rights without reservation in and to all work made for hire heretofore and hereafter written by ERIC WARREN SINGER pursuant to the aforesaid Employment Agreement as the employee for hire of the undersigned.

BULLSH!T ARTISTS, INC.

By: _____
Its Authorized Signatory

1

CONFIDENTIAL                                                                   PPC-GRAY-0000188

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
COUNTY OF Los Angeles )

On 8/14/17, 20 before me, Summer L-School, a Notary Public, personally appeared Fritz Singer, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SUMMER L. SCHOOLER
Commission # 2080614
Notary Public - California
Los Angeles County
My Comm. Exp. Oct 2, 2019

Signature of Notary Public

Place Notary Seal Above

## OPTIONAL

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

### Description of Attached Document:

Title or Type of Document: Certificate of Authorship

Document Date: _____   Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed By Signer(s): _____

Signer's Name: _____
Individual
Corporate Officer(s) -- Title(s): _____
Partner -- Limited  General
Attorney-in-fact
Trustee
Guardian or Conservator
Other: _____

Signer Is Representing: _____

Signer's Name: _____
Individual
Corporate Officer(s) -- Title(s): _____
Partner -- Limited  General
Attorney-in-fact
Trustee
Guardian or Conservator
Other: _____

Signer Is Representing: _____

2

CONFIDENTIAL                                                      PPC-GRAY-0000189

## SCHEDULE "S"

## SCRIPT FORMATTING POLICY

1.    **Submission**.  A hard copy and a digital copy (e.g., an Adobe [.pdf], Final Draft or Movie Magic file) of each draft of the screenplay shall be delivered to Company.

2.    **Page Limit**.  Screenplay drafts delivered to Company shall not exceed 130 pages in length.

3.    **Formatting Standards**.  All screenplay drafts delivered to Company shall conform to the following formatting standards:

- **Font**
  - Courier                              12 point

- **Page Layout**
  - Top Margin:                      1"
  - Bottom Margin:                1"

- **Action Format**
  - Left Margin:                    1.5"
  - Right End point:              7.5"
  - Single spaced

- **Dialogue Format**
  - Left Margin:                    2.5"
  - Right end point:              6"
  - Single spaced

- **Character Format**
  - Left Margin:                    3.5"
  - Right Margin:                  7.25"
  - Single spaced
  - One (1) blank space above the Character Name

- **Scene Heading Format**
  - Two (2) blank spaces above Scene Headings separating it from preceding action and dialogue.
  - One (1) blank space below scene headings separating them from the action or Character Names that follow.

1

CONFIDENTIAL                                                                              PPC-GRAY-0000190

EXHIBIT "AG"

ANNOTATION GUIDE

For each script element, whether such element is an event, character, setting or section of dialogue within a scene, marginal notes should provide the following complete, true and accurate information:

1.    Whether the element presents or portrays:

   1.1    Fact, in which case the note should indicate whether the name of the person portrayed is real, whether (s)he is alive and whether (s)he has signed a release.

   1.2    Fiction, but a product of inference from fact; or

   1.3    Fiction, not based on fact.

2.    Source material for the element:

   2.1    Book; or

   2.2    Newspaper or magazine article; or

   2.3    Recorded interview; or

   2.4    Trial or deposition transcript; or

   2.5    Any other source or combination of the above.

When identifying the source material, include the name of the source (e.g., *The Los Angeles Times* article), page reference (if any) and date. To the extent possible, identify multiple sources for each element. Retain copies of all materials used in the creation of the script, preferably cross-indexed by reference to script page and scene numbers. Source coding may be useful to avoid repeated, lengthy references.

Descriptive annotation notes are especially helpful (i.e., the setting is a farm because Jack/Jill usually had meetings at a farm – *The Los Angeles Times*; page 8, January 11, 1985).

1

CONFIDENTIAL                                                              PPC-GRAY-0000191

**RIDER TO EXHIBIT "ARB"**

This Rider to Exhibit "ARB" is attached to and made part of the Agreement dated as of June 6, 2017, between PARAMOUNT PICTURES CORPORATION and BULLSH!T ARTISTS, INC. for the services of ERIC WARREN SINGER in connection with the motion picture project currently entitled "TOP GUN 2".

1.    Exhibit "ARB" shall be subject to the terms of the WGA Basic Agreement.

2.    Paragraph 1.3: In line 4, delete "ten (10) days", and replace it with: "ten (10) business days".

3.    Paragraph 1.4: In line 1, delete "ten (10) days", and replace it with: "ten (10) business days".

4.    Paragraph 2.1: Delete the current sentence, and replace it with:  "Up to three (3) depositions may be taken by each party to the arbitration."

