**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHAUN GRAY, an individual,

        Plaintiff,

   vs.

PPC GLOBAL, a Delaware corporation; PPC
PICTURES CORPORATION, a Delaware
corporation; PPC STREAMING SERVICES
INC., a Delaware corporation; and DOES 1-10,

       Defendants.

Civil Action No. 1:25-cv-3484-JSR

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff Shaun Gray*

June 23, 2025

## <u>TABLE OF CONTENTS</u>

**Pages**

<u>INTRODUCTION</u> ........................................................................................................1

<u>FACTUAL BACKGROUND</u> ......................................................................................3

<u>LEGAL STANDARD</u> ...............................................................................................5

<u>ARGUMENT</u> ...........................................................................................................5

I.     GRAY HAS ADEQUATELY PLED JOINT AUTHORSHIP............................................6

      A.     Whether Directly or Through Its Agents, PPC and Gray  Intended to Create a Joint Work. ....................................................................................... 6

      B.     Gray Pleads Facts Satisfying All Tests for Joint Authorship Intent. ...................... 9

            1.     Courts in This District Do Not Determine Intent on a Motion to Dismiss. ........................................................................................... 9

            2.     Even Reaching The Issue, Gray Satisfies Any Requirement To Plead Intent. ........................................................................................... 9

II.     GRAY HAS ADEQUATELY PLED INFRINGEMENT IN THE ALTERNATIVE. ......15

      A.     PPC's "Merger" Defense Turns Copyright on Its Head. ..................................... 17

      B.     PPC's Affirmative Defense of an Implied License Cannot Be Resolved On a Motion to Dismiss. ........................................................................... 19

<u>CONCLUSION</u>......................................................................................................23

i

## TABLE OF AUTHORITIES

**Cases**

*16 Casa Duse, LLC v. Merkin,*
791 F.3d 247 (2d Cir. 2015)..............................................................................passim

*Aalmuhammed v. Lee,*
202 F.3d 1227 (9th Cir. 2000) ..........................................................................passim

*ABKCO Music, Inc. v. Sagan,*
50 F.4th 309 (2d Cir. 2022) ..............................................................................20, 21

*Ariel (UK) Ltd. v. Reuters Grp. PLC,*
No. 05-CV-9646 (JFK), 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006),
*aff'd,* 277 F. App'x 43 (2d Cir. 2008)..........................................................................20

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................5

*Astroworks v. Astroexhibit, Inc.,*
257 F. Supp. 2d 609 (S.D.N.Y. 2003) .......................................................................22

*Bayoh v. Afropunk Fest 2015 LLC,*
No. 18-CV-5820 (DLC), 2020 WL 229978 (S.D.N.Y. Jan. 15, 2020)......................21

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)......................................................................................................5

*Brooks v. Dash,*
852 F. App'x 40 (2d Cir. 2021) ...................................................................................9

*Burrow-Giles Lithographic Co. v. Sarony,*
111 U.S. 53 (1884).....................................................................................................14

*Caffey v. Cook,*
409 F. Supp. 2d 484 (S.D.N.Y. 2006) .........................................................................9

*Capitol Records, Inc. v. MP3tunes, LLC,*
No. 07-CV-9931 (WHP), 2009 WL 3364036 (S.D.N.Y. Oct. 16, 2009) ..................19

*Childress v. Taylor,*
945 F.2d 500 (2d Cir. 1991).................................................................................passim

*Chinacast Educ. Corp. v. Chinacase Educ. Corp.,*
809 F.3d 471 (9th Cir. 2015) .......................................................................................8

*City of New York by & through FDNY v. Henriquez,*
768 F. Supp. 3d 388 (E.D.N.Y. 2025) .........................................................................8

*Concannon v. LEGO Sys., Inc.*,
  No. 21-CV-01678 (JBA), 2023 WL 2526637 (D. Conn. Mar. 15, 2023)..........................21, 23

*Design Options, Inc. v. BellePointe, Inc.*,
  940 F. Supp. 86 (S.D.N.Y. 1996) ....................................................................................21

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ...............................................................................2

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
  140 F.2d 266 (2nd Cir. 1944).........................................................................................12

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
  697 F.2d 27 (2d Cir. 1982).............................................................................................22

*Elliott v. Cartagena*,
  No. 19-CV-1998 (NRB), 2025 WL 486634 (S.D.N.Y. Feb. 13, 2025)...............................9, 20

*Erickson v. Trinity Theatre, Inc.*,
  13 F.3d 1061 (7th Cir. 1994) ..........................................................................................10

*Exceller Software Corp. v. Pearson Educ., Inc.*,
  No. 10-CV-0381 (PGG), 2010 WL 4486944 (S.D.N.Y. Nov. 9, 2010) ..................................9

*Farkas v. Rich Coast Corp.*,
  No. 14-CV-0272 JEJ (MCC), 2017 WL 10299097 (M.D. Pa. June 7, 2017),
  *report and recommendation adopted*, 2017 WL 10299211 (M.D. Pa. Sept. 12, 2017) ..........16

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
  807 F.2d 1110 (2d Cir. 1986).............................................................................................4

*Gaiman v. McFarlane*,
  360 F.3d 644 (7th Cir. 2004) ..........................................................................................15

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998)............................................................................................21

*Graham v. Prince*,
  No. 15-CV-10160 (SHS), 2023 WL 3383029 (S.D.N.Y. May 11, 2023) ...............................20

*Heger v. Kiki Tree Pictures, Inc.*,
  No. 17-CV-3810 SJO (Ex), 2017 WL 5714517 (C.D. Cal. July 24, 2017) .............................15

*Heller v. NBCUniversal, Inc.*,
  No. 15-CV-9631 MWF (KSx), 2018 WL 11354835 (C.D. Cal. Dec. 21, 2018)......................15

*Horror Inc. v. Miller*,
335 F. Supp. 3d 273 (D. Conn. 2018),
*aff'd*, 15 F.4th 232 (2d Cir. 2021) ............................................................................ 6

*In re Patient Educ. Media, Inc.*,
210 B.R. 237 (Bankr. S.D.N.Y. 1997) ..................................................................... 20

*JBJ Fabrics, Inc. v. Brylane, Inc.*,
714 F. Supp. 107 (S.D.N.Y. 1989) ........................................................................... 22

*Johnson v. Arista Holding, Inc.*,
No. 05-CV-9645 (LBS), 2006 WL 3511894 (S.D.N.Y. Dec. 5, 2006) .................... 20

*Jose Luis Pelaez, Inc. v. McGraw-Hill Global Education Holdings LLC*,
399 F. Supp. 3d 120 (S.D.N.Y. 2019) ...................................................................... 21

*Keane Dealer Servs., Inc. v. Harts*,
968 F. Supp. 944 (S.D.N.Y. 1997) ........................................................................... 21

