**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAUN GRAY, an individual, | |
| Plaintiff, | Case No. 1:25-cv-03484-JSR |
| v. | |
| PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation; and DOES 1-10, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO COMPEL DISCLOSURE OF COMMUNICATIONS BETWEEN
PLAINTIFF AND NON-PARTY WRITER'S GUILD OF AMERICA**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 3

    A. Factual Background ..................................................................................... 3

    B. Procedural Background ................................................................................ 6

III. LEGAL STANDARD ........................................................................................ 8

IV. ARGUMENT ..................................................................................................... 9

    A. Gray's Communications With WGA Are Relevant To Support Paramount's Estoppel, Express License, And Implied License Defenses And To Show That Gray Lacks Independent Copyright Protection Over The Gray Scenes. ...................... 9

    B. Neither Gray Nor WGA Can Meet Their Burden Of Proving That Gray's Communications With WGA Are Privileged. .......................................................... 13

        1. Gray And WGA's Assertion That WGA Holds An Attorney-Client Privilege In Its Communications With Gray Is Baseless. ........................ 13

        2. Gray Agreed To Produce The Documents At Issue, And Otherwise Lacks Standing To Assert A Privilege On Behalf Of WGA. .................. 19

    V. CONCLUSION ................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*16 Casa Duse, LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015)................................................................. 11

*ABKCO Music, Inc. v. Sagan*,
   50 F.4th 309 (2d Cir. 2022) ........................................................... 10, 11

*Arcuri v. Trump Taj Mahal Associates*,
   154 F.R.D. 97 (D.N.J. 1994) .......................................................... 16, 17

*Belcastro v. United Airlines, Inc.*,
   2021 WL 1531601 (N.D. Ill. Apr. 19, 2021) .......................................... 16

*Carnegie Inst. of Washington v. Pure Grown Diamonds, Inc.*,
   481 F. Supp. 3d 276 (S.D.N.Y. 2020) ....................................... 12, 13, 14

*Chevron Corp. v. Donziger*,
   296 F.R.D. 168 (S.D.N.Y. 2013)............................................................6

*DeCarlo v. Archie Comic Publications, Inc.*,
   127 F. Supp. 2d 497 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001)................................... 9

*Graham v. James*,
   144 F.3d 229 (2d Cir. 1998).................................................................. 10

*Hernandez v. Office of the Commissioner of Baseball*,
   331 F.R.D. 474 (S.D.N.Y. 2019) ..................................................... 15, 16

*In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*,
   347 F.R.D. 1 (S.D.N.Y. 2024).......................................................... 8, 12

*In re County of Erie*,
   473 F.3d 413 (2d Cir. 2007).......................................... 8, 12, 13, 14

*In re Sarrio, S.A.*,
   119 F.3d 143 (2d Cir. 1997)................................................................. 18

*In re von Bulow*,
   828 F.2d 94 (2d Cir. 1987)................................................................... 15

*In re YS GM MARFIN II LLC*,
   2022 WL 624291 (S.D.N.Y. Mar. 2, 2022) ........................................... 8

*Keane Dealer Servs., Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997) ........................................................ 9

*Latour v. Columbia Univ.*,
   12 F. Supp. 3d 658 (S.D.N.Y. 2014)..................................................... 10

*Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
   2020 WL 7239615 (S.D.N.Y. Dec. 9, 2020) ....................................... 16

*Nat'l Day Laborer Org. Network v. United States Immigr. & Customs Enf't*,
   486 F. Supp. 3d 669 (S.D.N.Y. 2020).............................................. 8, 12

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Safeco Ins. Co. of Am. v. M.E.S., Inc.*,
    289 F.R.D. 41 (E.D.N.Y. 2011) ................................................................. 8

*United States v. Martoma*,
    962 F. Supp. 2d 602 (S.D.N.Y. 2013) ................................................. 15, 18

*Upjohn Co. v. United States*,
    449 U.S. 383 (1981) ................................................................................. 8

**Rules**

Fed. R. Civ. P. 26(b)(1) ................................................................................. 7

## I.  INTRODUCTION

Plaintiff Shaun Gray advances a single claim for copyright infringement against Defendants Paramount Pictures Corporation ("PPC"), Paramount Global, and Paramount Streaming Services, Inc. (collectively, "Paramount"),[1] arising from Gray's allegation that Paramount's 2022 film *Top Gun: Maverick* "substantially incorporates" without permission certain "scenes" Gray purportedly authored.  Compl., ECF No. 1 ¶¶ 57, 61–62.  In his Complaint, Gray alleges that he worked on the screenplay for *Maverick* at the invitation of his cousin, screenwriter Eric Singer, but that "Gray never entered into a work-made-for-hire agreement or any other written contract with PPC, Singer, or any other person or entity concerning his written contributions to the Screenplay," and that "Gray's written contributions to the Screenplay were not made as an employee of either Singer or PPC."  *Id.* ¶¶ 4, 28–29.[2]  But, in 2023, Gray made contradictory claims about his alleged work on *Maverick* in communications with the Writer's Guild of America ("WGA").  Specifically, far from claiming copyright infringement, Gray conceded that the scenes he allegedly wrote were intended to be included in *Maverick*, and that he had entered into an agreement with Singer allowing for the use of Gray's contributions (with Singer purportedly promising that Gray would receive a credit as well as a portion of Singer's compensation from Paramount).  Remarkably, however, Gray now seeks to

---

[1] On July 30, 2025, the Court dismissed with prejudice Gray's "joint authorship and ownership claim, as well as his related claim for an accounting."  ECF No. 29 at 2.

