UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ SHAUN GRAY,                          │
│                                      │
│           Plaintiff,                 │
│                                      │
│      -against-                       │
│                                      │
│ PARAMOUNT GLOBAL ET AL.,             │
│                                      │
│           Defendants.                │
└─────────────────────────────────────┘
```

25-cv-3484 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

This case arises out of the production and release of the "blockbuster" film Top Gun: Maverick. Plaintiff Shaun Gray, the cousin of the film's stated screenwriter, alleges that he co-wrote its screenplay. He has filed suit against various Paramount entities seeking a declaratory judgment that he is a joint author and owner of the film, along with an accounting and payment of an equal, undivided share of all the profits, gains, benefits, and advantages that the defendants have derived from it. In the alternative, Gray seeks damages for copyright infringement. The defendants have moved to dismiss both claims. In a Bottom-Line Order, this Court (1) dismissed with prejudice the joint authorship and ownership claim, as well as the related claim for an accounting and payment of profits, gains, benefits, and advantages; and (2) denied the motion to dismiss the copyright infringement claim. See ECF No. 29. This Opinion & Order confirming these rulings and states the reasons for them.

1

I.    Background

    A. Factual Background

On May 27, 2022, defendant Paramount Pictures Corporation ("PPC") released the film Top Gun: Maverick (the "Film"), which follows a group of fighter pilots at the Top Gun Navy Fighter Weapons School as they embark on a high-risk mission. See ECF No. 1 ("Complaint") at ¶ 2.

Gray alleges that in or around June 2017, his cousin Eric Warren Singer was hired by PPC to write the Film's screenplay and approached Gray to co-write it. See id. at ¶¶ 4, 21. Gray further alleges that "[o]ver the next five months, [he] actively participated in story meetings with Singer and the Film's director, Joseph Kosinski." Id. at ¶ 4. Gray claims that he wrote "key scenes for the screenplay that became the Film's central edge-of-your seat dramatic action sequences that made it a smash hit" ("Gray Scenes"). See id. at ¶ 4. According to Gray, his work is documented by time-stamped emails from him attaching drafts of scenes that later appeared in the Film. See id. at ¶ 30. Gray further claims that he "exercised decision-making authority over revisions of other scenes in the screenplay suggested by Singer and/or Kosinski" and that he "superintended his work by exercising creative control over separate and indispensable elements of the Screenplay." Id. at ¶ 31-32.

Gray notes that "unlike all the other writers who contributed to the [Film], Gray never entered into a work-made-for-hire agreement or any other written contract with PPC, Singer, or any other person or entity concerning his written contributions to the Screenplay."[1] Id. at ¶ 28. Gray was not an employee of either Singer or PPC and did not receive a salary, employee benefits, or any other form of compensation. See id. at ¶ 29. Nor was he featured in the Film's credits. See id. at ¶ 34.

Gray nevertheless alleges that he "owns all rights in and to" the scenes that he wrote. Id. at ¶ 59. He registered those scenes with the U.S. Copyright Office under Registration Numbers PAu004227902, PAu004228526, and PAu004228532. See id. at ¶ 59. According to Gray, PPC had full access to those scenes "by virtue of Gray's emailing them to Singer . . . and to Kosinski . . . and the inclusion of the Gray Scenes in the Screenplay draft(s) delivered by Singer to PPC." Id. at ¶ 60.

---

[1] A "work made for hire" is a "work prepared by an employee within the scope of his or her employment" or "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

B. Procedural History

On April 27, 2025, Gray filed suit against three Paramount entities: Paramount Global ("Paramount") and its subsidiaries PPC and Paramount Streaming Services Inc. ("Paramount Streaming") (collectively "defendants"). In his complaint, Gray seeks a declaration of joint authorship and joint ownership of both the screenplay's and the Film's copyrights. See id. at ¶ 8. To that end, he claims that he "is entitled to and seeks a full accounting and payment of his pro-rata share of all profits received by Defendants" from the screenplay and the Film. Id. Alternatively, Gray claims defendants are liable for copyright infringement. See id.

