**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAUN GRAY, an individual, | Civil Action No. 1:25-cv-3484-JSR |
| Plaintiff, | **DEFENDANTS' ANSWER** |
| | **AND PARAMOUNT PICTURES** |
| vs. | **CORPORATION'S** |
| | **COUNTERCLAIMS** |
| PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation; and DOES 1-10, | |
| Defendants. | |
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation; | |
| Counterclaim-Plaintiff, | |
| vs. | |
| SHAUN GRAY, an individual, | |
| Counterclaim-Defendant, | |

Through their undersigned attorneys, Defendants Paramount Global, Paramount Pictures Corporation ("PPC"), and Paramount Streaming Services Inc. (collectively, "Paramount" or "Defendants") answer in response to the above-captioned complaint as follows:

<u>**NATURE OF THE ACTION**</u>

1.      Paramount denies the allegations of Paragraph 1.

2.      Paramount denies that Paramount+ is operated by Paramount Streaming Services Inc., denies the allegations characterizing *Top Gun: Maverick*'s ("*Maverick*") box office success, and denies the allegations summarizing *Maverick*'s plot (and refers to the film itself for its full contents), but otherwise admits the allegations of Paragraph 2.

3.    Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, but denies the allegations to the extent that Paragraph 3 is intended to suggest that *Maverick*'s success is solely a product of its screenplay.

4.    Paramount denies the allegations of Paragraph 4.

5.    Paramount denies the allegations of Paragraph 5.

6.    Paramount denies the allegations of Paragraph 6, and further asserts that such allegations contain legal argument and/or conclusions of law to which no answer is required.

7.    Paramount admits that (setting aside Gray) all of the creative contributors to *Maverick*, including all of its screenwriters, made their contributions pursuant to agreements with PPC that contained, *inter alia*, work-made-for-hire provisions, and refers to those agreements for their full contents.  Paramount further admits that PPC is the single statutory author of those contributions.  Paramount also admits that PPC did not have a work-made-for-hire agreement directly with Gray, except to clarify that Gray had a work-made-for-hire agreement with Singer.  Paramount denies the remaining allegations of Paragraph 7, and further asserts that such allegations contain legal argument and/or conclusions of law to which no answer is required.

8.    The allegations of Paragraph 8 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 8.

### **PARTIES**

9.    Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9.

10.    Paramount admits the allegations of Paragraph 10.

11.    Paramount admits the allegations of Paragraph 11.

12.     Paramount admits that Paramount Streaming Services Inc. is a Delaware Corporation with a principal place of business in New York, New York, but denies the remaining allegations of Paragraph 12.

13.     Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

## JURISDICTION AND VENUE

14.     The allegations of Paragraph 14 contain legal argument and/or conclusions of law to which no answer is required.

15.     The allegations of Paragraph 15 contain legal argument and/or conclusions of law to which no answer is required.

16.     Paramount admits that Paramount Global and Paramount Streaming have their principal places of business in the State of New York and in this District.  The remaining allegations of Paragraph 16 contain legal argument and/or conclusions of law to which no answer is required.

17.     The allegations of Paragraph 17 contain legal argument and/or conclusions of law to which no answer is required.

18.     The allegations of Paragraph 18 contain legal argument and/or conclusions of law to which no answer is required.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

19.     Paramount denies the allegations of Paragraph 19.

20.     Paramount denies the allegations in the first sentence of Paragraph 20, except admits that Singer is Gray's relative, admits that PPC entered into a contract with Singer to provide screenwriting services on *Maverick* and refers to that agreement for its full contents, and clarifies that Singer worked only on an interim draft of *Maverick*'s screenplay.  PPC states that

the allegations in the second sentence of Paragraph 20 are conclusions of law to which no response is required, but admits that Singer's contributions to *Maverick* are owned by PPC.

21.    Paramount denies the allegations in the first sentence of Paragraph 21, except admits that PPC entered into a contract with Kosinski to provide directing services on *Maverick* and refers to that agreement for its full contents.  PPC states that the allegations in the second sentence of Paragraph 21 are conclusions of law to which no response is required, but admits that Kosinski's contributions to *Maverick* are owned by PPC.

22.    Paramount denies the allegations of Paragraph 22.

23.    The allegations of Paragraph 23 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 23.

24.    Paramount admits that Gray was present for certain story development meetings with Singer and Kosinski, but denies the remaining allegations of Paragraph 24.

25.    Paramount admits that, prior to entering into a contract with Singer, it entered into contracts with Peter Craig and Justin Marks, with such contracts containing, *inter alia*, work-made-for-hire provisions, and refers to those contracts for their full contents, but denies the remaining allegations of Paragraph 25.

26.    Paramount admits that, after Singer, it entered into contracts with Ehren Kruger and Christopher McQuarrie, with such contracts containing, *inter alia*, work-made-for-hire provisions, and refers to those contracts for their full contents, but denies the remaining allegations of Paragraph 26.

