**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAUN GRAY, an individual,<br><br>                     Plaintiff,<br><br>     vs.<br><br>PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation; and DOES 1-10,<br><br>                     Defendants.<br><br>PARAMOUNT PICTURES CORPORATION, a Delaware corporation;<br><br>                     Counterclaim-Plaintiff,<br><br>     vs.<br><br>SHAUN GRAY, an individual,<br><br>                     Counterclaim-Defendant, | Civil Action No. 1:25-cv-3484-JSR<br><br>**DEFENDANTS' AMENDED ANSWER AND PARAMOUNT PICTURES CORPORATION'S COUNTERCLAIMS** |

Through their undersigned attorneys, Defendants Paramount Global, Paramount Pictures Corporation ("PPC"), and Paramount Streaming Services Inc. (collectively, "Paramount" or "Defendants") file this amended answer[1] in response to the above-captioned complaint as follows:

## NATURE OF THE ACTION

1.    Paramount denies the allegations of Paragraph 1.

---

[1] Paramount hereby amends its answer only; PPC does not amend the counterclaims it filed on August 13, 2025 (Dkt. 48).  By stipulation of the parties, and as discussed with the Court, Plaintiff and Counter-Claim Defendant Shaun Gray's deadline to answer or otherwise respond to PPC's counterclaims remains September 3, 2025.

2.      Paramount denies that Paramount+ is operated by Paramount Streaming Services Inc., denies the allegations characterizing *Top Gun: Maverick*'s ("*Maverick*") box office success, and denies the allegations summarizing *Maverick*'s plot (and refers to the film itself for its full contents), but otherwise admits the allegations of Paragraph 2.

3.      Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, but denies the allegations to the extent that Paragraph 3 is intended to suggest that *Maverick*'s success is solely a product of its screenplay.

4.      Paramount denies the allegations of Paragraph 4.

5.      Paramount denies the allegations of Paragraph 5.

6.      Paramount denies the allegations of Paragraph 6, and further asserts that such allegations contain legal argument and/or conclusions of law to which no answer is required.

7.      Paramount admits that (setting aside Gray) all of the creative contributors to *Maverick*, including all of its screenwriters, made their contributions pursuant to agreements with PPC that contained, *inter alia*, work-made-for-hire provisions, and refers to those agreements for their full contents.  Paramount further admits that PPC is the single statutory author of those contributions.  Paramount also admits that PPC did not have a work-made-for-hire agreement directly with Gray, except to clarify that Gray had a work-made-for-hire agreement with Singer.  Paramount denies the remaining allegations of Paragraph 7, and further asserts that such allegations contain legal argument and/or conclusions of law to which no answer is required.

8.      The allegations of Paragraph 8 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 8.

## PARTIES

9.      Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9.

10.     Paramount admits the allegations of Paragraph 10.

11.     Paramount admits the allegations of Paragraph 11.

12.     Paramount admits that Paramount Streaming Services Inc. is a Delaware Corporation with a principal place of business in New York, New York, but denies the remaining allegations of Paragraph 12.

13.     Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

## JURISDICTION AND VENUE

14.     The allegations of Paragraph 14 contain legal argument and/or conclusions of law to which no answer is required.

15.     The allegations of Paragraph 15 contain legal argument and/or conclusions of law to which no answer is required.

16.     Paramount admits that Paramount Global and Paramount Streaming have their principal places of business in the State of New York and in this District.  The remaining allegations of Paragraph 16 contain legal argument and/or conclusions of law to which no answer is required.

17.     The allegations of Paragraph 17 contain legal argument and/or conclusions of law to which no answer is required.

18.     The allegations of Paragraph 18 contain legal argument and/or conclusions of law to which no answer is required.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

19.     Paramount denies the allegations of Paragraph 19.

20.     Paramount denies the allegations in the first sentence of Paragraph 20, except admits that Singer is Gray's relative, admits that PPC entered into a contract with Singer to provide screenwriting services on *Maverick* and refers to that agreement for its full contents, and clarifies that Singer worked only on an interim draft of *Maverick*'s screenplay.  PPC states that the allegations in the second sentence of Paragraph 20 are conclusions of law to which no response is required, but admits that Singer's contributions to *Maverick* are owned by PPC.

21.     Paramount denies the allegations in the first sentence of Paragraph 21, except admits that PPC entered into a contract with Kosinski to provide directing services on *Maverick* and refers to that agreement for its full contents.  PPC states that the allegations in the second sentence of Paragraph 21 are conclusions of law to which no response is required, but admits that Kosinski's contributions to *Maverick* are owned by PPC.

22.     Paramount denies the allegations of Paragraph 22.

23.     The allegations of Paragraph 23 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 23.

24.     Paramount admits that Gray was present for certain story development meetings with Singer and Kosinski, but denies the remaining allegations of Paragraph 24.

25.     Paramount admits that, prior to entering into a contract with Singer, it entered into contracts with Peter Craig and Justin Marks, with such contracts containing, *inter alia*, work-made-for-hire provisions, and refers to those contracts for their full contents, but denies the remaining allegations of Paragraph 25.

26.    Paramount admits that, after Singer, it entered into contracts with Ehren Kruger and Christopher McQuarrie, with such contracts containing, *inter alia*, work-made-for-hire provisions, and refers to those contracts for their full contents, but denies the remaining allegations of Paragraph 26.

27.    Paramount denies the allegations of Paragraph 27, except admits that all persons contributing creative content to *Maverick* did so pursuant to agreements, admits that such agreements contained, *inter alia*, work-made-for-hire provisions, and refers to such agreements for their full contents, and clarifies that Gray had a written agreement with Singer and refers to that agreement for its contents.

28.    Paramount denies the allegations of Paragraph 28, except admits that PPC did not have a written contract with Gray or directly compensate him in connection with *Maverick*.

29.    Paramount admits that Gray did not receive a salary or employment benefits from PPC in connection with *Maverick*, but denies the remaining allegations of Paragraph 29.

30.    Paramount denies the allegations of Paragraph 30.

31.    Paramount denies the allegations of Paragraph 31.

32.    Paramount denies the allegations of Paragraph 32.

33.    The allegations of Paragraph 33 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 33.

34.    Paramount admits that PPC theatrically released *Maverick* on May 27, 2022, and included film credits stating: "Screenplay by Eric Kruger, Eric Warren Singer and Christopher McQuarrie" and "Story by Peter Craig and Justin Marks."  Paramount denies the remaining allegations of Paragraph 34.

35.     Paramount admits the allegations of Paragraph 35, except that it denies that Paramount Streaming owns or operates Paramount+.

36.     The allegations of Paragraph 36 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 36.

37.     Paramount admits that it is exploring a potential sequel to *Maverick*, but does not yet know what its contents will be and therefore lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 37, except denies any allegation that such potential sequel will incorporate copyrighted material purportedly owned by Gray.

## FIRST CLAIM FOR RELIEF

### DECLARATORY JUDGMENT

38.     No response is required to Paragraph 38 because the Court has dismissed Gray's First Claim for Relief with prejudice.

39.     No response is required to Paragraph 39 because the Court has dismissed Gray's First Claim for Relief with prejudice.

40.     No response is required to Paragraph 40 because the Court has dismissed Gray's First Claim for Relief with prejudice.

41.     No response is required to Paragraph 41 because the Court has dismissed Gray's First Claim for Relief with prejudice.

42.     No response is required to Paragraph 42 because the Court has dismissed Gray's First Claim for Relief with prejudice.

43.     No response is required to Paragraph 43 because the Court has dismissed Gray's First Claim for Relief with prejudice.

44.     No response is required to Paragraph 44 because the Court has dismissed Gray's First Claim for Relief with prejudice.

45.     No response is required to Paragraph 45 because the Court has dismissed Gray's First Claim for Relief with prejudice.

46.     No response is required to Paragraph 46 because the Court has dismissed Gray's First Claim for Relief with prejudice.

47.     No response is required to Paragraph 47 because the Court has dismissed Gray's First Claim for Relief with prejudice.

48.     No response is required to Paragraph 48 because the Court has dismissed Gray's First Claim for Relief with prejudice.

49.     No response is required to Paragraph 49 because the Court has dismissed Gray's First Claim for Relief with prejudice.

