**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHAUN GRAY, an individual,

                Plaintiff,

    vs.

PARAMOUNT GLOBAL, a Delaware
corporation; PARAMOUNT PICTURES
CORPORATION, a Delaware corporation;
PARAMOUNT STREAMING SERVICES
INC., a Delaware corporation; and DOES 1-10,

                Defendants.

Civil Action No. 1:25-cv-3484-JSR

PARAMOUNT PICTURES CORPORATION,
a Delaware corporation;

                Counterclaim-Plaintiff,

    vs.

SHAUN GRAY, an individual,

                Counterclaim-Defendant,

**MEMORANDUM OF LAW IN OPPOSITION**
**TO SHAUN GRAY'S MOTION TO DISMISS**
**PARAMOUNT PICTURES CORPORATION'S COUNTERCLAIMS**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................. 1

II. BACKGROUND ............................................................................................................. 2

III. LEGAL STANDARD .................................................................................................... 4

IV. ARGUMENT ................................................................................................................. 4

    A. PPC Has Article III Standing To Assert Its Counterclaims ............................................ 4

    B. Gray's Statute Of Limitations Argument Is Premature And Wrong On Its Merits ........ 6

        1. PPC Timely Filed Its Copyright Infringement Claim Within Three
            Years Of Accrual ............................................................................................... 6

        2. PPC Timely Filed Its Fraud Claim Within Six Years Of Accrual .................... 10

    C. New York's Litigation Privilege Does Not Bar Copyright Claims Or Fraud
        Claims .................................................................................................................. 12

    D. PPC States A Viable Claim For Fraud ......................................................................... 14

        1. Gray Had a Duty to Disclose His Omissions to PPC ........................................ 15

        2. PPC Acted in Reasonable Reliance on Gray's Omissions ............................... 18

        3. PPC Has Adequately Alleged Damages Under Multiple, Viable
            Theories .......................................................................................................... 22

V. CONCLUSION .............................................................................................................. 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*105 E. Second St. Assocs. v. Bobrow,*
  175 A.D.2d 746 (1st Dep't 1991) .................................................................. 24, 25

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.,*
  957 F. Supp. 1308 (S.D.N.Y. 1997) ...................................................................... 20

*Acres Bonusing, Inc. v. Ramsey,*
  2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ....................................................... 13

*ADL, LLC v. Tirakian,*
  2010 WL 3925131 (E.D.N.Y. Aug. 26, 2010), *report and rec. adopted*, 2010
  WL 3926135 (E.D.N.Y. Sept. 29, 2010) ................................................................. 15

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,*
  404 F. 3d 566 (2d Cir. 2005) ................................................................................. 15

*Anwar v. Fairfield Greenwich Ltd.,*
  826 F. Supp. 2d 578 (S.D.N.Y. 2011) .............................................................. 19, 20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................. 4

*Baptiste-Elmine v. Richland & Falkowski, PLLC,*
  2025 WL 974346 (E.D.N.Y. Apr. 1, 2025) ............................................................... 5

*Barrie House Coffee Co. v. Teampac, LLC,*
  2016 WL 3645199 (S.D.N.Y. June 30, 2016) .......................................................... 23

*Bellino v. JPMorgan Chase Bank, N.A.,*
  209 F. Supp. 3d 601 (S.D.N.Y. 2016) ...................................................................... 6

*Caracci v. State,*
  203 A.D.2d 842 (3d Dep't 1994) ............................................................................. 16

*Carver v. City of New York,*
  621 F.3d 221 (2d Cir. 2010) ..................................................................................... 5

*CBI Cap. LLC v. Mullen,*
  2020 WL 4016018 (S.D.N.Y. July 16, 2020) .......................................................... 12

*Center v. Hampton Affiliates, Inc.,*
  66 N.Y.2d 782 (1985) ............................................................................................... 9

*Chanayil v. Gulati,*
  169 F.3d 168 (2d Cir. 1999) ................................................................................... 15

*Clark v. Druckman,*
  218 W. Va. 427 (2005) ........................................................................................... 14

*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,*
  88 A.D. 461 (2d Dep't 1982) ................................................................................... 23

*Colquhoun v. Webber,*
  684 A.2d 405 (Me. 1996) ........................................................................................ 24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Conti v. Doe*,
    535 F. Supp. 3d 257 (S.D.N.Y. 2021) ..................................................................... 14

*Davidoff v. Kaplan*,
    217 A.D.3d 918 (2023) ............................................................................................ 13

*DiGiacco v. Grenell Island Chapel*,
    234 A.D.3d 1315 (4th Dep't 2025) .......................................................................... 24

*Front, Inc. v. Khalil*,
    24 N.Y.3d 713 (2015) .............................................................................................. 13

*Full Circle United, LLC v. Skee-Ball, Inc.*,
    2014 WL 12829195 (E.D.N.Y. May 13, 2014) ....................................................... 14

*Gray v. Paramount Glob.*,
    2025 WL 2268046 (S.D.N.Y. Aug. 8, 2025) ........................................................... 10

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*,
    748 F.2d 729 (2d Cir. 1984) .................................................................................... 22

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................................................ 23

*In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*,
    347 F.R.D. 1 (S.D.N.Y. 2024) ................................................................................ 13

*In re Lehman Bros. Sec. & ERISA Litig.*,
    903 F. Supp. 2d 152 (S.D.N.Y. 2012) ...................................................................... 3

*In re Motors Liquidation Co.*,
    957 F.3d 357 (2d Cir. 2020) .................................................................................... 10

*In re Platinum-Beechwood Litig.*,
    2019 WL 1570808 (S.D.N.Y. Apr. 11, 2019) .................................................... 4, 18

*In re Platinum-Beechwood Litig.*,
    427 F. Supp. 3d 395 (2019) ............................................................................... 15, 16

*Kelly-Brown v. Winfrey*,
    717 F.3d 295 (2d Cir. 2013) ...................................................................................... 6

*Konig v. TransUnion, LLC*,
    2023 WL 3002396, (S.D.N.Y. Apr. 19, 2023) ......................................................... 6

*Landow v. Wachovia Sec., LLC*,
    966 F. Supp. 2d 106 (E.D.N.Y. 2013) .................................................................... 10

*Latimer v. Roaring Toyz, Inc.*,
    601 F.3d 1224 (11th Cir. 2010) ............................................................................... 10

*Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021) ........................................................................................ 6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Martirano v. Frost,*
    25 N.Y.2d 505 (1969) ......................................................................... 13

*Mausner v. Mausner,*
    2024 WL 4758563 (S.D.N.Y. Sept. 26, 2024).................................. 24, 25

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2,*
    419 F. Supp. 3d 668 (S.D.N.Y. 2019)............................................... 14

*Michael Grecco Prods., Inc. v. RADesign, Inc.,*
    112 F.4th 144 (2024)............................................................................ 8

*Mtume v. Sony Music Ent.,*
    2020 WL 832814 (S.D.N.Y. Feb. 20, 2020)..................................... 6

*Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Res. Dev. Servs., Inc.,*
    2011 WL 1882274 (N.D. Cal. May 17, 2011) ......................... 15, 16, 17

*NCR Corp. v. B.A.T. Indus. P.L.C.,*
    2024 WL 4188358 (S.D.N.Y. Sept. 14, 2024)................................. 20, 21

*New York Times Co. v. Microsoft Corp.,*
    777 F. Supp. 3d 283 (S.D.N.Y. 2025)........................................... 5, 7, 8

*Niedernhofer v. Wittels,*
    2018 WL 3650137 (S.D.N.Y. July 31, 2018) ................................... 15

*Oden v. Bos. Sci. Corp.,*
    330 F. Supp. 3d 877 (E.D.N.Y. 2018) ............................................. 17

*Pape Ventures, Inc. v. Am. Sports Media, LLC,*
    171 N.Y.S.3d 675 (4th Dep't 2022).................................................. 11