5.    Paragraph 2.2: In the second sentence after the word "films," add: "or the calculations"; and delete "this Agreement" and replace it with:  "the arbitration".

6.    Paragraph 2.3: Delete the current sentence, and replace it with: "Up to ten (10) interrogatories (inclusive of any subparts) may be propounded by each party to the arbitration."

7.    Paragraph 3: In line 3, between "claim" and ", in whole", add:  "or defense".

8.    Paragraph 6: In line 3, delete "directly".

9.    Paragraph 8.2: The words "reasonable outside" are inserted after the word "award" and before the word "attorney's" in the penultimate line.

10.   Paragraph 11: The words "or as required by law" are inserted at the end of the first sentence following the word "advisors".

* * *

1

CONFIDENTIAL                                                                                    PPC-GRAY-0000192

## EXHIBIT "ARB"

## ARBITRATION PROVISION

### 1.    Commencement of Arbitration.

1.1.  Arbitration Procedure.  Except as otherwise provided herein, the arbitrators shall administer the arbitration proceedings in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS then in effect. If any conflict exists between the procedures set forth herein and the Rules of JAMS, the procedures set forth herein shall be followed.

1.2.  Notice of Arbitration.  The initiating party must serve a written notice of intention to arbitrate (the "Notice of Arbitration") on the respondent, and shall file a copy with the Los Angeles office of JAMS, along with any required fee.

1.3.  Selection of Arbitrator.  Within fifteen (15) days of service of the Notice of Arbitration on the respondent, the parties shall jointly select three (3) neutral arbitrators. In the event of a deadlock within the allotted time, each of the parties shall select one arbitrator and, within ten (10) days of their appointment, the two party-appointed arbitrators shall appoint a third arbitrator, who shall be the chair. If the party-appointed arbitrators are unable or fail to agree on the third arbitrator within the allotted time, the third arbitrator shall be appointed by JAMS in accordance with its rules. No person may serve as an arbitrator unless he or she is either a retired state or federal judge, or a practicing lawyer with at least twenty (20) years of experience, including at least ten (10) years of experience in entertainment law. The Covered Claim(s) shall be heard by all three (3) arbitrators (the "Arbitrators"), and all procedural matters and the final decision and award shall be decided by a majority of them.

1.4.  Arbitration Schedule.  Within ten (10) days of the selection of the Arbitrators, the Arbitrators shall confer with the parties to set the arbitration schedule. Except for good cause, the arbitration hearing shall be within ninety (90) days of the selection of the Arbitrators.

### 2.    Discovery.  Discovery will be handled expeditiously, according to the following terms and conditions:

2.1.  Depositions. Depositions shall not be taken by any party.

1

CONFIDENTIAL                                                                          PPC-GRAY-0000193

2.2. Documents. Each party shall be entitled to limited document discovery. Only documents that are directly relevant to the disputed issues and refer or relate directly to the film or films which are the subject of this Agreement may be requested. Any document request shall be narrowly tailored to cause the least possible expense, burden, disclosure of confidential information and inconvenience to the parties on which they are served. If financial data is sought, only documents sufficient to establish the contested issue shall be required to be produced. The schedule for propounding and responding to document requests shall be determined by the Arbitrators. Should disagreement arise with respect to the scope of any document request, the Arbitrators shall resolve such disagreement, in conformity with this Agreement.

2.3. Written Interrogatories. The parties agree that no interrogatories shall be propounded by any party.

2.4. Requests for Admission. The parties agree that no requests for admission shall be propounded by any party.

2.5. Subpoenas. The parties agree that the Arbitrators shall, to the fullest extent permitted by law, have the power to issue subpoenas to third parties to compel testimony at the arbitration hearing or the production of documents prior to or at the arbitration hearing, subject to the same limitations on document discovery set forth in Section 2.2 hereof.

3. Dispositive Motions. The Arbitrators shall have the discretion to hear and determine at any time prior to the arbitration hearing any issue of law asserted by any party to be dispositive of any claim, in whole or in part, in accordance with such procedure as the Arbitrators may deem appropriate.

4. Hearing Memoranda. Pre-hearing memoranda shall be permitted at the discretion of the Arbitrators. Each party shall be permitted to submit a post-hearing memorandum within fifteen (15) days following the completion of the arbitration hearing. Rebuttal memoranda, if any, shall be submitted twenty-one (21) days following the completion of the arbitration hearing.

5. Witness Lists. Ten (10) days before the arbitration hearing, each party shall serve a witness list identifying the name, address, occupation, work experience, and relationship to the party, if any, of each witness on its direct case and describing the subject matter and substance of that witness's anticipated testimony.