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015) ........................................................................................ 22

*Kwan v. Schlein*,
No. 05-CV-0459-SHS-JCF, 2009 WL 10678967 (S.D.N.Y. Apr. 23, 2009) .......... 17

*Marshall v. Marshall*,
No. 08-CV-1420 LB, 2012 WL 1079550 (E.D.N.Y. Mar. 30, 2012),
*aff'd*, 504 F. App'x 20 (2d Cir. 2012) ...................................................................... 17

*Maurizio v. Goldsmith*,
84 F. Supp. 2d 455 (S.D.N.Y. 2000),
*aff'd*, 230 F.3d 518 (2d Cir. 2000) .................................................................... passim

*Maurizio v. Goldsmith*,
No. 96-CV-4332 (LMM), 2001 WL 1568428 (S.D.N.Y. Dec. 5, 2001) ................. 18

*McGucken v. Newsweek LLC*,
No. 19-CV-9617 (KPF), 2022 WL 836786 (S.D.N.Y. Mar. 21, 2022) .................... 19

*Neu Prods. Inc. v. Outside Interactive, Inc.*,
No. 23-CV-4125 (LAK) (GWG), 2024 WL 1161498 (S.D.N.Y. Mar. 19, 2024) ...... 21

*Ortiz v. Guitian Music Bros.*,
No. 07-CV-3897-RWS, 2009 WL 2252107 (S.D.N.Y. July 28, 2009) .................... 23

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
531 F.3d 962 (9th Cir. 2008) .................................................................................... 14

*Smith v. Mikki More, LLC*,
  59 F. Supp. 3d 595 (S.D.N.Y. 2014) ................................................................ 2

*Sohm v. Scholastic Inc.*,
  959 F.3d 39 (2d Cir. 2020) ............................................................................ 19

*Systems XIX, Inc. v. Parker*,
  30 F. Supp. 2d 1225 (N.D. Cal. 1998) ...................................................... 10, 12

*Thompson v. Larson*,
  147 F.3d 195 (2d Cir. 1998) ................................................................... passim

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016) ............................................................................ 5

*Walker v. Carter*,
  No. 12-CV-5384 ALC (RLE), 2014 WL 4363956 (S.D.N.Y. Sept. 3, 2014) ........................ 21

*Wolf v. Travolta*,
  167 F. Supp. 3d 1077 (C.D. Cal. 2016) ........................................................... 22

## Rules, Statutes, and Regulations

17 U.S.C. § 101 .................................................................................... passim

17 U.S.C. § 201 .................................................................................... passim

Federal Rule of Civil Procedure 12 .......................................................... 5, 6, 19

## Other Authorities

2 Patry on Copyright § 5:6 (2023 rev. ed.) ................................................... 12

Sarah Polcz, *Co-Creating Equality*, 96 S. Cal. L. Rev. 607 (2023) ........................... 17

## INTRODUCTION

Despite deploying the words "alleged" and "allegedly" sixteen times in its motion to dismiss, Defendant PPC Global and its related entities ("PPC") know there is no real dispute that Plaintiff Shaun Gray ("Gray") wrote fifteen scenes (the "Gray Scenes") of the screenplay PPC turned into the film *Top Gun: Maverick* (the "Film"), including some of its most gripping and iconic scenes, such as where Maverick opens the film by pushing a high-tech prototype jet to break records before it catastrophically fails and where he "steals" a jet to show his team that their impossible mission can indeed be flown. Dkt. 1 ¶ 30; Ex. 2. PPC nevertheless asks the Court to dismiss Gray's Complaint before discovery, claiming that the *only* plausible explanation for PPC's failure to obtain a work-for-hire agreement with Gray is that the Gray Scenes somehow exist in copyright limbo—conveniently free for PPC's taking. But as alleged (and proven with time-stamped drafts and emails, *id.* Exs. 1, 2), Gray wrote his scenes at the express invitation of the Film's director Joseph Kosinski ("Kosinski") and key credited screenwriter Eric Singer ("Singer"), both of whom were employed by PPC. *Id.* ¶¶ 22-23, 30, 60. PPC and Kosinski then used Gray's pivotal scenes in the Film's final screenplay ("Screenplay") and the Film. *Id.* Ex. 1. But according to PPC, Gray is owed nothing. That is not the law and never will be.

Screenplays co-authored by multiple writers represent a quintessential joint work under the Copyright Act, 17 U.S.C. § 101, such as screenplays written collaboratively "on spec" and later purchased by and assigned to studios, which is not unusual in the film industry. That here the screenwriters, other than Gray, who contributed to the Screenplay did so pursuant to "work-for-hire" agreements does not eradicate Gray's central co-authorship or the Screenplay's legal status as a joint work, just because Gray wrote his scenes "on spec." PPC stitches its self-serving argument together, to absurd result, by ignoring two critical, disputed issues of fact in this case.

It asks the Court to determine Gray cannot be a co-author *as a matter of law* because PPC purportedly did not intend him to be such. Dkt. 21 at 5-14. But Gray, a younger less business-savvy writer than his cousin Singer, whom PPC credits as a principal screenwriter, alleges that: (1) both Singer and the Film's director, Kosinski, requested that Gray write for this project, Dkt. 1 ¶ 22; (2) Gray communicated often and directly with both Kosinski and Singer in the process of making independently copyrightable contributions to the Screenplay, Dkt. 1 ¶¶ 24, 31, as PPC concedes for this part of its Motion, Dkt. 21 at 5 n.3; (3) Gray exercised control and decision-making authority over his scenes, Dkt. 1 ¶¶ 24, 29, 32; and (4) both Singer and Kosinski had actual or apparent authority from PPC to engage in this creative process with Gray, *id.* ¶¶ 22-23, 60. If true, as must be assumed for purposes of a motion to dismiss, then Gray is a co-author of at least the Screenplay under 17 U.S.C. §§ 101, 201(a), and the Second Circuit's interpretation of that provision set forth in *Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991).[1]

Gray alleges in the alternative that if the Screenplay is not a joint work, he is entitled to enforce his separate copyright in the Gray Scenes in an infringement action. Other than PPC's absurd suggestion that a writer who fixes ideas in a tangible medium of expression has no copyright at all, Dkt. 21 at 14-19, PPC's only defense to Gray's alternative cause of action is an "implied license." *Id.* at 20-23. But the assertion of an implied license, as PPC scrupulously fails to apprise the Court, is an *affirmative* defense, *Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 610 (S.D.N.Y. 2014), and "affirmative defenses usually cannot be considered on a motion to dismiss." *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 401 (S.D.N.Y. 2023). If PPC wishes to bear the burden of pleading and proving an implied license, it may answer