[2] While the Complaint does not admit as much, in 2015, Singer and Gray entered into a written agreement memorializing that Gray was employed as "an assistant for Eric Singer" and Singer's company, Bullsh!t Artists, Inc., and that Gray would "not acquire any rights of any kind or nature in or to any materials" that he worked on for Singer.  Declaration of Molly M. Lens ("Lens Decl."), Ex. B (Oct. 6, 2015 Agreement (the "Gray-Singer Agreement") (SINGER-GRAY-0013155)).

hide the evidence of his prior inconsistent statements behind WGA's strained assertion of the attorney-client privilege.

Paramount thus moves to compel the production of communications between Gray and/or his lawyer Matthew Saver on the one hand, and non-party WGA, on the other, relating to Gray's 2023 claims to WGA. It is undisputed that these communications are relevant to the issues in this case. It is also undisputed that Plaintiff willingly disclosed these communications to WGA. Indeed, on a call on Friday, July 25, Gray's counsel agreed to produce all communications between Gray and WGA, confirming Gray's waiver of any privilege that Gray may have otherwise asserted.

But five days later, Gray reneged, and now refuses to produce the communications on the basis that *WGA* holds an unspecified "WGA privilege." *See* Lens Decl., Ex. A (Aug. 1, 2025 Email from M. Toberoff to M. Lens, S. Graham); *id.*, ¶ 5. Despite this assertion, Gray has not provided a privilege log for these withheld documents. WGA, for its part, asserts that it holds an "attorney-client privilege" in emails between its lawyers and Gray (or Gray's counsel). It does not. The communications satisfy none of the elements that WGA must prove to invoke the attorney-client privilege: the communications were not kept confidential (in oral conversations and in an email, WGA revealed their contents to an adverse party, Eric Singer); the communications were not made for the purpose of soliciting or providing legal advice (Gray lodged a complaint about Singer's alleged misconduct, not a request for legal advice); and, critically, *WGA's attorneys were not acting as counsel to Gray*—they were investigating allegations of misconduct raised by one WGA member (Gray) against another WGA member (Singer).

Despite Paramount's repeated requests for substantiation to Gray and WGA, neither Gray nor WGA has proffered *any* legal authority showing that such a privilege exists. None does. The Court should issue an order: (1) compelling Gray and his attorney, Saver—or alternatively, WGA—to produce the 24 emails that WGA lists as attorney-client-privileged in its privilege log, and any other such communications between WGA and Gray (including his agents) that may have been withheld on that basis; and (2) directing Gray and WGA to cease their efforts to prevent Paramount from obtaining discovery into these probative, unprivileged communications. It is crucial that Gray, or WGA, produce these communications in advance of Paramount's forthcoming deposition of Gray, which is anticipated to take place during the last week of August.[3]

## II.  BACKGROUND

### A.  Factual Background

After many years of development, in 2022, Paramount released the film *Top Gun: Maverick* ("*Maverick*"). Compl. ¶¶ 2, 25. Gray alleges that after Paramount hired non-party Eric Singer as a screenwriter for *Maverick* in 2017, Singer asked Gray to "contribute his talents as a writer to the Screenplay" and "join [Singer]" in writing it, and that Gray worked with Singer on the screenplay between June and November of 2017. Compl. ¶¶ 4, 20, 22, 24, 27.

Singer was credited as one of three screenwriters on *Maverick*; Gray was not billed or credited at all. Compl. ¶¶ 34, 50. The decision regarding who would receive writing credits for

---

[3] Unfortunately, it does not appear that the deposition will occur until the last week of August. Indeed, even leaving WGA communications aside, Gray's productions remain incomplete, though, per court order, Gray is to complete them today. In addition, Gray's counsel, Marc Toberoff, has represented that he is travelling on a family vacation during the weeks of August 11 and 18, and will not agree to have Gray deposed either week. Paramount has asked repeatedly for Gray's counsel to confirm Gray's deposition on August 25 or 26, but continues to await a substantive response.

work on *Maverick* was made by WGA via a credit arbitration in 2020, pursuant to WGA's collective bargaining agreement.  Lens Decl., Ex. C (Jan. 23, 2023 Statement from Shaun Gray to Paramount (PPC-GRAY-0085467 at -0085470)); *id.*, Ex. O (Feb. 21, 2023 Letter from K. Christovich to Shaun Gray (WGAW 3760)).  Gray, who was a WGA member[4] *and* represented by counsel at the time, was aware as of 2019 that the "WGA credit arbitration [for *Maverick*] was soon to get underway," but he chose not to submit a claim in the WGA arbitration.  Lens Decl., Ex. C (Jan. 23, 2023 Statement from Shaun Gray to Paramount (PPC-GRAY-0085467 at -0085470)).