On June 9, 2025, the defendants moved to dismiss both claims with prejudice. See ECF No. 20 ("Motion to Dismiss"). Following full briefing and oral argument on July 18, 2025, the Court issued a Bottom-Line Order on July 30, 2025, granting the motion to dismiss Gray's joint authorship and ownership claim and the related accounting claim, but denying the motion to dismiss the copyright infringement claim. See ECF No. 29.

II.  Legal Standard

On a motion to dismiss, courts must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to

plaintiff, and construe the complaint liberally."[2] Rescuecom Corp. v. Google, Inc., 562 F.3d 123, 127 (2d Cir. 2009). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014). To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

III. Discussion

The defendants raise two bases for dismissal.[3] First, they argue that Gray has not adequately alleged that he is a joint author or owner of the Film or its screenplay. See ECF No. 21 ("Opening Brief") at 4-14. Second, they argue that Gray has not adequately alleged that the Gray Scenes were entitled to copyright

---

[2] Unless otherwise indicated, all case citations omit internal alterations, brackets, citations, ellipses, emphases, quotations, and quotation marks.

[3] The defendants also ask the Court to take judicial notice of the Film's copyright registrations, the Film's final screenplay, Singer's employment contract, and copies of the Gray Scenes -- all of which are incorporated by reference into the complaint or are otherwise integral to it. See ECF No. 23. Gray does not oppose the motion, so the Court grants it on consent.

protection. See id. at 14-230. They further argue that even if they infringed Gray's copyright, they are entitled to an "implied license" defense applies in any event. See id. at 20-23. The Court considers each argument in turn.

A. Joint Authorship

The defendants move to dismiss Gray's claim that he is a joint author and owner of the Film and its screenplay.[4] Under the Second Circuit's two-prong test for joint authorship, the Court must evaluate whether the parties (1) made independently copyrightable contributions to the Film and (2) mutually intended to be co-authors. See Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998); see also 17 U.S.C. § 101 ("A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."). While Gray adequately alleges a copyrightable contribution, he fails to plead that he and PPC shared a mutual intent to be co-authors.

---

[4] The Second Circuit has held that "joint authorship entitles the co-authors to equal undivided interests in the whole work." Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998). Because Gray does not allege any other method of ownership, the Court focuses its analysis on joint authorship, assuming that a finding of co-authorship would lead to co-ownership.

### 1. Copyrightable Contribution

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). A work is original if it is independently created and displays at least some minimal degree of creativity. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 358 (1991). The "requisite level of creativity is extremely low; even a slight amount will suffice." Id. at 345.

Gray claims to have "authored entire scenes in the completed Screenplay draft written by Gray and Singer, as documented by time-stamped emails and drafts." Complaint at ¶ 30. The Gray Scenes, which allegedly "comprised some of the most character-defining and impactful scenes in the Film," Complaint at ¶ 34, are protectable because they are not merely stock ideas or elements, see Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (distinguishing unprotectable scenes a faire, such as settings, themes, and stock characters, from protectable original expression in the presentation of such elements). Taken together, Gray's allegations show "at least some non-de minimis copyrightable contribution." Thomson, 147 F.3d at 200, 201 n.14 (finding a non-zero contribution where lines in a script "originated verbatim" with the plaintiff). On their motion to dismiss, the defendants do not contest for these purposes that Gray created the Gray Scenes or that they meet the minimal threshold of originality under Feist, so the Court

concludes that Gray has satisfied the first joint authorship requirement.

Nor do the defendants mount a serious challenge to fixation. Under 17 U.S.C. §101, "[a] work is 'fixed' when its embodiment in a copy . . . by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." See also Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 107 (2d Cir. 2002) (discussing the fixation requirement). Gray alleges that he drafted and saved his contributions in tangible, timestamped documents, see Complaint, Exhibit 2, and that he emailed them to Singer and PPC's agents, see Complaint at ¶ 60. These allegations plausibly establish that his contributions were fixed in a tangible medium of expression, as required under section 101.

Accordingly, Gray has sufficiently alleged that he made independently copyrightable contributions to the Film and its screenplay.