27.    Paramount denies the allegations of Paragraph 27, except admits that all persons contributing creative content to *Maverick* did so pursuant to agreements, admits that such

agreements contained, *inter alia*, work-made-for-hire provisions, and refers to such agreements for their full contents, and clarifies that Gray had a written agreement with Singer and refers to that agreement for its contents.

28.     Paramount denies the allegations of Paragraph 28, except admits that PPC did not have a written contract with Gray or directly compensate him in connection with *Maverick*.

29.     Paramount admits that Gray did not receive a salary or employment benefits from PPC in connection with *Maverick*, but denies the remaining allegations of Paragraph 29.

30.     Paramount denies the allegations of Paragraph 30.

31.     Paramount denies the allegations of Paragraph 31.

32.     Paramount denies the allegations of Paragraph 32.

33.     The allegations of Paragraph 33 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 33.

34.     Paramount admits that PPC theatrically released *Maverick* on May 27, 2022, and included film credits stating: "Screenplay by Eric Kruger, Eric Warren Singer and Christopher McQuarrie" and "Story by Peter Craig and Justin Marks."  Paramount denies the remaining allegations of Paragraph 34.

35.     Paramount admits the allegations of Paragraph 35, except that it denies that Paramount Streaming owns or operates Paramount+.

36.     The allegations of Paragraph 36 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 36.

37.     Paramount admits that it is exploring a potential sequel to *Maverick*, but does not

yet know what its contents will be and therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 37, except denies any allegation that such potential sequel will incorporate copyrighted material purportedly owned by Gray.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT

38.     No response is required to Paragraph 38 because the Court has dismissed Gray's First Claim for Relief with prejudice.

39.     No response is required to Paragraph 39 because the Court has dismissed Gray's First Claim for Relief with prejudice.

40.     No response is required to Paragraph 40 because the Court has dismissed Gray's First Claim for Relief with prejudice.

41.     No response is required to Paragraph 41 because the Court has dismissed Gray's First Claim for Relief with prejudice.

42.     No response is required to Paragraph 42 because the Court has dismissed Gray's First Claim for Relief with prejudice.

43.     No response is required to Paragraph 43 because the Court has dismissed Gray's First Claim for Relief with prejudice.

44.     No response is required to Paragraph 44 because the Court has dismissed Gray's First Claim for Relief with prejudice.

45.     No response is required to Paragraph 45 because the Court has dismissed Gray's First Claim for Relief with prejudice.

46.     No response is required to Paragraph 46 because the Court has dismissed Gray's First Claim for Relief with prejudice.

47.     No response is required to Paragraph 47 because the Court has dismissed Gray's First Claim for Relief with prejudice.

48.     No response is required to Paragraph 48 because the Court has dismissed Gray's First Claim for Relief with prejudice.

49.     No response is required to Paragraph 49 because the Court has dismissed Gray's First Claim for Relief with prejudice.

50.     No response is required to Paragraph 50 because the Court has dismissed Gray's First Claim for Relief with prejudice.

51.     No response is required to Paragraph 51 because the Court has dismissed Gray's First Claim for Relief with prejudice.

52.     No response is required to Paragraph 52 because the Court has dismissed Gray's First Claim for Relief with prejudice.

53.     No response is required to Paragraph 53 because the Court has dismissed Gray's First Claim for Relief with prejudice.

54.     No response is required to Paragraph 54 because the Court has dismissed Gray's First Claim for Relief with prejudice.

55.     No response is required to Paragraph 55 because the Court has dismissed Gray's First Claim for Relief with prejudice.

## <u>SECOND CLAIM FOR RELIEF</u>
### (In the alternative to the First Claim)

### COPYRIGHT INFRINGEMENT

56.     Paramount incorporates by reference its answers to Paragraphs 1 through 37, inclusive.

57.     Paramount denies the allegations of Paragraph 57.

58.     The allegations of Paragraph 58 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 58.

59.     The allegations of Paragraph 59 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 59, except that it admits Gray appears to have registered the so-called "Gray Scenes" with the U.S. Copyright Office.

60.     The allegations of Paragraph 60 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 60, except that PPC admits it received a draft screenplay for *Maverick* from Singer.

61.     The allegations of Paragraph 61 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 61.

62.     The allegations of Paragraph 62 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 62.

63.     The allegations of Paragraph 63 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 63, including the purported substantial similarities set forth in Exhibit 1.

64.     Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64, except that Paramount denies that Gray wrote the so-called "Gray Scenes."