50.     No response is required to Paragraph 50 because the Court has dismissed Gray's First Claim for Relief with prejudice.

51.     No response is required to Paragraph 51 because the Court has dismissed Gray's First Claim for Relief with prejudice.

52.     No response is required to Paragraph 52 because the Court has dismissed Gray's First Claim for Relief with prejudice.

53.     No response is required to Paragraph 53 because the Court has dismissed Gray's First Claim for Relief with prejudice.

54.     No response is required to Paragraph 54 because the Court has dismissed Gray's First Claim for Relief with prejudice.

55.    No response is required to Paragraph 55 because the Court has dismissed Gray's First Claim for Relief with prejudice.

**SECOND CLAIM FOR RELIEF**
**(In the alternative to the First Claim)**

**COPYRIGHT INFRINGEMENT**

56.    Paramount incorporates by reference its answers to Paragraphs 1 through 37, inclusive.

57.    Paramount denies the allegations of Paragraph 57.

58.    The allegations of Paragraph 58 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 58.

59.    The allegations of Paragraph 59 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 59, except that it admits Gray appears to have registered the so-called "Gray Scenes" with the U.S. Copyright Office.

60.    The allegations of Paragraph 60 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 60, except that PPC admits it received a draft screenplay for *Maverick* from Singer.

61.    The allegations of Paragraph 61 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 61.

62.    The allegations of Paragraph 62 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 62.

63.    The allegations of Paragraph 63 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 63, including the purported substantial similarities set forth in Exhibit 1.

64.    Paramount lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 64, except that Paramount denies that Gray wrote the so-called "Gray Scenes."

65.    The allegations of Paragraph 65 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 65.

66.    The allegations of Paragraph 66 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 66.

67.    The allegations of Paragraph 67 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 67.

68.    The allegations of Paragraph 68 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 68.

69.    The allegations of Paragraph 69 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 69.

70.    The allegations of Paragraph 70 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 70.

71.    The allegations of Paragraph 71 contain legal argument and/or conclusions of law to which no answer is required.  To any extent a response is required, Paramount denies the allegations of Paragraph 71.

## THIRD CLAIM FOR RELIEF

### ACCOUNTING

72.    No response is required to Paragraph 72 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

73.    No response is required to Paragraph 73 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

74.    No response is required to Paragraph 74 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

75.    No response is required to Paragraph 75 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

76.    No response is required to Paragraph 76 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

77.    No response is required to Paragraph 77 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

78.     No response is required to Paragraph 78 because the Court has dismissed Gray's Third Claim for Relief with prejudice.

## PRAYER FOR RELIEF

The remaining paragraphs of the Complaint are requests for relief to which no response is required.  To any extent a response is required, Paramount denies that Gray is entitled to the relief requested or any other relief.

## AFFIRMATIVE DEFENSES

As separate and additional defenses to the Complaint, and without suggesting or conceding that it has the burden of proof on any such defenses, Paramount hereby alleges the following affirmative defenses, while reserving the right to assert any other applicable legal or equitable defense.  Paramount further reserves the right to amend or supplement these affirmative defenses in light of ongoing discovery, including but not limited to: (a) Gray's Court-ordered production of documents; (b) Gray's continued deposition; and (c) the deposition of Gray's attorney, Matthew Saver.

## FIRST AFFIRMATIVE DEFENSE

(Failure to State a Claim)

Gray's claim is barred, in whole or in part, because Gray fails to state a claim upon which relief can be granted.  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2] Gray fails to adequately plead the constituent elements of his claim: (1) that he is the owner of a valid copyright in the so-called "Gray Scenes," and (2) that Paramount copied substantial, original expression from those purported works and did so without authorization.

---

[2] Paramount includes certain, limited case citations herein.  For the avoidance of doubt, Paramount does so without limitation, including, without concession that the cited law applies.

Paramount incorporates the following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## SECOND AFFIRMATIVE DEFENSE

### (First Amendment)

Gray's claim is barred, in whole or in part, by the First Amendment. Movies are a form of expression that fall squarely within the protections of the First Amendment. Gray's claim for copyright infringement has the purpose and effect of chilling Paramount's exercise of its First Amendment right to freedom of speech.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## THIRD AFFIRMATIVE DEFENSE

### (Lack of Ownership)

Gray's claim is barred because Gray does not own the so-called "Gray Scenes" allegedly at issue here. "Legal ownership of the exclusive rights under a copyright initially vests in the author of the copyrighted work." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (citing 17 U.S.C. § 201(a)). Gray is not the author of those scenes—PPC is (or, at minimum, Eric Singer and/or his loan-out company Bullsh!t Aritsts, Inc.)—and Gray therefore never obtained any ownership interest in the work. To the extent that Gray was involved in creating the screenplay for *Top Gun: Maverick*, his involvement was limited to serving as Singer's assistant. Singer—and all other actual screenwriters for *Top Gun: Maverick*—made their contributions as works made for hire for PPC pursuant to express written agreements.

Further still, Gray is not entitled to any rebuttable presumption of ownership by virtue of his eleventh-hour copyright registrations. "[T]he presumption of validity afforded a copyright registration may be rebutted by proof of deliberate misrepresentation." *Medforms, Inc. v.*

*Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 114 (2d Cir. 2002) ("[W]e have previously affirmed the findings of a trial court that the presumption of validity was rebutted where the defendants showed the copyright holder had deliberately misrepresented facts about authorship to the Copyright Office.").  Here, as set forth more fully below in connection with Paramount's Fourteenth Affirmative Defense, Gray committed fraud on the Copyright Office by, *inter alia*, failing to list PPC as a joint author—to any extent Gray could claim any sort of authorship at all—and failing to list prior drafts of the *Maverick* screenplay as works from which the so-called "Gray Scenes" derived.  Gray likewise committed fraud on the Copyright Office by failing to disclose that he lacked authorization to incorporate material from *Top Gun* into the so-called "Gray Scenes," which renders them infringing derivative works unentitled to copyright protection, as discussed more fully below in connection with Paramount's Seventh Affirmative Defense.  Gray also committed fraud on the Copyright Office by listing himself in any authorship capacity with respect to the so-called "Gray Scenes."  Even further still, Gray committed fraud by representing to the Copyright Office that all the so-called "Gray Scenes" were included in *Top Gun: Maverick*, which is manifestly not true.

Moreover, as the Copyright Office itself repeatedly explained to Gray's counsel, the Copyright Office previously registered *Top Gun: Maverick* to PPC under registration number PA0002351572, effective 5/31/2022, with which Gray's registrations clashed; the Copyright Office explained in response to Gray's copyright registration submission that it "generally does not have the authority to adjudicate adverse or conflicting claims submitted for registration," and in response Gray confirmed he understood that the dispute should be adjudicated by federal courts rather than the Copyright Office.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

### FOURTH AFFIRMATIVE DEFENSE

(Work Made For Hire)

Gray's claim is barred because, to the extent that Gray prepared the so-called "Gray Scenes," which Paramount disputes, he did so as work made for hire for Eric Singer and/or Singer's loan-out company Bullsh!t Artists, Inc., and Gray therefore is not the author or owner of the so-called "Gray Scenes." "A work is 'for hire' if it is either (1) 'prepared by an employee within the scope of his or her employment,' or (2) "specially ordered or commissioned for use . . . , if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.'" *Price v. Fox Ent. Grp., Inc.*, 473 F. Supp. 2d 446, 456 (S.D.N.Y. 2007) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738 n.5 (1989)).

Here, Gray was Singer/Bullsh!t Artists, Inc.'s employee, as their October 2015 employment agreement expressly confirms. Moreover, any work that Gray performed in connection with the screenplay for *Top Gun: Maverick* was the kind of work that he was employed by Singer/Bullsh!t Artists, Inc. to perform; Gray's work occurred substantially within the authorized time and space limits of his employment with Singer/Bullsh!t Artists, Inc.; and any work made by Gray was made for the purpose of serving his employer, Singer/Bullsh!t Artists, Inc.