*Pentacon BV v. Vanderhaegen,*
    2024 WL 1255992 (S.D.N.Y. Mar. 25, 2024) ................................. 21

*PK Music Performance, Inc. v. Timberlake,*
    2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018)................................. 7

*Psihoyos v. John Wiley & Sons, Inc.,*
    748 F.3d 120 (2d Cir. 2014).......................................................... 7, 8

*Religious Tech. Ctr. v. Wollersheim,*
    971 F.2d 364 (9th Cir. 1992) .......................................................... 13

*Saba Cap. CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund,*
    88 F.4th 103 (2d Cir. 2023) ........................................................... 5

*SCO Grp., Inc. v. Novell, Inc.,*
    2010 WL 413807 (D. Utah Jan. 28, 2010)...................................... 24, 25

*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.,*
    345 F. Supp. 3d 515 (S.D.N.Y. 2018)............................................. 17

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sewell v. Bernardin,*
 795 F.3d 337 (2d Cir. 2015) ............................................................................... 7

*Sexter & Warmflash, P.C. v. Margrabe,*
 38 A.D.3d 163 (1st Dep't 2007), *abrogated by Front, Inc. v. Khalil,* 24
 N.Y.3d 713 (2015) ............................................................................................. 13

*Spira v. TransUnion, LLC,*
 2022 WL 2819469 (S.D.N.Y. July 19, 2022) ..................................................... 6

*Sohm v. Scholastic Inc.,*
 959 F.3d 39, (2d Cir. 2020) ................................................................................. 9

*Steffes v. Stepan Co.,*
 144 F.3d 1070 (7th Cir. 1998) ........................................................................... 13

*Stevenson Equip., Inc. v. Chemig Const. Corp.,*
 170 A.D.2d 769 (3d Dep't 1991), *aff'd,* 79 N.Y.2d 989 (1992) ................... 18, 23

*Stewart v. Stewart,*
 2018 WL 11365079 (W.D.N.Y. Nov. 29, 2018) ................................................ 12

*Strasser v. Prudential Sec., Inc.,*
 218 A.D.2d 526 (1995) ......................................................................... 16, 17, 18

*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC,*
 205 Cal. App. 4th 999 (2012) ............................................................................ 24

*Sykes v. Mel Harris & Assocs., LLC,*
 757 F. Supp. 2d 413 (S.D.N.Y. 2010) ............................................................... 14

*Tesla Wall Sys., LLC v. Related Companies, L.P.,*
 2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ................................................... 11

*The Intercept Media, Inc. v. OpenAI, Inc.,*
 767 F. Supp. 3d 18 (S.D.N.Y. 2025) ......................................................... 5, 6, 23

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ............................................................................................ 6

*U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.,*
 2021 WL 1956369 (S.D.N.Y. May 17, 2021), *report and rec. adopted,* 2021
 WL 3082209 (S.D.N.Y. July 21, 2021) ......................................................... 13, 14

*VR Glob. Partners, L.P. v. Petroleos de Venezuela,*
 2024 WL 1514982 (S.D.N.Y. Apr. 8, 2024), *aff'd sub nom. VR Glob.
 Partners, L.P. v. Petroleos de Venezuela, S.A.,* 2024 WL 4891271 (2d Cir.
 Nov. 26, 2024) ............................................................................................... 11, 12

*Woodberry v. Graham,*
 2017 WL 151617 (S.D.N.Y. Jan. 13, 2017) ...................................................... 23

*Wu v. Bitfloor, Inc.,*
 460 F. Supp. 3d 418 (S.D.N.Y. 2020) ............................................................... 10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

N.Y. C.P.L.R. 213(8) ................................................................................................................. 11

**Rules**

Fed. R. Civ. P. 9(b) .................................................................................................................... 4

Fed. R. Evid. 501 ...................................................................................................................... 13

## I.  INTRODUCTION

Paramount Pictures Corporation ("PPC") is the studio that brought audiences *Top Gun*—the 1986 blockbuster film following the exploits of Navy fighter pilot Pete "Maverick" Mitchell. Counterclaim Defendant Shaun Gray is a former assistant to Eric Singer, one of the screenwriters that PPC hired to draft a screenplay for *Top Gun*'s sequel—the 2022 film *Top Gun: Maverick*. PPC safeguarded its copyright rights in this popular franchise (as any prudent studio would) by entering into work-made-for-hire contracts with all of its screenwriters and other creative contributors, making PPC the original author and owner of their contributions.

Gray knew those ground rules, but, by his own telling, dodged any legitimate business dealings with PPC at every turn.  According to Gray, he worked in secret on Singer's draft, knowing that PPC believed it to be Singer's work alone, and, thereafter, concealed his ostensible writing role from PPC for five years while PPC developed and produced *Maverick*.  Only after *Maverick*'s theatrical run did Gray emerge from the shadows in January 2023, belatedly attempting to demand a writing credit on *Maverick*.

After the Writers Guild of America rebuffed Gray's demand for a credit, he filed a trio of meritless claims against PPC based on his purported authorship, two of which the Court has already dismissed.  But it is Gray who violated the law, if he actually had the writing role he claims.  First, if Gray is to be believed, he infringed PPC's copyrights in *Top Gun* and previous screenplays and treatments for *Maverick* by making derivative works without PPC's authorization.  And second, he defrauded PPC by intentionally concealing his ostensible writing role to PPC's detriment.

To be clear, PPC strenuously disputes Gray's claims of authorship.  However, PPC is unwilling to stand by and allow Gray to claim that he infringed PPC's copyrights and defrauded PPC with impunity.  So PPC counter-sued.

1

Now, to evade responsibility for his own claimed actions, Gray moves to dismiss PPC's Counterclaims, asserting a slew of misguided attacks and premature affirmative defenses. Tellingly, Gray does not, because he cannot, dispute PPC's claim that Gray infringed PPC's copyrights in *Top Gun* and the *Maverick* Materials. And Gray's challenge to PPC's fraud claim fails because PPC specifically pleads the details of Gray's fraudulent scheme. Namely, Gray willfully concealed his purported writing role from PPC for years—despite his duty to disclose that information—such that when *Maverick* was finalized in 2022, it was too late to excise Gray's alleged contributions from the film and Gray's fraud placed a cloud upon PPC's title to *Maverick*. In the face of these well-pled allegations, Gray conjures up facts from outside the pleadings to support his arguments that PPC's claims are barred by New York's litigation privilege and the statute of limitations. But both of these affirmative defenses fail as a matter of law, and are otherwise premature at the pleading stage. The Court should deny Gray's Motion in its entirety.

## II. BACKGROUND

In 2022, PPC released its hit film *Top Gun: Maverick* ("*Maverick*")—the sequel to *Top Gun*. Counterclaims (Dkt. 56) ¶ 1. "PPC is the sole owner of the copyright in *Top Gun*, and that status confers on PPC the exclusive statutory right to prepare derivative works based on *Top Gun*." *Id.* ¶ 2. PPC registered *Top Gun* and *Maverick* with the U.S. Copyright Office. *Id.* ¶¶ 15, 27.

PPC's status as sole owner of the copyrights in *Top Gun* is undisputed. *Id.* ¶ 14. And until recently, PPC's status as sole owner of the copyrights in *Maverick* went undisputed too. But in 2023, Gray sent PPC a letter (the "Gray Narrative") asserting a claim of authorship over certain scenes in Singer's screenplay draft (the so-called "Gray Scenes"). *Id.* ¶ 31.[1] In doing so, Gray

---

[1] Gray asks the Court to consider the Gray Narrative at this stage. PPC disputes much of the Narrative, but has no objection, provided it is not considered "for the truth of the matters asserted" therein. *See In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 169 (S.D.N.Y. 2012).

revealed to PPC for the first time the bases for PPC's counterclaims: (1) Gray had exploited PPC's copyrights in *Top Gun* and early drafts and treatments of the *Maverick* screenplay in 2017, by copying key elements from both without authorization, *id.* ¶¶ 61–70; and (2) Gray had concealed his purported writing role from PPC for years—knowing that PPC believed Singer's draft to be its exclusive property as work made for hire and was using it to make *Maverick*—thereby clouding PPC's title to its intellectual property rights in the film, *id.* ¶¶ 26, 71–79.