2

CONFIDENTIAL                                                                                   PPC-GRAY-0000194

6.  Arbitration Hearing.  During the arbitration hearing, the Arbitrators shall hear the oral testimony and cross-examination of each party's witnesses. Rebuttal witnesses may be heard to directly refute the testimony of any such witness.    A full stenographic record shall be taken of these proceedings, and the Federal Rules of Evidence shall apply.

7.  Governing Law.  The Arbitrators' decision shall be made pursuant to the substantive law of the State of California without regard to its choice of law rules.

8.  Written Decision and Award.  The Arbitrators shall issue a written decision and award (the "Decision and Award") within forty-five (45) days of the submission of the final, post-hearing memoranda. This Decision and Award shall be signed and dated by the Arbitrators and shall set forth the Arbitrators' reasoning in support of each issue necessary to their decision.

    8.1.  Remedies.  Except as expressly limited herein, the Arbitrators shall have the power to grant any remedy or relief they deem just and equitable, including, but not limited to, injunctive relief, whether interim and/or final, and any provisional measures ordered by the Arbitrators may be specifically enforced by any court of competent jurisdiction.    Notwithstanding the foregoing, the Arbitrators shall not have the power to award punitive or exemplary damages of any kind, and any limitation on the availability of injunctive relief contained in this Agreement shall be binding on the Arbitrators.

    8.2.  Fees, Costs and Attorneys' Fees.  All fees and costs relating to the Arbitrators will be paid by the parties in equal shares, except that the Arbitrators may award such fees and costs to the prevailing party.  Each party's attorneys' fees and costs shall be borne by that party, except that if the Arbitrators determine a party's position on the Covered Claim(s) to be without substantial justification, they shall award attorneys' fees and costs to the other party.

    8.3.  Final and Binding.  The parties agree that the Decision and Award shall be final and binding.

9.  Enforcement of Arbitrators' Award.    Following the issuance of the Arbitrators' Decision and Award, either party may petition any court of competent jurisdiction in the County of Los Angeles to confirm the Decision and Award.

3

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                      PPC-GRAY-0000195

10. Arbitration Appeal Procedure. By executing this Exhibit ARB, the parties hereby agree that any arbitration conducted hereunder shall be governed by and subject to JAMS Optional Arbitration Appeal Procedure.

11. Confidentiality. All aspects of the arbitration proceedings, including, but not limited to, any testimony, all documents, and the culminating Decision and Award, shall be completely confidential, except that confidential information may be disclosed, as necessary, to the parties' legal counsel and financial or tax advisors. For purposes of any judicial proceedings on the Decision and Award, including, without limitation, confirmation proceedings, the parties stipulate and agree to request a court order or orders requiring that all records of the arbitration proceedings, including, without limitation, the Decision and Award and all court filings disclosing any aspect of the arbitration proceedings ("Confidential Records"), be filed under seal. Pending a ruling on any such request, the parties agree to file all Confidential Records conditionally under seal.

* * *

4

CONFIDENTIAL                                                                                                      PPC-GRAY-0000196

## RIDER TO SCHEDULE "I"

### ADDITIONAL TERMS AND CONDITIONS (LOANOUT)

Attached to the Memorandum of Agreement dated as of June 6, 2017 (the "Agreement"), between PARAMOUNT PICTURES CORPORATION ("Company") and BULLSH!T ARTISTS, INC. ("Lender") for the writing services of ERIC WARREN SINGER ("Writer") relating to the motion picture currently entitled "TOP GUN 2" ("Picture").

In the event of any inconsistency between the provisions of Schedule "I" Additional Terms and Conditions ("Additional Terms") or the Rider thereto and the provisions of the Agreement to which the Additional Terms are attached, the provisions of the Agreement shall control.



1

CONFIDENTIAL

PPC-GRAY-0000197





2

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL



Paragraph G (Ownership; Representations and Warranties; Further Documents):

Paragraph G shall be subject to Article 28 of the WGA Agreement.

In the first sentence of subparagraph (ii), after the phrase "original with Writer," insert: "other than incidental material in the public domain."

In the first sentence of subparagraph (ii), after the phrase "shall not infringe upon the copyright or," insert: "to the best of Writer's knowledge after the exercise of reasonable prudence and due diligence,".

Notwithstanding anything to the contrary contained in Paragraph G, Writer and Lender make no warranty with respect to any material not furnished by Writer or Lender to Company.

In the first sentence of subparagraph (iii), insert the words "consistent herewith" after the word "instruments" and before the words "in form."

At the beginning of the second sentence of subparagraph (iii), insert: "Company shall first request that Lender and Writer execute and deliver such documents, but if Lender and/or Writer do not execute and deliver the same to Company within five (5) business days (or three (3) business days in cases of exigent circumstances) after Company's request for such documents,".