---

[1] The actual or apparent authority of either (or both of) Kosinski and Singer to act on behalf of PPC, owner of the original *Top Gun* film, additionally disposes of PPC's argument that the Gray Scenes are unauthorized derivative works. Dkt. 21 at 22-23.

accordingly and depose Gray, just as Gray may depose Kosinski, Singer, and PPC. Here, though, is a preview: Nobody grants someone an implied license to exploit their work for no credit and no money. Strip away the legal maneuvering, and PPC's Motion reveals an audacious assumption: We're a big sophisticated movie studio—if we didn't get a work-for-hire agreement from Gray, it must be because he has no claim. But as Exhibits 1 and 2 to the Complaint reveal, there is no question Gray made major contributions to the Screenplay that became the Film, and there is similarly no dispute PPC failed to credit or compensate him.[2]

## FACTUAL BACKGROUND

In June 2017, screenwriter Eric Singer approached his cousin Shaun Gray to collaborate on Singer's draft screenplay for PPC's highly anticipated sequel to its 1986 film *Top Gun*. Dkt. 1 ¶¶ 4, 22. Gray, a talented screenwriter and Singer's co-writing collaborator in the past, decided to work with him. *Id.* ¶¶ 9, 22. From June through November 2017, Gray worked intensively on the Screenplay that would become *Top Gun: Maverick*. *Id.* ¶¶ 24, 57. During this period, Gray authored fifteen complete, original scenes for the Screenplay (the "Gray Scenes"). *Id.* ¶ 30, Ex. 2. These scenes were not mere suggestions or minor contributions—they were fully realized dramatic sequences with a beginning, middle, and end, original dialogue, character development, and narrative structure that together were integral to the Screenplay and the resulting Film. *Id.*

For purposes of the joint authorship claim, Gray alleges that he created these scenes with the specific intent that his contributions would be "merged into inseparable or interdependent parts of a unitary whole" with the other screenplay elements. *Id.* ¶ 45. This intent is reflected by

---

[2] PPC may claim on reply that it fails to dispute these facts due to the procedural posture of the case. But PPC disputes plenty of other facts in its Motion, especially matters of intent. PPC only accepts the facts fundamental to the equities of the case as true (discounted by "allegedly") because it knows it cannot state anything to the contrary.

the objective facts of Gray's participation "in story meetings, writing sessions, and other communications between Gray and [PPC]'s employees, agents, and/or representatives, including Singer and the Film's director, Kosinski." *Id.* Gray worked as a creative equal, exercising independent judgment and creative control over the scenes he authored. *Id.* ¶ 32. The scenes and literary elements Gray created included key character-defining action scenes, and dramatic moments PPC and its director Kosinski ultimately featured in the Film. *Id.* ¶¶ 30, 34, 63, Ex. 1. Throughout the creative process, Gray worked closely with both Singer and Kosinski, *id.* ¶¶ 22-24, at times emailing certain Gray Scenes to Kosinski directly, *id.* ¶ 60.

Gray's contributions to the Screenplay cannot be overstated. "The audience appeal of the Screenplay and Film turns on the contributions of both Gray and [PPC], and the share of each in the Screenplay and Film's success cannot readily be separately appraised." *Id.* ¶ 46. The Gray Scenes are "significant written contributions to the Screenplay and Film," such that "Gray is a joint author of the Screenplay and Film." *Id.* ¶ 41.

In contrast to the other screenwriters who worked on the Screenplay and Kosinski, who oversaw its development, PPC, through negligence or otherwise, did not secure a work-for-hire agreement or any other agreement from Gray.[3] *Id.* ¶¶ 27-28. Peter Craig and Justin Marks prepared an initial draft before Singer and Gray's work. *Id.* ¶ 20. After Singer delivered his draft containing Gray's contributions to PPC, Ehren Kruger and Christopher McQuarrie prepared

---

[3] Whether this was an oversight by PPC or a deliberate, bad-faith attempt by PPC or its employed agents Singer and Kosinski to deprive Gray of credit and compensation for his work, cannot be known without discovery. While the underlying reason for PPC's failure to obtain a work-for-hire agreement or an assignment from Gray will be relevant to damages, it has nothing to do with liability. Obviously, a writer may be a joint author without a work-for-hire agreement, so its absence is not probative of intent to create a joint work. And as far as the alternative copyright infringement claim is concerned, that is a strict liability claim; intent is irrelevant, except to damages. *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986) ("Even an innocent infringer is liable for infringement.").

subsequent drafts that built upon this foundation. *Id.* ¶¶ 26, 60. PPC's failure to obtain a work-for-hire agreement from Gray and thereafter, a copyright assignment from Gray when given the opportunity to do so before this lawsuit, was a serious oversight.

PPC released *Top Gun: Maverick* theatrically on May 27, 2022. *Id.* ¶¶ 2, 24, 57. The Film achieved both critical acclaim and unprecedented commercial success, earning six Academy Award nominations, including the prestigious nomination for Best Adapted Screenplay—a recognition of the very Screenplay to which Gray contributed substantially. *Id.* ¶ 2. The Film garnered astronomical box office success and became one of the highest grossing movies of all time. *Id.* Despite Gray's substantial and original contributions to both the Screenplay and the Film's ultimate success, PPC has systematically excluded him from any credit or compensation, whatsoever. *Id.* ¶¶ 8, 61-62. Gray therefore filed this action seeking a declaration of joint authorship and joint ownership with PPC of the Screenplay and Film, or at a minimum, the Screenplay, or, in the alternative, relief for copyright infringement. *Id.* ¶¶ 8, 53-54.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a motion to dismiss, the Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,* 843 F.3d 561, 566 (2d Cir. 2016).

## ARGUMENT

PPC argues Gray is not a joint author of either the *Top Gun: Maverick* Screenplay or Film under 17 U.S.C. § 101 and the Second Circuit test for a "joint work," as elucidated in

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991). It then goes so far as to argue that, despite

accepting as true Gray's substantial, indeed predominating, contributions of the Gray Scenes to

both the Screenplay and Film, Gray still has no copyright interest nor copyright infringement

claim. Neither argument withstands scrutiny, and regardless, both involve factual issues and

assumptions by PPC that are plainly inappropriate for a Federal Rule 12(b)(6) motion.

## I.    GRAY HAS ADEQUATELY PLED JOINT AUTHORSHIP.

The Copyright Act defines a "joint work" as one "prepared by two or more authors with

intention that their contributions be merged into inseparable or interdependent parts of a unitary

whole." 17 U.S.C. § 101. Under Second Circuit precedent, this definition requires proof of two

elements: (1) independently copyrightable contributions; and (2) intent to be co-authors.

*Childress*, 945 F.2d at 507; *see Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). PPC does

not seriously challenge, and could not seek dismissal as a matter of law, based on, the first

element. Accordingly, Gray addresses the second.