Years later, on January 23, 2023, Gray approached Paramount for the first time regarding *Maverick*, asserting in a nine-page list of grievances that he had entered into a "good faith verbal agreement" with Singer, that pursuant to such "agreement" Gray had written a substantial portion of the screenplay, and that Singer had violated the terms of the agreement by failing to ensure that Gray was credited as a writer, and by failing to pay Gray certain purportedly agreed-upon compensation.  *Id.* at -0085467.  On or around the same day, Gray sent what *appears* to be a similar complaint about Singer to WGA.  Lens Decl., Ex. D (Jan. 27, 2023 Email from M. Plonsker to A. Segall (SINGER-GRAY-0013164 at -0013165)).  Critically, while Paramount anticipates the complaints were substantially the same, Paramount cannot be sure, since the documents submitted to WGA have been withheld from Paramount.

---

[4] Even though Gray became a WGA member on August 31, 2019, Gray attempted to claim otherwise in his January 23, 2023 statement to Paramount, suggesting that he did not submit a claim in the credit arbitration for *Maverick* because Singer was Gray's "boss on a different project . . . and [he] needed to stay employed there to accrue enough [experience] to join the WGA."  Lens Decl., Ex. C (Jan. 23, 2023 Statement from Shaun Gray to Paramount (PPC-GRAY-0085467, at -0085470)). That timeline is false: the *Maverick* credit arbitration did not conclude until March 2020, more than six months after Gray became a WGA member.  Lens Decl., Ex. O (Feb. 21, 2023 Letter from K. Christovich to Shaun Gray (WGAW 3760)).

And to be clear, Gray's narrative has been highly inconsistent over time, making it especially important that Paramount receive discovery into all such communications. Between January 23 and February 23, Gray and his lawyer, Matthew Saver, exchanged 24 emails with WGA regarding Gray's complaint about Singer. Lens Decl., Ex. E (WGAW Priv. Log) at 1–4. None of these emails have been produced. Gray and Saver also had oral conversations with WGA representatives. Lens Decl. ¶ 2. Paramount seeks deposition testimony on these conversations.

On February 21, 2023, WGA informed Singer—and later, Gray—that it had decided that it would not reopen the 2020 credit arbitration for *Maverick* in response to Gray's allegations against Singer. *Id.*, Ex. M (Feb. 21, 2023 Email from A. Segall to M. Plonsker (SINGER-GRAY-0013175 at -0013176)). In response to Gray's request that "the [WGA] determine whether there was a claim to be made under the WGA collective bargaining agreement . . . based on the assertion that [Gray] performed writing services on . . . [*Maverick*]," WGA informed Gray "that there is no viable claim the Guild could bring." Lens Decl., Ex. O (Feb. 21, 2023 Letter from K. Christovich to Shaun Gray (WGAW 3760)). WGA based its decision on, *inter alia*: (1) the fact that Gray was admitted to membership in WGA "on August 31, 2019, based on writing employment on another project, but did not refer to [his] alleged employment on [*Maverick*] as part of that application process"; and (2) a text message from Gray to Singer on November 8, 2019, where Gray "refers to the credit determination for [*Maverick*], but doesn't raise the contention that [he] performed writing services or should have been considered a participating writer on the project." *Id.*; *see also id.*, Ex. P (WGAW 3763 (S. Gray's May 16, 2019 "Application for Current Membership")). Indeed, discovery has also shown that Gray—who again was represented by counsel at the time—learned about the 2020 credit arbitration for

5

*Maverick* before it occurred, but intentionally decided "*to stay silent*" rather than file a claim. Lens Decl., Ex. D (Jan. 30, 2023 Email from A. Segall to M. Plonsker (SINGER-GRAY-0013164)).

### B. Procedural Background

In response to Paramount's requests for production of documents, Gray agreed to produce "Communications Concerning any [WGA] credit arbitration Concerning [*Maverick*] and/or [the] Screenplay," and "All Communications . . . with . . . the [WGA]," subject to various objections. Lens Decl., Exs. F (Def.'s May 12, 2025 RFPs) &. G (Pl.'s Responses to Def.'s RFPs 7 & 12).

To ensure that Paramount received a complete set of documents, Paramount also served a subpoena on WGA, requesting production of "[a]ll Documents Concerning any claim or request by Shaun Gray for writing credit, including Concerning *Top Gun: Maverick* . . . , Including Communications with Gray." Lens Decl., Ex. H (June 11, 2025 Subpoena to WGA) at 6.[5] WGA refused to produce such communications, but subsequently served on Paramount a privilege log listing the 24 emails with Gray, and asserting that they are all shielded by the attorney-client privilege. *Id.*, Ex E. (WGAW Priv. Log) at 1–4. WGA also refused to produce 16 emails (the "Singer Emails") exchanged between Singer's attorney, Michael Plonsker, and WGA's counsel, Anthony Segall, on the basis of attorney-client privilege. *Id.* at 4–6. At the