### 2. Mutual Intent

The crux of the defendants' joint authorship argument centers on the second prong: whether Gray and PPC shared a mutual intent to be co-authors. In this case, the relevant inquiry is whether Gray and PPC contemporaneously intended for Gray's contributions to be a part of a jointly authored work. See Childress v. Taylor,

945 F.2d 500, 508 (2d. Cir. 1991) (requiring proof that "the nature of the intent" was "entertained by each putative joint author at the time the contribution of each was created").

Gray alleges that he and PPC "each manifested an objective intent for their contributions to be merged into inseparable or interdependent parts of a unitary whole as joint authors in story meetings, writing sessions, and other communications." Complaint at ¶ 45. He further alleges that both Singer and Kosinski represented themselves to him as having either the actual or apparent authority of PPC to involve him in the project and that they acted as PPC's employees and/or agents. See id. at ¶¶ 22-23.

The defendants respond that these allegations are insufficient to show mutual intent. At the outset, they argue that Gray did not communicate or have a relationship with PPC itself. They next argue that Singer and Kosinski lacked actual authority to designate co-authors on PPC's behalf and that Singer's contract explicitly denied him such authority. Finally, they argue that there is no basis to find that Singer and Kosinski had apparent authority to bind PPC because Gray "does not, and cannot, point to any words or conduct on the part of PPC suggesting that [its agents] . . . had authority to engage Gray to co-write." ECF No. 21 ("Opening Brief") at 14.

The Court agrees with the defendants. In Thomson v. Larson, the Second Circuit identified several factors that courts may

consider when assessing mutual intent, including: (1) how the parties billed and credited themselves, (2) decision-making authority over the work at issue, and (3) the parties' written agreements.[5] 147 F.3d 195, 202-05 (2d Cir. 1998). While no single factor is dispositive, Gray's allegations fail to adequately allege any of these factors.

First, billing and crediting weigh against a finding of joint authorship. In his complaint, Gray concedes that he was not billed or credited in the Film. See Complaint at ¶ 34. Moreover, the copyright registration for the Film lists PPC as its sole author. See ECF No. 22, Exhibits A & B. The first Thomson factor thus suggests that PPC did not intend for Gray to co-author the Film.

The second Thomson factor also weighs against a finding of joint authorship. While Gray alleges that he "exercised decision-making and editorial authority over revisions to other scenes in the screenplay" and "superintended his work by exercising decision-making and editorial authority over revisions to other

---

[5] Gray argues that this test applies "only where the copyright claimant does not occupy a traditional authorship role." ECF No. 24 ("Answering Brief") at 11-12. However, on its face, Thomson does not limit its application to such contexts. Moreover, courts in this District have applied the Thomson test to cases involving traditional co-authors. See, e.g., Malloy v. EMI Christian Music Group, Inc., 2012 WL 13388992 at *2 (S.D.N.Y. May 16, 2012) (applying the Thomson test where the plaintiff alleged that he had "created some of the melody and wrote all of the music" of a song).

scenes," he does not allege any greater control over the Film or any authority comparable to PPC's. See Thomson, 147 F.3d at 203 (finding that a principal playwright did not intend for a dramaturg to be a co-author of a musical because the playwright retained decision-making authority over the final work). He does not allege, for example, that he wrote or edited the final draft of the screenplay or that he participated in the shooting or post-production processes of the Film. See Aalmuhammed v. Lee, 202 F.3d 1227, 1234-35 (9th Cir. 2000) (finding that while the plaintiff made "very valuable contributions" by revising the script for accuracy, he was not a co-author because he was not the "'inventive or master mind' of the movie") (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 61 (1884)). Gray's lack of authority over the final cut of the screenplay or the Film further suggests that PPC did not intend for him to be a co-author.