65.     The allegations of Paragraph 65 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 65.

66.     The allegations of Paragraph 66 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 66.

67.     The allegations of Paragraph 67 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 67.

68.     The allegations of Paragraph 68 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 68.

69.     The allegations of Paragraph 69 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 69.

70.     The allegations of Paragraph 70 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 70.

71.     The allegations of Paragraph 71 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 71.

## THIRD CLAIM FOR RELIEF

### ACCOUNTING

72.     No response is required to Paragraph 72 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

73.     No response is required to Paragraph 73 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

74.     No response is required to Paragraph 74 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

75.     No response is required to Paragraph 75 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

76.     No response is required to Paragraph 76 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

77.     No response is required to Paragraph 77 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

78.     No response is required to Paragraph 78 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

## PRAYER FOR RELIEF

The remaining paragraphs of the Complaint are requests for relief to which no response is required.  To any extent a response is required, Paramount denies that Gray is entitled to the relief requested or any other relief.

## AFFIRMATIVE DEFENSES

As separate and additional defenses to the Complaint, and without suggesting or conceding that it has the burden of proof on any such defenses, Paramount hereby alleges the

-10-

following affirmative defenses, while reserving the right to assert any other applicable legal or equitable defense.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Gray's claim is barred, in whole or in part, because Gray fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (First Amendment)

Gray's claim is barred, in whole or in part, by the First Amendment.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Ownership)

Gray's claim is barred because Gray does not own the so-called "Gray Scenes" allegedly at issue here.

## FOURTH AFFIRMATIVE DEFENSE

### (Work Made For Hire)

Gray's claim is barred because Gray prepared the so-called "Gray Scenes" as work made for hire for Eric Singer and/or Singer's loan-out company Bullsh!t Artists, Inc., and therefore is not the author or owner of the "Gray Scenes."

## FIFTH AFFIRMATIVE DEFENSE

### (Copyright Assigned By Gray)

Gray's claim is barred because Gray assigned any copyright in the so-called "Gray Scenes" to Eric Singer and/or Singer's loan-out company Bullsh!t Artists, Inc., and therefore is not the owner of the "Gray Scenes."

## SIXTH AFFIRMATIVE DEFENSE

### (Lack of Copyrightability)

Gray's claim is barred because the so-called "Gray Scenes" are not independently copyrightable.

## SEVENTH AFFIRMATIVE DEFENSE

### (Infringing Derivative Work)

Gray's claim is barred because PPC's preexisting copyrighted material so pervades the so-called "Gray Scenes" that they are not protected by copyright.

## EIGHTH AFFIRMATIVE DEFENSE

### (Express License)

Gray's claim is barred, in whole or in part, because Paramount has or had an express license to use the so-called "Gray Scenes" pursuant to Gray's agreement with Eric Singer, of which Paramount was an intended beneficiary.

## NINTH AFFIRMATIVE DEFENSE

### (Implied License)

Gray's claim is barred, in whole or in part, because Paramount has or had an implied license to use the so-called "Gray Scenes," either directly or as an intended beneficiary of a license to Eric Singer.

## TENTH AFFIRMATIVE DEFENSE

### (*De Minimis* Infringement)

Gray's claim is barred, in whole or in part, because any infringement by Paramount was, at most, *de minimis* and not actionable.

## ELEVENTH AFFIRMATIVE DEFENSE

(Innocent Infringement)

Any statutory damages awarded to Gray should be reduced because PPC was not aware and had no reason to believe that its acts would constitute an infringement of copyright.

## TWELFTH AFFIRMATIVE DEFENSE

(Estoppel)

Gray's claim is barred, in whole or in part, by the doctrine of estoppel, including due to Gray's concealment from PPC of his alleged authorial role until long after *Maverick*'s release.

## THIRTEENTH AFFIRMATIVE DEFENSE

(Waiver)

Gray's claim is barred, in whole or in part, by the doctrine of waiver.

## FOURTEENTH AFFIRMATIVE DEFENSE

(Unclean Hands)

Gray's claim is barred, in whole or in part, by the doctrine of unclean hands.

## FIFTEENTH AFFIRMATIVE DEFENSE

(Statute of Limitations)

Gray's claim is barred, in whole or in part, by the statute of limitations, because it is predicated on a claim of authorship that accrued more than three years prior to the filing of Gray's Complaint.

## SIXTEENTH AFFIRMATIVE DEFENSE

(Additional Defenses)

Paramount Pictures reserves the right to allege other affirmative defenses as they may become known during the course of discovery.

**WHEREFORE,** Paramount prays for judgment against Gray and in favor of Paramount, and for such other relief as the Court deems proper, including attorneys' fees under 17 U.S.C. § 505.

## COUNTERCLAIMS

Counterclaimant Paramount Pictures Corporation ("PPC"), for its Counterclaims against Shaun Gray, alleges as follows:

## NATURE OF THE CLAIMS

1.      With these Counterclaims, PPC sets the record straight about who is the true aggrieved party in its dispute with Shaun Gray.  In 2022, PPC released its hit film *Top Gun: Maverick* ("*Maverick*")—the sequel to its 1986 blockbuster *Top Gun*—to widespread critical acclaim and box-office success.  With *Maverick*'s success, Plaintiff and Counterclaim-Defendant Shaun Gray saw an opportunity to shake down PPC, but in the process, he has effectively admitted to infringing PPC's copyright in *Top Gun* and defrauding PPC as to his purported authorial role.