Furthermore, and independently, any work to which Gray contributed in connection with the screenplay for *Top Gun: Maverick* was work specially ordered or commissioned for use as a contribution to a collective work (to any extent, as Gray theorizes, individual scenes are independently copyrightable as discrete works) and as a part of a motion picture. Indeed, Gray

-14-

and Singer/Bullsh!t Artists, Inc. expressly agreed in a written instrument, signed by them and dated October 6, 2015, that Singer/ Bullsh!t Artists, Inc. shall be the sole and exclusive owner of any screenplays or other materials or creative projects of any kind or nature that Gray assisted Singer/Bullsh!t Artists, Inc. with.  Even further still, in this same written agreement, Gray agreed, among other things, that he would not acquire any rights of any kind or nature in or to any materials of any kind or nature that he assisted Singer/Bullsh!t Artists, Inc. with.

Moreover, even setting aside the express employment and work-made-for-hire agreement, Gray qualifies as Singer/Bullsh!t Artists, Inc.'s employee for purposes of the work-for-hire doctrine.  Under the Supreme Court's decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), courts consider the so-called *Reid* factors, which "are weighed by referring to the facts of a given case."  *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 85 (2d Cir. 1995) (citing *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992)).  Here, the *Reid* factors weigh in favor of finding that Gray was Singer/Bullsh!t Artists, Inc.'s employee when serving as one of Singer's assistants when Singer was hired by PPC to draft the screenplay for *Top Gun: Maverick*, including, for example:

1.    Singer/Bullsh!t Artists, Inc. had the exclusive "right to control the manner and means by which the product is accomplished," such as setting parameters for the substance and timeline of the contributions that Gray made;

2.    "the skill required" for Gray to complete his work as an assistant was minimal compared to that of a screenwriter, consisting largely of transcribing Singer's words, implementing edits, and proofreading drafts;

3.    "the location of the work" was Singer's office for all of the story sessions on the screenplay, though Singer also allowed Gray to work from home at times;

4.    "the duration of the relationship between the parties" lasted years, with Gray serving as Singer's writing assistant prior to *Top Gun: Maverick*;

5.    Singer, as "the hiring party[,] ha[d] the right to assign additional projects to the hired party," Gray, and would frequently delegate specific tasks to Gray, such as taking notes, transcribing Singer's thoughts, and doing research;

6.    "the extent of the hired party's discretion over when and how long to work;" with Singer dictating the terms of Gray's schedule;

7.    "the method of payment" was a set amount, and not royalties;

8.    "the hired party's role in hiring and paying assistants" was nonexistent—Gray served as one of several of Singer's assistants during the course of his employment, and Gray neither hired nor paid Singer's other assistants;

9.    "the work [was] part of the regular business of the hiring party"—Singer is a successful screenwriter who has been credited for his writing on several major motion pictures and television projects, often with the aid of writing assistants; and

10.    "the hiring party is in business"—Singer has been engaged in the business of writing and producing for television and movies for decades.  *See Carter*, 71 F.3d at 85.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## FIFTH AFFIRMATIVE DEFENSE

(Copyright Assigned By Gray)

Gray's claim is barred because, to the extent that Gray had any copyright interest, which Paramount disputes, Gray assigned any such copyright to Eric Singer and/or Singer's loan-out company Bullsh!t Artists, Inc. via that express written agreement among them dated October 6, 2015.  Gray therefore is not the owner of the so-called "Gray Scenes."

-16-

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## SIXTH AFFIRMATIVE DEFENSE

(Lack of Copyrightability)

Gray's claim is barred becausethe so-called "Gray Scenes" are not independently copyrightable. An individual's "creative contributions to a work in which copyright protection subsists, such as a film," are not themselves "a 'work of authorship' amenable to copyright protection," when those "contributions are inseparable from the work." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255–56 (2d Cir. 2015). In other words, "inseparable contributions integrated into a single work cannot separately obtain [copyright] protection" distinct from the unitary work in which those contributions are embodied. *Id.* at 257. Indeed, "while originality and fixation are necessary prerequisites to obtaining copyright protection, *see* 17 U.S.C. § 102(a), they are not alone sufficient: Authors are not entitled to copyright protection except for the 'works of authorship' they create and fix." *Casa Duse*, 791 F.3d at 258.

Here, to the extent that Gray made any contributions to *Top Gun: Maverick* and/or its screenplay (including Singer's drafts of it), which Paramount denies, such contributions are inseparable from the work as a whole. The so-called "Gray Scenes" are not freestanding works of authorship, but rather inseparable *parts* of a unitary work of authorship, and they are therefore not *independently* copyrightable as discrete works. The so-called "Gray Scenes" are instead covered by the copyright in the version of the unitary work in which they are embodied (*i.e.*, *Top Gun: Maverick* and/or its earlier versions, such as screenplay drafts), just as any other scene in a film is covered by the copyright in that film (or the version of the film that existed at a given time). Where multiple purported authors lay claim to the copyright in a single work, copyright law resolves that contest by asking whether they are joint authors of that work, and if they are

-17-

not, and there also was no work-made-for-hire agreement in place (which is not the case here), which of those individuals was the dominant author. *Id.* at 260. Copyright law does *not* fracture the copyright into many pieces and dole out those pieces among the claimants.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

**SEVENTH AFFIRMATIVE DEFENSE**

(Infringing Derivative Work)

Gray's claim is barred because PPC's preexisting copyrighted material so pervades the so-called "Gray Scenes" that they are not protected by copyright. "[C]opyright protection does not extend to any part of the derivative work in which pre-existing material was used unlawfully—for example, if the copyrighted portions of the pre-existing work were used without the owner's permission." *Wozniak v. Warner Bros. Ent. Inc.*, 726 F. Supp. 3d 213, 237 (S.D.N.Y. 2024) (quoting *Dynamic Sols., Inc. v. Plan. & Control, Inc.*, 646 F. Supp. 1329, 1340 (S.D.N.Y. 1986)). "And if the pre-existing material used without permission tends to pervade the entire derivative work, copyright protection is denied to the derivative work entirely." *Id.*

Here, PPC owns the copyright in the 1986 film *Top Gun*, which, among other notable contributions, created the well-delineated character of Pete "Maverick" Mitchell, who is the protagonist of that film and *Top Gun: Maverick* alike. PPC also owns (as the proprietor of works made for hire) the copyright in all versions of the screenplay for *Top Gun: Maverick* that predate Gray's ostensible drafting of the so-called "Gray Scenes." Gray did not have permission to use these copyrighted materials in connection with the so-called "Gray Scenes." PPC's preexisting copyrighted material pervades the entirety of the so-called "Gray Scenes"—most blatantly, the character of Maverick itself—such that copyright protection is denied to the so-called "Gray

Scenes" entirely.  *See infra*, Counterclaims ¶¶ 54–56 (listing examples of copyrighted material appearing in the so-called "Gray Scenes" that Gray was not authorized to use).

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

<u>**EIGHTH AFFIRMATIVE DEFENSE**</u>

(Express License)

Gray's claim is barred, in whole or in part, because, to the extent that Gray is the author of the so-called "Gray Scenes," which Paramount disputes, Paramount has or had an express license to use the so-called "Gray Scenes" pursuant to Gray's agreements with Eric Singer/Bullsh!t Artists, Inc., of which Paramount was an intended beneficiary.  "A license is a complete defense to a claim for copyright infringement."  *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 661 (S.D.N.Y. 2014).  Here, both in the 2015 agreement and in the "verbal" agreement described in Gray's own January 23, 2023 statement, Gray granted Singer/Bullsh!t Artists, Inc. an express license to any work that Gray assisted Singer/Bullsh!t Artists, Inc. in producing.  The parties agreed that Gray would be Singer's writing assistant for the *Maverick* screenplay, just as Gray had been previously, thereby licensing any work that Gray produced to Singer.  PPC, as the studio that hired Singer to write the *Maverick* screenplay via a work-made-for-hire agreement, was the intended beneficiary of these license agreements between Singer and Gray.  And Singer, in turn, expressly granted all copyright rights in his screenplay drafts to PPC via that work-made-for-hire agreement.  Indeed, Gray made his contributions with the intent that they would be incorporated in Singer's screenplay draft—and ultimately, the intent and desire that they make the cut for inclusion by PPC in *Top Gun: Maverick* itself.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## NINTH AFFIRMATIVE DEFENSE

(Implied License)

Gray's claim is barred, in whole or in part, because, to the extent that Gray is the author of the so-called "Gray Scenes," which Paramount disputes, Paramount has or had an implied license to use the so-called "Gray Scenes," either directly or as an intended beneficiary of a license to Eric Singer. The Second Circuit has pointed to two possible tests to determine whether an implied license to a copyright exists. *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022). One is a "narrow test," whereby courts will "find[] an implied license only where [i] one party created a work at the other's request and [ii] handed it over, [iii] intending that the other copy and distribute it." *Id.* (cleaned up). The other is a "more permissive test" whereby "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id.* (cleaned up).