*First*, the Gray Narrative revealed Gray's claim of authorship in the November 3, 2017 screenplay draft prepared by PPC's work-made-for-hire screenwriter, Singer. *Id.* ¶ 3. The Narrative acknowledges Singer's assertion that Gray "was just his 'assistant,'" but disputes that point, arguing that Singer "*fraudulently* claimed credit as sole author." Dkt. 35-3 at 4, 6 (emphasis added).[2] And "Gray further contends that he did not work subject to Singer's contract with PPC, or otherwise license PPC's use of the 'Gray Scenes,' which would have provided his only potential sources of authorization to use PPC's copyrighted material." Counterclaims ¶ 50. Thus, by informing PPC that he claimed to have authored key portions of the Singer Draft, Gray revealed to PPC in January 2023 that Gray had "exploit[ed] substantial protected expression owned by PPC from" *Top Gun*, and from "prior treatments and screenplay drafts for *Maverick*." *Id.* ¶¶ 51, 55.

*Second*, the Gray Narrative revealed that Gray had "concealed his purported writing role" since 2017, "continuing his deception through and after *Maverick*'s 2022 release." *Id.* ¶ 44. Gray had "exclusive or superior knowledge" of the relevant facts, but remained willfully silent at key junctures throughout, such as when Singer sent PPC a screenplay draft in November 2017 that listed Singer as an author but made no mention of Gray. *Id.* ¶ 39. And because "Gray did not disclose his alleged secret writing role to PPC until January 2023, by which point PPC could not

---

[2] Unless otherwise noted, all secondary citations are omitted and all emphases are added.

extricate from *Maverick* the contributions that Gray allegedly made," *id.*, PPC's title to the copyright rights in *Maverick* was clouded from its inception, in or around 2022. *Id.* ¶ 48.

## III.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  For this analysis, the "well-pleaded factual allegations" of the complaint are assumed to be true. *Id.* at 678–79. Fraud claims are subject to the pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Where a fraudulent omission is alleged, the complaint must allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *In re Platinum-Beechwood Litig.*, 2019 WL 1570808, at *8 (S.D.N.Y. Apr. 11, 2019) (Rakoff, J.).

## IV.  ARGUMENT

### A.  PPC Has Article III Standing To Assert Its Counterclaims

Gray halfheartedly challenges PPC's standing to bring its Counterclaims—specifically, whether PPC has suffered an injury-in-fact, Mot. 16–17, 22—but that effort fails: PPC alleges classic injuries-in-fact from both Gray's copyright infringement and fraud.

"To establish Article III standing, 'a plaintiff must demonstrate (1) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.'" *Saba Cap. CEF Opportus. 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 110 (2d Cir. 2023).  Standing "must be supported in the same way as any other matter . . . , *i.e.*, with the

manner and degree of evidence required at the successive stages of the litigation." *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010). As noted, Gray challenges only the injury prong.

Regarding copyright infringement, PPC's injury-in-fact is Gray's infringement itself. "Copyright claims predate the Constitution's ratification," and "[t]he individual harm forming the basis of Founding Era copyright suits was grounded in notions of 'property rights.'" *The Intercept Media, Inc. v. OpenAI, Inc.*, 767 F. Supp. 3d 18, 26–27 (S.D.N.Y. 2025) (Rakoff, J.). PPC alleges that Gray invaded its property rights in the copyrights to *Top Gun* and the *Maverick* Materials, "including the exclusive right to prepare derivative works based upon" the same. Counterclaims ¶ 64. This is the quintessential "kind of property-based harm[] traditionally actionable in copyright," and it gives rise to Article III standing. *See The Intercept Media, Inc.*, 767 F. Supp. 3d at 27–28; *New York Times Co. v. Microsoft Corp.*, 777 F. Supp. 3d 283, 312 (S.D.N.Y. 2025) (for "copyright infringement claims, the harm involves an injury to 'an author's property right in his original work of authorship'" (quoting *id.* at 28)).

Regarding fraud, PPC alleges, "[a]mong other injuries, Gray's fraud has placed a cloud over PPC's title to *Maverick*." Counterclaims ¶ 78. A cloud on one's title—whether to real or intellectual property—constitutes injury-in-fact. *Baptiste-Elmine v. Richland & Falkowski, PLLC*, 2025 WL 974346, at *6 n.* (E.D.N.Y. Apr. 1, 2025) ("That lien has placed an 'actionable cloud' on [plaintiff]'s 'title to the property . . . ,' and 'such harms' suffice for a concrete injury under Article III." (quoting *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021))); *Bellino v. JPMorgan Chase Bank, N.A.*, 209 F. Supp. 3d 601, 609, 612 (S.D.N.Y. 2016) (finding Article III injury where plaintiff "alleged intangible harm—a cloud on title"); *Mtume v. Sony Music Ent.*, 2020 WL 832814, at *5 (S.D.N.Y. Feb. 20, 2020) (finding Article III injury where defendant "created a cloud over Mtume's future copyright ownership").

5

None of Gray's citations support his position that PPC failed to plead an injury-in-fact. In *Maddox* (<u>Mot. 17, 22</u>), the court actually *confirmed* that a title-cloud could constitute an Article III injury-in-fact. 19 F.4th at 64. It ultimately held those plaintiffs lacked standing only because they "*had no title on which a cloud could settle.*" *Id.* Here, conversely, PPC holds title to the copyrights in *Maverick*, and alleges that Gray's fraud clouded that title via his surreptitious purported acquisition of rights in the so-called "Gray Scenes." Counterclaims ¶¶ 27, 48, 78.[3]

## B. Gray's Statute Of Limitations Argument Is Premature And Wrong On Its Merits

Gray's "statute-of-limitations defense . . . is not clearly presented on the face of the [Counterclaims] and 'thus is inappropriate to resolve on a motion to dismiss.'" *The Intercept Media, Inc.*, 767 F. Supp. 3d at 33 (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). But even if it were, the facts show that both of PPC's counterclaims are timely.

### 1. PPC Timely Filed Its Copyright Infringement Claim Within Three Years Of Accrual

"[A]n infringement claim does not 'accrue,'" and the three-year statute of limitations does not begin to run, "until the copyright holder discovers, or with due diligence should have discovered, the infringement." *New York Times*, 777 F. Supp. 3d at 302. "Dismissal of a copyright infringement claim on statute of limitations grounds at the pleadings stage is only appropriate when 'it is clear from the face of the complaint" and judicially noticed matters that the "claim[] [is] barred as a matter of law." *Id.* at 303 (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)). "However, where there is even 'some doubt' as to whether dismissal is warranted, a court

---

[3] Gray's cases on inaccurate credit reporting are even less apposite. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 434–35 (2021) (<u>Mot. 16–18</u>) (information in TransUnion's "internal credit files" only a concrete injury if disseminated); *Konig v. TransUnion, LLC*, 2023 WL 3002396, at *7, *9 (S.D.N.Y. Apr. 19, 2023) (<u>Mot. 17</u>) ("hypothetical likelihood of harms on credit score," *unlike* "allegations of cloud on title," insufficient); *Spira v. TransUnion, LLC*, 2022 WL 2819469, at *4 (S.D.N.Y. July 19, 2022) (<u>Mot. 17</u>) (disclosure of credit information, without more, insufficient).

should not grant a Rule 12(b)(6) motion on statute of limitations grounds." *PK Music Performance, Inc. v. Timberlake*, 2018 WL 4759737, at *7 (S.D.N.Y. Sept. 30, 2018).