At the end of the subparagraph (iii), add: "Upon Lender's and/or Writer's request therefor, Company shall provide Writer with a copy of any document executed by Company pursuant to this power of attorney, provided that any failure by Company to provide such copy(ies) shall not be deemed a breach hereunder or affect the validity of such document."

3

CONFIDENTIAL

PPC-GRAY-0000199



4

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL



5

CONFIDENTIAL

PPC-GRAY-0000201



6

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL



7

CONFIDENTIAL

PPC-GRAY-0000203



\* \* \*

8

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

## SCHEDULE "1"

## ADDITIONAL TERMS AND CONDITIONS (LOANOUT)

Attached to the Memorandum of Agreement dated as of June 6, 2017 (the "Agreement"), between PARAMOUNT PICTURES CORPORATION ("Company") and BULLSH!T ARTISTS, INC. ("Lender") for the writing services of ERIC WARREN SINGER ("Writer") relating to the motion picture project currently entitled "TOP GUN 2" (the "Picture").

A.    Work. The material to be delivered to Company under the Agreement shall be suitable for reproduction as a motion picture of feature length, the photographing of which sound, including spoken words, dialogue, songs and music, may be synchronously recorded by any electrical, digital or mechanical means that may be employed therefor. Writer's services shall be rendered for and as directed by Company at its studios in Hollywood, California, and at such other places and on such locations as Company may from time to time designate.

B.    Employment. Lender hereby accepts said employment and agrees that Writer shall be exclusive to the extent provided in the Agreement; and that Writer will devote Writer's best time, attention, talents and abilities to the service of Company pursuant to the Agreement; and Writer will comply with all written and/or oral instructions given to Writer by Company. Lender warrants Lender is free to enter into the Agreement and not subject to any conflicting obligations or any disability which will or might prevent or interfere with the execution and performance of the Agreement by Lender and Writer.

C.    Delivery. The material, as delivered to Company, shall be full and complete in substance and in form and shall conform to the requirements of the Agreement. Lender shall cause Writer to execute and deliver to Company a certificate in the form attached to the Agreement prior to commencement of services under the Agreement and, if requested by Company, with respect to each delivery of material thereafter. No submission or purported delivery to Company of any material shall be deemed an actual delivery under the Agreement unless and until said material shall fully comply with the foregoing provisions. Should Writer fail for any reason whatsoever to complete and deliver any material within the time and in the manner herein specified, Company may, at its election, either: (i) terminate and cancel in its entirety, Lender's engagement to furnish Writer's services under the Agreement, in which event Company shall be released and discharged of and from all further obligations to Lender and Writer under the Agreement or otherwise, including but not limited to the obligation to make any further payments to Lender, and Lender shall thereupon be obligated to repay and shall repay to Company the

1

CONFIDENTIAL                                                                 PPC-GRAY-0000205

gross amount of all sums that have previously been paid to Lender under the provisions of the Agreement; or (ii) specify a new date on or before which Writer shall complete and deliver such material to Company.

Should Writer fail for any reason whatsoever to complete and deliver such material on or before any such new date, Company shall again have the same election as hereinabove provided and may repeat such election either until Company shall have elected to terminate Writer's services under the Agreement as aforesaid or until Writer shall have completed and delivered such material to Company. Time is of the essence in the performance of the Agreement by Lender and Writer.

D.     Payments.   All payments to be made to Lender under the Agreement are subject to the full and faithful performance and observance by Lender and Writer of Writer's services and the other obligations of Lender and Writer under the Agreement. With respect to each payment to be made by Company to Lender under the Agreement, it is expressly understood and agreed that should Company for any reason whatever fail to make such payment as herein provided, then Company shall not be deemed in default under the Agreement unless and until following such failure Lender shall have given Company written notice demanding such payment and Company shall have failed to make such payment within five (5) business days after Company's receipt of said notice. In any event Company's liability for any such default and Lender's and Writer's rights and remedies therefor shall be limited to the recovery of money only, not exceeding the amount of such payment, and in no event shall any of the rights acquired or to be acquired by Company under the Agreement be affected or impaired. Lender hereby authorizes Company to deduct and withhold from any payments under the Agreement any telephone, restaurant or other fixed amounts owed to Company by Lender and/or Writer.