### A.    Whether Directly or Through Its Agents, PPC and Gray
###        Intended to Create a Joint Work.

As a preliminary matter, it remains an open question *whose* intent matters for the joint

authorship analysis, i.e., whether it is the intent of Gray and Singer, who actually did the writing,

or the intent of Gray and PPC, including Singer/Kosinski, acting as PPC's authorized agents.

PPC assumes—without citing any authority—that only its *corporate* intent matters because it

holds work-for-hire agreements with all writers except Gray. PPC's position, however, finds no

clear legal support. For instance, in *Childress,* the Second Circuit emphasized that joint

authorship analysis "concerns the *creation* of the work by the joint authors, not the

circumstances, in addition to joint authorship, under which a work may be jointly *owned,*" 945

F.2d at 505 (emphasis added)—such as here, where a co-owner (PPC) is but a statutory author

under the legal fiction of its work-for-hire agreements. PPC itself, however, authored nothing; Singer, Gray (and the other writers) are the joint *authors* "who translate[d] an idea into a fixed, tangible expression entitled to copyright protection." *Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 293 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir. 2021). PPC's own authority in fact undermines its position. In *Aalmuhammed v. Lee*, the Ninth Circuit considered the intent of the claimed co-author and the studio—*but also the director*. 202 F.3d 1227, 1235 (9th Cir. 2000) ("Also, neither Aalmuhammed, nor Spike Lee, nor Warner Brothers, made any objective manifestations of an intent to be coauthors."). If the intent of PPC's agents Singer and Kosinski matters, as PPC's cited legal authority indicates it does, then there can be no question Gray was a co-author. Dkt. 1 ¶¶ 22, 24, 29-31.

Even if it is PPC's intent that matters, Gray alleges, and PPC cannot dispute (and certainly not on a motion to dismiss) that, "In or about June 2017, Singer approached Gray to contribute his talents as a writer to the Screenplay, emphasizing that the Film's director, Kosinski, had specifically requested Gray's involvement because he was impressed with Gray's previous work as a writer. Both Singer and Kosinski represented themselves to Gray as having the authority and the approval of PPC and/or had the apparent authority of PPC to involve Gray in the project." *Id*. ¶ 22. In other words, Kosinski (the director of the Film charged with overseeing the Screenplay's development) and Singer (a key writer of the Screenplay) had either actual or apparent authority to bind PPC. *Id*. ¶¶ 22-23. Gray further alleges that both Singer and Kosinski collaborated with Gray in their capacities as agents for PPC and manifested clear intent that Gray's substantial contributions (i.e., the Gray Scenes) be merged with Singer's work into inseparable or independent parts of the unitary screenplay they co-wrote. *Id*. ¶¶ 22, 24, 31, 44. A corporation acts through its employees and agents. As PPC's key employees and/or agents on the

Film, Kosinski's and Singer's authorization and intent to have Gray co-author the Screenplay binds PPC under agency principles. *Id*. ¶¶ 20-22.

In *Chinacast Educ. Corp. v. Chinacase Educ. Corp.*, for instance, the Ninth Circuit imputed an agent's intent to defraud to the agent's principal, even though the agent acted adverse to the principal's interests, 809 F.3d 471, 472-73 (9th Cir. 2015), because "principals generally are responsible for the acts of agents committed within the scope of their authority," *id.* at 476 (discussing Restatement (Third) of Agency § 5.03). Here, Gray alleges PPC employed and authorized Singer to write the Screenplay and Kosinski to direct the Film and oversee its development. Dkt. 1 ¶¶ 20-21. Collaborating with a co-writer like Gray to accomplish these tasks reasonably falls within their "scope of authority."

*Chinacast* also confirms that, in the absence of actual authority, intent can be imputed through apparent authority. 809 F.3d at 478 ("[T]he principal is charged with even the faithless agent's knowledge when an innocent third-party relies on representations made with apparent authority."). Just so here. Gray alleges that the Film's director, Kosinski, specifically requested Gray be brought on to co-author the Screenplay. Dkt. 1 ¶ 22. Singer complied, and Kosinski worked with Gray and Singer as they co-wrote the script. *Id*. ¶¶ 22, 24. Gray reasonably relied on and trusted in Kosinski's and Singer's authority or apparent authority (particularly as Singer was his cousin) to represent and bind PPC. *Id*. ¶¶ 20, 22.

Further, the question of apparent authority is a paradigmatic "fact intensive inquiry," *City of New York by & through FDNY v. Henriquez*, 768 F. Supp. 3d 388, 416 (E.D.N.Y. 2025), rendering dismissal at this stage improper. Indeed, in general, "to assess whether [an agent] has apparent authority to bind the [the principal]" requires courts to "consider the 'custom in the industry' because '[t]he appointment of a person to a position with generally recognized duties

may create apparent authority." *Id.* PPC asks this Court to rule as a matter of law that no major motion picture director or screenwriter can ever have apparent authority to bind the studio which employed him/her—an invitation the Court should decline. As a matter of both controlling precedent and fundamental logic, the intent analysis should properly focus on Gray, Singer, and Kosinski as the actual creative collaborators on the Screenplay and under principles of agency.

**B.    Gray Pleads Facts Satisfying All Tests for Joint Authorship Intent.**

1.    *Courts in This District Do Not Determine Intent on a Motion to Dismiss*.

"To determine whether this mutual intent requirement is satisfied, a court conducts a 'nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts.'" *Brooks v. Dash*, 852 F. App'x 40, 41 (2d Cir. 2021) (quoting *Thomson v. Larson*, 147 F.3d 195, 201 (2d Cir. 1998)). "This test 'will vary depending on the specific factual circumstances.'" *Elliott v. Cartagena*, No. 19-CV-1998 (NRB), 2025 WL 486634, at *8 (S.D.N.Y. Feb. 13, 2025) (quoting *Caffey v. Cook*, 409 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) (citation and quotation marks omitted)). Thus it "is generally 'not susceptible to resolution on a motion to dismiss.'" *Id.* (quoting *Exceller Software Corp. v. Pearson Educ., Inc.*, No. 10 Civ. 0381 (PGG), 2010 WL 4486944, at *4 (S.D.N.Y. Nov. 9, 2010)). There is no basis to treat this case any differently.

2.    *Even Reaching The Issue, Gray Satisfies Any Requirement To Plead Intent*.

The intent that the screenplay be a joint work of authorship should be measured against an objective, factual standard that Gray and Singer co-wrote the Screenplay—later revised by two additional screenwriters—"with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Here, the Complaint

alleges objective indicia of Gray's intent to be a co-author: he exercised creative control over his contributions, authoring complete scenes, rather than merely implementing others' ideas,[4] Dkt. 1 ¶ 30, and he created original dramatic content integral to the Screenplay and Film on his own time, at his own pace, using his own judgment. *Id*. ¶¶ 29-32. Singer and Kosinski's objective conduct in both requesting and blessing Gray's substantial contribution of fifteen Gray Scenes to the Screenplay, many of which became key scenes directed by Kosinski in the Film, likewise demonstrate objective intent that Gray was meant to be a co-author—intent that is imputed to PPC under principles of agency.