---

[5] Paramount also subpoenaed Gray's counsel, Saver, for a deposition and to produce Gray's communications with WGA. Lens Decl., Ex. N. Paramount does not separately move to compel production of documents from Saver because the Court's ruling as to Gray's ability to shield written and oral communications will be binding on Saver—in his capacity as Gray's agent— too. *See Chevron Corp. v. Donziger*, 296 F.R.D. 168, 186 (S.D.N.Y. 2013) (holding "lawyers are agents of their clients and, therefore," a party compelled to produce documents is "obliged to produce all responsive documents in the possession, custody, or control of their . . . attorneys"). Paramount is prepared to brief the issue with respect to Saver, if briefing would be helpful to the Court.

time that WGA produced its privilege log, on August 1, WGA was aware that Singer had already produced the Singer Emails in this litigation.  Lens Decl. ¶ 3.  On a July 10, 2025 call , Segall surmised that Singer had waived any privilege by producing the Singer Emails, implying that Singer—not WGA—held a privilege in the emails.  *Id.*

On July 25, the parties met and conferred regarding certain outstanding discovery issues. Lens Decl. ¶ 4.  On that call, after extended back and forth, Gray's counsel agreed to produce Gray's communications with WGA, including in connection with Gray's 2023 grievance.  *Id.*; *see also id.*, Ex. I (July 28, 2025 Email from M. Kaiser to M. Toberoff memorializing July 25 call).  But five days later, Gray reneged, when during the parties' July 30 meet and confer, Gray's counsel stated that Gray would not produce his communications with WGA on the basis of an unspecified privilege.  Lens Decl. ¶ 5; *id.*, Ex. J (July 30, 2025 Email from M. Lens to M. Toberoff memorializing July 30 call).  However, Gray has yet to furnish a privilege log.  Lens Decl. ¶ 5.

On July 31, the parties appeared for a telephonic conference before the Court to address outstanding discovery issues, during which Gray asserted that his communications with WGA are privileged.  *Id.* ¶ 6.  The Court instructed Paramount "to either (1) move to enforce [its] related subpoena and notice or (2) jointly call chambers with a representative of [WGA]."  *Id.*, Ex. K (Minute Entry).  Gray requested a formal motion, based on conversations between Gray and WGA that Paramount was not privy to.

In a final attempt to obtain Gray's emails with WGA without further Court intervention, on August 1, counsel for Paramount emailed counsel for WGA to again request production of the emails, or to at least provide Paramount with authority to support WGA's assertion of the attorney-client privilege.  *Id.*, Ex. A (Aug. 1, 2025 Email from M. Lens to S. Graham, M.

Toberoff) at 2.  Counsel for WGA responded that "WGAW wants to brief this issue," but did provide any authority to support its assertion of privilege.  *Id.* (Aug. 2, 2025 Email from S. Graham to M. Toberoff, M. Lens) at 1.  Paramount followed up, reiterating again to Gray and WGA that they should provide any authority in support of their position, but neither Gray nor WGA responded.  *Id.* (Aug. 2, 2025 Email from M. Lens to S. Graham, M. Toberoff); Lens Decl., ¶ 9.

Having reached an impasse with both Gray and WGA, Paramount files the instant motion to compel Gray—or in the alternative, WGA—to produce all communications between Gray and WGA and for an order permitting discovery into all such communications.

### III.  LEGAL STANDARD

Under Rule 26(b)(1), a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  On a motion to compel discovery, "the movant has the burden of 'demonstrating that the information sought is relevant to the subject matter of the pending action.'"  *In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*, 347 F.R.D. 1, 9 (S.D.N.Y. 2024) ("*BM Brazil 1*") (quoting *In re YS GM MARFIN II LLC*, 2022 WL 624291, at *5 (S.D.N.Y. Mar. 2, 2022)).  The burden then shifts "to the responding party to justify curtailing discovery."  *Id.* (citation omitted).

Where the responding party asserts the attorney-client privilege, courts "construe the privilege narrowly because it renders relevant information undiscoverable[,] [and] apply it only where necessary to achieve its purpose"; *i.e.*, "to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.'"  *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (internal citation omitted) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The respondent bears a "'heavy burden' of proving that the privilege . . . applies to the

documents or communications at issue." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 693 (S.D.N.Y. 2020) (quoting *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 289 F.R.D. 41, 48 (E.D.N.Y. 2011)).

## IV.  ARGUMENT

### A.  Gray's Communications With WGA Are Relevant To Support Paramount's Estoppel, Express License, And Implied License Defenses And To Show That Gray Lacks Independent Copyright Protection Over The Gray Scenes.

Gray's communications with WGA are relevant, at minimum, to establish (1) Paramount's estoppel defense, (2) Paramount's express license defense, (3) Paramount's implied license defense, and (4) the lack of independent copyrightability over the so-called "Gray Scenes" as distinct from the screenplay draft of which they are a part.  Such evidence is therefore unquestionably "relevant to the subject matter of the pending action."  *See BM Brazil 1*, 347 F.R.D. at 9.  Indeed, neither Gray nor WGA has attempted to argue otherwise.