Finally, the third Thomson factor also counsels against concluding that the parties intended to be joint authors. Thomson emphasized that sophisticated parties in the entertainment industry, such as the defendants in this case, typically commit their co-authorship arrangements and relationships to writing. See Thomson, 147 F.3d at 203. As Gray himself alleges, PPC had previously employed other writers under work-made-for-hire contracts before he began his work on the Film. See Complaint at ¶ 25. He further alleges that after he finished working with

11

Singer, PPC hired a second set of writers under additional work-made-for-hire agreements. See id. at ¶ 26. Unlike the other writers who contributed to the screenplay, Gray never entered into any contractual relationship with PPC, Singer, or "any other person or entity concerning written contributions." Id. at ¶ 28. The fact that PPC entered into a work-made-for-hire agreement with every other writer who was formally involved in the Film demonstrates that it did not intend to share authorship with any individual, including Gray. After all, any finding to the contrary would suggest that Gray was the only writer PPC sought to make a joint author and owner. Such an allegation is implausible on its face.

Gray also fails to adequately allege that Singer and Kosinski had actual authority to act as PPC's agents. The complaint does not allege that PPC granted Singer and Kosinski actual authority to recruit Gray -- or, for that matter, anyone else -- to assist them with the screenwriting process. Nor could it. Singer's contract makes clear that he lacked such authority, stating that "the Material shall be solely written by [Singer] and shall be wholly original with [Singer]." ECF No. 22, Exhibit F at 36.

Of course, "an agent [who] lacks actual authority . . . may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." Highland Cap. Mgmt. v. Schneider, 607 F.3d 322, 328 (2d Cir. 2010).

In this case, Gray alleges, in conclusory fashion, that Singer and Kosinski represented themselves as having authority to bind PPC. See Complaint at ¶¶ 22-23. However, he pleads no facts showing that Singer or Kosinski engaged in any conduct that would have created a reasonable basis to believe that they had such authority. Accordingly, he has not adequately alleged that Singer and Kosinski bound PPC to a joint authorship relationship with him.

It is well-established that, in determining whether parties had mutual intent, courts must generally conduct "a nuanced inquiry into factual indicia of ownership and authorship." Thomson, 147 F.3d at 201. Here, however, Gray has failed to plausibly allege that PPC intended for him to be a joint author or that Singer or Kosinski bound PPC to such a relationship via actual or apparent authority. Accordingly, the Court grants the defendants' motion to dismiss Gray's joint authorship claim, as well as his related claim for an accounting and payment, with prejudice.[6]

B. Copyright Infringement

---

[6] In Gray's answering brief, he does not request leave to amend his joint authorship claim. See Answering Brief at 17 n.6 (requesting leave to amend to "plead unjust enrichment" if the Court were to dismiss the complaint). At oral argument, the Court asked Gray's counsel what facts he would plead to substantiate his joint authorship and ownership claim. Because counsel was unable to proffer any facts, the Court finds that granting leave to amend the joint authorship claim would be futile. See Rukoro v. Fed. Republic of Germany, 976 F.3d 218, 228 (2d Cir. 2020) ("Futility is a determination, as a matter of law, that proposed amended would fail to cure prior deficiencies.").

13

The defendants also move to dismiss Gray's copyright infringement claim. To prevail on that claim, Gray must adequately allege: "(1) ownership of a valid copyright and (2) copying of constituent elements of [his] work that are original." Fonar Corp. v. Domenick, 105 F.3d 99, 103 (2d Cir. 1997). For the reasons stated below, at this stage of the litigation, Gray has successfully alleged both.

1. Ownership of a Valid Copyright

Gray alleges that he holds valid copyrights for the Gray Scenes. See 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made."). Specifically, the complaint alleges that Gray registered fifteen scenes with the U.S. Copyright Office under Registration Numbers PAu004227902, PAu004228526, and PAu004228532. See Complaint at ¶ 59.

Gray's allegations of valid registration are sufficient to plead ownership of a valid copyright. The Copyright Act specifies that "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Whether Gray's registrations will ultimately benefit from the prima facie presumption of validity under section 410(c) depends on facts such

14

as the dates of first publication and registration. However, these are evidentiary matters that the Court need not resolve at the pleading stage. See Fonar, 105 F.3d at 104. The Court therefore concludes that Gray has adequately alleged the first element of his copyright infringement claim.