2.      PPC advances claims against Gray for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*., and for common-law fraud.  PPC is the sole owner of the copyright in *Top Gun*, and that status confers on PPC the exclusive statutory right to prepare derivative works based on *Top Gun*.  Gray, however, contends that he drafted several scenes for *Maverick*  (the so-called "Gray Scenes") that are based on *Top Gun* and liberally use its protected expression, including its distinctive characters such as protagonist Pete "Maverick" Mitchell.  Gray contends he had no agreement with PPC concerning the drafting of those scenes— indeed, Gray had no contact with PPC at all—making his alleged preparation of such derivative works of *Top Gun* unauthorized and infringing.  Further still, the "Gray Scenes" incorporate PPC's

protected expression from its earlier treatments and screenplay drafts for *Maverick*, which Gray's own narrative likewise renders infringing.

3.     Gray also fraudulently concealed *for over five years* his ostensible role in drafting scenes that he contends were incorporated into a screenplay draft for *Maverick*.  Gray contends he worked with PPC's work-made-for-hire screenwriter Eric Singer on a draft of *Maverick*'s screenplay, and in that process, drafted the "Gray Scenes."  Gray's alleged work spanned several months in 2017, culminating in Singer's November 3, 2017 screenplay draft.  But Gray did not inform PPC of his purported involvement.  To the contrary, Gray made the concerted decision to hide his alleged role from PPC, in an effort to obtain favorable financial terms for Singer's deal (in which Gray claims he is entitled to share) and to retain the opportunity to work on *Maverick* in the first place (as Gray believed that his involvement might "blow[] up the deal" between Singer and PPC, which Gray later admitted in a written statement).  Gray did not come out of the woodwork until 2023, long after *Maverick*'s release, when he suddenly told PPC that he had allegedly authored portions of Singer's draft and clouded PPC's title to *Maverick* as its sole author and copyright owner.

## PARTIES

4.     Counterclaim-Plaintiff Paramount Pictures Corporation is a Delaware corporation, with a principal place of business in Los Angeles, California.

5.     Counterclaim-Defendant Shaun Gray is an individual who is a citizen and resident of Ulster County, New York.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction over this copyright infringement action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

-15-

7.     This Court has supplemental jurisdiction over the related state-law fraud claim pursuant to 28 U.S.C. § 1367, because it forms part of the same case or controversy as the federal claims in this action.

8.     This Court has personal jurisdiction over Gray because he is domiciled in New York.

9.     Venue is proper in this District because PPC's counterclaims are compulsory, in that they arise out of the same transaction or occurrence that is the subject matter of Gray's claim. *Gary Friedrich Enters., LLC v. Marvel Enters., Inc*., 2011 WL 13262163, at *2-3 (S.D.N.Y. May 4, 2011), *report & recommendation adopted*, 2011 WL 3163570 (S.D.N.Y. July 26, 2011); *see also V&A Collection, LLC v. Guzzini Props. Ltd*., 46 F.4th 127, 132 (2d Cir. 2022) ("a plaintiff bringing suit in a forum 'submit[s] itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants'" (quoting *Leman v. Krentler-Arnold Hinge Last Co*., 284 U.S. 448, 451 (1932)).

## FACTUAL ALLEGATIONS

10.     PPC is one of the world's leading and longest-standing film studios.  Since its founding in 1912, PPC has brought some of the highest-quality and best-known films to generations of audiences in the United States and worldwide.

11.     PPC has released thousands of feature films in its storied history, including the films that comprise its popular *Top Gun* franchise.

12.     In 1986, PPC released the blockbuster film *Top Gun*, which follows a cohort of young naval aviators as they train at the U.S. Navy's Fighter Weapons School, also known as Top Gun.

13.    *Top Gun* centers on Lieutenant Pete "Maverick" Mitchell, who trains at Top Gun alongside his close friend and radar intercept officer, Lieutenant Nick "Goose" Bradshaw.  As his call-sign suggests, Maverick is an unorthodox and independent-minded yet highly-skilled fighter pilot, who excels in training but repeatedly defies the rules.  Maverick's time at Top Gun takes a dark turn when Maverick and Goose are involved in a training accident, with Maverick piloting. Maverick safely ejects when their plane falls into an unrecoverable spin, but the accident tragically claims the life of Goose, who leaves behind a widow and young son.  Maverick is cleared of any wrongdoing, but harbors guilt over the accident and nearly quits Top Gun.  Maverick starts to reconcile with Goose's death after a heroic dogfight in his first deployment after graduating Top Gun, and he ultimately chooses to return to Top Gun as an instructor.

14.    PPC is the author of *Top Gun* as a work made for hire, and it is the sole owner of *Top Gun*'s copyright.

15.    PPC registered its copyright in *Top Gun* with the U.S. Copyright Office under registration number PA0000293347.

16.    *Top Gun* was a box office hit and became the highest grossing film of the year.