Here, regardless of which test applies, Gray's own allegations demonstrate an implied license, as will be conclusively established by ongoing discovery. Indeed, Gray's own January 23, 2023 statement further underscores the existence of an implied license.

First, on even the narrower of the tests, Gray admits that, after PPC hired Singer as a screenwriter, Singer asked Gray to "contribute his talents as a writer to the Screenplay" and "join [Singer]" in writing it. Dkt. 1 ("Compl.") ¶¶ 4, 22. Thus, by Gray's admissions, Gray's contributions to the screenplay for *Maverick*, including the so-called "Gray Scenes," were created at Singer's request, satisfying the test's first element. *ABKCO Music*, 50 F.4th at 320. Second, Gray admits that he emailed the "Gray Scenes" to Singer, Compl. ¶ 60, thereby "hand[ing] [them] over" and satisfying the test's second element. *ABKCO Music*, 50 F.4th at 320. Third, Gray admits that he "inten[ded] for [his] contributions to be merged into inseparable or interdependent parts" of the Screenplay and *Maverick*. Compl. ¶ 45. Indeed, it is the only

logical conclusion that Gray, who wrote the "Gray Scenes" *specifically for inclusion* in the Singer Draft, "intend[ed] that [Singer] copy and distribute" the "Gray Scenes" to PPC—and, in turn, to commercial audiences upon *Maverick*'s release. *ABKCO Music*, 50 F.4th at 320; *see Fontana v. Harra*, 2013 WL 990014, at *8 (C.D. Cal. Mar. 12, 2013) (finding implied license on motion to dismiss; "[P]laintiff's intent is apparent from the fact that he was hired to write a screenplay . . . . Screenplays are written to be made into movies, and it would be unusual if plaintiff created the screenplay believing that it was going to be used for some other purpose."). After all, Gray alleges that he was working on the Singer Draft *with Singer*, so it would have come as no surprise that the so-called "Gray Scenes" were incorporated in it; it is exactly what they set out to do. From the outset, PPC was the intended beneficiary of this license; PPC's use of the Singer Draft (and all material incorporated in it) in *Maverick* was all parties' intention and goal in this arrangement.

Because the "narrow test" is satisfied, the "more permissive test" is necessarily satisfied too. *Id.* That test recognizes that "[c]reating material at another's request is not the essence of a license; an owner's grant of permission to use the material is." *MidlevelU, Inc. v. ACI Info. Grp*., 989 F.3d 1205, 1216 (11th Cir. 2021). Thus, "[w]hen an owner's conduct clearly manifests a consent to use of copyrighted material, the owner impliedly grants a nonexclusive license." *Id.* (cleaned up). Silence in the face of an otherwise-infringing use can suffice to manifest consent. *ABKCO Music*, 50 F.4th at 320; *Psihoyos v. Pearson Educ., Inc*., 855 F. Supp. 2d 103, 121 (S.D.N.Y. 2012) (collecting cases). Per his own allegations, Gray wrote the so-called "Gray Scenes" specifically for inclusion in the screenplay he worked on with Singer, and with the intent that they later be incorporated into *Maverick* and its ultimate Screenplay. *See* Compl. ¶¶ 4, 22, 30, 45. Gray consented to the use of those scenes in the ultimate work product—it was his entire

purpose in creating them.  And when aspects of the "Gray Scenes" (allegedly) made it into the

Singer Draft and then into *Maverick*, Gray did not protest that use, thereby manifesting his

consent for their use.  Indeed, Gray does not (and cannot) allege that he *ever* told anyone at PPC

that use of the Singer Draft would somehow infringe Gray's purported copyright until long after

*Maverick* was released.

Paramount incorporates the preceding and following affirmative defenses, as well as its

answer and counterclaims, as if fully stated hereunder.

## TENTH AFFIRMATIVE DEFENSE

### (*De Minimis* Infringement)

Gray's claim is barred, in whole or in part, because, to the extent that Gray is the author

of the so-called "Gray Scenes," which Paramount disputes, any infringement by Paramount was,

at most, *de minimis* and not actionable.  If a defendant's "copying is *de minimis* and so 'trivial' as

to fall below the quantitative threshold of substantial similarity, the copying is not actionable."

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008).

Here, to the extent that *Maverick* bears similarity to the so-called "Gray Scenes," upon

"extract[ing] the unprotectible elements from [] consideration and ask[ing] whether the

protectible elements, standing alone, are substantially similar," the answer is ***no***.  *See Nobile v.*

*Watts*, 747 F. App'x 879, 882 (2d Cir. 2018).  Gray does not have any copyright rights in the

preexisting material incorporated into the so-called "Gray Scenes" —including PPC's intellectual

property from *Top Gun* and the earlier *Maverick* screenplay drafts and treatments—so that

material (including all constituent characters and plot elements) must be filtered out of any

similarity analysis.  After extracting out that material and other non-protectible aspects of the so-

called "Gray Scenes," such as stock characters, tropes, and facts, any similarity between the so-

called "Gray Scenes" and *Maverick* is *de minimis*, and Gray's claim therefore fails.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## ELEVENTH AFFIRMATIVE DEFENSE

(Innocent Infringement)

To the extent that Paramount infringed the so-called "Gray Scenes," which Paramount disputes, any statutory damages awarded to Gray should be reduced because Paramount was not aware and had no reason to believe that its acts would constitute an infringement of copyright. "An innocent infringer must prove that he 'was not aware and had no reason to believe that his or her acts constituted infringement.'" *Bryant v. Europadisk, Ltd.*, 2009 WL 1059777, at *7 (S.D.N.Y. Apr. 15, 2009), *aff'd sub nom. Bryant v. Media Right Prods., Inc.*, 603 F.3d 135 (2d Cir. 2010) (quoting *Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp.*, 97 F.Supp.2d 395, 419 (S.D.N.Y. 2000)).

Here, Paramount did not know—and had no reason to believe—that Gray allegedly contributed written expression to Singer's 2017 draft screenplay for *Maverick* until January 2023, more than six months after the global release of *Maverick*. Gray's own statement to PPC in January 2023 establishes that Singer "ha[d] informed no one at all" of Gray's alleged contribution to the *Maverick* screenplay. Moreover, during at least one conversation in January 2023, Gray's attorney expressly confirmed to PPC that Gray was not claiming infringement and/or seeking damages from PPC.

And even after Gray sent his statement to PPC in January 2023, PPC had no reason to believe that its continued distribution of *Maverick* constituted infringement of any copyrights owned by Gray. Gray's January 2023 statement evinces an arrangement between Gray and Singer whereby Gray licensed any work he performed on the *Maverick* screenplay to Singer, and in turn to PPC, for use in *Maverick*. And Gray did not even attempt to register copyrights in any

of the so-called "Gray Scenes" until April 2024.  Accordingly, in the event that Paramount is found liable, the Court should reduce any award of statutory damages, given that any such infringement was innocent.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## TWELFTH AFFIRMATIVE DEFENSE

### (Estoppel)

To the extent that Paramount infringed the so-called "Gray Scenes," which Paramount disputes, Gray's claim is barred, in whole or in part, by the doctrine of estoppel, including due to Gray's concealment from PPC of his alleged authorial role until long after *Maverick*'s release.  A copyright infringement plaintiff will be estopped from bringing an infringement claim if: (1) he "had knowledge of defendant's infringing conduct," (2) he "either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended," (3) "the defendant [was] ignorant of the true facts," and (4) the defendant "rel[ied] on plaintiff's conduct to his detriment."  *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (quoting *Lottie Joplin Thomas Tr. v. Crown Publishers, Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (2d Cir. 1978)).  As applied here, Gray knew that PPC was using the screenplay draft he allegedly prepared with Singer (incorporating the so-called "Gray Scenes") to make *Maverick*; he chose to hide his purported role in that drafting process from PPC until long after *Maverick* was released, knowing that PPC believed the draft to be the sole work product of its work-made-for-hire screenwriter Singer; and PPC detrimentally relied on that conduct when it used Singer's screenplay draft in making *Maverick* and invested vast sums in the film's production, marketing, and release.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

### THIRTEENTH AFFIRMATIVE DEFENSE

(Waiver)

Gray's claim is barred, in whole or in part, by the doctrine of waiver. "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd.*, 226 F. Supp. 3d 206, 223 (S.D.N.Y. 2016). And under New York law, "waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 185 (D. Conn. 2005) (quoting *City of N.Y. v. State of N.Y.*, N.Y.S.2d 332, 340 (1976)).