Here, Gray cannot meet his burden of establishing on the face of the Counterclaims that PPC discovered, or should have discovered, Gray's infringement prior to three years before the commencement of this suit. PPC repeatedly alleges that it did not know of Gray's purported writing role on *Maverick*, including the scenes he claimed to have drafted, until Gray sent PPC the Gray Narrative in January 2023. Counterclaims ¶¶ 3, 31–32, 44–45. In fact, PPC alleges that Gray affirmatively *concealed* his purported writing role from PPC until then. *Id.* ¶¶ 3, 31, 35, 37, 40–44. PPC therefore did not know or have reason to know that Gray had been preparing unauthorized derivative works until January 2023. *Id.* ¶¶ 44–45, 74. The statute of limitations did not begin to run until at least January 2023.[4]

Gray tries to twist the law and the facts alike to bar PPC's claims, but he fails. To start, Gray wrongly tries to saddle PPC with the burden on *his* motion to establish its claims are timely, citing *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120 (2d Cir. 2014) for the proposition that the discovery rule "requires [PPC] to *prove* both (1) lack of knowledge and (2) reasonable diligence in investigating the potential infringement." Mot. 9. That is wrong. *Psihoyos* was decided at summary judgment, not on a Rule 12(b)(6) motion, and is silent as to the burden of proof. 748 F.3d at 122–24. On a motion to dismiss, the movant bears the "burden of establishing that [the copyright holder] discovered, or with due diligence should have discovered, the alleged infringement" more than three years before the suit commenced. *New York Times*, 777 F. Supp. 3d at 303. Moreover, even if a court finds it "unreasonable or implausible [that infringement]

---

[4] To clear, the Gray Narrative *does not* accuse PPC of copyright infringement; Gray asserted infringement years later.

claims were timely" at the pleading stage, "a likelihood, even a high one, that claims are untimely is not enough to make it 'clear' that they are. To hold otherwise would improperly shift the pleading burden." *Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 153 (2024).

Gray's application of the facts is flatly wrong too. He asserts that "PPC pleads no diligence whatsoever" in inquiring into Gray's infringement, Mot. 10, but that assertion puts the cart before the horse. "[T]o establish constructive notice, [the movant] must identify specific 'facts or circumstances *that would have prompted such an inquiry*' by the copyright holder into the alleged infringing activity" in the first place. *New York Times Co.*, 777 F. Supp. 3d at 303 (quoting *Sohm v. Scholastic Inc.*, 959 F.3d 39, 51 (2d Cir. 2020)). Gray can point to no facts alleged in PPC's Counterclaims that should have prompted an inquiry prior to January 2023. Gray himself *obstructed* PPC from learning that he had any writing role. Counterclaims ¶¶ 37–40, 44. All facts in PPC's orbit indicated that the Singer Draft was Singer's exclusive written work product (save for PPC's prior property, which it had permitted Singer to use): for example, PPC had a work-made-for-hire agreement with Singer (and Singer alone) to prepare the Singer Draft (*id.* ¶¶ 3, 22); the draft was delivered to PPC with a cover-page attributing authorship only to Singer and two prior work-made-for-hire screenwriters, with no reference whatsoever to Gray (*id.* ¶ 39); and the WGA's credit arbitration for *Maverick* yielded a screenwriting credit for Singer, while Gray did not so much as submit a claim (*id.* ¶ 40).

Nor does Gray's argument that "PPC's own employed *agents* ([*Maverick*]'s director, Kosinski, and key writer, Singer) possessed contemporaneous *knowledge* of Gray's 2017 *screenwriting*. . ." help him. Mot. 10. After all, PPC *does not allege* that Singer and Kosinski were its "*agents*," or that they ever had "*knowledge*" of any purported "*screenwriting*" by Gray. There was no such agency relationship between them and PPC, and certainly not with respect to

infringement of PPC's rights in *Top Gun* or the *Maverick* Materials.  Nor do PPC's allegations guess at what Kosinski or Singer knew or did not know about Gray's purported writing role prior to January 2023.  It is PPC's allegations—not Gray's Complaint—that are assumed true on Gray's motion to dismiss.  And even as to Gray's own Complaint, this Court found Gray's pleading of agency deficient.  Dkt. 40 at 12–13.

Moreover, none of Gray's cases actually support his position.  Indeed, *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782 (1985) (Mot. 8, 11) squarely counsels against dismissal.  There, Center sued a corporation to recover the value of certain stock that a third party had promised to transfer to Center, but had instead sold to the corporation.  *Id.* at 783–84.  The corporation obtained summary judgment on its *bona fide* purchaser defense, arguing that it was a good faith purchaser and was unaware of Center's claim to the stock.  *Id.*  The Court of Appeals reversed because there were "triable issues of fact . . . on whether the corporate defendant had imputed knowledge of [Center]'s adverse claim [to the stocks] because its agent . . . had knowledge of [certain relevant facts]."  *Id.* at 784.  Like in *Center*, there is no basis to resolve as a matter of law the issue whether PPC obtained imputed knowledge via an ostensible (and indeed, factually false) agency relationship with Kosinski and/or Singer.  Nor do any of Gray's other cases counsel in favor of dismissal.  *Cf. Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 426–27 (S.D.N.Y. 2020) (Mot. 12) (analyzing discovery rule applicable to claims under the Commodities Exchange Act, and holding that plaintiffs were placed on inquiry notice by "publicly-available New York State Division of Corporations records"); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 128–29 (E.D.N.Y. 2013) (Mot. 12) (finding that plaintiff had actual "knowledge of at least one fraudulent act," but failed to make "even the most minimal of inquiries," which would have revealed at least 16 relevant court decisions that were "reasonably accessible via electronic media").

Finally, Gray suggests that by asserting the defense that PPC had an implied license to use the so-called "Gray Scenes," PPC made a "judicial admission" that is "incompatible with PPC's claim that it first learned of Gray's authorship in January 2023." *See* Mot. 8–9 (quoting *In re Motors Liquidation Co.*, 957 F.3d 357, 360–61 (2d Cir. 2020)); *id.* at 11. Not so. PPC's implied license defense is consistent with the fact that it never knew about Gray's purported writing role on *Maverick* until 2023—PPC principally asserts that it was an intended beneficiary of an implied license agreement between Gray and Singer.[5] Dkt. 48 at 12. Moreover, to any extent that PPC's implied license defense conflicts with the allegations in its Counterclaims, they are pled in the alternative. As Gray well knows, "a party may state as many separate *claims or defenses* as the party has regardless of consistency." *Gray v. Paramount Glob.*, 2025 WL 2268046, at *7 (S.D.N.Y. Aug. 8, 2025) (Rakoff, J.).

*2. PPC Timely Filed Its Fraud Claim Within Six Years Of Accrual*

Under New York law, "an 'action based on fraud' must be brought within the 'greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it.'" *VR Glob. Partners, L.P. v. Petroleos de Venezuela*, 2024 WL 1514982, at *5 (S.D.N.Y. Apr. 8, 2024), *aff'd sub nom. VR Glob. Partners, L.P. v. Petroleos de Venezuela, S.A.*, 2024 WL 4891271 (2d Cir. Nov. 26, 2024) (quoting N.Y. C.P.L.R. 213(8)). "A fraud claim accrues . . . only when all the elements of [the] tort claim can be alleged." *Id.* (quoting *Pape Ventures, Inc. v. Am. Sports Media, LLC*, 171 N.Y.S.3d 675, 677 (4th Dep't 2022)).

---

[5] Nor does PPC's secondary direct-license theory clash with PPC's lack of knowledge of Gray's purported writing role, as it does not hinge on any actual contact between the two. For example, an implied license can be premised on work requested and delivered through an intermediary, and the licensee need not have any contact with or even knowledge of the licensor in that permutation. *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235–36 (11th Cir. 2010).