E.     No Obligation To Use.   Failure of Company to actually utilize the services of Writer, in whole or in part, shall not be deemed a breach of the Agreement by Company, and in any such event neither Writer nor Lender shall be entitled to any damages by reason thereof; provided, however, that if Lender and Writer shall fully and faithfully perform and observe all the terms and conditions of the Agreement, such failure shall not relieve Company of its obligation to pay Lender compensation as provided in the Agreement, subject, however, to any other provisions of the Agreement relieving Company of its obligation to pay compensation under the Agreement. Without limiting the foregoing, it is understood that Company shall have the unqualified right at all times to engage further writer(s) to work on the material delivered under the Agreement and/or the assigned material upon which said material is based.

2

CONFIDENTIAL

PPC-GRAY-0000206

F.    Transportation and Expenses.    If not specifically provided for in the Agreement, whenever Writer is required by Company to travel to an overnight location away from any place where Writer maintains a residence to perform services under the Agreement, Company agrees to provide Writer with reasonable transportation and to furnish and pay for the reasonable lodging and reasonable living expenses of Writer.    Any specified living allowance or reimbursement paid under the Agreement may be withheld upon and reported by Company to the IRS if it is required by law.

G.    Ownership; Representations and Warranties; Further Documents.

(i)    Lender and Writer agree and warrant that all results and proceeds of every kind of the services heretofore and hereafter rendered by Writer in connection with the Picture, including without limitation any and all literary and other materials and all ideas, themes, stories, plots, characterizations, dialogue, lyrics, music, illustrations, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter written, conceived, submitted, and/or contributed by Writer and/or Lender pursuant to Writer's employment agreement with Lender in connection with the Picture and/or pursuant to the Agreement, or otherwise if relating to the Picture, (collectively "Material"), either alone or in collaboration with others, shall be encompassed within the provisions of the Agreement and are and shall be a "work made for hire" within the meaning of the copyright laws of the United States or any similar or analogous law or statute of any other jurisdiction. If, or to the extent for any reason in any country, any or all such Material is not recognized to be a "work made for hire," then Lender and Writer hereby irrevocably and absolutely assign to Company all of Lender's and Writer's respective rights in the Material, whether copyrights or otherwise and whether now or hereafter known, and including all renewals and extensions of such rights as may now or hereafter exist, and accordingly for this purpose Company shall be deemed the author of the Material and the sole and exclusive owner of the Material and all rights therein for all purposes, in all media and by all means now or hereafter known or devised, throughout the universe in perpetuity.    Company, as author, shall own the copyright in the Material forever with the right to make such changes therein and such uses thereof, including, but not limited to derivative works, as Company may determine as author, and Writer hereby waives the "moral rights" of authors as said term is commonly understood throughout the world.    For the avoidance of doubt, it is the intention of the parties that any and all illustrations, lyrics and/or music as may be submitted by Writer for and/or in conjunction with the Picture shall be deemed submitted separately from the screenplay even if physical delivery is made via insertion in the screenplay.

3

CONFIDENTIAL                                                                    PPC-GRAY-0000207

(ii)    The Material shall be solely written by Writer and shall be wholly original with Writer and shall not infringe upon the copyright or violate the right of privacy of or constitute a libel or slander against or violate any common law rights or any other rights of any person or entity. The same agreements and warranties are made by Lender and Writer with reference to any and all Material of any kind which Writer may add to or interpolate in any material assigned to Writer by Company, but are not made with respect to violations or infringements contained in the material so assigned to Writer by Company, unless such assigned material is written or conceived by Writer.

(iii)    Lender and Writer agree to execute and deliver to Company such assignment(s) of the Material and/or rights therein and such other instruments in form reasonably satisfactory to Company as may be necessary for Company to confirm Company's ownership of the results and proceeds of Writer's services pursuant to the Agreement. Lender and Writer each hereby appoint Company, or its nominee, as Lender's and Writer's irrevocable attorney-in-fact, with the right, but not the obligation, to execute the same in Lender's and/or Writer's name, or obtain execution thereof by others, and record or register the same in the United States Copyright Office or elsewhere as Company sees fit.

H.    Publicity.  Lender hereby grants to Company the right to use the name of Writer in connection with the Material and the Picture and in advertising, exploiting and exhibiting the same. Company shall have the exclusive right to issue publicity concerning the Picture and Writer's engagement in connection with the Picture, and Lender and Writer shall not, without Company's prior written approval in each instance, issue or authorize the dissemination of any information or publicity relating to the Picture, Company, or Writer's engagement pursuant to the Agreement. Nothing contained in this paragraph shall be construed to prevent the use by Writer of Writer's name in connection with any literary material written by Writer in connection with any project outside of this engagement.