Courts apply subjective intent analysis only where one party is indisputably the dominant author and the person claiming co-authorship status would *not normally be considered* an "author." *See Thomson,* 147 F.3d at 202 (dramaturge who did not list herself as a co-author and lacked decision-making authority over revisions proposed to author's play was not co-author); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061 (7th Cir. 1994) (finding actors' improvisations and suggestions did create co-authorship); *Systems XIX, Inc.,* 30 F. Supp. 2d at 1227 (rejecting *Childress* subjective analysis for record producer's co-authorship claim because, unlike research assistants, "the producer/performer relationship here was under the specific contemplation of Congress as joint authors of a sound recording under the Act.").

In *Childress*, the Second Circuit articulated both objective and subjective factors to consider when determining joint authorship intent. 945 F.2d at 508. *Childress* involved a playwright who "wrote the play" and "was responsible for the actual structure of the play and

---

[4] PPC cites Ninth Circuit cases on the "control" element without disclosing to the Court that there is a circuit split on this issue. The Ninth Circuit emphasizes that "[c]ontrol in many cases will be the most important factor," because a joint author must also be an "inventive or master mind," *Aalmuhammed*, 202 F.3d at 1234, while the Second Circuit focuses on the parties' intent, *Thomson*, 147 F.3d at 207. Gray addresses this superfluous "control" element in any event.

dialogue," while an actress merely suggested that the playwright write a play about "Moms" Mabley and provided research and editorial assistance. 945 F.2d at 502. When the parties later disagreed over their rights, the actress claimed to be the playwright's co-author. *Id*. at 501-02. Thus, the Second Circuit faced a situation where two persons contributed to a work's creation, but one was "indisputably the dominant author" while the other was just a researcher or editor that would unlikely qualify as a joint author to Congress, in enacting 17 U.S.C. § 101.

The court observed that joint authorship intent can be demonstrated by "factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts." *Id.* at 508. Yet, to avoid overextending joint authorship, the court also observed that "[w]hat distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors." *Id.* at 507-08. The court ruled that in such situations, it is proper to consider whether the parties "entertaine[d] in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of that relationship." *Id.* at 508.

*Thomson*, which applied the subjective intent test of *Childress*, similarly involved a non-traditional author. There the plaintiff identified herself in the play's billing, not as a co-author or playwright, but as a dramaturg, while the playwright retained sole authorial control and identified himself as *Rent*'s exclusive author in contracts and credits. 147 F.3d at 202-04. Based on this, the court ruled for the playwright, holding that the lower court's finding of no co-authorship intent was not clearly erroneous, *id*. at 205, illustrating the line between providing creative input in a non-writing capacity, and, as here, engaging in true collaborative authorship.

Courts thus apply the subjective *Childress* test, rather than an objective factual standard, only where the copyright claimant does not occupy a traditional authorship role contemplated by Congress. Here, Gray clearly does. Congress explicitly recognized joint authorship of motion pictures and by clear inference their screenplays:

> It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up … although a novelist, playwright, or songwriter may write a work with the hope or expectation that it will be used in a motion picture, this is clearly a case of separate or independent authorship rather than one [a screenplay] where the basic intention behind the writing of the work was for motion picture use.

H.R. Rep. No. 94-1476, at 120 (1976). Copyright scholars confirm this understanding. *See* 2 *Patry on Copyright* § 5:6 (2023 rev. ed.) (listing as a clear example of a "joint work … two or more individuals collaboratively writing a screenplay[.]") (collecting cases).

Indeed, in *Systems XIX, Inc. v. Parker*, the court denied summary judgment due to material factual disputes over the parties' intent to create a joint work, holding that agency principles could impute the requisite objective intent of co-authorship. 30 F. Supp. 2d 1225, 1229 (N.D. Cal. 1998). The court further found that where, as in this case, the collaborative relationship fell within the specific contemplation of Congress as giving rise to joint authorship, subjective joint-authorship intent was irrelevant. 30 F. Supp. 2d  at 1228 (citing and quoting *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2nd Cir. 1944) ("[I]t makes no difference whether the authors work in concert, or even whether they know each other, it is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such.")).

Regardless, accepting Gray's allegations as true, the *Childress* analysis supports the mutual intent of PPC and Gray to create a joint work. The Complaint alleges Gray was brought

on specifically to co-write the Screenplay with Singer as an independent collaborator, not an employee, *id.* ¶¶ 4, 22, and director Kosinski himself approved Gray's involvement as a creative contributor, *id.*, giving Gray a reasonable—and at the very least plausible—reason to "regard[]" himself as a joint author. PPC's argument that other writers' involvement undermines Gray's "decisionmaking authority" fails. Dkt. 21 at 7 n.4. The Complaint alleges facts more than sufficient to plausibly conclude Gray exercised decision-making authority over the Gray Scenes. Dkt. 1 ¶¶ 24, 30-32.  PPC's repeated reference to "three waves of writers" misses the mark. The fact of an earlier draft by two writers (who received the lesser "Story by" credit because their draft was less evident in the final Screenplay) or that two writers subsequently revised the screenplay by Gray and Singer (for which "Screenplay by" credit to Singer was accorded), Dkt. 1 ¶ 34, is of no moment to Gray's status as a co-author given that the Gray Scenes predominate the Gray-Singer draft, the final Screenplay, and the resulting Film, Dkt. 1 ¶¶ 30, 41, 62-63, Exs 1, 2. *Aalmuhammed* offers no help to PPC either. There, the plaintiff claimed to be a co-author of Warner Bros' motion picture, *Malcolm X*, directed by Spike Lee and starring Denzel Washington. Before the movie was produced, Washington asked the plaintiff, a devout Muslim knowledgeable about Islam, to assist him in preparing for his role, who accompanied him during some of the filming. 202 F.3d at 1229-30. The plaintiff claimed he co-owned the film based on things that clearly did not rise to copyrightable subject matter, such as acting as an interpreter and instigating some script changes included in the film. *Id*. at 1231-32.

Thus, as in *Childress* and *Thompson*, *Aalmuhammed* involved a non-writer who made some suggestions regarding the work in question, there a film, not a writer like Gray who actually co-wrote substantial portions of a film's screenplay. *Id.* at 1229-30. The Ninth Circuit thus emphasized that the culture consultant "did not at any time have superintendence of the

13

work" and his contributions were subject to the director's unfettered discretion." *Id.* at 1235. This contrasts starkly with Gray's authorship of fifteen complete scenes.[5] *See, e.g.,* Dkt. 1 ¶ 29 ("Gray wrote using his own tools and instruments, in his own space, set his own hours, and worked at his own pace."), ¶ 31 ("Gray also exercised decision-making and editorial authority over revisions . . ."), ¶ 32 ("Gray superintended his work by exercising creative control. . .").