*First*, Gray's communications with WGA are probative of Paramount's defense of estoppel.  A copyright infringement plaintiff will be estopped from bringing an infringement claim if: (1) he "had knowledge of defendant's infringing conduct," (2) he "either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended," (3) "the defendant [was] ignorant of the true facts," and (4) the defendant "rel[ied] on plaintiff's conduct to his detriment."  *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *Lottie Joplin Thomas Tr. v. Crown Publishers, Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978)); *see also DeCarlo v. Archie Comic Publications, Inc.*, 127 F. Supp. 2d 497, 509, 511 (S.D.N.Y.), *aff'd*, 11 F. App'x 26 (2d Cir. 2001) (cartoonist estopped from claiming that comic book publisher had violated his rights in the characters he created because publisher had "the right to rely on his silence").  As applied here, Gray knew that Paramount was using the screenplay draft he

9

allegedly prepared with Singer (incorporating the Gray Scenes) to make *Maverick*; he chose to

hide his purported role in that drafting process from Paramount until long after *Maverick* was

released, knowing that Paramount believed the draft to be the sole work product of its work-

made-for-hire screenwriter Singer; and Paramount detrimentally relied on that conduct when it

used Singer's screenplay draft in making *Maverick* and invested vast sums in the film's

production, marketing, and release.

Gray's communications with WGA will bolster Paramount's assertion of estoppel. For

example, according to WGA, Gray told WGA "that he learned sometime in 2019 that principal

photography [for *Maverick*] had completed and the [WGA] was about to begin a credit

arbitration," and Gray "raised with [Singer] the issue of notifying the studio of his contribution,

but [Singer] convinced him that would be bad for the credit determination and [Gray] *agreed to

stay silent*." Lens Decl., Ex. D (Jan. 30, 2023 Email from A. Segall to M. Plonsker (SINGER-

GRAY-0013164)) (emphasis added). While Paramount has this January 30 email from WGA

because Singer produced it, additional highly relevant emails between Gray and WGA remain

unproduced. Put simply, communications demonstrating Gray's longstanding deception of

Paramount as to his alleged authorship role, as he laid in wait for years while Paramount racked

up expenses and invested in making *Maverick* the blockbuster success it would later become, are

unquestionably relevant to Paramount's dispositive estoppel defense.

*Second*, Gray's communications with WGA are probative of Paramount's independently

dipositive defense that Gray expressly licensed any work he performed on the *Maverick*

screenplay to Singer, and by extension, to Paramount. "A license is a complete defense to a

claim for copyright infringement." *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 661

(S.D.N.Y. 2014). Unlike other transfers of copyright interests, a non-exclusive license can be

granted orally without any requirement that it be memorialized in writing. *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998).

In the statement that Gray submitted to Paramount on January 23, 2023, Gray asserted that he had entered into a "good faith verbal agreement with [Singer] for the project 'Top Gun: Maverick' in which [Singer] guaranteed that [Gray] would be credited for [Gray's] writing and paid the lesser portion of a 60/40 split of all residuals." Lens Decl., Ex. C (Jan. 23, 2023 Statement from Shaun Gray to Paramount (PPC-GRAY-0085467)). Gray further asserted that he had contributed to the *Maverick* screenplay pursuant to this "agreement," but that Singer had breached his own obligations. *Id.* If true, this destroys Gray's claims against Paramount, because it establishes that Gray *expressly* authorized the use of his materials in the screenplay and the film, and Gray's only remedy is a breach of contract claim against Singer.

Gray will undoubtedly seek somehow to evade the impact of his own prior inconsistent statements. It is thus critical that Paramount receive the communications between Gray and WGA, as those communications will likely bear on the existence and terms of the purported "verbal agreement."

*Third*, even if Gray could somehow evade the impact of his own admissions regarding the existence of an express agreement governing the use of his materials in *Maverick*, the communications between Gray and WGA are also highly relevant to Paramount's *implied license* defense. A non-exclusive license also can be implied through conduct without any express agreement among the parties. *Graham*, 144 F.3d at 235. The Second Circuit has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," but it has pointed to two possible tests. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (cleaned up). One is a "narrow test," whereby courts will "find[] an implied license only where

[i] one party created a work at the other's request and [ii] handed it over, [iii] intending that the other copy and distribute it." *Id.* (cleaned up).  The other is a "more permissive test" whereby "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id.* (cleaned up).

Here, Paramount will establish that Gray granted Singer (and Paramount, as a third-party beneficiary) an implied license to use Gray's work in Singer's interim screenplay draft and ultimately in *Maverick* (to any extent it is copyrightable at all).  Gray's currently-withheld communications with WGA are highly relevant to such defense.  For example, Paramount anticipates that Gray's withheld communications with WGA will underscore that Gray fully intended that his purported scenes be turned over to Paramount and used in the ultimate motion picture.  As another example, evidence that Gray was aware that the WGA credit arbitration for *Maverick* was about to begin, but that he never submitted a claim in the arbitration, is highly probative of the fact that Gray "kn[ew] of [Paramount's] use [of the *Maverick* screenplay, including material from Singer's draft] and encourage[d] it," and remained "silent" rather than assert a claim of ownership in the WGA credit arbitration.  *See ABKCO Music, Inc.*, 50 F.4th at 320.  Indeed, Gray's revelation to WGA that, as of 2019, he knew about the credit arbitration for *Maverick* but decided to "stay silent" rather than "notify[] the studio of his contribution" is a clear example of the type of crucial supporting documents Paramount expects to find in the withheld production.  Lens Decl., Ex. D (Jan. 30, 2023 Email from A. Segall to M. Plonsker (SINGER-GRAY-0013164)).  Gray's communications with WGA almost certainly address Gray's silence in the face of the upcoming 2020 WGA credit arbitration for *Maverick*, as well as the broader context in which Gray allegedly ended up contributing to *Maverick*'s screenplay, and are therefore relevant to Paramount's implied license defense.