2. Copying of Constituent Original Elements

As noted above, Gray must also adequately allege that the defendants copied "constituent" and "original" elements of his work. Id. at 103. To satisfy this element, Gray must establish, first that the defendants actually copied his work, and second, that the copying was illegal because a "substantial similarity" exists between the Film and the protectible elements of the Gray Scenes. Abdin v. CBS Broad. Inc., 971 F.3d 57, 66 (2d Cir. 2020).

As to the first element, "[b]ecause direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that [the defendant] . . . had access to the copyrighted material . . . and that there are similarities between the two works that are "probative" of copying." Jorgenson v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). Gray successfully pleads both sub-elements. First, Gray alleges that the defendants had access to the Gray Scenes. Specifically, he alleges that "PPC had full access to the Gray Scenes, including without limitation, by virtue of Gray's emailing them to Singer . . . and to Kosinski . . . and the inclusion of

the Gray Scenes in the Screenplay draft(s) delivered by Singer to PPC." Complaint at ¶ 60. Second, Gray alleges numerous similarities between "literary elements" in the Gray Scenes, the final screenplay, and the Film. Id. at ¶ 63. Appended to the complaint is a document that engages in an extensive side-by-side comparison of numerous Gray Scenes and corresponding elements in the screenplay and the Film. See Exhibit 2. Alleged similarities include common characters, dialogue, plot points, and sequences that go well beyond general ideas or themes. See id. Such allegations support the inference that the defendants copied the Gray Scenes.

Turning to the second element, "[t]he standard test for substantial similarity between two items is whether an ordinary observer, unless he sets out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Abdin v. CBS Broadcasting Inc., 971 F.3d 57, 67 (2d Cir. 2020). "In applying the so-called ordinary observer test," the Court must "ask whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 66 (2010). Where "the works in question are attached to a plaintiff's complaint, . . . the court has before it all that is necessary in order to make such an evaluation." Id. at

64. "No discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works." Id.

As noted above, appended to the complaint is a document that engages in a side-by-side comparison of the Gray Scenes, the screenplay, and the Film. The defendants also ask the Court to take judicial notice of the text of the Gray Scenes and the screenplay themselves, which are incorporated in the complaint by reference. See ECF No. 27; Exhibit E; Exhibit G-U. Having reviewed the side-by-side comparisons, the Gray Scenes, and the screenplay, the Court finds that Gray has adequately alleged that the three works share substantial similarities.

The document containing the side-by-side comparisons includes approximately ninety examples of significant overlap between the works. For example, Gray alleges that in one of his scenes a character named "Lardo" tells the protagonist Maverick as he is in flight: "You are cleared above flight level six zero zero, accelerate to Mach 3.5." Exhibit 2 at ¶ 5. By comparison, in both the screenplay and the Film, a character "Hondo" tells Maverick as he is in flight: "You are cleared above flight level six zero zero, accelerate to Mach 3.5." Id.; see also ECF No. 22, Exhibit E at 13 (detailing this same language). As another example, in a later Gray Scene, Maverick "transitions to a scram jet" and the "main engines shut down," followed by an "eery [sic] silence," which is in turn followed by a "THUNDEROUS PEAL as the SCRAMJET engine

bursts into life." Exhibit 2 at § 6. Once again, the screenplay repeats this same language nearly verbatim: "[Maverick] hits switches: main engines SHUT DOWN. An eerie silence, then a THUNDEROUS PEAL as SCRAMJET engine bursts to life." Exhibit E at 15. According to Gray, the Film depicts this same sequence of events. See Exhibit 2 at § 6. Together, these and the myriad other documented similarities are more than sufficient to survive the defendants' motion to dismiss.

The defendants do not contest Gray's side-by-side comparisons at this stage. Instead, they argue that Gray has not satisfied the substantial similarity requirement because the Gray Scenes are not protectible. Invoking the Second Circuit's decision in 16 Casa Duse LLC v. Merkin ("Casa Duse"), 791 F.3d 247, 256 (2d Cir. 2015), the defendants argue that the Gray Scenes are not protectible because they are not "freestanding, separate, and independent from the broader film" and are instead "merged with it," Opening Brief at 17. Relatedly, the defendants also claim that Gray intended for his scenes to be merged into an "integrated, unitary work of authorship" and that he therefore "cannot receive copyright protection for those scenes as discrete works." Id.