17.    *Top Gun*'s success had longevity too: it remained popular with audiences for decades after its release.

18.    *Top Gun* was so significant to American culture and cinema that it was selected by the Library of Congress for preservation in the National Film Registry.

19.    In light of *Top Gun*'s success, PPC set out to make a sequel to the film.

20.    After an early vision for the sequel was scrapped in the 1990s, PPC revived the idea in the 2010s and hired a series of screenwriters to flesh out the sequel.

21.     PPC hired screenwriter Peter Craig, and later, screenwriter Justin Marks, to prepare drafts of the screenplay for the *Top Gun* sequel on a work-made-for-hire basis.  Craig submitted his screenplay draft to PPC on July 27, 2012 (the "Craig Draft"), and Marks submitted his final screenplay draft to PPC on July 14, 2016 (the "Marks Draft").

22.     On June 6, 2017, PPC entered into a contract with another screenwriter, Eric Singer, to prepare further drafts of the sequel's screenplay on a work-made-for-hire basis.  Singer prepared an initial screenplay draft as of July 16, 2017, and he submitted his final screenplay draft to PPC on November 3, 2017.  Singer also prepared a series of screenplay drafts in the interim, including drafts dated September 14, 2017; October 6, 2017; October 11, 2017; October 13, 2017; October 14, 2017; October 16, 2017; October 17, 2017; and October 19, 2017.

23.     In its contract with Singer, PPC authorized Singer to use its copyrighted material— with the intent that Singer would build off of the screenplay drafts written for PPC by Craig and Marks and, of course, the original *Top Gun* film.

24.     On June 12, 2017, PPC entered into a contract with director Joseph Kosinski to direct the *Top Gun* sequel on a work-made-for-hire basis.  As part of his pitch for this directing role, Kosinski prepared a treatment for *Maverick* on May 16, 2017 (the "Kosinski Treatment"). Kosinski's contract with PPC deemed that treatment a work made for hire for PPC, and alternatively assigned it to PPC.

25.     PPC later hired two more screenwriters, Ehren Kruger and Christopher McQuarrie, to develop yet further drafts of the sequel's screenplay on a work-made-for-hire basis.  In these contracts, PPC similarly authorized Kruger and McQuarrie to use PPC's copyrighted material to prepare these screenplay drafts, including the screenplay drafts previously prepared by Singer.

26.    *Maverick* was theatrically released on May 27, 2022, culminating over a decade of work since its first screenwriter started on the project.

27.    PPC registered its copyright in *Maverick* with the U.S. Copyright Office under registration number PA0002351572.

28.    In all, PPC spent well over a hundred million dollars to produce and market *Maverick*.

29.    Gray claims to have written for *Maverick* midway through that process, in connection with Singer's interim draft of the screenplay for the film in 2017.

30.    According to Gray, Gray agreed with Singer to co-write Singer's screenplay draft for *Maverick*—and came to that agreement even before Singer entered into a contract with PPC.

31.    But Gray did not try to negotiate a screenwriting contract with PPC, either individually or jointly with Singer, even though he knew that PPC (like any mainstream studio) would not knowingly allow a writer to work on a screenplay for a major film without a work-made-for-hire agreement in place deeming PPC the statutory author and owner of the proceeds. To the contrary, Gray deliberately concealed from PPC his purported writing role on Singer's screenplay draft from June 2017 (when PPC hired Singer) to January 2023.

32.    In January 2023, Gray sent PPC a written statement (the "Gray Narrative") through his attorney, in which Gray suddenly claimed that he had a writing role on *Maverick* that he had kept hidden for years from PPC.

33.    According to the Gray Narrative, Gray had concealed his involvement from PPC out of concern that, if his role were disclosed, PPC might not agree to hire him and Singer as a writing team and they would both lose out on the opportunity to work on *Maverick*.

34.    As he put it in the Gray Narrative, Gray worried that "if [Singer] pushed for the Studio to contract [them] as a writing team, with a shared credit, it risked blowing up the deal and could cause [them] to lose the project entirely."  After all, "by delaying notifying the Studio or producers of [Gray's] involvement, [Singer] could ensure that [they] secured the chance to write the movie."

35.    According to the Gray Narrative, Gray also concealed his involvement out of concern that, if his role were disclosed, PPC might offer less favorable terms than Singer could obtain with his name alone, given Gray's lack of experience.

36.    Gray continued to hide his purported writing role from PPC throughout the entire writing process on Singer's screenplay draft from June to November 2017.

37.    According to the Gray Narrative, Gray made the concerted decision again and again to actively conceal his purported writing role from PPC.

38.    For example, according to the Gray Narrative, in late October 2017, Gray revisited whether PPC should be informed about his purported writing role and his name added to the script. And Gray decided against it.