Here, as set forth above, Gray granted PPC a nonexclusive implied license, and as such, he has waived his right to sue PPC. *PaySys Int'l, Inc.*, 226 F. Supp. 3d at 223. Moreover, that license aside, Gray intentionally relinquished his known (alleged) rights in the "Gray Scenes" through his tactical silence between June 2017 and January 2023. Gray had worked as a writer's assistant on at least three screenplays prior to 2017; became a member of the Writers Guild of America in 2019; was represented by experienced counsel in connection with his alleged work on *Maverick* as early as 2019; and asked Singer in 2019 whether he would receive any credit on *Maverick*. Given Gray's background and representation by counsel, to the extent that Gray had copyrights in the "Gray Screens," he had knowledge of those rights. But he intentionally relinquished any such rights by lying in wait until six months after *Maverick*'s release—after the film had obtained great critical and commercial success—before informing PPC in January 2023

of his alleged work on the screenplay.  Gray's tactical silence under these circumstances constitutes waiver.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## FOURTEENTH AFFIRMATIVE DEFENSE

(Unclean Hands / Fraud on the Copyright Office)

To the extent that Paramount infringed the so-called "Gray Scenes," which Paramount disputes, Gray's claim is barred, in whole or in part, by the doctrine of unclean hands and Gray's fraud on the Copyright Office.  A plaintiff's "knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute reason for holding the registration invalid and thus incapable of supporting an infringement action, . . . or denying enforcement on the ground of unclean hands." *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F. Supp. 980, 988 (S.D.N.Y. 1980); *accord Sorenson v. Wolfson*, 96 F. Supp. 3d 347, 364 (S.D.N.Y. 2015) (defendant prevailed on plaintiff's infringement claim following bench trial "because [plaintiff] committed fraud on the Copyright Office" by failing to list author in copyright application).  Where a plaintiff "deliberately misrepresented facts about authorship to the Copyright Office," such evidence may demonstrate that the plaintiff acted with unclean hands. *See Medforms, Inc.*, 290 F.3d at 114.

Here, Gray alleges in his Complaint that "Gray and PPC are the sole joint authors of the Screenplay" for *Maverick*, (Dkt. 1 ¶ 7), yet Gray knowingly failed to list PPC as an author when he registered the so-called "Gray Scenes."  Moreover, although Gray's copyright applications "identif[y] the 1986 film '*Top Gun*' and exclude[] any protectable expression that [his] work may have implicated from" that film, Gray knowingly failed to inform the Copyright Office that any work he performed on the *Maverick* screenplay was derivative of the work in: a 2012 draft of the

screenplay by screenwriter Peter Craig; a 2016 draft by screenwriter Justin Marks; a treatment for *Maverick* prepared by director Joseph Kosinski on May 16, 2017; and interim drafts produced by Singer beginning in September 2017.  Gray's failure to list PPC as his joint author, and failure to list the copyrighted drafts and treatment from which any work he performed derived leave him with unclean hands and constitute a "fraud on the Copyright Office."  *See Sorenson*, 96 F. Supp. 3d at 364.  Gray likewise committed fraud on the Copyright Office by failing to disclose that he lacked authorization to incorporate material from *Top Gun* into the so-called "Gray Scenes," which renders them infringing derivative works unentitled to copyright protection, as discussed more fully above in connection with Paramount's Seventh Affirmative Defense.  Even further still, Gray knowingly mispresented to the Copyright Office that all the so-called "Gray Scenes" appear in *Top Gun: Maverick*, which is not true.

In addition to fraud on the Copyright Office, Gray's fraud on PPC leaves him with unclean hands.  The "unclean hands defense applies where 'a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct.'"  *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 136 (S.D.N.Y. 2021) (quoting *Sands v. CBS Interactive Inc.*, 2019 WL 1447014, at *4 (S.D.N.Y. Mar. 13, 2019)).  Here, Gray's tactical silence with respect to his alleged authorship persisted from June 2017 until January 2023—six months after the release of *Maverick*.  In the interim, PPC spent hundreds of millions of dollars producing and promoting the film.  It was only once the film had garnered great commercial and critical success, and on the eve of the awards nomination season, that Gray came out of the woodwork and asserted that he had purportedly contributed to writing the screenplay.  This was fraud, *see infra*, and Gray

committed this fraud so as to maximize the potential payout to him and the harm to PPC.  Gray therefore asserts his claim for infringement with unclean hands, and the Court should reject it.

Paramount incorporates the preceding and following affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

### FIFTEENTH AFFIRMATIVE DEFENSE

(Statute of Limitations)

To the extent that Paramount infringed the so-called "Gray Scenes," which Paramount disputes, Gray's claim is barred, in whole or in part, by the statute of limitations, because it is predicated on a claim of authorship that accrued more than three years prior to the filing of Gray's Complaint.  Copyright claims premised on authorship "accrue when plain and express repudiation of [authorship] is communicated to the claimant, and are barred three years from the time of repudiation."  *D'Arezzo v. Appel*, 753 F. Supp. 3d 294, 307 (S.D.N.Y. 2024).  Here, the writing credits for *Top Gun: Maverick* were determined through a credit arbitration conducted by the Writers Guild of America ("WGA") in 2020.  Gray, who became a member of WGA in August 2019, knew about the credit arbitration.  Pursuant to the collective bargaining agreement between PPC and WGA, PPC submitted a notice of tentative writing credits for *Top Gun: Maverick* to WGA in September 2019.  That notice did not include Gray, and WGA's final determination of the writers credits for *Top Gun: Maverick* did not include Gray.

The exclusion of Gray from PPC's September 2019 notice of tentative writing credits constituted a plain and express repudiation of Gray's authorship.  So too did WGA's final determination in 2020 that Gray was not one of the writers for *Top Gun: Maverick*, by which PPC was bound.  Gray claims the so-called "Gray Scenes" were incorporated into *Top Gun: Maverick*, but PPC has long repudiated any authorship by Gray in the film and instead has attributed authorship to itself (in the copyright sense of the term) and to its work-made-for-hire

-28-

screenwriters Peter Craig, Justin Marks, Eric Singer, Ehren Kruger, and Christopher McQuarrie (in the colloquial sense of the term).  As another example, Gray's purported authorship was also repudiated by his knowing exclusion from the cover page of Singer's November 3, 2017 screenplay draft, which listed the following writing credits to the exclusion of Gray: "Written by / Peter Craig / Justin Marks / Current Revisions by / Eric Warren Singer."

Gray's claim of authorship therefore accrued more than three years before he filed his Complaint on April 27, 2025.  Authorship is Gray's sole path to copyright ownership, which is a prerequisite to Gray's infringement claim.

Paramount incorporates the preceding affirmative defenses, as well as its answer and counterclaims, as if fully stated hereunder.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Additional Defenses)

Paramount reserves the right to allege other affirmative defenses as they may become known during the course of discovery.

**WHEREFORE,** Paramount prays for judgment against Gray and in favor of Paramount, and for such other relief as the Court deems proper, including attorneys' fees under 17 U.S.C. § 505.