Here, Gray's statute of limitations defense fails because the face of PPC's fraud counterclaim *does not* "show[] noncompliance with the limitations period and the affirmative defense [*does not*] clearly appear[] on the face of the pleading." *Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2017 WL 6507110, at *6 (S.D.N.Y. Dec. 18, 2017) (Rakoff, J.). PPC's fraud claim did not accrue until "all the elements of [the] tort claim [could] be alleged." *VR Glob. Partners, L.P.*, 2024 WL 1514982, at *5. "The pleading of damages is a necessary element of a fraud claim," *id.*, and here, Gray's fraud damages were caused by the "cloud over PPC's title to *Maverick*." Counterclaims ¶ 78. PPC's title to copyrights in *Maverick* became fixed upon completion of the film, in or around 2022. *Id.* ¶ 1. Gray filed this lawsuit on April 27, 2025 (Dkt. 1), and PPC filed its Counterclaims on August 13, 2025 (Dkt. 48), both well under six years from accrual of PPC's fraud claim.

The face of the Counterclaims does not show, as Gray suggests, that PPC's fraud claim accrued at the time of Gray's very first omissions in 2017.[6] *Cf.* Mot. 6. At that time, PPC had not yet suffered cognizable damages from Gray's fraud. Rather, the fraud claim accrued when "all the elements of [the] tort claim [could] be alleged." *VR Glob. Partners, L.P.*, 2024 WL 1514982, at *5. No allegations in PPC's Counterclaims suggest that date passed more than six years before this action commenced, so Gray's statute of limitations argument fails. *See id.* (fraud claim arising from omissions in 2016 did not accrue until plaintiff could plead damages, in 2019); *Stewart v.*

---

[6] Gray's reference to PPC's pleading of *reliance* on Gray's conduct is a red herring. Mot. 6–7. First, reliance and damages are distinct elements of a fraud claim, which Gray conflates. *Tesla*, 2017 WL 6507110, at *4. That PPC relied on Gray's omissions does not mean that it immediately suffered damages. For example, if PPC had scrapped *Maverick* rather than postpone through the Covid-19 pandemic, PPC's cognizable damages might never have materialized. Second, Gray has no basis for his bald assertion that all of PPC's reliance occurred in 2017—it plainly did not (and certainly is not alleged to have been), and indeed, PPC could have taken remedial steps up to the point of *Maverick*'s 2022 release, but for Gray's concealment.

*Stewart*, 2018 WL 11365079, at *19 (W.D.N.Y. Nov. 29, 2018) (fraud claims did not accrue when "the concealment . . . occur[ed] in 1994," but rather in 2014—the "earliest that [the plaintiff] might have been able to truthfully allege injury arising from her [fraud] claims"); *CBI Cap. LLC v. Mullen*, 2020 WL 4016018, at *7 (S.D.N.Y. July 16, 2020) (fraud counter-claim did "not accrue when the fraudulent act [was] committed, but rather when the [defendant] suffer[ed] a loss," which did not occur until three years after the fraudulent statements).

## C. New York's Litigation Privilege Does Not Bar Copyright Claims Or Fraud Claims

Gray devotes much of his brief to a nonexistent affirmative defense under New York's litigation privilege. Mot. 12–18. He argues that "[t]he essence of PPC's counterclaims is that Gray's assertion of his legal rights through legal process has injured PPC." *Id.* 12. This argument is baseless; the litigation privilege cannot shield Gray from liability for either fraud or copyright infringement. And even if it could, neither claim arises from litigation-privileged activity.

*First*, state-law privileges are no defense to federal claims like copyright infringement. "[Gray] point[s] to no case where the litigation privilege has been applied to bar a federal cause of action. In fact, case law holds that *such an application is improper*." *U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 2021 WL 1956369, at *4 (S.D.N.Y. May 17, 2021), *report and rec. adopted*, 2021 WL 3082209 (S.D.N.Y. July 21, 2021) (holding that New York litigation privilege could not bar federal claim, and collecting cases). To put it simply, "state privileges apply only to state law claims." *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *22 (N.D. Cal. Nov. 22, 2022); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 & n.10 (9th Cir. 1992) (rejecting argument that copyright claim was barred by California's litigation privilege because "federal courts will recognize state privileges only in cases in which 'state law supplies the rule of decision'" (quoting Fed. R. Evid. 501)). Gray's invocation of a state privilege to bar a federal copyright claim therefore fails. *Collector's Coffee Inc.*, 2021 WL 1956369, at *4; *Wollersheim*,

971 F.2d at 367 & n.10 (California litigation privilege inapplicable to federal copyright claim); *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998) ("A state absolute litigation privilege . . . cannot defeat a federal cause of action.").

*Second*, New York's litigation privilege does not apply to claims of fraud. Gray bears the burden of establishing that any privilege applies. *See In re BM Brazil 1 Fundo de Investimento em Participacoes Multistrategia*, 347 F.R.D. 1, 9 (S.D.N.Y. 2024). But Gray cannot meet his burden, because he cites not a *single* case where the litigation privilege barred a claim for fraud; all Gray's cases involved defamation claims.[7] That is unsurprising—courts in this district routinely decline to stretch New York's litigation privilege beyond the defamation context. *See, e.g.*, *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010) ("Because plaintiffs have not claimed defamation, the [litigation] privilege is wholly inapplicable here."); *Conti v. Doe*, 535 F. Supp. 3d 257, 281 (S.D.N.Y. 2021) ("Conti provides no legal authority from the Second Circuit, and the Court is aware of none, to suggest that the litigation privilege can or should be extended to preclude a claim for breach of confidentiality."); *see also Collector's Coffee Inc.*, 2021 WL 1956369, at *4 (surveying the law in other jurisdictions, and quoting *Clark v. Druckman*, 218 W. Va. 427, 435 (2005) for the proposition that the litigation "privilege does not apply to claims of . . . fraud"); *Full Circle United, LLC v. Skee-Ball, Inc.*, 2014 WL 12829195, at *7 (E.D.N.Y. May 13, 2014) (declining to apply litigation privilege to claim for breach of contract and finding defendant's cases "inapposite as they involve claims for defamation"). Indeed, at least one court in this district has expressly rejected application of the litigation privilege to claims rooted in fraud.

---

[7] *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015) (Mot. 13–15); *Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D.3d 163, 164 (1st Dep't 2007), *abrogated by id.* (Mot. 13, 15); *Davidoff v. Kaplan*, 217 A.D.3d 918, 920 (2023) (Mot. 14); *Martirano v. Frost*, 25 N.Y.2d 505, 508 (1969) (Mot. 15).

*Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, 419 F. Supp. 3d 668, 681, 692 (S.D.N.Y. 2019) (rejecting litigation privilege as defense to claims under the FDCPA, N.Y. General Business Law Section 349, and N.Y. Judiciary Law Section 487 arising from defendants' "fraudulent scheme"). The Court should do the same here.

*Finally*, on its substance, Gray's assertion that PPC's counterclaims are "predicated on pre-suit legal communications and on the effects of this lawsuit" is flat wrong. *Cf.* Mot. 12 (regarding fraud claim); *id.* at 15 (regarding infringement claim). PPC's claims arise from: (1) Gray's infringement, in 2017, of PPC's copyrights in *Top Gun* and the *Maverick* Materials (Counterclaims ¶ 66); and (2) Gray's fraudulent concealment, from 2017 to 2023, of his purported authorial role on the *Maverick* screenplay (*id.* ¶¶ 31, 72). Nowhere does PPC allege that Gray violated PPC's rights by sending the Gray Narrative in 2023 or filing this lawsuit in 2025. *Cf.* Mot. 12.