I.    Suspension and Termination.  Company shall have the right to suspend Writer's engagement and the payment of compensation under the Agreement during all periods that: (i) Writer does not render services thereunder because of illness, physical or mental incapacity, default or similar matters; (ii) development and/or production of the Picture is prevented or interrupted because of an event of force majeure or any other event which prevents or interferes with the development and/or production of the Picture or interferes with Company's normal business operations, including without limitation any labor dispute, strike, fire, war or governmental action, or any disruptive event beyond Company's control; or

4

CONFIDENTIAL                                                                                          PPC-GRAY-0000208

(iii) production of the Picture is prevented, interrupted or delayed by reason of the death, illness or incapacity of a principal member of the cast, the director or the director of photography, except that suspension under this Subdivision (iii) shall not exceed two (2) continuous weeks in connection with such interruption. Unless the Agreement is terminated, the period of the parties' obligations provided for in the Agreement shall be deemed extended by a period equivalent to all such periods of suspension, plus, in an event of force majeure, an additional period of four (4) weeks to enable Company to commence or recommence development or production of the Picture or to resume Company's normal business operations. If any matter referred to in Subdivision (i) above, other than default, continues for longer than seven (7) consecutive days or for an aggregate of ten (10) days, or if any matter referred to in Subdivision (ii) above continues for more than eight (8) consecutive weeks (or has an impact that, at the time of onset, can reasonably be expected to continue for not less than eight [8] consecutive weeks), or if any matter referred to in Subdivision (iii) above continues for more than two (2) weeks (or has an impact that, at the time of onset, can reasonably be expected to continue for not less than two [2] weeks), or in the event of any material default on the part of Writer, Company may terminate Writer's services under the Agreement. If Lender does not receive compensation for the maximum suspension periods under Subdivisions (ii) and (iii) above, Lender may terminate Writer's services under the Agreement unless compensation is resumed within one (1) week after Lender gives Company written notice requiring such resumption. If Writer's services under the Agreement are terminated prior to Writer's delivery to Company of any writing step on which Writer is then working, Lender shall immediately deliver to Company all of the writing for the Picture by Writer then completed or in progress at whatever stage of completion it may be and all other Picture-related materials in Writer's possession. The provisions of this paragraph are in addition to and not exclusive of or in limitation of any other rights and remedies of Company under the Agreement or at law or in equity.

During any period of suspension due to incapacity or default, Writer shall not render any services in the entertainment industry for others or on Lender's or Writer's own behalf. During any suspension due to an event of force majeure, Lender may furnish Writer's services to any other person or entity or cause Writer to render services on Lender's or Writer's own behalf; provided, that Company shall have the right to recall Writer to render services under the Agreement, and Lender shall cause Writer to resume rendering services to Company on two (2) days oral or written notice.

J.      Remedies. Writer and Lender hereby expressly agree that in the event of any breach of the Agreement by Company, Writer's and Lender's remedy, if any, shall be limited to an action at law for actual damages, if any, and in no event shall Writer or Lender be entitled to terminate the Agreement or to seek to enjoin the

5

CONFIDENTIAL                                                                                      PPC-GRAY-0000209

exploitation of the rights granted herein (including but not limited to the exhibition, distribution, advertising, and promotion of works created pursuant to the Agreement) or to any other equitable relief. No waiver by either party of any breach hereof shall be deemed a waiver of any prior or subsequent breach hereof. Company shall not be liable for any breach of the Agreement unless it has received written notice from Lender of such breach and has not, within a reasonable time after receipt of such notice, cured such breach. All remedies shall be cumulative, and the pursuit of one remedy shall not be deemed a waiver of any other remedy. In no event shall either party be liable for any special, incidental, consequential, exemplary or punitive damages, or any claim for loss of profits, lost business or lost business opportunities, even if the other party has been advised of the possibility of such damages.

K.    Credit. During the term of the current Writer's Guild of America – Alliance of Motion Picture and Television Producers Theatrical and Television Basic Agreement ("WGA Agreement"), as it now is or as it may hereafter be amended, modified or extended, and during the term of any new contract which may hereafter be entered into between Company and the WGA, the provisions of Schedule A of the WGA Agreement or the then current provisions, if any, for credits set forth in any amendment, modification or extension of the WGA Agreement or in any such new contract, shall govern the determination of such credits, if any, as Company shall accord Writer under the Agreement in connection with feature length motion pictures. If contingent or other compensation of any kind payable under the Agreement is conditioned upon Writer's entitlement to a particular credit, the following shall be applicable: (i) If Writer receives such credit as the result of a unanimous agreement among the participating writers pursuant to Paragraph 7 of Schedule A of the aforesaid WGA Agreement, such credit shall not govern for the purpose of determining whether such contingent or other compensation based on credit shall be payable; but the determination as to whether such contingent or other compensation based on credit shall be payable shall be determined solely on the basis of Writer's contribution to the final screenplay; (ii) If Writer receives such credit as a result of either (x) Writer being designated for such credit in the notice of tentative credits, which tentative credits become final within the time period specified in the WGA Agreement, or (y) a WGA determination through its arbitration committee, then, in either such event, such contingent or other compensation based on credit shall be payable under the Agreement. Subject to the foregoing, Company shall determine the size and placement of Writer's credit in its sole election. No inadvertent failure to comply with any provisions of this paragraph shall be deemed a breach of the Agreement by Company. Writer and Lender hereby expressly recognize that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage, if any, caused Writer or Lender thereby is not irreparable or sufficient to entitle Writer or Lender to injunctive or other equitable relief. Consequently,