PPC also suggests, based on the 1800s-era case *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884), and a case arising under the 1909 Copyright Act, *Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 970 (9th Cir. 2008), that because Gray did not superintend the *entire* Screenplay or the Film, he cannot be a joint author as a matter of law. Whatever those cases' correctness under early copyright acts, they are not the law under the 1976 Copyright Act, which grants protection to tangible forms of expression at the moment of creation. *See e.g.*, *Maurizio v. Goldsmith*, 84 F. Supp. 2d 455, 462-67 (S.D.N.Y.), *aff'd*, 230 F.3d 518 (2d Cir. 2000) (addressing and finding genuine issue of material fact as to joint authorship under the Copyright Act, despite a statute of limitations issue, where plaintiff contributed only an outline and two draft chapters of novel later adapted in a film).

PPC's other arguments fail. PPC claims, for example, that its own improper refusal to credit Gray for his work somehow defeats joint authorship, ignoring that the Complaint pleads a demand for billing because PPC wrongfully withheld it. Dkt. 1 ¶¶ 41; *id.* at 17 (¶ 14). PPC also erroneously argues the *only* inference one can draw from the absence of a work-for-hire employment agreement with Gray, when all other screenwriters executed one, is that Gray was

---

[5] Even if Gray were merely a minor consultant, *Aalmuhammed* applies the Ninth Circuit's more restrictive joint authorship test, requiring that a joint author exercise "control over the work" and be "the inventive or master mind." *Id.* at 1234. The Second Circuit has explicitly rejected such a narrow approach, recognizing that joint authorship can exist even where one party is the "dominant author." *Childress*, 945 F.2d at 508.

not a joint author. As stated, PPC employed Singer, as a key writer, and Kosinski, as the director of the Film, charged with overseeing the development of its Screenplay. Dkt. 1 ¶¶ 23, 45. Singer and Kosinski in turn enlisted Gray to co-author the Screenplay and had either the authority or apparent authority to do so. *Id.* ¶ 22. That Singer, Kosinski, and/or PPC were negligent (or worse) in failing to obtain a work-for-hire agreement, or at least an assignment from Gray, cannot be used to penalize Gray or rob him of his copyright interests.

Indeed, courts routinely find joint authorship where creative contributors worked without agreements and contributed far less than Gray did. In *Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004), Judge Posner writing for the Seventh Circuit, opined that one can be a joint author even when his "contribution *may not have been copyrightable by itself." Id.* at 661 (emphasis added). PPC's examples to the purported contrary are, like the facts of the cases from which it draws its rules of law (*Childress*, *Thomson,* and *Aalmuhammed*), wildly far afield. *See e.g., Heger v. Kiki Tree Pictures, Inc.*, 2017 WL 5714517, at *5 (C.D. Cal. July 24, 2017) ("Aerial Coordinator" on film set of *Sully* not a joint author); *Heller v. NBCUniversal*, Inc., 2018 WL 11354835 at *4 (C.D. Cal. Dec. 21, 2018) (alleged co-author whose Estate failed to timely challenge motion to dismiss third amended complaint, wrote no screenplay scenes, made only "*proposed* revisions", and submitted affidavit inconsistent with joint authorship (emphasis in original)). Such cases cited by PPC were also decided under the Ninth Circuit's more restrictive approach and do not accord with the cases decided under the Second Circuit's standard that looks not for the Ninth Circuit's "mastermind," but merely intent. *Childress*, 945 F.2d at 508.

## II.    GRAY HAS ADEQUATELY PLED INFRINGEMENT IN THE ALTERNATIVE.

In the event that, after full discovery, the Court determines Gray has failed to adduce sufficient evidence to sustain a genuine issue whether Singer, Kosinski, and/or PPC (under

principles of agency or otherwise) intended Gray to be a joint author of the Screenplay, there remains the indisputable fact that Gray wrote the Gray Scenes. Dkt. 1 ¶ 30. There further remains the indisputable fact that, even after two writers revised the Gray-Singer draft Screenplay, PPC and its director Kosinski found the Gray Scenes sufficiently compelling to include them in the Film. *Id.* Ex. 1. At a minimum, Gray therefore has a claim for copyright infringement based on PPC's unauthorized exploitation of his creative work.

PPC makes two arguments to evade this inevitable conclusion. It first argues the copyright in the Gray Scenes—which adhered when this creative work was fixed in a tangible medium of expression—just disappeared and "merged" into the Film. For this, PPC relies exclusively on *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 256-57 (2d Cir. 2015), which addressed whether a film's *director* holds a copyright in a film (while confirming that a writer does), and an unpublished report and recommendation addressing whether a film's *editor* has a copyright in the film. *Farkas v. Rich Coast Corp*., 2017 WL 10299097, at *9 (M.D. Pa. June 7, 2017), *report and recommendation adopted*, 2017 WL 10299211 (M.D. Pa. Sept. 12, 2017). Neither authority is apposite. The so called "merger" doctrine has no application to Gray's significant contributions to the Screenplay, and as confirmed by scholarly commentary and case law, it has no application to the Film.

PPC's second argument fares no better. It asks the Court to determine on a motion to dismiss that PPC has proven the affirmative defense of an implied license. *First*, no screenwriter plausibly implies a license to use substantial amounts of his material (here, *fifteen* scenes), Dkt. 1 ¶ 30, without credit or compensation. *Second*, this fact-intensive question—whether there was an implied license, and if so, its scope—cannot properly be resolved on a motion to dismiss.

16

### A.    PPC's "Merger" Defense Turns Copyright on Its Head.

PPC argues that if the Screenplay is not a joint work, Gray has no copyright interest in the pivotal Gray Scenes it exploited without any rights thereto because they "merged" into the Screenplay and/or the Screenplay "merged" into the Film, and copyright protection in his significant literary work simply disappeared. That proposition has no support in case law and is, *at best*, an open question that to answer in the affirmative would effectively write screenplays— at least those good enough to be made into a film—out of the Copyright Act. *See Thompson v. Larson*, 147 F.3d 195, 205-06, n.30 (2d Cir. 1998) (leaving open the question of what copyright interest a person who makes a copyrightable contribution to co-created work, retains in the absence of a joint work, a work-for-hire agreement or explicit contractual assignment of his work) (citing 17 U.S.C. § 201(d); *Childress*, 945 F.2d at 509); *Marshall v. Marshall*, No. 08-CV-1420 LB, 2012 WL 1079550, at *13 n.27 (E.D.N.Y. Mar. 30, 2012), *aff'd*, 504 F. App'x 20 (2d Cir. 2012) (same); *Kwan v. Schlein*, No. 05-CV-0459-SHS-JCF, 2009 WL 10678967, at *5 n.5 (S.D.N.Y. Apr. 23, 2009) (rejecting defendants' argument that plaintiff "can only retain a copyright if the material she claims to have written was 'created independently from the contribution of the author of the rest of the work.' This misinterprets the case law....*Thomson* specifically leaves open the point at which a person's rewriting of a work is so extensive that it in fact counts as original work."). *See* Sarah Polcz, *Co-Creating Equality*, 96 S. Cal. L. Rev. 607, 663 (2023).[6]

PPC relies on *16 Casa Duse, LLC v. Merkin*, where the Second Circuit held that, on the facts of the case, *a director's* creative contributions to a film did not merit copyright protection.