*Fourth*, Gray's communications with WGA are anticipated to underscore that Gray's "basic intention behind the writing of the [so-called Gray Scenes] was for motion picture use"; that Gray himself viewed the Gray Scenes as inseparable contributions integrated into a single unitary work; and therefore, that under *16 Casa Duse, LLC v. Merkin*, Gray is not entitled to independent copyright protection. 791 F.3d 247, 257 (2d Cir. 2015). Paramount anticipates that Gray's communications with WGA will be probative of Gray's intent behind writing the so-called Gray Scenes and the way in which Gray envisioned his purported contributions fitting into the broader film and/or the screenplay for it. Accordingly, the withheld communications are relevant for a third, independent reason.

**B. Neither Gray Nor WGA Can Meet Their Burden Of Proving That Gray's Communications With WGA Are Privileged.**

Because Paramount has established that Gray's communications with WGA are relevant, the burden shifts to Gray and WGA "to justify curtailing discovery." *BM Brazil 1*, 347 F.R.D. at 9. Gray's sole basis for withholding his communications with WGA is the entirely conclusory statement that they are shielded by a "WGA privilege [that is] well-known in the entertainment industry." Lens Decl., Ex. A (Aug. 1, 2025 Email from M. Toberoff to M. Lens, S. Graham). WGA asserts that it holds an attorney-client privilege in its communications with Gray. *Id.*, Ex. E (WGA Priv Log). Neither Gray nor WGA can carry the "heavy burden" to establish that the emails are privileged. *Nat'l Day Laborer Org.*, 486 F. Supp. 3d at 693. To the contrary, WGA's and Gray's assertion of privilege has been nebulous and shifting, but always unsupported.

*1. Gray And WGA's Assertion That WGA Holds An Attorney-Client Privilege In Its Communications With Gray Is Baseless.*

The emails listed on WGA's privilege log, and related communications between Gray and WGA, are not protected by the attorney-client privilege. That privilege protects only "confidential communications between client and counsel made for the purpose of obtaining or

providing legal assistance." *In re Cnty. of Erie*, 473 F.3d at 418. The party invoking the

privilege "must show (1) a communication between client and counsel that (2) was intended to

be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing

legal advice." *Id.* at 419. As is typical when a plaintiff withholds documents, "[D]efendant[]

argue[s] from a position of partial ignorance, having not seen the [withheld] material." *See*

*Carnegie Inst. of Washington v. Pure Grown Diamonds, Inc.*, 481 F. Supp. 3d 276, 278

(S.D.N.Y. 2020) (Rakoff, J.). But the objective facts demonstrate that WGA fails to establish

that its communications with Gray are privileged.

      *First*, the emails Gray and his lawyer exchanged with WGA's in-house counsel were

neither "between client and counsel" nor "made for the purpose of obtaining or providing legal

advice," *id.*, because WGA and its lawyers *did not represent Gray*, and *Gray did not request or*

*receive legal advice from WGA*. To the contrary, Gray—who was represented by his own

lawyer, Saver—wrote to WGA to lodge a complaint against Singer. Lens Decl., Ex. D (Jan. 27,

2023 Email from M. Plonsker to A. Segall (SINGER-GRAY-0013164 at -0013165)) (Singer's

attorney states: "Could you please send me a copy of what Shaun Gray or his attorney sent to the

WGA. It will help us in providing you with the information/documents necessary to respond to

his claims."). WGA's counsel Segall then divulged the substance of Gray's claims to Singer's

attorney. *Id.* (Jan. 30, 2023 Email from A. Segall to M. Plonsker (SINGER-GRAY-0013164)).

And when Singer provided information to WGA rebutting Gray's claims, Segall responded:

"Thanks for your letter and accompanying documentation. All very helpful. We are obviously

going to go *back to Gray and his lawyer and ask some hard questions*." *Id.*, Ex. L (Feb. 7, 2023

Email from A. Seagall to M. Plonsker (SINGER-GRAY-0013166)) (emphasis added). Segall's

statement that he would ask "Gray and his lawyer . . . some hard questions" demonstrates that

WGA was interrogating Gray's and his lawyer's claims about Singer; not representing Gray or providing him with legal advice.