The Court rejects these arguments for two reasons. First this case is readily distinguishable from Casa Duse, where the alleged works of authorship were creative contributions that the director had made regarding "camera angles and lighting to wardrobe and

makeup to the actors' dialogue and movement." Id. at 250. Under those circumstances, the Second Circuit cautioned against recognizing copyrights for every minor artistic contribution that a film's staff members -- from actors to designers to camera operators and "a host of skilled technical contributors" -- might make. Id. at 258. By contrast, in this case, Gray alleges that he personally authored multiple scenes in the Film, which were original and fixed in emails and other documents. Second, Gray's allegations regarding the integration of his scenes into the Film were raised as part of his joint authorship and ownership claim, not his copyright infringement claim, which he pled in the alternative. And courts have long accepted that "a party may state as many separate claims or defenses as the party has regardless of consistency." Henry v. Daytop Village, Inc., 42 F.3d 89, 95 n.2 (2d Cir. 1994).

For all of these reasons, the Court denies the defendants' motion to dismiss Gray's copyright infringement claim.

### 3. Implied License Defense

The defendants also assert the affirmative defense of an implied license. According to the defendants, Gray "gave Singer (and in turn PPC) an implied license to use the Gray Scenes in Singer's interim screenplay draft and in PPC's ultimate Screenplay and Maverick." Opening Brief at 20.

The Second Circuit has not yet adopted a definitive test for the implied license defense. See ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 320 (2d Cir. 2022). Some courts apply a narrow approach, finding an implied license only where one party created a work at the request of another and delivered it with the intent that it be copied and distributed. See id. (citing Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990)). Other courts take a more permissive approach, recognizing an implied license where a copyright owner is aware that a third-party is using their work and either encourages it or does not actively oppose it. See id. (citing Field v. Google Inc., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006)).

In this case, the scope of the implied license defense is irrelevant as both approaches "require a meeting of the minds between the parties to permit the particular usage at issue." Id. Here, there is no allegation that Gray intended to grant the defendants, particularly PPC, a license to use his work without receiving any credit or compensation in return. In fact, Gray's complaint expressly states that he "never transferred, assigned or licensed his work, including but not limited to the Gray Scenes, to Singer, Kosinski, PPC, the other Defendants, or anyone else, nor did he authorize Defendant's commercial exploitation of his work." Complaint at ¶ 33.

The defendants nevertheless contend that Gray intended for PPC to use the Gray Scenes in the final screenplay and in the Film. See Opening Brief at 22. They again point to the part of Gray's complaint where "Gray alleges that he 'intended for his contributions to be merged into inseparable or interdependent parts'" of the Film. Id. at 21 (citing Complaint at ¶ 45). However, as discussed above, those and other similar allegations were pled in the alternative as part of Gray's joint ownership and authorship claim. Moreover, no matter the scope of the implied license test, the defendants bear the burden of demonstrating that Gray intended to license the Gray Scenes to them. See Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 562 (S.D.N.Y. 2013). The defendants have not met that burden at this stage of the litigation. The Court, therefore, rejects their implied license defense, subject to renewal after the close of discovery.

IV.  Conclusion

For the foregoing reasons, the Court reconfirms its Bottom-Line Order granting in part and denying in part the defendants' motion to dismiss. Specifically, the Court dismisses with prejudice Gray's joint authorship and ownership claim, as well as the related claim for accounting and payment of the profits, gains, benefits, and advantages that the defendants obtained from the screenplay and the Film. However, the Court denies the defendants' motion to dismiss Gray's copyright infringement claim.

The Clerk of Court is respectfully directed to close ECF No. 23.

SO ORDERED.

New York, NY
8/8, 2025

JED S. RAKOFF, U.S.D.J.