39.    With Gray's knowledge and assent, Singer delivered to PPC his final draft screenplay on November 3, 2017, with the following writing credits on the cover: "Written by / Peter Craig / Justin Marks / Current Revisions by / Eric Warren Singer."  Each of Singer's screenplay drafts along the way likewise purported to be the sole work product of PPC's work-made-for-hire contributors, with no credit on any draft to Gray.

40.    For years thereafter, Gray continued to conceal his purported writing role from PPC.  For example, according to the Gray Narrative, Gray learned in late 2019 that the Writers Guild of America ("WGA") was about to begin a credit arbitration for *Maverick*, which would

bind PPC as to the writing credits that would appear on the film. But Gray chose to stay silent rather than lodge a claim for a writing credit, even though Gray (who was both represented by counsel and a WGA member at the time) knew the WGA credit arbitration was the formal process for screenwriters to assert that they had made material writing contributions to the film and seek a film credit from the studio. Gray did not reach out to WGA during the credit arbitration, and Gray also did not reach out to PPC directly to disclose his purported writing role.

41.     Meanwhile, Gray was engaged by PPC as a staff writer on a separate project, the television series *Shantaram*, starting in April 2019. Gray had a written contract with PPC for his work on *Shantaram* and was represented by legal counsel in connection with that engagement. Yet Gray continued to conceal from PPC his purported role on *Maverick*.

42.     According to the Gray Narrative, Gray concealed his involvement at the time of the WGA arbitration because he worried about jeopardizing Singer's claim for credit in that heavily-contested arbitration—and Gray wanted to share in the bonus that Singer would receive from PPC if Singer received writing credit.

43.     On information and belief, Gray ultimately concealed his asserted involvement from PPC to entrap PPC in purported copyright infringement and/or joint copyright ownership once *Maverick* had already been finalized incorporating Singer's screenplay draft (to which Gray allegedly contributed in secret) and released to the general public.

44.     Gray concealed his purported writing role for several years after the WGA credit arbitration, continuing his deception through and after *Maverick*'s 2022 release. Gray did not disclose his alleged secret writing role to PPC until January 2023, by which point PPC could not extricate from *Maverick* the contributions that Gray allegedly made. Even then, Gray did not assert

that PPC was infringing any purported copyright rights of his, but rather requested that PPC assist in reopening *Maverick*'s credits so that he could belatedly receive a writing credit.

45.    PPC was unaware of Gray's purported writing role until Gray belatedly disclosed it to PPC in January 2023. And Gray knew that PPC was unaware of this fact. PPC's dealings were directly with Singer; PPC had a contract with Singer (and every other screenwriter on *Maverick*) but not with Gray; Singer's screenplay drafts credited Singer as a writer but not Gray; the WGA arbitration yielded a screenwriting credit for Singer, while Gray did not so much as submit a claim; and Gray did not inform PPC at any previous point that he claimed to have made writing contributions to *Maverick*'s screenplay.

46.    Gray's concealment of his purported writing role was material to PPC. As Gray himself understood, PPC would have prevented Gray from making writing contributions to the screenplay draft for *Maverick* if it had been aware that Gray was planning to do so. At minimum, PPC would have demanded that Gray enter into a work-made-for-hire agreement, deeming PPC the statutory author and owner of his contributions. As Gray knew, PPC required such agreements of every one of its screenwriters, including Singer. Had PPC known of Gray's purported contributions to Singer's screenplay draft, PPC certainly would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material. Even later on (but before *Maverick*'s release), had PPC known of Gray's purported contributions, PPC could have excised those elements from the screenplay and ultimately the film, albeit likely at significant expense.

47.    But Gray laid in wait for over five years.

48.    Gray's fraud has placed a cloud over PPC's title to *Maverick*, thereby causing injury to PPC.

49.     Gray also alleges that he drafted several scenes—which he dubs the "Gray Scenes"—that Singer incorporated into his screenplay draft, and that Gray did so without entering into any agreement with PPC.

50.     Gray further contends that he did not work subject to Singer's contract with PPC, or otherwise license PPC's use of the "Gray Scenes," which would have provided his only potential sources of authorization to use PPC's copyrighted material.

51.     The "Gray Scenes" exploit substantial protected expression owned by PPC from *Top Gun*—most significantly, the character of Maverick himself.

52.     The Maverick character is distinctive and well-delineated in *Top Gun* (and indeed the focal point of the film), and protected by PPC's copyright in *Top Gun*.

53.     Maverick features prominently in the "Gray Scenes," which comes as no surprise, since Maverick is the protagonist and titular character of the *Top Gun* sequel for which Gray contends he was writing the "Gray Scenes."

54.     The "Gray Scenes" borrow other elements of *Top Gun* too, including the training accident in *Top Gun*, which occurs while Maverick is piloting and kills Goose, leaving his young son Bradley Bradshaw without a father.  This key plot development from *Top Gun* drives the relationship between Maverick and Bradley, which plays out in the "Gray Scenes."