## COUNTERCLAIMS

Counterclaimant Paramount Pictures Corporation ("PPC"), for its Counterclaims against Shaun Gray, alleges as follows:

## NATURE OF THE CLAIMS

1.      With these Counterclaims, PPC sets the record straight about who is the true aggrieved party in its dispute with Shaun Gray.  In 2022, PPC released its hit film *Top Gun: Maverick* ("*Maverick*")—the sequel to its 1986 blockbuster *Top Gun*—to widespread critical

acclaim and box-office success.  With *Maverick*'s success, Plaintiff and Counterclaim-Defendant Shaun Gray saw an opportunity to shake down PPC, but in the process, he has effectively admitted to infringing PPC's copyright in *Top Gun* and defrauding PPC as to his purported authorial role.

2.     PPC advances claims against Gray for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq*., and for common-law fraud.  PPC is the sole owner of the copyright in *Top Gun*, and that status confers on PPC the exclusive statutory right to prepare derivative works based on *Top Gun*.  Gray, however, contends that he drafted several scenes for *Maverick*  (the so-called "Gray Scenes") that are based on *Top Gun* and liberally use its protected expression, including its distinctive characters such as protagonist Pete "Maverick" Mitchell.  Gray contends he had no agreement with PPC concerning the drafting of those scenes— indeed, Gray had no contact with PPC at all—making his alleged preparation of such derivative works of *Top Gun* unauthorized and infringing.  Further still, the "Gray Scenes" incorporate PPC's protected expression from its earlier treatments and screenplay drafts for *Maverick*, which Gray's own narrative likewise renders infringing.

3.     Gray also fraudulently concealed *for over five years* his ostensible role in drafting scenes that he contends were incorporated into a screenplay draft for *Maverick*.  Gray contends he worked with PPC's work-made-for-hire screenwriter Eric Singer on a draft of *Maverick*'s screenplay, and in that process, drafted the "Gray Scenes."  Gray's alleged work spanned several months in 2017, culminating in Singer's November 3, 2017 screenplay draft.  But Gray did not inform PPC of his purported involvement.  To the contrary, Gray made the concerted decision to hide his alleged role from PPC, in an effort to obtain favorable financial terms for Singer's deal (in which Gray claims he is entitled to share) and to retain the opportunity to work on *Maverick* in the first place (as Gray believed that his involvement might "blow[] up the deal" between Singer

and PPC, which Gray later admitted in a written statement).  Gray did not come out of the woodwork until 2023, long after *Maverick*'s release, when he suddenly told PPC that he had allegedly authored portions of Singer's draft and clouded PPC's title to *Maverick* as its sole author and copyright owner.

## PARTIES

4.    Counterclaim-Plaintiff Paramount Pictures Corporation is a Delaware corporation, with a principal place of business in Los Angeles, California.

5.    Counterclaim-Defendant Shaun Gray is an individual who is a citizen and resident of Ulster County, New York.

## JURISDICTION AND VENUE

6.    This Court has subject-matter jurisdiction over this copyright infringement action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

7.    This Court has supplemental jurisdiction over the related state-law fraud claim pursuant to 28 U.S.C. § 1367, because it forms part of the same case or controversy as the federal claims in this action.

8.    This Court has personal jurisdiction over Gray because he is domiciled in New York.

9.    Venue is proper in this District because PPC's counterclaims are compulsory, in that they arise out of the same transaction or occurrence that is the subject matter of Gray's claim. *Gary Friedrich Enters., LLC v. Marvel Enters., Inc*., 2011 WL 13262163, at *2-3 (S.D.N.Y. May 4, 2011), *report & recommendation adopted*, 2011 WL 3163570 (S.D.N.Y. July 26, 2011); *see also V&A Collection, LLC v. Guzzini Props. Ltd*., 46 F.4th 127, 132 (2d Cir. 2022) ("a plaintiff bringing suit in a forum 'submit[s] itself to the jurisdiction of the court with respect to all the issues

embraced in the suit, including those pertaining to the counterclaim of the defendants'" (quoting *Leman v. Krentler-Arnold Hinge Last Co*., 284 U.S. 448, 451 (1932)).

## FACTUAL ALLEGATIONS

10.    PPC is one of the world's leading and longest-standing film studios.  Since its founding in 1912, PPC has brought some of the highest-quality and best-known films to generations of audiences in the United States and worldwide.

11.    PPC has released thousands of feature films in its storied history, including the films that comprise its popular *Top Gun* franchise.

12.    In 1986, PPC released the blockbuster film *Top Gun*, which follows a cohort of young naval aviators as they train at the U.S. Navy's Fighter Weapons School, also known as Top Gun.

13.    *Top Gun* centers on Lieutenant Pete "Maverick" Mitchell, who trains at Top Gun alongside his close friend and radar intercept officer, Lieutenant Nick "Goose" Bradshaw.  As his call-sign suggests, Maverick is an unorthodox and independent-minded yet highly-skilled fighter pilot, who excels in training but repeatedly defies the rules.  Maverick's time at Top Gun takes a dark turn when Maverick and Goose are involved in a training accident, with Maverick piloting. Maverick safely ejects when their plane falls into an unrecoverable spin, but the accident tragically claims the life of Goose, who leaves behind a widow and young son.  Maverick is cleared of any wrongdoing, but harbors guilt over the accident and nearly quits Top Gun.  Maverick starts to reconcile with Goose's death after a heroic dogfight in his first deployment after graduating Top Gun, and he ultimately chooses to return to Top Gun as an instructor.

14.    PPC is the author of *Top Gun* as a work made for hire, and it is the sole owner of *Top Gun*'s copyright.

15.     PPC registered its copyright in *Top Gun* with the U.S. Copyright Office under registration number PA0000293347.

16.     *Top Gun* was a box office hit and became the highest grossing film of the year.

17.     *Top Gun*'s success had longevity too: it remained popular with audiences for decades after its release.

18.     *Top Gun* was so significant to American culture and cinema that it was selected by the Library of Congress for preservation in the National Film Registry.

19.     In light of *Top Gun*'s success, PPC set out to make a sequel to the film.

20.     After an early vision for the sequel was scrapped in the 1990s, PPC revived the idea in the 2010s and hired a series of screenwriters to flesh out the sequel.

21.     PPC hired screenwriter Peter Craig, and later, screenwriter Justin Marks, to prepare drafts of the screenplay for the *Top Gun* sequel on a work-made-for-hire basis. Craig submitted his screenplay draft to PPC on July 27, 2012 (the "Craig Draft"), and Marks submitted his final screenplay draft to PPC on July 14, 2016 (the "Marks Draft").

22.     On June 6, 2017, PPC entered into a contract with another screenwriter, Eric Singer, to prepare further drafts of the sequel's screenplay on a work-made-for-hire basis. Singer prepared an initial screenplay draft as of July 16, 2017, and he submitted his final screenplay draft to PPC on November 3, 2017. Singer also prepared a series of screenplay drafts in the interim, including drafts dated September 14, 2017; October 6, 2017; October 11, 2017; October 13, 2017; October 14, 2017; October 16, 2017; October 17, 2017; and October 19, 2017.

23.     In its contract with Singer, PPC authorized Singer to use its copyrighted material— with the intent that Singer would build off of the screenplay drafts written for PPC by Craig and Marks and, of course, the original *Top Gun* film.

24.     On June 12, 2017, PPC entered into a contract with director Joseph Kosinski to direct the *Top Gun* sequel on a work-made-for-hire basis.  As part of his pitch for this directing role, Kosinski prepared a treatment for *Maverick* on May 16, 2017 (the "Kosinski Treatment"). Kosinski's contract with PPC deemed that treatment a work made for hire for PPC, and alternatively assigned it to PPC.

25.     PPC later hired two more screenwriters, Ehren Kruger and Christopher McQuarrie, to develop yet further drafts of the sequel's screenplay on a work-made-for-hire basis.  In these contracts, PPC similarly authorized Kruger and McQuarrie to use PPC's copyrighted material to prepare these screenplay drafts, including the screenplay drafts previously prepared by Singer.

26.     *Maverick* was theatrically released on May 27, 2022, culminating over a decade of work since its first screenwriter started on the project.

27.     PPC registered its copyright in *Maverick* with the U.S. Copyright Office under registration number PA0002351572.

28.     In all, PPC spent well over a hundred million dollars to produce and market *Maverick*.

29.     Gray claims to have written for *Maverick* midway through that process, in connection with Singer's interim draft of the screenplay for the film in 2017.