## D. PPC States A Viable Claim For Fraud

"Under New York law, the elements of common law fraud are '[1] a material, false representation, [2] an intent to defraud thereby, and [3] reasonable reliance on the representation, [4] causing damage to the plaintiff."[8] *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999). The pleading requirements under California law "are substantially similar." *Niedernhofer*, 2018 WL 3650137, at *5 n.8. Where fraud is premised on an omission, the "plaintiff must allege that the defendant had a duty to disclose the concealed fact[s] and that it failed to do so." *ADL, LLC v. Tirakian*, 2010 WL 3925131, at *15 (E.D.N.Y. Aug. 26, 2010), *report and rec. adopted*, 2010 WL 3926135 (E.D.N.Y. Sept. 29, 2010); *Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Res. Dev. Servs., Inc.*, 2011 WL 1882274, at *5 (N.D. Cal. May 17, 2011) (same in California). Here, Gray attacks

---

[8] Absent a true conflict, New York law applies. The elements of fraud are substantially the same under California and New York law. *Niedernhofer v. Wittels*, 2018 WL 3650137, at *5 & n.8 (S.D.N.Y. July 31, 2018).

three elements of the fraud claim: (1) Gray's duty to disclose; (2) PPC's reasonable reliance; and (3) PPC's damages.  Mot. 19–22.  PPC has adequately pleaded each element.

### 1. Gray Had a Duty to Disclose His Omissions to PPC[9]

"[P]ure omissions (as opposed to misleading statements) are actionable when defendant had an affirmative duty to disclose that information to plaintiff."  *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, at 440–41 (2019).  A duty to disclose may arise under various circumstances, "such as when defendant owes fiduciary duty to plaintiff."  *Id.* at 441.  "[I]n the absence of fiduciary duty, a duty to disclose arises if 'one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'"  *Id.* (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005)).  Although courts often find a duty to disclose arises between "parties to [a] transaction[,]" *cf. id.* at 450, the duty "is not limited to parties in privity of contract, when nondisclosure would 'le[a]d the person to whom it was or should have been made to forego action that might otherwise have been taken for the protection of that person.'"  *Strasser v. Prudential Sec., Inc.*, 218 A.D.2d 526, 527 (1995) (citation omitted) (quoting *Caracci v. State*, 203 A.D.2d 842, 844 (3d Dep't 1994)); *Nat'l Union Fire Ins. Co.*, 2011 WL 1882274, at *5 (in California, duty to disclose "not limited to contractual relationships").

---

[9]  Gray's duty-to-disclose argument attacks only PPC's allegations regarding Gray's "misrepresentations by *omission*," and appears to rely on the flawed premise that PPC does not allege any *affirmative* misrepresentations.  Mot. 2.  That is incorrect.  In addition to Gray's omissions, PPC alleges that Gray: (1) in 2017, knowingly "assent[ed]" to Singer's delivery of the Singer Draft to PPC, which according to Gray, misrepresented the true authorship of the Draft; and (2) "[f]or years thereafter, . . . conceal[ed] from PPC his purported role on *Maverick*."  Counterclaims ¶¶ 39–41.  Indeed, in further support of (2), at Gray's August 26 deposition, Gray testified that he submitted a knowingly false resume to work on *Shantaram*, where he stated that he was a "development executive" for Eric Singer on *Maverick*—*not* a screenwriter.  Though Gray's motion does not target these alleged misrepresentations, in the event that the Court finds PPC's fraud allegations deficient, PPC is prepared to amend its pleading to more fully flesh out that Gray's fraudulent scheme involved fraudulent misrepresentations, as well as omissions.

Here, PPC's allegations that Gray possessed superior knowledge, not readily available to PPC, and that Gray knew PPC was acting on the basis of mistaken knowledge, give rise to a duty to disclose. *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d at 441. Specifically, PPC alleges that "Gray intentionally concealed from PPC that he was purportedly writing scenes and making other authorial contributions to Singer's draft of the *Maverick* screenplay," and that Gray had "exclusive or superior knowledge" of those facts. Counterclaims ¶¶ 72–73. PPC further alleges that it "was not aware of Gray's purported writing role in connection with Singer's draft of *Maverick*'s screenplay until Gray belatedly disclosed it to PPC in January 2023," and that PPC instead "reasonably believ[ed] [the Singer Draft] to be the exclusive work product of Singer (whose contributions PPC owned as work made for hire) and PPC's other work-made-for-hire contributors." *Id.* ¶¶ 74, 77. The omitted facts were not readily available to PPC because, beginning in 2017, "Gray concealed his involvement from PPC," and continued to do so until 2023. *Id.* ¶¶ 32–44. From PPC's perspective, all signs pointed to Singer's (and by extension, PPC's) sole authorship of the Singer Draft: PPC had contracted with Singer for that express purpose, the Singer Draft bore Singer's name with no credit attributed to Gray, and Gray made no claim of authorship even as the Writers Guild adjudicated credits for *Maverick*. *Id.* ¶¶ 22, 31, 39–40, 45. Finally, "Gray knew that PPC was unaware of [Gray's purported writing role]," based on, among other things, the facts that "PPC's dealings were directly with Singer; PPC had a contract with Singer (and every other screenwriter on *Maverick*) but not with Gray; Singer's screenplay drafts credited Singer as a writer but not Gray; the WGA arbitration yielded a screenwriting credit for Singer, while Gray did not so much as submit a claim; and Gray did not inform PPC at any previous point that he claimed to have made writing contributions to *Maverick*'s screenplay." *Id.* ¶ 45. These allegations regarding Gray's "creation of such a deceptive scheme clearly satisfy[]

the requirements of the special facts doctrine, and thereby impose[] a duty to disclose." *See Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 526–27 (S.D.N.Y. 2018) (Rakoff, J.).

Gray asserts that his fraudulent omissions "*must* be in connection with 'a transaction'" to give rise to a duty. Mot. 19 (quoting *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 898 (E.D.N.Y. 2018)). It is unclear what Gray means, but to the extent Gray asserts that his omissions are actionable *only* if he omitted information from PPC while *engaged in a transaction* with PPC, Gray is wrong. The duty to disclose "is not limited to parties in privity of contract" where, as here, "nondisclosure would 'le[a]d the person to whom [the disclosure] was or should have been made to forego action that might otherwise have been taken for the protection of that person.'" *Strasser*, 218 A.D.2d at 527; *Nat'l Union Fire Ins. Co.*, 2011 WL 1882274, at *5 (same in California).

In any event, Gray's omissions were very much "in connection with" the transaction between PPC and Singer (and Gray's purported related transaction with Singer). "On June 6, 2017, PPC entered into a contract with . . . Singer[] to prepare further drafts of the sequel's screenplay" and "Singer prepared an initial screenplay draft as of July 16, 2017, and [] submitted his final screenplay draft to PPC on November 3, 2017." Counterclaims ¶ 22. And Gray, in turn, alleges that he entered into an agreement with Singer concerning his work on the same screenplay. *Id.* ¶ 30. Gray—but not PPC—knew that the draft Singer delivered to PPC pursuant to the work-made-for-hire contract contained a hidden poison pill—Gray's purported rights in the so-called "Gray Scenes." *Id.* ¶¶ 73, 75.

It therefore does not matter that Gray and PPC were not engaged in a "transaction" with each other, or in "privity of contract," at the time of Gray's fraudulent scheme; Gray had a duty to disclose in connection with PPC's transaction with Singer. *See Strasser*, 218 A.D.2d at 527; *Louis*

17

*Foodservice Corp. v. 839 Rest. Corp.*, 15 Misc. 3d 1102(A), 836 N.Y.S.2d 500 (Civ. Ct. 2007) (individual defendant had a duty to disclose facts to plaintiff relating to a transaction between plaintiff and corporate defendant, even though "plaintiff [] never had occasion to have so much as a conversation with [the individual defendant]"); *see also Stevenson Equip., Inc. v. Chemig Constr. Corp.*, 170 A.D.2d 769, 771 (3d Dep't 1991), *aff'd*, 79 N.Y.2d 989 (1992) (defendants—non-parties to a contract for the sale of a machine—owed the buyer a duty to disclose because they "possessed superior knowledge").