6

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

Writer's and Lender's rights and remedies in the event of such breach shall be limited to their rights, if any, to recover damages in an action at law.

L. Indemnity.

(i)     Lender and Writer hereby agree to indemnify and hold harmless Company, its successors, licensees, officers, directors, employees, and assigns (each an "Indemnified Party") from and against any losses, damages, costs, charges, reasonable attorneys' fees, recoveries, actions, judgments, penalties, expenses, and any other loss ("Losses") that may be obtained against, imposed upon, or suffered by Company or any other Indemnified Party, arising out of any claim or action which if true would constitute a breach of Lender's and/or Writer's representations, warranties, and/or agreements under the Agreement or tortious conduct by Lender and/or Writer ("Claim"). If any Claim is asserted or filed by a third party against any Indemnified Party, Company shall give Lender and Writer prompt written notice thereof, and Company may, at Lender's expense, defend against any such Claim with counsel selected and retained by Company. Company may compromise or settle such Claim upon such terms that Company may deem reasonable.

(ii)    Except to the extent that Lender and/or Writer are in material breach hereunder (and such breach contributed to the event in question) or have tortiously contributed in an intentional or grossly negligent manner to the event in question, Company shall indemnify and hold harmless Lender and Writer against any liability, costs and/or damages which Lender and/or Writer may incur in connection with any claim or action or liability arising out of the development, production, distribution, release and/or ancillary and subsidiary exploitation of the Picture or any element thereof and shall provide Lender and Writer with a defense, subject to subparagraph (iii) below.

(iii)   The indemnified party shall cooperate fully with the indemnifying party. Notwithstanding the foregoing, Lender and Writer hereby agree to fully cooperate with Company in defending against any claim brought against the Picture. If Lender and Writer fail to so cooperate, Lender and Writer shall indemnify Company and/or any Indemnified Party from and against any Losses that may be obtained against, imposed upon, or suffered by Company or any other Indemnified Party, arising out of such Claim.

(iv)    Lender and Writer shall be covered under Company's policies of errors and omissions insurance and general liability insurance for the Picture,

7

CONFIDENTIAL                                                                    PPC-GRAY-0000211

subject to all the terms and conditions thereof including without limitation the exclusions and limitations set forth in such policies.

M.    Severability.  Nothing contained in the Agreement shall be construed so as to require the commission of any act contrary to law, and the parties acknowledge that the Agreement is subject to applicable provisions of Federal, State, and local laws and governmental regulations and the provisions of any collective bargaining agreement affecting the rights and/or services of Writer under the Agreement and that the provisions thereof shall supersede the provisions of the Agreement to the extent that they are inconsistent therewith, but in such event any provision of the Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within such requirements.

N.    Services Unique.  It is mutually understood and agreed that Writer's services are special, unique, unusual, extraordinary and of an intellectual character, giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that in the event of any breach by Lender or Writer, Company shall be entitled to equitable relief by way of injunction or otherwise.

O.    Guild Membership.

(i)    Lender agrees that Writer is now (or, if not, then forthwith upon the execution hereof Writer will become) a member in good standing of the WGA, and that during the entire term of the Agreement during such period or periods as it may be lawful for Company to require Writer so to do, Writer will remain or become and remain a member in good standing of the properly designated labor organization or organizations (as defined and determined under the applicable law) representing persons performing services of the type and character that are required to be performed by Writer under the Agreement.

(ii)    If Writer should cease to be a member in good standing of such guild or organization by reason of failure to pay any dues or assessments, and if Writer should fail to pay such dues or assessments and such failure to pay shall not be cured within five (5) days after written notice from such guild or organization, Company shall have the right, at its election, to deduct the amount thereof from any compensation then or thereafter payable to Lender under the Agreement and to pay such amount to such guild or organization on behalf of Writer.  Company shall be entitled to rely upon any facts, figures and other information furnished by such guild or organization with respect to any such failure or default on the part of Writer and shall not be liable to Lender or Writer for any payment or overpayment to such guild or

8

CONFIDENTIAL                                                                    PPC-GRAY-0000212

organization based upon such facts, figures or other information, nor shall Company be under any obligation to take any steps whatever to reclaim or recover such payment or overpayment from such guild or organization. Nothing herein contained, however, shall be construed to prevent Writer from taking any such steps on Writer's own behalf.