---

[6] If, contrary to the other district courts within the Second Circuit, the Court were to accept this position and destroy Gray's property interest in his creative work, he requests leave to amend to plead unjust enrichment.

791 F.3d at 256-57. As an initial matter, *Merkin* itself acknowledged that "[o]ur conclusion in the present case does not suggest that motion picture directors such as Merkin may never achieve copyright protection for their creative efforts. The director of a film may, of course, be the sole or joint author of that film, such that she or he can secure copyright protection for the work." *Id.* at 258. Only after discovery and summary judgment practice did the Second Circuit resolve this fact-intensive issue "on the facts of the present case." *Id.* at 250-51, 254. *See also Maurizio v. Goldsmith*, 84 F. Supp. 2d at 466-68 (denying summary judgment against infringement claim brought in the alternative by co-writer of novel against principal author; "While [plaintiff's] ideas and suggestions are not copyrightable, language which she produced as a tangible form of expression (in the outline or draft chapters) and which was intended to and did indeed merge with [defendant]'s work in [the book] may be copyrightable ….[T]he question of whether the language was independently created by [plaintiff] is disputed, and thus one for the trier of fact."), *aff'd*, 230 F.3d 518 (2d Cir. 2000), *on remand*, 2001 WL 1568428, at *3 (S.D.N.Y. Dec. 5, 2001) (denying "summary judgment as to the copyright infringement claim" where "question of fact remains as to whether the draft chapters were jointly authored").

The real problem with PPC's reliance on *Merkin* is not just its highly fact-dependent inquiry, however. It is that *Merkin* has nothing to do with the *authors* of a *screenplay*. It concerned a film's director, someone who does not write but instead contributes only that creativity inherent in directorial choices, such as "camera angles and lighting" and "wardrobe and makeup" that are not otherwise inherently copyrightable. *Id.* at 251. Gray, however, is a writer, who actually wrote many of the pivotal scenes in the Screenplay that were later used in the Film. *Merkin* nowhere suggests an author of a screenplay lacks copyright protection simply because a film is made of it. To the contrary, the Court wrote: "'[A] motion picture would

normally be a joint [] work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of coownership from coming up.'" *Id.* at 257 (quoting H.R.Rep. No. 94-1476, at 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736). In addition to buttressing Gray's claim that he is a joint author of not only the Screenplay but the Film, this statement confirms that, when more than one writer substantially contributes to a screenplay, Congress intended those writers, like Gray, who are not an "employee[] for hire" to enjoy all the benefits of copyright protection. *Merkin* was about not extending the privileges of copyright to every crew member of a film (be it the director, set designer, key grip, wardrobe assistant) who makes an arguably creative contribution. The "making Swiss cheese of copyrights" that *Merkin* wished to avoid has no application to a writer who co-authored substantial portions of a literary work. *Id.* at 258. PPC's attempt to stretch this holding should be rejected.

**B.    PPC's Affirmative Defense of an Implied License Cannot Be Resolved On a Motion to Dismiss.**

"The existence of a license to engage in the challenged copying is 'an affirmative defense to a claim of copyright infringement…that the alleged infringer must plead and prove.'" *McGucken v. Newsweek LLC*, 2022 WL 836786, at *6 (S.D.N.Y. Mar. 21, 2022) (quoting *Sohm v. Scholastic Inc.*, 959 F.3d 39, 48 (2d Cir. 2020)). "While a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense," this is rare because the defense must "appear[] on the face of the complaint"; that is, "the complaint itself [must] establish[ ] the facts necessary to sustain defendant's defense." *Capitol Recs., Inc. v. MP3tunes, LLC*, 2009 WL 3364036, at *3 (S.D.N.Y. Oct. 16, 2009) (internal quotation marks and citations omitted). Here, taking Gray's allegations as true, no implied license was conveyed and, were one assumed *arguendo*, PPC far exceeded its scope. Even if Gray impliedly authorized

Singer and/or Kosinski to submit the Gray-Singer draft Screenplay to PPC, it does not follow (and is counterintuitive) that Gray authorized PPC to exploit his fifteen scenes in its blockbuster Film for no compensation or credit.

The standards governing an implied license (discussed *infra*) reflect just how fact-intensive and unsuitable it is for decision on a motion to dismiss. Furthermore, even if the inherent questions of fact were capable of resolution on a motion to dismiss (they are not), PPC's affirmative defense fails as a matter of law. According to PPC, Gray had no direct contact with it. Dkt. 21 at 13. Thus, the implied license it asserts could only have been to Singer or Kosinski. Implied licenses are necessarily non-exclusive because they are not written, 17 U.S.C. §§ 101, 204(a), and non-exclusive licenses are not transferrable. *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 240-41 (Bankr. S.D.N.Y. 1997) ("Accordingly, the nonexclusive license is personal to the transferee, and the licensee cannot assign it to a third party without the consent of the copyright owner."); *Ariel (UK) Ltd. v. Reuters Grp. PLC*, 2006 WL 3161467, at *6 n.8 (S.D.N.Y. Oct. 31, 2006), *aff'd,* 277 F. App'x 43 (2d Cir. 2008) ("Under the 1976 Act,…the result is the same: a non-exclusive license holder cannot assign the license unless expressly authorized to do so.").

"Although the Second Circuit has 'not yet ruled on the precise circumstances under which an implied non-exclusive license will be found,' *at minimum* there must be a 'meeting of the minds between the parties *to permit the particular usage at issue*.'"[7] *Graham v. Prince*, 2023 WL 3383029, at *23 (S.D.N.Y. May 11, 2023) (emphasis added) (quoting *ABKCO Music, Inc. v.*

---

[7] The absence of a meeting of the minds as to an implied license (e.g., "use my work for free") is not factually inconsistent with a meeting of the minds on joint authorship (e.g., "we will write this together"). Regardless, Gray pled his claims in the alternative, as he is plainly allowed to do. *Elliott,* 2025 WL 486634, at *10 (refusing to dismiss alternative claims for sole and joint authorship); *Johnson v. Arista Holding, Inc*., No. 05 CIV. 9645 (LBS), 2006 WL 3511894, at *5 (S.D.N.Y. Dec. 5, 2006) (denying summary judgment where plaintiff alleged "joint authorship and copyright infringement as alternative grounds for relief"); *Maurizio*, 84 F. Supp. 2d at 467 (same).