*Second*, even if these were communications between a client and his lawyer—and they were not—the communications were not "intended to be and [] in fact kept confidential." *In re Cnty. of Erie*, 473 F.3d at 418. Gray certainly did not intend his communications to be confidential; he lodged his complaint about Singer with WGA in the apparent hope that WGA would reprimand Singer for allegedly lying to Gray about receiving credit for *Maverick*, and file a claim arising from Gray's allegations against Singer. And Gray sent a related statement of grievances about Singer to Paramount on or around the same day, demonstrating that he had no intention of keeping his quarrel with Singer confidential. Lens Decl., Ex. C (Jan. 23, 2023 Statement from Shaun Gray to Paramount (PPC-GRAY-0085467 at -0085470)).

Nor did WGA intend and "in fact ke[ep] confidential" Gray's communications. *In re Cnty. of Erie*, 473 F.3d at 418. When a party divulges privileged information to "a counterparty with which it shared no legal interest at that time, [the party] waive[s] the attorney-client privilege." *Carnegie Inst. of Washington*, 481 F. Supp. 3d at 279. That is what happened here. As noted above, Segall divulged the substance of Gray's claims against Singer to Singer's attorney. And when WGA ultimately resolved not to assert a claim "related to [Gray's] allegation that he performed writing services on *Top Gun: Maverick*," WGA informed Singer of its decision before it informed Gray. Lens Decl., Ex. M (Feb. 21, 2023 Email from A. Segall to M. Plonsker (SINGER-GRAY-0013175 at -0013176)). Informing Singer—to whom Gray was adverse—of WGA's decision before informing Gray is hardly the kind of conduct one might expect of WGA if it truly was acting as Gray's lawyer at the time.

Moreover, WGA's assertion that its communications with Gray in response to Gray's complaint are privileged is undercut by WGA's production of its response letter in this litigation. WGA produced its February 21, 2023 letter to Gray and his lawyer, Saver, in which WGA details the steps it took to investigate Gray's claims, the evidence it considered, and its reason for rejecting Gray's claim. Lens Decl., Ex. O (Feb. 21, 2023 Letter from K. Christovich to Shaun Gray (WGAW 3760)). WGA has no basis to assert that the communications Gray initiated at the start of his complaint process are privileged, but that the communication WGA sent to end Gray's complaint process is not.

Nor can WGA's assertion that *WGA* holds an attorney-client privilege in its emails with Gray be squared with WGA's position that *Singer* held—and waived—an attorney-client privilege in the Singer Emails. Lens Decl. ¶ 3. The attorney-client privilege "belongs solely to the client and may only be waived by him." *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). If the privilege belongs to WGA, Singer and Gray would lack authority to waive it, *see id.*; if the privilege belongs to Singer and Gray, WGA would lack authority to assert it. *See United States v. Martoma*, 962 F. Supp. 2d 602, 604 (S.D.N.Y. 2013) (unauthorized third-party lacks standing to assert privilege on behalf of another).

The fact that WGA asserted a claim of attorney-client privilege as to both Singer and Gray with respect to the latter's dispute against the former further rebuts any purported privileged. Surely WGA does not contend it concurrently represented as legal counsel the adverse parties on both sides of a single dispute. Such a representation would not square with the Rules of Professional Conduct or common sense.[6]

---

[6] What's more, WGA acted as the decision-maker as to this dispute.

Finally, although WGA has provided no authority to support its position that its communications with Gray are attorney-client-privileged, during the July 31 conference, for the first time, Gray cited two cases that he says support WGA's assertion of privilege. Lens Decl. ¶ 6. Aside from the citations, Gray failed to provide any information about these cases or why they may be relevant. In any event, neither case supports WGA's assertion of the attorney-client privilege.

The first case, *Hernandez v. Office of the Commissioner of Baseball*, 331 F.R.D. 474 (S.D.N.Y. 2019), is inapposite because it does not address the attorney-client privilege at all. Rather, the plaintiff there sought to invoke a novel "union relations privilege," *id.* at 477—a purported "privilege" that WGA does not assert here. Lens Decl., Ex. E (WGAW Priv. Log). Moreover, *Hernandez* noted the absence of "any Second Circuit case law that recognizes a 'union relations privilege,'" 331 F.R.D. at 477, and declined to apply such a privilege where, as here, the communications at issue were not "made in the context of representation by a union representative during disciplinary proceedings" *against* the union member who invoked the privilege. *Id.* at 478; *Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, 2020 WL 7239615, at *4 (S.D.N.Y. Dec. 9, 2020) (declining to recognize or apply "union leader privilege"); *see also Belcastro v. United Airlines, Inc.*, 2021 WL 1531601, at *4 (N.D. Ill. Apr. 19, 2021) (noting courts' "obligation to construe privileges narrowly," and concluding "that recognizing an employee-union representative privilege in this case would not be in line with 'reason and experience'" (quoting Fed. R. Evid. 501)).