55.     The "Gray Scenes" also exploit substantial protected expression owned by PPC from prior treatments and screenplay drafts for *Maverick*—including the Kosinski Treatment, Singer's screenplay drafts, the Marks Draft, and the Craig Draft (collectively, the "*Maverick* Materials")—all of which PPC owns as works made for hire and/or via assignment.

56.     For example, the "Gray Scenes" copy from each of these works the premise of an older, seasoned Maverick who is tapped to train a cohort of next-generation pilots for a daring

mission—with Maverick ultimately shot down in enemy territory and making a harrowing escape to come out alive and victorious. The "Gray Scenes" also copy from the Craig Draft the presence of Goose's child among Maverick's trainees and that relationship as a driver of the sequel's story, and that same element from the Kosinski Treatment and each of Singer's drafts. The "Gray Scenes" copy from the Marks Draft the escape by Maverick from enemy territory by stealing an old F-14 plane from the enemy—the same type of plane that Maverick flew in the original *Top Gun* film. And the "Gray Scenes" copy the more-developed version of that element from the Kosinski Treatment and Singer's drafts, in which Maverick and Goose's child together steal an F-14 plane from an enemy airbase after getting shot down, with Goose's child serving as Maverick's radar intercept officer just as Goose had done, and the pair shooting down enemy planes to ultimately fly safely back to their aircraft carrier. The "Gray Scenes" further copy from the Kosinski Treatment and Singer's drafts the first act in which Maverick is working as a test pilot on a hypersonic aircraft program; he is found in a hanger with the aircraft, preparing to take one final run to try to break a speed record; and in that run, he surpasses the limits of the aircraft, causing the aircraft to break apart in midair in a wrenching and suspenseful accident where it is not immediately clear Maverick will survive. In each of these examples (among others not enumerated here), the copied content from the *Maverick* Materials also appears in *Maverick* and therefore falls within the scope of *Maverick*'s copyright registration.

57. PPC provided the *Maverick* Materials to Singer for Singer to use in drafting a screenplay for *Maverick* (setting aside Singer's drafts, which Singer himself prepared). Gray, in turn, had access to those materials through Singer—and in fact used them when purportedly drafting the "Gray Scenes."

58.     According to Gray, the earliest of the "Gray Scenes" was written from August 16 to 17, 2017.  According to Gray, the remaining "Gray Scenes" were created, respectively, on August 21, 2017; August 29, 2017; September 9, 2017; September 13 to 14, 2017; September 12 to 15, 2017; September 23, 2017; September 27, 2017; October 7, 2017; October 1 to 9, 2017; October 12, 2017; October 14, 2017; and October 30, 2017.

59.     The Kosinski Treatment, the Marks Draft, the Craig Draft, and Singer's initial July 16 draft predate all of the "Gray Scenes."  In addition, Singer's interim drafts spanning September 14, 2017 to October 19, 2017 each predate some of the "Gray Scenes."

60.     If, as Gray contends, he did not prepare the "Gray Scenes" subject to Singer's contract with PPC, or otherwise license the "Gray Scenes" for PPC's use in *Maverick* (which might entail a reciprocal implied license to Gray), then Gray lacked authorization to use PPC's copyrighted material from *Top Gun* or the *Maverick* Materials when he allegedly wrote the "Gray Scenes" and accordingly infringed PPC's exclusive right to prepare derivative works of *Top Gun* and the *Maverick* Materials.

### COUNT I: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

61.     PPC realleges and incorporates by reference paragraphs 1 through 60, inclusive, as though fully set forth herein.

62.     PPC is the sole owner of a valid copyright in the 1986 motion picture *Top Gun*, registered with the U.S. Copyright Office under registration number PA0000293347.

63.     PPC is also the sole owner of a valid copyright in the *Maverick* Materials.  Each of those works is an early, unpublished version of *Maverick*, and the parts of those works that also appear in *Maverick* are covered by PPC's copyright registration for *Maverick* under registration number PA0002351572.

64.    As the owner of the copyright in *Top Gun* and the *Maverick* Materials, PPC enjoys several exclusive rights in and to the works pursuant to 17 U.S.C. § 106, including the exclusive right to prepare derivative works based upon *Top Gun* and the *Maverick* Materials.

65.    If Gray is correct that he did not prepare the "Gray Scenes" subject to Singer's contract with PPC or otherwise license the "Gray Scenes" for PPC's use in *Maverick*, then PPC did not authorize Gray to exploit its copyrighted material from *Top Gun* or the *Maverick* Materials.

66.    Gray nonetheless exploited in substantial amount PPC's copyrighted material from *Top Gun* and the *Maverick* Materials in his asserted preparation of the "Gray Scenes," including Gray's use of the Maverick character and other protectable elements of those works.

67.    Gray had access to *Top Gun* and the *Maverick* Materials at all relevant times, and in fact used copyrighted material from *Top Gun* (including its protagonist, Maverick) and the *Maverick* Materials as part of his asserted writing process.