30.     According to Gray, Gray agreed with Singer to co-write Singer's screenplay draft for *Maverick*—and came to that agreement even before Singer entered into a contract with PPC.

31.     But Gray did not try to negotiate a screenwriting contract with PPC, either individually or jointly with Singer, even though he knew that PPC (like any mainstream studio) would not knowingly allow a writer to work on a screenplay for a major film without a work-made-for-hire agreement in place deeming PPC the statutory author and owner of the proceeds.

-34-

To the contrary, Gray deliberately concealed from PPC his purported writing role on Singer's screenplay draft from June 2017 (when PPC hired Singer) to January 2023.

32.    In January 2023, Gray sent PPC a written statement (the "Gray Narrative") through his attorney, in which Gray suddenly claimed that he had a writing role on *Maverick* that he had kept hidden for years from PPC.

33.    According to the Gray Narrative, Gray had concealed his involvement from PPC out of concern that, if his role were disclosed, PPC might not agree to hire him and Singer as a writing team and they would both lose out on the opportunity to work on *Maverick*.

34.    As he put it in the Gray Narrative, Gray worried that "if [Singer] pushed for the Studio to contract [them] as a writing team, with a shared credit, it risked blowing up the deal and could cause [them] to lose the project entirely."  After all, "by delaying notifying the Studio or producers of [Gray's] involvement, [Singer] could ensure that [they] secured the chance to write the movie."

35.    According to the Gray Narrative, Gray also concealed his involvement out of concern that, if his role were disclosed, PPC might offer less favorable terms than Singer could obtain with his name alone, given Gray's lack of experience.

36.    Gray continued to hide his purported writing role from PPC throughout the entire writing process on Singer's screenplay draft from June to November 2017.

37.    According to the Gray Narrative, Gray made the concerted decision again and again to actively conceal his purported writing role from PPC.

38.    For example, according to the Gray Narrative, in late October 2017, Gray revisited whether PPC should be informed about his purported writing role and his name added to the script. And Gray decided against it.

39.     With Gray's knowledge and assent, Singer delivered to PPC his final draft screenplay on November 3, 2017, with the following writing credits on the cover: "Written by / Peter Craig / Justin Marks / Current Revisions by / Eric Warren Singer."  Each of Singer's screenplay drafts along the way likewise purported to be the sole work product of PPC's work-made-for-hire contributors, with no credit on any draft to Gray.

40.     For years thereafter, Gray continued to conceal his purported writing role from PPC.  For example, according to the Gray Narrative, Gray learned in late 2019 that the Writers Guild of America ("WGA") was about to begin a credit arbitration for *Maverick*, which would bind PPC as to the writing credits that would appear on the film.  But Gray chose to stay silent rather than lodge a claim for a writing credit, even though Gray (who was both represented by counsel and a WGA member at the time) knew the WGA credit arbitration was the formal process for screenwriters to assert that they had made material writing contributions to the film and seek a film credit from the studio.  Gray did not reach out to WGA during the credit arbitration, and Gray also did not reach out to PPC directly to disclose his purported writing role.

41.     Meanwhile, Gray was engaged by PPC as a staff writer on a separate project, the television series *Shantaram*, starting in April 2019.  Gray had a written contract with PPC for his work on *Shantaram* and was represented by legal counsel in connection with that engagement.  Yet Gray continued to conceal from PPC his purported role on *Maverick*.

42.     According to the Gray Narrative, Gray concealed his involvement at the time of the WGA arbitration because he worried about jeopardizing Singer's claim for credit in that heavily-contested arbitration—and Gray wanted to share in the bonus that Singer would receive from PPC if Singer received writing credit.

43.    On information and belief, Gray ultimately concealed his asserted involvement from PPC to entrap PPC in purported copyright infringement and/or joint copyright ownership once *Maverick* had already been finalized incorporating Singer's screenplay draft (to which Gray allegedly contributed in secret) and released to the general public.

44.    Gray concealed his purported writing role for several years after the WGA credit arbitration, continuing his deception through and after *Maverick*'s 2022 release.  Gray did not disclose his alleged secret writing role to PPC until January 2023, by which point PPC could not extricate from *Maverick* the contributions that Gray allegedly made.  Even then, Gray did not assert that PPC was infringing any purported copyright rights of his, but rather requested that PPC assist in reopening *Maverick*'s credits so that he could belatedly receive a writing credit.

45.    PPC was unaware of Gray's purported writing role until Gray belatedly disclosed it to PPC in January 2023.  And Gray knew that PPC was unaware of this fact.  PPC's dealings were directly with Singer; PPC had a contract with Singer (and every other screenwriter on *Maverick*) but not with Gray; Singer's screenplay drafts credited Singer as a writer but not Gray; the WGA arbitration yielded a screenwriting credit for Singer, while Gray did not so much as submit a claim; and Gray did not inform PPC at any previous point that he claimed to have made writing contributions to *Maverick*'s screenplay.

46.    Gray's concealment of his purported writing role was material to PPC.  As Gray himself understood, PPC would have prevented Gray from making writing contributions to the screenplay draft for *Maverick* if it had been aware that Gray was planning to do so.  At minimum, PPC would have demanded that Gray enter into a work-made-for-hire agreement, deeming PPC the statutory author and owner of his contributions.  As Gray knew, PPC required such agreements of every one of its screenwriters, including Singer.   Had PPC known of Gray's purported

contributions to Singer's screenplay draft, PPC certainly would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material. Even later on (but before *Maverick*'s release), had PPC known of Gray's purported contributions, PPC could have excised those elements from the screenplay and ultimately the film, albeit likely at significant expense.

47. But Gray laid in wait for over five years.

48. Gray's fraud has placed a cloud over PPC's title to *Maverick*, thereby causing injury to PPC.

49. Gray also alleges that he drafted several scenes—which he dubs the "Gray Scenes"—that Singer incorporated into his screenplay draft, and that Gray did so without entering into any agreement with PPC.

50. Gray further contends that he did not work subject to Singer's contract with PPC, or otherwise license PPC's use of the "Gray Scenes," which would have provided his only potential sources of authorization to use PPC's copyrighted material.

51. The "Gray Scenes" exploit substantial protected expression owned by PPC from *Top Gun*—most significantly, the character of Maverick himself.

52. The Maverick character is distinctive and well-delineated in *Top Gun* (and indeed the focal point of the film), and protected by PPC's copyright in *Top Gun*.

53. Maverick features prominently in the "Gray Scenes," which comes as no surprise, since Maverick is the protagonist and titular character of the *Top Gun* sequel for which Gray contends he was writing the "Gray Scenes."

54. The "Gray Scenes" borrow other elements of *Top Gun* too, including the training accident in *Top Gun*, which occurs while Maverick is piloting and kills Goose, leaving his young

-38-

son Bradley Bradshaw without a father.  This key plot development from *Top Gun* drives the relationship between Maverick and Bradley, which plays out in the "Gray Scenes."

55.    The "Gray Scenes" also exploit substantial protected expression owned by PPC from prior treatments and screenplay drafts for *Maverick*—including the Kosinski Treatment, Singer's screenplay drafts, the Marks Draft, and the Craig Draft (collectively, the "*Maverick* Materials")—all of which PPC owns as works made for hire and/or via assignment.

56.    For example, the "Gray Scenes" copy from each of these works the premise of an older, seasoned Maverick who is tapped to train a cohort of next-generation pilots for a daring mission—with Maverick ultimately shot down in enemy territory and making a harrowing escape to come out alive and victorious.  The "Gray Scenes" also copy from the Craig Draft the presence of Goose's child among Maverick's trainees and that relationship as a driver of the sequel's story, and that same element from the Kosinski Treatment and each of Singer's drafts.  The "Gray Scenes" copy from the Marks Draft the escape by Maverick from enemy territory by stealing an old F-14 plane from the enemy—the same type of plane that Maverick flew in the original *Top Gun* film.  And the "Gray Scenes" copy the more-developed version of that element from the Kosinski Treatment and Singer's drafts, in which Maverick and Goose's child together steal an F-14 plane from an enemy airbase after getting shot down, with Goose's child serving as Maverick's radar intercept officer just as Goose had done, and the pair shooting down enemy planes to ultimately fly safely back to their aircraft carrier.  The "Gray Scenes" further copy from the Kosinski Treatment and Singer's drafts the first act in which Maverick is working as a test pilot on a hypersonic aircraft program; he is found in a hanger with the aircraft, preparing to take one final run to try to break a speed record; and in that run, he surpasses the limits of the aircraft, causing the aircraft to break apart in midair in a wrenching and suspenseful accident where it is

not immediately clear Maverick will survive. In each of these examples (among others not enumerated here), the copied content from the *Maverick* Materials also appears in *Maverick* and therefore falls within the scope of *Maverick*'s copyright registration.