Gray also rehashes the argument that he "was not in a superior position of knowledge as to PPC" because Singer and Kosinki were PPC's "*agents*," and "directed his involvement in *co-writing the screenplay*." Mot. 20. This argument, again, relies on Gray's unfounded musings that Singer and Kosinski were PPC's agents and that they understood Gray to be an author of the *Maverick* screenplay. *See supra*, § IV.B.1. Gray's argument is without support in PPC's well-pled allegations, which are controlling.

### 2. PPC Acted in Reasonable Reliance on Gray's Omissions

Gray argues that PPC's reliance allegations "do not satisfy Rule 9(b) or the plausibility standard." Mot. 22. Gray is wrong. Under Rule 9(b), the complaint must allege: "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *In re Platinum-Beechwood Litig.*, 2019 WL 1570808, at *8; *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 578, 586 (S.D.N.Y. 2011).

Here, PPC's Counterclaims allege that:

(1)     "Gray intentionally concealed from PPC that he was purportedly writing scenes and making other authorial contributions to Singer's draft of the *Maverick* screenplay," (¶ 72);

(2)     Gray was responsible for failing to disclose that information to PPC (*id.*);

(3)    The context of Gray's omissions centered around the work-made-for-hire relationship between Singer and PPC (from June to November 2017), Gray's purported writing of the so-called "Gray Scenes" during that period (*id.* ¶¶ 22, 29), and Gray's continued concealment of his purported authorial role through January 2023 (*id.* ¶¶ 31–42), including his admitted deliberate decisions during that period to hide his role from PPC, *inter alia*, (i) when Singer was making his initial contract with PPC (*id.* ¶¶ 31, 33–35), (ii) when Singer delivered his draft to PPC without attribution to Gray (*id.* ¶¶ 38–39), and (iii) during and after the WGA's credit arbitration, in which Gray did not lodge a claim for credit, and in which Singer did receive a writing credit (*id.* ¶¶ 40, 42).  Gray's omissions misled PPC into believing the Singer Draft was the exclusive work product of Singer and PPC's other work-made-for-hire contributors, such that PPC would own all content therein (*id.* ¶¶ 74, 77); and but for his omissions, "PPC would have prevented Gray from contributing to *Maverick*'s screenplay or at minimum . . . required Gray to enter into a work-made-for-hire agreement deeming Gray's contributions to be authored and owned by PPC (or to confirm that any work Gray performed was owned by Singer and thus subject to Singer's agreement with PPC)"; "would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material"; and/or "would have excised any of Gray's purported contributions from *Maverick*'s screenplay and the ultimate film, so as to avoid any question about its rights" (*id.* ¶ 76); and

(4)    Gray's omissions allowed him to purportedly obtain rights in the so-called "Gray Scenes" and "entrap PPC in purported copyright infringement and/or joint copyright ownership once *Maverick* had already been finalized incorporating Singer's screenplay draft . . . and released to the general public," while "cloud[ing] PPC's title to *Maverick*" in the process (*id.* ¶¶ 3, 33–34, 48, 78).  Gray's omissions were also designed to otherwise serve Gray's self-interest, such as

Gray's desire to ensure Singer would receive a credit on *Maverick* and accompanying monetary bonus from PPC, in which Gray hoped to share (*id.* ¶ 42).

These specific allegations satisfy Rule 9(b).  *See Anwar*, 826 F. Supp. 2d at 586 (plaintiffs satisfied Rule 9(b) "by alleging that [defendant]'s failure to disclose [third party]'s association with Madoff induced plaintiff to make the investment and, in turn, [the defendant] received a fee for securing that investment"); *NCR Corp. v. B.A.T. Indus. P.L.C.*, 2024 WL 4188358, at *11 (S.D.N.Y. Sept. 14, 2024) ("[T]he counterclaims allege with particularity what the omissions were, NCR's responsibility for the failed disclosure, the context of the omissions, and how they impacted BAT's decision to enter into [an agreement].").

Gray also questions the reasonableness of PPC's reliance, but PPC's allegations more than suffice at the pleading stage.  At the outset, "whether or not a plaintiff reasonably relied upon a defendant's statements is generally a factual inquiry that cannot be resolved on a motion to dismiss."  *NCR Corp.*, 2024 WL 4188358, at *11; *see ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1324 (S.D.N.Y. 1997) ("Courts applying New York law generally have found that . . . reasonable reliance raises issues of fact that should not be resolved on a motion to dismiss.") (collecting cases).  This case is no exception.

PPC pleads in detail the bases for its reasonable reliance.  For example:

> As Gray himself understood, PPC would have prevented Gray from making writing contributions to the screenplay draft for *Maverick* if it had been aware that Gray was planning to do so.  At minimum, PPC would have demanded that Gray enter into a work-made-for-hire agreement, deeming PPC the statutory author and owner of his contributions.  As Gray knew, PPC required such agreements of every one of its screenwriters, including Singer.

Counterclaims ¶ 46.  Indeed, Gray used his superior knowledge and "intended to deceive PPC by concealing [his purported writing role], and he understood that PPC would not have permitted him

to contribute to *Maverick*'s screenplay if PPC had been aware of Gray's activities." *Id.* ¶¶ 73–75. Under the circumstances, where PPC had no reason to know or suspect that the assistant to one of its work-made-for hire screenwriters was surreptitiously purportedly performing work as an author, PPC's reliance on Gray's omissions was reasonable. That is particularly so given Gray's superior—indeed, exclusive—knowledge of the facts. *Id.* ¶ 73. *See Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 377 (S.D.N.Y. 2024) ("alleged information imbalance" supports finding that "reliance was reasonable"); *accord NCR Corp.,* 2024 WL 4188358, at *11.

PPC's reliance on Gray's omissions is all the more reasonable when viewed in light of the WGA credit arbitration for *Maverick*. "[A]ccording to the Gray Narrative, Gray learned in late 2019 that [WGA] was about to begin a credit arbitration for *Maverick*, which would bind PPC as to the writing credits that would appear on the film." Counterclaims ¶ 40. That "arbitration was the formal process for screenwriters to assert that they had made material writing contributions to the film and seek a film credit from the studio." *Id.* "Gray (who was both represented by counsel and a WGA member at the time) knew" that. *Id.* But he "chose to stay silent rather than lodge a claim for a writing credit [with WGA]," nor did he contact "PPC directly to disclose his purported writing role." *Id.* Because PPC was bound by WGA's credit determination, it was reasonable for PPC to rely on that arbitration—and more importantly, Gray's willful failure to make his existence known in that arbitration—before finalizing *Maverick* in or around 2022.

Gray's final salvo of arguments on reliance fares no better. He first cites *Grumman Allied Industries, Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984), for the proposition that there can be "no justifiable reliance where party could have protected itself through contract." Mot. 21. But *Grumman*'s discussion of contracts stands for the unremarkable—and inapposite— proposition that "where a person has read and understood the disclaimer of representation clause

[in a contract], he is bound by it."  748 F.2d at 737.  Gray also dismisses PPC's reliance pleading as "incredulous allegation[s]" based on entirely imagined allegations like "PPC would have pulled the plug on its $177 million production" but for Gray's fraud (Mot. 21); PPC pleads no such thing. Nor can Gray question the plausibility of PPC's allegation that it "would have excised any of Gray's purported contributions from *Maverick*'s screenplay and the ultimate film" based on Gray's self-serving exaggeration of his contributions (Mot. 21–22); Gray's contributions, if any, were minimal, and Gray's false assertion to the contrary means nothing on his motion to dismiss.