P.    Assignment.    The Agreement, at the election of Company, shall also inure to the benefit of Company's successors, assigns, licensees, grantees and associated, affiliated and subsidiary companies, and Lender agrees that Company and any subsequent assign may freely assign the Agreement and grant its rights under the Agreement, in whole or in part, to any person or entity.

Q.    Governmental Limitations.    If the compensation provided by the Agreement shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated compensation shall be reduced while such limitation is in effect to the amount that is so permitted; and the payment of such reduced compensation shall be deemed to constitute full performance by Company of its obligations under the Agreement with respect to compensation for such period.

R.    Notices.    In the event that the last day on which the parties hereto are empowered to give notice pursuant to any provision of the Agreement or to perform any other act which the parties are required or may desire to perform under or in connection with the Agreement, should fall on a Saturday, Sunday, national holiday, the period between Christmas and New Year's Day, or other day on which either party is closed for business ("Closed Day(s)"), then, in that event, the parties shall have until the end of the first full business day following such Closed Day(s) within which to give such notice or to perform such act. If any date established by any notice for the commencement of any period or the performance of any other act shall fall on a Closed Day, then such commencement date for such period or such date for the performance of any such act shall be extended until the close of the first full business day following such Closed Day(s).

S.    Entire Agreement; Modifications; Contract Interpretation.    The Agreement contains the entire agreement between the parties with reference to the subject matter of the Agreement, supersedes all prior agreements and understandings, whether written or oral, pertaining to such subject matter, and may not be modified or amended unless by a written instrument executed by each of the parties hereto. Lender and Writer acknowledge that no representation or promise not expressly contained in the Agreement (including the attachments) has been made by Company or any of its agents, employees or representatives.    The Agreement shall be deemed to have been drafted by all the parties hereto, since all parties were assisted by their counsel in reviewing and agreeing thereto, and no

9

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                                PPC-GRAY-0000213

ambiguity shall be resolved against any party by virtue of its participation in the drafting of the Agreement. Paragraph headings are for convenience only and shall not be given any legal effect. The Agreement may be signed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

T.   **APPLICABLE LAW. THE AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE IN AND WHOLLY TO BE PERFORMED IN THAT JURISDICTION, AND THE PARTIES HERETO SUBMIT AND CONSENT TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA IN ANY ACTION BROUGHT TO ENFORCE (OR OTHERWISE RELATING TO) THE AGREEMENT.**

U.   Fringe Benefits.   To the extent required by Section 17.A. of the WGA Agreement, Company agrees to pay on behalf of Lender directly to the proper authority concerned all applicable WGA union pension and health fund contributions; provided, however, in no event shall the aggregate amount of such payments exceed the total of all similar payments which Company would be required to make had Company employed Writer directly. Any such payments will be treated by Company for United States Federal, State and local tax purposes as additional income paid by Company to Lender and as if Lender had made such payment to the proper authority concerned.

V.   Corporate Representations and Warranties.   Lender represents and warrants that Lender is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing in good standing under the laws of Lender's state or country of incorporation; that Lender is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Writer; that Writer is under an exclusive written contract of employment with Lender for a term extending at least until the completion of all services required of Writer under the Agreement, which contract gives Lender the right to direct the Writer as to when and how Writer performs Writer's services, and to loan or furnish the services of Writer to Company, as herein provided; that, if Lender was incorporated outside the United States of America, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States as this term is defined in the Tax Treaty between the United States and the country of incorporation and will provide Company with a properly executed Form W-8BEN; and that it does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on behalf of Lender. Lender further acknowledges that the foregoing representations and warranties will be relied upon by Company for the purpose of determining whether or not it is necessary to make withholdings for United States Federal,

10

CONFIDENTIAL                                                                                                    PPC-GRAY-0000214

State or local taxes from monies being paid to Lender under the Agreement, and Lender agrees that if withholdings are not made from said payments, and if thereafter it is determined that such withholdings were legally required, Lender and Writer will indemnify Company against all loss, costs, damages and expenses relating thereto (including but not limited to penalties, interest, and reasonable attorneys fees and costs in the defense and disposition of such matters). Notwithstanding the foregoing, Company may make United States Federal, State or local tax withholdings if, in Company's good faith business judgment, it is required by law.

\* \* \*

11

CONFIDENTIAL                                                                          PPC-GRAY-0000215