*Sagan*, 50 F.4th 309, 320 (2d Cir. 2022)) (denying motion for summary judgment). The "two

potential tests" include "a narrow test, finding an implied license only where one party 'created a

work at the other's request and handed it over, intending that the other copy and distribute it,'

and 'a more permissive test by which consent may be inferred based on silence where the

copyright holder knows of the use and encourages it.'" *Concannon v. LEGO Sys., Inc.*, 2023 WL

2526637, at *6 (D. Conn. Mar. 15, 2023) (quoting *ABKCO*, 50 F.4th at 320). At this stage,

however, the court must "[t]ak[e] Plaintiff's factual allegations about his own understanding and

knowledge as true, [and] cannot conclude that there was a 'meeting of the minds' on how [his

work] would be used[.]" *Id.* at *7. Indeed, "an implied license to use a copyrighted work 'cannot

arise out of the unilateral expectations of one party.'" *Jose Luis Pelaez, Inc. v. McGraw-Hill*

*Global Education Holdings LLC*, 399 F. Supp. 3d 120, 142 (S.D.N.Y. 2019) (quoting *Design*

*Options, Inc. v. BellePointe, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996)).

     Dismissal is also generally unavailable "when the contested issue is the scope of a[n

implied] license, rather than the existence of one…." *Neu Prods. Inc. v. Outside Interactive, Inc.*,

2024 WL 1161498, at *4 (S.D.N.Y. Mar. 19, 2024) (denying summary judgment where plaintiff

admitted existence of implied license for airing of show but issue remained whether streaming

networks were authorized) (quoting *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998), citing

*Bayoh v. Afropunk Fest 2015 LLC*, 2020 WL 229978, at *5 (S.D.N.Y. Jan. 15, 2020) (denying

summary judgment due to genuine dispute of material fact as to the scope of a license)).

     Nowhere in its Motion does PPC point to facts establishing—let alone conclusively

establishing as a matter of law—anything more than its unilateral view of what it believes it was

and is permitted to do under a nonexistent license. *See Design Options, Inc.*, 940 F. Supp. at 92.

PPC's strenuous attempt to fashion this defense by pointing to alternatively pled allegations is

also frivolous. "It is black letter law that a complaint may plead in the alternative." *Walker v. Carter*, 2014 WL 4363956, at *2 (S.D.N.Y. Sept. 3, 2014) (quoting *Astroworks v. Astroexhibit, Inc.,* 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003)) (denying motion to dismiss over use of copyrighted logo: "Taking the facts as Plaintiff alleged them to be true, even if an implied license existed, there certainly is a question as to the scope of Plaintiff's intent.").

Finally, with no substantive analysis, PPC baldly asserts "the 'Gray Scenes' borrow heavily from PPC's original 1986 *Top Gun* film" as well as "earlier treatments" for the sequel Film. Dkt. 21 at 22. But stating that Gray's original expression is pervaded by one or more preexisting works does not make it so. Rather, as PPC admits, Dkt. 21 at 27, it would need to establish "as a matter of law, that the purportedly cribbed portions so 'pervade' the [Gray Scenes] that they render them completely unprotected under the Copyright Act." *Wolf v. Travolta*, 167 F. Supp. 3d 1077, 1090-91 (C.D. Cal. 2016) (denying summary judgment on issue of whether derivative work was lawful) (citation omitted); *see also JBJ Fabrics, Inc. v. Brylane, Inc.*, 714 F. Supp. 107, 110 (S.D.N.Y. 1989) ("even if plaintiff's use of the underlying design were unlawful, it would be entitled to protection for its original contributions absent some showing by defendant that the unlawful use pervaded the entire work.").[8]

Perhaps most importantly, for the same reason there are issues of fact concerning whether the Film's director, Kosinski, and key screenwriter, Singer, had apparent authority under agency

---

[8] PPC's string cites, Dkt. 21 at 27, are equally inapposite, including its citation to dicta in a footnote in *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 n.6 (2d Cir. 1982). In *Keeling v. Hars,* 809 F.3d 43, 51 n.8 (2d Cir. 2015) the Second Circuit rejected the "argument that [prior] material improperly 'pervade[d]' the [plaintiff's] script in contravention of *Eden Toys*", noting that "[t]o the extent it even applies in this case, which is uncertain, *Eden Toys* requires merely 'some substantial, not merely trivial, originality' to meet the standard for sufficient originality.") (quoting *Eden Toys*, 697 F.2d at 34). The Gray Scenes far exceed this threshold.

principles to bind PPC for purposes of Gray's joint authorship claim, discussed *supra*, there is a factual issue whether Kosinski and/or Singer had the apparent authority to recruit and permit Gray to work on the Screenplay, which cannot be resolved on a motion to dismiss.

Lastly, "an implied license is revocable[] where no consideration has been given for the license." *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997). And "regardless of whether there was an implied license…it has been revoked by the filing of this lawsuit." *Concannon*, 2023 WL 2526637, at *8 (holding that "implied licenses are revocable by definition" and that "by filing this action, Plaintiff has revoked any implied license that may have existed prior to the lawsuit. As such, Defendant cannot show that there is *now* an implied license, and as Plaintiff has alleged that distribution of the [work] continues, he has plausibly alleged a copyright infringement claim.") (emphasis in original) (citing *Ortiz v. Guitian Music Bros.*, 2009 WL 2252107, at *4 (S.D.N.Y. July 28, 2009)). Both facts sufficient for revocation exist here. *See* Dkt. 1 ¶¶ 28, 36-37, 62.

## **CONCLUSION**

For the foregoing reasons, Gray respectfully requests that the Court deny PPC's Motion in its entirety and bring this case to a just resolution.

Dated:   June 23, 2025                    TOBEROFF & ASSOCIATES, P.C.

                                        */s/ Marc Toberoff*
                                        Marc Toberoff
                                        23823 Malibu Road, Suite 50-363
                                        Malibu, CA 90265
                                        Telephone: (310) 246-3333
                                        Facsimile: (310) 246-3101

                                        *Attorneys for Plaintiff Shaun Gray*

## <u>CERTIFICATION</u>

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum of Law contains 7,861 words, calculated using Microsoft Word, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. The foregoing Memorandum of Law is also 23 double-spaced pages, and it therefore complies with Rule 2(e) of this Court's Individual Rules of Practice.

Dated:   June 23, 2025

*/s/ Marc Toberoff*
Marc Toberoff
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff Shaun Gray*