Nor does Gray's second case, *Arcuri v. Trump Taj Mahal Associates*, 154 F.R.D. 97 (D.N.J. 1994), help WGA. *Arcuri* stands for the unremarkable proposition that "where an attorney, pursuant to inquiries by a client, engages in an investigation, the purpose of which is to

provide a basis for responding to the client's queries, and then discusses with the client the investigation, this communication falls within the attorney-client privilege." *Id.* at 104. The *Arcuri* plaintiffs moved to compel Flanagan—a court-appointed union representative—and the union's outside counsel to testify about "conversations between union counsel and Flanagan concerning [an] investigation into the [plaintiff's] charges, and the consultation between union counsel and Flanagan about whether the union should attempt to reopen [an] arbitration." *Id.* at 102. The union's outside counsel had conducted an investigation whereby they interviewed members of the union as "part of the process in which they engaged in the interest of providing legal advice and opinion to their client," *i.e.*, Flanagan and the union. *Id.* at 110; *see also id.* at 103 ("both Local 54 and Flanagan are the clients"). The plaintiffs challenged the union's assertion of privilege, arguing that they should be permitted "to delve into 'investigations' performed by [the] attorneys" at the direction of the union, *id.*, because "the communication at issue between [the attorney] and Flanagan 'does not involve any 'advice.''" *Id.* at 104. The court rejected that argument because the union's attorneys had engaged in the investigation "for the purpose of obtaining and providing 'advice' or 'opinion'" to the union, and the attorneys' "discuss[ion] with the client [about] the investigation" was therefore privileged. *Id.*

Here, unlike the circumstances in *Arcuri*, there is no indication that any WGA "attorney, pursuant to inquiries *by a client*, engage[d] in an investigation, the purpose of which [was] to provide a basis for responding to the client's queries, and then discusse[d] *with the client* the investigation." *Id.* at 104 (emphasis added). As set forth above, there was *no attorney-client relationship between Gray and WGA.* Gray's emails with WGA were not intended to be confidential, nor actually kept confidential by WGA; Gray did not request or receive legal advice from WGA; and, most fatal to WGA's assertion of privilege, WGA was not acting as Gray's

lawyer. *See supra* § IV.B.1. To the contrary, the WGA effectively adjudicated Gray's complaint. Thus, the communications between Gray and WGA are a far cry from the attorney-client communications in *Arcuri*, which were between a union representative and the outside counsel he had hired to represent the union, and related to an investigation that counsel carried out at the union's request. *See* 154 F.R.D. at 104.

> ### 2. Gray Agreed To Produce The Documents At Issue, And Otherwise Lacks Standing To Assert A Privilege On Behalf Of WGA.

Gray does not assert that he holds a privilege in his communications with WGA; only that WGA holds an unspecified "WGA privilege." Lens Decl., Ex. A (Aug. 1, 2025 Email from M. Toberoff to M. Lens, S. Graham). Indeed, Gray already agreed to produce his communications with WGA, only to renege shortly thereafter and hide behind WGA's asserted privilege. Lens Decl. ¶ 5; *id.*, Ex. J (July 30, 2025 Email from M. Lens to M. Toberoff memorializing July 30 call). "The attorney-client privilege 'can be asserted only by the client (or one authorized to do so on the client's behalf),'" not by an unauthorized third-party. *See Martoma*, 962 F. Supp. at 604 (quoting *In re Sarrio, S.A.*, 119 F.3d 143, 147 (2d Cir. 1997)). Gray therefore lacks standing to assert any privilege on behalf of WGA, *see id.* at 605, and has no basis to withhold his communications with WGA. Moreover, WGA has already repeatedly confirmed that it does not object to Gray producing them. Lens Decl., Ex. Q (July 22, 2025 Email from S. Graham to M. Lens); Lens Decl. ¶ 3. The Court should compel Gray to produce them.

## V. CONCLUSION

For the foregoing reasons, Paramount respectfully requests that the Court grant its motion and issue an order: (1) compelling Gray—or alternatively, WGA—to produce the 24 emails that WGA lists as attorney-client-privileged in its privilege log, and any other such

communications between WGA and Gray (including his agents) that may have been withheld on

that basis; and (2) directing Gray and WGA to cease their efforts to prevent Paramount from

obtaining discovery into these probative, unprivileged communications.  Paramount further

requests that the Court direct Gray, or WGA, to produce these communications at least one week

before Gray's deposition, to afford Paramount sufficient time to review the documents before

deposing Gray.[7]

Dated: August 5, 2025                    By: */s/ Molly M. Lens*
_____

O'MELVENY & MYERS LLP
Molly M. Lens
mlens@omm.com
Matthew Kaiser (admitted *pro hac vice*)
mkaiser@omm.com
1999 Avenue of the Stars, 8th Fl
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Danielle Feuer
dfeuer@omm.com
1301 Avenue of the Americas, Ste 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendants Paramount Global,*
*Paramount Pictures Corporation, and*
*Paramount Streaming Services, Inc.*

---

[7] Pursuant to the parties' conversations with the Court, Paramount intends to call the Court once this motion is filed to secure a date for the in-person hearing in the coming days.

## <u>CERTIFICATE OF WORD COUNT (L.R. 7.1(C))</u>

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law contains 6268 words, counted using the Microsoft Word program used to prepare it. It therefore complies with the word-count limitation of Local Rule 7.1(c). The foregoing Memorandum of Law is also 20 double-spaced pages, and it therefore complies with Rule 2(e) of this Court's Individual Rules of Practice.

Dated:   August 5, 2025                         */s/ Molly M. Lens*

                                                Molly M. Lens

21