68.    Gray's asserted preparation of the "Gray Scenes" infringed PPC's exclusive copyright rights in *Top Gun* and the *Maverick* Materials, including its exclusive right to prepare derivative works.

69.    Gray did so with actual and/or constructive knowledge of PPC's exclusive rights in *Top Gun* and the *Maverick* Materials.

70.    Gray's acts are thus willful infringements of PPC's copyright rights in *Top Gun* and the *Maverick* Materials.

## COUNT II: FRAUD

71.    PPC realleges and incorporates by reference paragraphs 1 through 60, inclusive, as though fully set forth herein.

72.     Gray intentionally concealed from PPC that he was purportedly writing scenes and making other authorial contributions to Singer's draft of the *Maverick* screenplay.

73.     That fact was within Gray's exclusive or superior knowledge, and PPC could not reasonably have discovered it amid Gray's deception.

74.     PPC was not aware of Gray's purported writing role in connection with Singer's draft of *Maverick*'s screenplay until Gray belatedly disclosed it to PPC in January 2023.

75.     Gray intended to deceive PPC by concealing this fact, and he understood that PPC would not have permitted him to contribute to *Maverick*'s screenplay if PPC had been aware of Gray's activities.

76.     The concealed information was material to PPC.  Had PPC been aware of the concealed information, PPC would have prevented Gray from contributing to *Maverick*'s screenplay or at minimum would have required Gray to enter into a work-made-for-hire agreement deeming Gray's contributions to be authored and owned by PPC (or to confirm that any work Gray performed was owned by Singer and thus subject to Singer's agreement with PPC).  Moreover, PPC would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material.  Further, had the information been disclosed to PPC after Gray made his purported contributions but before *Maverick*'s release, PPC would have excised any of Gray's purported contributions from *Maverick*'s screenplay and the ultimate film, so as to avoid any question about its rights.

77.     PPC reasonably relied on Gray's concealment to its detriment.  PPC freely used Singer's screenplay draft in making *Maverick*, reasonably believing it to be the exclusive work product of Singer (whose contributions PPC owned as work made for hire) and PPC's other work-made-for-hire contributors.  PPC invested well over a hundred million dollars in *Maverick*, with

the bulk of that expenditure occurring after Singer's screenplay draft. PPC paid additional screenwriters to develop *Maverick*'s screenplay based on Singer's draft, actors to act out a screenplay that derived in significant part from Singer's draft, and so forth. But for Gray's concealment, PPC would have prevented Gray from contributing to *Maverick*'s screenplay or at minimum entered into a work-made-for-hire agreement with him (or required him to confirm that his purported contributions were owned by Singer) to conclusively establish PPC as the author and owner of Gray's contributions. And but for Gray's continued concealment up through and past *Maverick*'s release, PPC alternatively would have excised any of Gray's contributions from *Maverick*'s screenplay and the ultimate film (and, if early enough, not provided Singer's draft to the next wave of screenwriters as source material in the first place). But due to Gray's five-plus years of concealment from PPC, PPC was not able to take any of these measures to protect its rights in *Maverick*

78.     PPC was harmed as a result of Gray's fraud. Among other injuries, Gray's fraud has placed a cloud over PPC's title to *Maverick*; devaluing one of PPC's most significant properties and undercutting the fruits of its substantial investment in the film across more than a decade.

79.     Gray acted with malice, oppression, and/or fraud, as part of a scheme to entrap PPC in unwitting copyright infringement or joint copyright ownership after PPC had invested in *Maverick*'s success over the course of a decade. PPC is therefore entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, PPC prays for a judgment against Gray on each counterclaim as follows:

A.     For (i) actual damages and the profits derived by Gray from his infringing activities, or (ii) in the alternative to actual damages, for statutory damages in the maximum amount

permitted under applicable law with respect to PPC's infringed copyrights pursuant to 17 U.S.C. § 504, which election PPC shall make prior to the rendering of final judgment herein, according to proof in an amount to be determined at trial;

      B.      For compensatory damages for Gray's fraud in an amount to be determined at trial;

      C.      For punitive damages for Gray's fraud in an amount to be determined at trial;

      D.      For PPC's attorneys' fees and costs incurred; and

      E.      For such other and further relief as the Court deems just and equitable.

Dated:  August 13, 2025             By: */s/ Molly M. Lens*　　　　　　　　

O'MELVENY & MYERS LLP
Molly M. Lens
mlens@omm.com
Matthew Kaiser (admitted *pro hac vice*)
mkaiser@omm.com
1999 Avenue of the Stars, 8th Fl
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Danielle Feuer
dfeuer@omm.com
1301 Avenue of the Americas, Ste 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant and Counterclaim-Plaintiff Paramount Pictures Corporation and Defendants Paramount Global and Paramount Streaming Services Inc.*