57. PPC provided the *Maverick* Materials to Singer for Singer to use in drafting a screenplay for *Maverick* (setting aside Singer's drafts, which Singer himself prepared). Gray, in turn, had access to those materials through Singer—and in fact used them when purportedly drafting the "Gray Scenes."

58. According to Gray, the earliest of the "Gray Scenes" was written from August 16 to 17, 2017. According to Gray, the remaining "Gray Scenes" were created, respectively, on August 21, 2017; August 29, 2017; September 9, 2017; September 13 to 14, 2017; September 12 to 15, 2017; September 23, 2017; September 27, 2017; October 7, 2017; October 1 to 9, 2017; October 12, 2017; October 14, 2017; and October 30, 2017.

59. The Kosinski Treatment, the Marks Draft, the Craig Draft, and Singer's initial July 16 draft predate all of the "Gray Scenes." In addition, Singer's interim drafts spanning September 14, 2017 to October 19, 2017 each predate some of the "Gray Scenes."

60. If, as Gray contends, he did not prepare the "Gray Scenes" subject to Singer's contract with PPC, or otherwise license the "Gray Scenes" for PPC's use in *Maverick* (which might entail a reciprocal implied license to Gray), then Gray lacked authorization to use PPC's copyrighted material from *Top Gun* or the *Maverick* Materials when he allegedly wrote the "Gray Scenes" and accordingly infringed PPC's exclusive right to prepare derivative works of *Top Gun* and the *Maverick* Materials.

## COUNT I: COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

61.    PPC realleges and incorporates by reference paragraphs 1 through 60, inclusive, as though fully set forth herein.

62.    PPC is the sole owner of a valid copyright in the 1986 motion picture *Top Gun*, registered with the U.S. Copyright Office under registration number PA0000293347.

63.    PPC is also the sole owner of a valid copyright in the *Maverick* Materials.  Each of those works is an early, unpublished version of *Maverick*, and the parts of those works that also appear in *Maverick* are covered by PPC's copyright registration for *Maverick* under registration number PA0002351572.

64.    As the owner of the copyright in *Top Gun* and the *Maverick* Materials, PPC enjoys several exclusive rights in and to the works pursuant to 17 U.S.C. § 106, including the exclusive right to prepare derivative works based upon *Top Gun* and the *Maverick* Materials.

65.    If Gray is correct that he did not prepare the "Gray Scenes" subject to Singer's contract with PPC or otherwise license the "Gray Scenes" for PPC's use in *Maverick*, then PPC did not authorize Gray to exploit its copyrighted material from *Top Gun* or the *Maverick* Materials.

66.    Gray nonetheless exploited in substantial amount PPC's copyrighted material from *Top Gun* and the *Maverick* Materials in his asserted preparation of the "Gray Scenes," including Gray's use of the Maverick character and other protectable elements of those works.

67.    Gray had access to *Top Gun* and the *Maverick* Materials at all relevant times, and in fact used copyrighted material from *Top Gun* (including its protagonist, Maverick) and the *Maverick* Materials as part of his asserted writing process.

68. Gray's asserted preparation of the "Gray Scenes" infringed PPC's exclusive copyright rights in *Top Gun* and the *Maverick* Materials, including its exclusive right to prepare derivative works.

69. Gray did so with actual and/or constructive knowledge of PPC's exclusive rights in *Top Gun* and the *Maverick* Materials.

70. Gray's acts are thus willful infringements of PPC's copyright rights in *Top Gun* and the *Maverick* Materials.

## COUNT II: FRAUD

71. PPC realleges and incorporates by reference paragraphs 1 through 60, inclusive, as though fully set forth herein.

72. Gray intentionally concealed from PPC that he was purportedly writing scenes and making other authorial contributions to Singer's draft of the *Maverick* screenplay.

73. That fact was within Gray's exclusive or superior knowledge, and PPC could not reasonably have discovered it amid Gray's deception.

74. PPC was not aware of Gray's purported writing role in connection with Singer's draft of *Maverick*'s screenplay until Gray belatedly disclosed it to PPC in January 2023.

75. Gray intended to deceive PPC by concealing this fact, and he understood that PPC would not have permitted him to contribute to *Maverick*'s screenplay if PPC had been aware of Gray's activities.

76. The concealed information was material to PPC. Had PPC been aware of the concealed information, PPC would have prevented Gray from contributing to *Maverick*'s screenplay or at minimum would have required Gray to enter into a work-made-for-hire agreement deeming Gray's contributions to be authored and owned by PPC (or to confirm that any work Gray

performed was owned by Singer and thus subject to Singer's agreement with PPC).  Moreover, PPC would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material.  Further, had the information been disclosed to PPC after Gray made his purported contributions but before *Maverick*'s release, PPC would have excised any of Gray's purported contributions from *Maverick*'s screenplay and the ultimate film, so as to avoid any question about its rights.

77.    PPC reasonably relied on Gray's concealment to its detriment.  PPC freely used Singer's screenplay draft in making *Maverick*, reasonably believing it to be the exclusive work product of Singer (whose contributions PPC owned as work made for hire) and PPC's other work-made-for-hire contributors.  PPC invested well over a hundred million dollars in *Maverick*, with the bulk of that expenditure occurring after Singer's screenplay draft.  PPC paid additional screenwriters to develop *Maverick*'s screenplay based on Singer's draft, actors to act out a screenplay that derived in significant part from Singer's draft, and so forth.  But for Gray's concealment, PPC would have prevented Gray from contributing to *Maverick*'s screenplay or at minimum entered into a work-made-for-hire agreement with him (or required him to confirm that his purported contributions were owned by Singer) to conclusively establish PPC as the author and owner of Gray's contributions.  And but for Gray's continued concealment up through and past *Maverick*'s release, PPC alternatively would have excised any of Gray's contributions from *Maverick*'s screenplay and the ultimate film (and, if early enough, not provided Singer's draft to the next wave of screenwriters as source material in the first place).  But due to Gray's five-plus years of concealment from PPC, PPC was not able to take any of these measures to protect its rights in *Maverick*

78.    PPC was harmed as a result of Gray's fraud.  Among other injuries, Gray's fraud has placed a cloud over PPC's title to *Maverick*; devaluing one of PPC's most significant properties and undercutting the fruits of its substantial investment in the film across more than a decade.

79.    Gray acted with malice, oppression, and/or fraud, as part of a scheme to entrap PPC in unwitting copyright infringement or joint copyright ownership after PPC had invested in *Maverick*'s success over the course of a decade.  PPC is therefore entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, PPC prays for a judgment against Gray on each counterclaim as follows:

A.    For (i) actual damages and the profits derived by Gray from his infringing activities, or (ii) in the alternative to actual damages, for statutory damages in the maximum amount permitted under applicable law with respect to PPC's infringed copyrights pursuant to 17 U.S.C. § 504, which election PPC shall make prior to the rendering of final judgment herein, according to proof in an amount to be determined at trial;

B.    For compensatory damages for Gray's fraud in an amount to be determined at trial;

C.    For punitive damages for Gray's fraud in an amount to be determined at trial;

D.    For PPC's attorneys' fees and costs incurred; and

E.    For such other and further relief as the Court deems just and equitable.

Dated:  September 3, 2025

By: */s/ Molly M. Lens*
_____

O'MELVENY & MYERS LLP
Molly M. Lens
mlens@omm.com
Matthew Kaiser (admitted *pro hac vice*)
mkaiser@omm.com
1999 Avenue of the Stars, 8th Fl
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Danielle Feuer
dfeuer@omm.com
1301 Avenue of the Americas, Ste 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant and Counterclaim-Plaintiff Paramount Pictures Corporation and Defendants Paramount Global and Paramount Streaming Services Inc.*