What PPC actually alleges is a waterfall of actions it could have taken to safeguard its rights from Gray's encroachment, but for his fraud: "PPC would have prevented Gray from contributing to Maverick's screenplay or at minimum would have required Gray to enter into a work-made-for-hire agreement deeming Gray's contributions to be authored and owned by PPC (or to confirm that any work Gray performed was owned by Singer and thus subject to Singer's agreement with PPC)"; it "would not have freely given Singer's draft to the next wave of *Maverick* screenwriters to work from or authorized those writers to use it as source material" and/or it "would have excised any of Gray's purported contributions from *Maverick*'s screenplay and the ultimate film, so as to avoid any question about its rights."  Counterclaims ¶ 76.  That is a perfectly plausible course of action for a studio that prizes its intellectual property rights.

### 3. PPC Has Adequately Alleged Damages Under Multiple, Viable Theories

*First*, "'[t]he prime standard for measuring [fraud damages] is the "out of pocket" rule,' under which 'the loss is computed by ascertaining the difference between the consideration paid for the property and its actual value as affected by the consequences of the fraud.'"  *Barrie House Coffee Co. v. Teampac, LLC*, 2016 WL 3645199, at *11 (S.D.N.Y. June 30, 2016).  PPC paid Singer pursuant to a work-made-for-hire contract to produce a draft-screenplay—*i.e.*, intellectual property—for PPC.  Counterclaims ¶ 22.  However, Gray alleges that when Singer delivered the

draft to PPC, it contained a hidden poison pill—Gray's purported property rights in the so-called "Gray Scenes." *Id.* ¶¶ 73, 75. Gray's fraud ultimately placed a cloud over PPC's title to *Maverick*, "devaluing one of PPC's most significant properties and undercutting the fruits of its substantial investment in the film across more than a decade." *Id.* ¶ 78. Accordingly, PPC has suffered, at minimum, out-of-pocket damages equal to the delta between "the consideration paid [to Singer] for the [Singer Draft] and its actual value as affected by the consequences of [Gray's] fraud.'" *See Barrie House*, 2016 WL 3645199, at *11; *Stevenson Equip.*, 170 A.D.2d at 771 (affirming damages award for fraud by concealment, where defendant concealed that purchased property had been stolen).

*Second*, a plaintiff may recover damages "based on damage demonstrably attributable to diminution in [property]'s value" that is "tied to" the defendant's fraud. *Woodberry v. Graham*, 2017 WL 151617, at *7 (S.D.N.Y. Jan. 13, 2017). "[T]he Copyright Act confers a bundle of exclusive rights to the owner of the copyright." *The Intercept Media, Inc.*, 767 F. Supp. 3d at 27 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985)). Those are valuable property rights, akin to the real property concept of a bundle-of-sticks. *See id.* Here, PPC owns the copyright rights in *Maverick*. But Gray's fraud has diminished PPC's bundle of sticks by "plac[ing] a cloud over PPC's title to *Maverick* [and] devaluing [it]." Counterclaims ¶ 78. PPC is therefore entitled to damages in an amount to be proven at trial equal to the difference between the value of the copyright rights in *Maverick* with and without Gray's cloud on the title.

*Finally*, under California and New York law, "legal fees and expenses in clearing the cloud on title created by [fraud]" are recoverable as damages. *See Mausner v. Mausner*, 2024 WL 4758563, at *10 (S.D.N.Y. Sept. 26, 2024) (in California, "[s]uch damages are recoverable for both breach of fiduciary duty and slander of title"); *105 E. Second St. Assocs. v. Bobrow*, 175

A.D.2d 746 (1st Dep't 1991) (applying New York law and affirming that "counterclaim plaintiffs suffered damages in the form of . . . substantial legal fees incurred in clearing title [to property]," arising from breach of fiduciary duty and slander of title).[10]  In suits for slander of title, California courts hold that a "plaintiff may recover as damages the expense of legal proceedings necessary to remove a cloud on the plaintiff's title."  *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC*, 205 Cal. App. 4th 999, 1031 (2012).  Such cases follow the "majority rule" that "attorney's fees associated with removing the cloud placed on the title of [property]" are "considered special damages."  *SCO Grp., Inc. v. Novell, Inc.*, 2010 WL 413807, at *7 (D. Utah Jan. 28, 2010) (quoting *Colquhoun v. Webber*, 684 A.2d 405, 411 (Me. 1996)); *see Sumner Hill*, 205 Cal. App. 4th at 1033–34 (quoting *Colquhoun*, 684 A.2d at 411)).

*SCO* is instructive.  SCO claimed to own certain copyrights, but Novell "disputed [SCO's] claims of ownership and [] publicly claimed that" Novell was "the true owner."  *SCO Grp.*, 2010 WL 413807, at *1.  SCO sued for slander of title, alleging that Novell's "claim of ownership and statements refuting [SCO's] claim of ownership" were "slanderous."  *Id.*  Novell moved for summary judgment, arguing that SCO's "attorney's fees in pursuing [a] slander of title action are not recoverable."  *Id.* at *6.  The court disagreed.  Applying the "majority rule," the court noted that "both the issue of ownership of title and slander of title will be decided in this action," and

---

[10] A recent New York case took a different tack, recognizing "some support for the proposition that pecuniary loss includes 'the expenses . . . [incurred in] litigation to remove the doubt cast upon" title, but holding that such fees did not establish the special damages element of a slander of title claim where the plaintiff alleged no other pecuniary damages.  *DiGiacco v. Grenell Is. Chapel*, 234 A.D.3d 1315, 1317 (4th Dep't 2025).  To the extent the Court finds that California and New York law conflict, the former would apply, given that Gray's fraud occurred there.  If necessary, PPC requests leave to amend to supplement its allegations regarding this case's connection to California, including Gray's admission at his August 26 deposition that he lived there until 2025.

concluded that "those attorney's fees and costs associated with removing the cloud from the title are appropriately considered and may be recoverable as special damages." *Id.* at *6–7.

The same principles apply to PPC's fraud claim, regardless of whether New York or California law applies. *See Mausner*, 2024 WL 4758563, at *10; *105 E. Second St. Assocs.*, 175 A.D.2d at 746. Both the issue of ownership of title in copyrights in *Maverick* and PPC's fraud claim will be decided in this action. And resolution of Gray's claim and PPC's Counterclaims will necessarily require a determination of the parties' respective ownership interests of copyrights related to *Maverick*. PPC therefore has incurred, and will continue to incur, damages in the form of attorney's fees and other costs in clearing the cloud from its title to *Maverick*. PPC requests, *inter alia*, attorneys' fees in connection with its fraud claim. Counterclaims at 44. "To the extent that [PPC] can segregate and identify those attorney's fees associated with removing the cloud placed on the title of [its] copyrights," which PPC will be able to do, those fees are recoverable as damages. *See SCO Grp., Inc.*, 2010 WL 413807, at *7.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Gray's Motion in its entirety. In the event that the Court grants any part of Gray's Motion, PPC respectfully requests leave to amend.

Dated: September 17, 2025       By: */s/ Molly M. Lens*

O'MELVENY & MYERS LLP
Molly M. Lens
mlens@omm.com
Matthew Kaiser (admitted *pro hac vice*)
mkaiser@omm.com
1999 Avenue of the Stars, 8th Fl
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Danielle Feuer
dfeuer@omm.com
1301 Avenue of the Americas, Ste 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendants Paramount Global,*
*Paramount Pictures Corporation, and*
*Paramount Streaming Services, Inc.*

## <u>CERTIFICATE OF WORD COUNT (L.R. 7.1(C))</u>

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law contains 8,745 words, counted using the Microsoft Word program used to prepare it.  It therefore complies with the word-count limitation of Local Rule 7.1(c).  The foregoing Memorandum of Law is also 25 double-spaced pages, and it therefore complies with Rule 2(e) of this Court's Individual Rules of Practice.

Dated:   September 17, 2025                 __/s/ *Molly M. Lens*_____

                                                               Molly M. Lens