**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SHAUN GRAY, an individual,

                 Plaintiff,

      vs.

PARAMOUNT GLOBAL, a Delaware
corporation; PARAMOUNT PICTURES
CORPORATION, a Delaware corporation;
PARAMOUNT STREAMING SERVICES
INC., a Delaware corporation; and DOES 1-10,

                 Defendants.

Civil Action No. 1:25-cv-3484-JSR

---

PARAMOUNT PICTURES CORPORATION,
a Delaware corporation;

                 Counterclaim-Plaintiff,

      vs.

SHAUN GRAY, an individual,

                 Counterclaim-Defendant,

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................ 1

III. ARGUMENT ................................................................................................... 4

    A.    Gray's Infringement Claim Is Barred By Equitable Estoppel .............................. 4

        1.    Gray Had Knowledge Of Paramount's Allegedly Infringing Conduct ................................................................................................ 5

        2.    Gray Acted Or Failed To Act In Such A Manner That Paramount Had A Right To Believe It Could Use Material From The "Gray Scenes" In *Maverick* ................................................................... 6

        3.    Paramount Was Ignorant Of The True Facts ........................................... 11

        4.    Paramount Relied On Gray's Conduct To Its Detriment ......................... 13

    B.    Gray's Infringement Claim Is Alternatively Barred Because Paramount Had A License, Express Or Implied, To Use The "Gray Scenes" In *Maverick* ................................................................................................ 16

    C.    The "Gray Scenes" Are Not Substantially Similar To *Maverick* As A Matter Of Law ............................................................................................ 22

    D.    Gray's Infringement Claim Fails Because He Has No Valid Copyright In The "Gray Scenes" For Paramount To Infringe .................................... 25

        1.    No Presumption Of Copyright Validity Applies Here (And Any Would Be Rebutted) ............................................................................. 25

        2.    Gray Made Any Contributions As Work For Hire For Eric Singer/Bullsh!t Artists .......................................................................... 26

        3.    The "Gray Scenes" Are Not Independently Copyrightable Works Of Authorship ...................................................................................... 26

        4.    If Prepared By Gray As Discrete Works, The "Gray Scenes" Are Infringing Derivative Works Not Entitled To Copyright Protection ....... 31

            a.    The "Gray Scenes" Are Derivative Of Paramount's Copyrighted Material ......................................................................... 31

            b.    Gray's Use Of Paramount's Copyrighted Material Was Unauthorized .................................................................................... 32

            c.    As Unauthorized Derivatives, The "Gray Scenes" Lack Copyright Protection ................................................................................. 33

IV. CONCLUSION ............................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin,*
  791 F.3d 247 (2d Cir. 2015) ................................................................. 26, 27, 28, 29

*Abdin v. CBS Broad. Inc.,*
  971 F.3d 57 (2d Cir. 2020) .................................................................................. 22

*ABKCO Music, Inc. v. Sagan,*
  50 F.4th 309 (2d Cir. 2022) ........................................................................ 4, 17, 18

*Anderson v. Stallone,*
  1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ................................................ 32, 34, 35

*Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC,*
  616 F. Supp. 3d 291 (S.D.N.Y. 2022) ..................................................................... 21

*Buckward Digital Servs., Inc v. Millar Instruments,*
  2006 WL 1118003 (S.D. Tex. Apr. 26, 2006) ..................................... 10, 16, 18, 21

*Carano v. Vina Concha y Toro,*
  288 F. Supp. 2d 397 (S.D.N.Y. 2003) ................................................................... 18

*Carmichael Lodge No. 2103 v. Leonard,*
  2009 WL 2985476 (E.D. Cal. Sept. 16, 2009) ......................................................... 5

*Carson v. Dynegy, Inc.,*
  344 F.3d 446 (5th Cir. 2003) ........................................................................... 5, 16

*Center v. Hampton Affiliates, Inc.,*
  66 N.Y.2d 782 (1985) ......................................................................................... 12

*DeCarlo v. Archie Comic Publications, Inc.,*
  127 F. Supp. 2d 497 (S.D.N.Y.), *aff'd,* 11 F. App'x 26 (2d Cir. 2001) ................... 5, 9

*Effects Assocs., Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990) ............................................................................... 20

*Est. of Kauffmann v. Rochester Inst. of Tech.,*
  932 F.3d 74 (2d Cir. 2019) .................................................................................. 13

*Fam. Fashions, Inc. v. Sterling Jewelers, Inc.,*
  2022 WL 4109720 (S.D.N.Y. Sept. 8, 2022) ......................................................... 19

*Field v. Google Inc.,*
  412 F. Supp. 2d 1106 (D. Nev. 2006) .............................................................. 5, 9, 16

*Fontana v. Harra,*
  2013 WL 990014 (C.D. Cal. Mar. 12, 2013) .................................................... 18, 19

*Graham v. James,*
  144 F.3d 229 (2d Cir. 1998) ................................................................................ 20

*Hudson & Broad, Inc. v. J.C. Penney Corp.,*
  2013 WL 3203742 (S.D.N.Y. June 18, 2013), *aff'd,* 553 F. App'x 37 (2d Cir. 2014)............. 12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Interscope Records v. Time Warner, Inc.*,
  2010 WL 11505708 (C.D. Cal. June 28, 2010) ........................................................ 16

*Jeffreys v. City of New York*,
  426 F.3d 549 (2d Cir. 2005) ........................................................................................ 19

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings*,
  399 F. Supp. 3d 120 (S.D.N.Y. 2019) ....................................................................... 17

*Keeling v. Hars*,
  809 F.3d 43 (2d Cir. 2015) ................................................................................... 31, 34

*Keller-Wala v. Coello*,
  206 N.Y.S.3d 347 (N.Y. App. Div. 2024) ................................................................. 21

*Latimer v. Roaring Toyz, Inc.*,
  601 F.3d 1224 (11th Cir. 2010) ............................................................................ 17, 18

*Latour v. Columbia Univ.*,
  12 F. Supp. 3d 658 (S.D.N.Y. 2014) ..................................................................... 17, 20

*Logicom Inclusive, Inc. v. W.P. Stewart & Co.*,
  2004 WL 1781009 (S.D.N.Y. Aug. 10, 2004) ........................................................... 26

*Mahavisno v. Compendia Bioscience, Inc.*,
  164 F. Supp. 3d 964 (E.D. Mich. 2016) ..................................................................... 21

*MidlevelU, Inc. v. ACI Info. Grp.*,
  989 F.3d 1205 (11th Cir. 2021) .................................................................................. 17

*Newsome v. Brown*,
  209 F. App'x 11 (2d Cir. 2006) .................................................................................. 27

*Nobile v. Watts*,
  747 F. App'x 879 (2d Cir. 2018) ................................................................................ 25

*Peterson v. Kolodin*,
  2013 WL 5226114 (S.D.N.Y. Sept. 10, 2013) .......................................................... 25

*Pickett v. Prince*,
  207 F.3d 402 (7th Cir. 2000) ...................................................................................... 34

*Psihoyos v. Pearson Educ., Inc.*,
  855 F. Supp. 2d 103 (S.D.N.Y. 2012) ................................................................... 18, 20

*Quinn v. City of Detroit*,
  23 F. Supp. 2d 741 (E.D. Mich. 1998) ....................................................................... 16

*Slate v. Am. Broad. Companies, Inc.*,
  941 F. Supp. 2d 27 (D.D.C. 2013), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2014) ...................... passim

*Sobhani v. @Radical.Media Inc.*,
  257 F. Supp. 2d 1234 (C.D. Cal. 2003) ................................................................. 34, 35

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Trump v. Simon & Schuster, Inc.*,
  791 F. Supp. 3d 470 (S.D.N.Y. 2025) .................................................. 25, 29

*Warren v. Fox Fam. Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) .............................................................. 26

*Webber v. Dash*,
  2021 WL 3862704 (S.D.N.Y. Aug. 30, 2021) ........................................ 27

*Wozniak v. Warner Bros. Ent. Inc.*,
  726 F. Supp. 3d 213 (S.D.N.Y. 2024) .................................. 22, 32, 34, 35

**Statutes**

17 U.S.C. § 101 .............................................................................................. 26, 32

17 U.S.C. § 102 .................................................................................................. 26

17 U.S.C. § 201(b) ............................................................................................. 26

**Treatises**

4 Nimmer on Copyright § 13.07[A] ................................................................... 5

**Other Authorities**

H.R. Rep. No. 94-1476 (1976).............................................................................. 29

U.S. Copyright Office, Circular 34: Multiple Works (Mar. 2021), accessible at
  https://www.copyright.gov/circs/circ34.pdf ....................................................... 29

## I.  INTRODUCTION

With this action, Plaintiff Shaun Gray tries to take advantage of a studio he *admits to deceiving* about the work over which he now claims infringement.  Gray claims he secretly wrote fifteen scenes for a screenplay draft for Paramount's[1] *Top Gun: Maverick* ("*Maverick*"), which he passed off as the writing of Paramount's work-for-hire screenwriter.  Gray said nothing about his alleged writing role (much less his purported copyrights) for more than five years until *Maverick*'s theatrical run was over.  The law does not reward bad actors with the windfall Gray seeks.  Even assuming Gray wrote everything he claims (he did not), his sole live count fails as a matter of law.

Gray's infringement claim cannot proceed for four independent reasons: *first*, it is barred by equitable estoppel; *second*, it is foreclosed because Paramount at minimum had a license to use the disputed material; *third*, it fails because the so-called "Gray Scenes" are not substantially similar in their original expression to *Maverick*; and *fourth*, it fails because Gray has no valid copyright in the so-called "Gray Scenes" on which to sue.  For all these reasons, or any of them, summary judgment should be entered for Paramount on Gray's Complaint.

## II.  FACTUAL BACKGROUND

Paramount released its blockbuster film *Top Gun: Maverick* in May 2022, the long-awaited sequel to its 1986 film *Top Gun*.  SMF 1, 18.  Paramount hired five consecutive work-for-hire screenwriters to work on its screenplay starting in 2011.  SMF 3-17.  Sandwiched in the middle was writer Eric Singer, whose final screenplay draft was submitted to Paramount on November 3, 2017 ("Singer Draft").  SMF 9-13.  Eight years later, Gray now claims that he secretly wrote fifteen "Gray Scenes" for the Singer Draft and that *Maverick* infringes his copyright in them.  SMF 19.

Many of the most crucial facts here are Gray's own words.  In January 2023, Gray sent

---

[1] This Memorandum refers collectively to Defendants as "Paramount."

Paramount a written statement detailing a secret side deal he allegedly reached with Singer in 2017 to co-write the Singer Draft and hide that purported writing role from Paramount.[2]  SMF 20-30. Even before Singer had a deal with Paramount, Gray says that Singer "asked [Gray] to develop and write the screenplay for 'Top Gun: Maverick' with him as a writing team."  SMF 21.  But they opted *not* to ask "the Studio to contract us as a writing team," because "it risked blowing up the deal and could cause us to lose the project entirely."  SMF 22-24.  Gray says that Singer "proposed that he negotiate the initial contract as an individual writer and said that after the script was written, he would reapproach the Studio and Producers to 'set the record straight,'" to which Gray agreed. SMF 24-25.  The thought was that "by delaying notifying the Studio or producers of [Gray's] involvement," they "could ensure that we secured the chance to write the movie" and also serve "both of our financial interests" because Gray's "lack of prior writing credits would cause the size of that deal to be greatly reduced as compared to the rate [Singer] was able to command."  SMF 26. On his own, Singer could "negotiate a better deal" and get from Paramount "more money…for both of us."  SMF 27.  So they resolved to "ask forgiveness [rather] than permission."  SMF 23.

Gray thus entered into "a good faith verbal agreement" with Singer to help write a screenplay for *Maverick*, in which Singer "guaranteed [Gray] would be credited for [his] writing and paid the lesser portion of a 60/40 split" of Singer's back-end compensation. SMF 28.  Later, "when Paramount made the official deal offer to [Singer], our internal deal was already agreed upon." SMF 29.  Gray says this "agreement" "hinged on" Singer's commitment "that regardless of the initial Studio contract terms, [Singer] would subsequently inform the Studio and all parties…that [Gray] was, in fact, his co-writer, if and when the film went into production."  SMF 30.

---

[2] For purposes of this Motion, Paramount adopts Gray's version of events to show that even Gray's own narrative forecloses his claim.  But to be clear, Paramount vehemently disputes the truth of Gray's narrative, including his ostensible writing role.

Meanwhile, Singer entered into a contract with Paramount to write a screenplay for *Maverick* as an individual writer, representing and warranting to Paramount that his draft would be "solely written by [Singer]" and "wholly original with [Singer]." SMF 9-11.

Gray says he had a further conversation with Singer "[i]n late October 2017, as we neared completion of the first draft of 'Top Gun: Maverick,'" at which point Gray "believed it was time to notify the Studio and put both of our names on the script." SMF 31. According to Gray, Singer said "it wasn't the right time" and "it could potentially blow up the movie or get our chance to do the rewrites taken away." SMF 32. So neither said a thing to Paramount, and the Singer Draft was submitted to Paramount under Singer's name (alongside Paramount's prior work-for-hire writers, Peter Craig and Justin Marks), with Gray's name nowhere to be found. SMF 33-36.

Gray says he broached the topic with Singer again in 2019, as Singer "had still not informed the Studio of [Gray's] co-writing role." SMF 38. Around the same time, Singer "informed [Gray] the 'Top Gun' WGA [Writers Guild] credit arbitration was soon to get underway." SMF 39. Gray told Singer "it was the opportune time for him to inform everyone that [Gray] had actually co-written the script with him," as "the WGA arbitration was the exact process to submit both of our names on the draft." SMF 40. Singer responded that the arbitration was "gearing up to be a major fight," and "if [Gray's] attorney and [Gray] got involved, [Gray] would muddy the waters and the result might cost both of us any chance of being credited." SMF 41. Gray "had growing doubts that [Singer] held any intentions to ever notify the Guild and Studio that [Gray] was his co-writer." SMF 42. Yet Gray said nothing to the WGA or to Paramount in the credit arbitration for *Maverick*. SMF 43. The WGA determined Singer (not Gray) should receive a credit. SMF 44-45.

Gray hid his purported writing role from Paramount for over five years, as Paramount spent hundreds of millions of dollars developing, producing, and releasing *Maverick*. SMF 46-47. Gray

said nothing to Paramount as Singer entered into a solo writing contract with Paramount, as Gray allegedly wrote scenes for the Singer Draft, as the Singer Draft was submitted to Paramount under Singer's name with no mention of Gray, as Paramount shared the Singer Draft with the next screenwriters, as Gray through counsel negotiated a contract with Paramount to write for a separate Paramount television series, as Gray saw a trailer for *Maverick* featuring content he claimed to have written, as the WGA conducted a credit arbitration and awarded Singer (not Gray) a credit, as Paramount produced and released *Maverick*, as Gray watched it in theaters, and as *Maverick* completed its theatrical run. SMF 48. After entrapping Paramount with his purported secret screenwriting—which Paramount also factually disputes—Gray cannot now claim infringement.

### III. ARGUMENT

**A. Gray's Infringement Claim Is Barred By Equitable Estoppel.**

Estoppel applies "where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022). Here, it would work an injustice on Paramount to hold it infringed an alleged copyright interest that Gray deliberately concealed for over five years and passed off as the work product of Paramount's work-made-for-hire screenwriter—lying in wait until Paramount had invested hundreds of millions of dollars in the film's production and release, *Maverick*'s theatrical run ended, and potential damages soared.

"To prevail on an estoppel defense in the copyright context, a defendant must show that: (1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment." *Id.* Acts or omissions, words or silence, can all give rise to estoppel. *Carson v.*

*Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) ("estoppel may be accomplished by a plaintiff's silence and inaction"); *DeCarlo v. Archie Comic Publications, Inc*., 127 F. Supp. 2d 497, 510-11 (S.D.N.Y.) (similar), *aff'd*, 11 F. App'x 26 (2d Cir. 2001).  Each element is readily satisfied here.

### 1. Gray Had Knowledge Of Paramount's Allegedly Infringing Conduct.

To take Gray's account at face value, Gray worked on the Singer Draft with Singer; personally inserted several of the "Gray Scenes" into the Singer Draft and sent the rest to Singer for him to paste into it; knew the "Gray Scenes" were included in the Singer Draft and believed the "Gray Scenes" to comprise a majority of the draft; and knew the Singer Draft was to be submitted to Paramount for Paramount's use in developing *Maverick*—that was the entire reason the Singer Draft was created.  SMF 49-52.  In fact, Gray described it as a draft that "*we* were set to deliver" to Paramount, and that ultimately "*we* delivered to the Studio," though Gray did not handle the physical act of submission.  SMF 52.  Gray didn't just know that Paramount was using material he had purportedly authored to prepare *Maverick*; he induced Paramount to use it.

This type of knowledge—that infringement *will* occur—suffices to establish the first element of estoppel.  *Field v. Google Inc*., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (finding estoppel where plaintiff knew of defendant's "allegedly infringing conduct well before any supposed infringement of his works took place"); *Carmichael Lodge No. 2103 v. Leonard*, 2009 WL 2985476, at *15 (E.D. Cal. Sept. 16, 2009) (holding infringement does not need to predate conduct satisfying estoppel elements); *Carson*, 344 F.3d at 453-54 (same); *Slate v. Am. Broad. Companies, Inc*., 941 F. Supp. 2d 27, 41-46 (D.D.C. 2013) (finding estoppel based on plaintiff's conduct surrounding preparation and delivery of footage to defendant, with defense ripening before defendant even incorporated footage into infringing broadcast), *aff'd*, 584 F. App'x 2 (D.C. Cir. 2014).  After all, "[t]he defense of estoppel is clearly available[] if the plaintiff has induced or caused the defendant to perform the acts of alleged infringement." *Slate*, 941 F. Supp. 2d at 41

(quoting 4 Nimmer on Copyright § 13.07[A]) (cleaned up).  It would make little sense to also require the plaintiff's knowledge that the defendant actually fell for his trap.

In any event, by 2019, Gray knew that Paramount had, in fact, used the Singer Draft, including the "Gray Scenes," to develop *Maverick*.  By July 19, 2019, Gray had seen the trailer for *Maverick* and took note of its inclusion of "the inverted pull over the mountain," which appears in his claimed "Scene 12."  SMF 53-56.  According to Gray, that was one of his proudest written contributions to the Singer Draft.  *Id.*  Under Gray's theory, the trailer was (1) itself an act of infringement, and (2) a clear indicator that content from the "Gray Scenes" was used in the film.

Later that year, on November 16, 2019, Singer told Gray that he was "97 percent confident I will get credit" in the WGA credit arbitration, meaning that *Maverick*'s shooting draft bore a close connection to the Singer Draft.  SMF 57.  Then on April 3, 2020, Singer told Gray that the "[a]rbitration verdict came down this week" and that Singer "got credit," thereby confirming the Singer Draft featured prominently in the ultimate screenplay.  SMF 58.  According to Gray, the "Gray Scenes" comprise 58 percent of the Singer Draft.  SMF 51.  Finally, on May 29, 2022—just two days after *Maverick*'s release—Gray watched *Maverick* in theaters, confirming for Gray exactly what content it used from the Singer Draft (including, in Gray's view, the "Gray Scenes").  SMF 59.  Yet Gray did not tell Paramount he claimed to have made any written contributions to *Maverick* until January 23, 2023, after *Maverick* completed its theatrical run.  SMF 60-61.

## 2. Gray Acted Or Failed To Act In Such A Manner That Paramount Had A Right To Believe It Could Use Material From The "Gray Scenes" In *Maverick*.

The paradigmatic case for estoppel is when "the copyright claimant led a party to believe that the party had the right to use a copyrighted work by failing to assert his or her rights until after the party had already used the work."  *Slate*, 941 F. Supp. 2d at 43.  That is this case.

Gray's bad-faith conduct presents a textbook case for estoppel: According to Gray, he and

Singer agreed that Singer would contract with Paramount to write a screenplay for *Maverick* as a solo writer, rather than a writing team with Gray, even though the two of them had already come to an agreement amongst themselves that they would write the screenplay together. SMF 62-68. They knew they were doing something wrong: they agreed to "ask forgiveness [rather] than permission." SMF 67. They agreed to wait until "after the script was written" to "set the record straight" and tell Paramount that Gray had contributed to the screenplay too—though they never did. SMF 64-68, 78-80. In short, Gray would work in secret. This was strategic: According to Gray, they worried disclosing Gray's role to Paramount too soon "risked blowing up the deal and could cause us to lose the project entirely," or could "cause the size of that deal [with Paramount] to be greatly reduced as compared to the rate [Singer] was able to command for his name alone," given Gray's inexperience. SMF 63. Gray knew that Paramount would believe the Singer Draft to be only Singer's work product, not his—that is exactly what they arranged to happen.

Gray provided the "Gray Scenes" to Singer to use in the Singer Draft, and in turn for Paramount to use in *Maverick*, all while concealing from Paramount any claim of ownership. SMF 69-70, 91. Gray knew that Paramount was planning to use the Singer Draft to make *Maverick*, that Paramount contracted with Singer alone to write the Singer Draft, and that Paramount would have no reason to believe Gray wrote any of it, much less claimed copyrights in it. SMF 71-72, 75-80.

According to Gray, he revisited with Singer in October 2017 whether to notify Paramount of his writing role, but decided against it because doing so "could potentially blow up the movie" or get their "chance to do the rewrites taken away." SMF 73-79. So Singer's name was put on the cover of the Singer Draft, with Gray's name nowhere to be found. SMF 75-76. Thereafter, Gray continued to lie in wait while Paramount spent years (and well over $100 million) producing *Maverick*, understanding that it had all of the necessary rights to do so. SMF 78-82. And Gray

remained silent even as, represented by a respected entertainment attorney, he entered into a contract with Paramount to write on a separate television project. SMF 83.

In 2019, Gray learned the WGA was beginning its credit arbitration to determine the writing credits that Paramount would use on *Maverick*, and Gray recognized "the WGA arbitration was the exact process to submit both of our names on the draft." SMF 84-85. But Gray nevertheless decided not to get involved in the arbitration or submit a claim for credit to either the WGA or Paramount. SMF 87. And when Singer told Gray on April 3, 2020 that Singer had received a credit in the arbitration, Gray continued to stay silent. SMF 86-87.

At no point prior to *Maverick*'s release did Gray ask Paramount not to use material from the "Gray Scenes" in *Maverick*, advise Paramount he contended its use of the "Gray Scenes" was unauthorized, or request compensation or credit from Paramount in exchange for using the "Gray Scenes." SMF 88. Gray saw *Maverick* in theaters just two days after its May 27, 2022 release. SMF 89. But still, Gray said nothing about his purported authorial role. SMF 91. It was not until January 2023, after *Maverick*'s theatrical run was over, and more than five years after the Singer Draft was delivered to Paramount, that Gray said *anything* to Paramount about his ostensible authorship. SMF 77, 90-91. And he did not submit copyright registration applications for the "Gray Scenes" until 2024, long after Paramount's estoppel defense matured. SMF 92. Gray's acts and omissions, spanning more than five years, entitled Paramount to believe it could freely use all the material in the Singer Draft, and with it, content from the "Gray Scenes." Gray even *intended* that Paramount rely on his conduct suggesting authorization: He affirmatively wanted Paramount to incorporate the "Gray Scenes" into *Maverick*. SMF 93.

It is immaterial that Gray contends Singer convinced him to go along with this course of conduct, or that Gray says he needed to stay in Singer's good graces to keep their other work on

track. That does not change the equitability of Gray's conduct *vis-à-vis Paramount.* Gray blames Singer, but Gray acted out of his own self-interest at each step of the way and made the calculated decision to mislead Paramount. Even if Gray *had* innocent intent, "it is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead." *DeCarlo*, 127 F. Supp. 2d at 510.

It is also immaterial that Gray eventually made his claims known. Gray's 2023 statement occurred more than five years after Gray allegedly prepared and delivered the "Gray Scenes." SMF 91, 94. In the intervening years, Paramount paid Singer for the Singer Draft, permitted further screenwriters to prepare screenplays based on it, produced and released *Maverick*, and shepherded *Maverick*'s theatrical run from start to finish. SMF 95. Thus, by the time of Gray's revelation, Paramount's estoppel defense already matured. *See Slate*, 941 F. Supp. 2d at 43.

Courts regularly find this element satisfied by similar—indeed, lesser—acts and omissions to Gray's. For example, in *DeCarlo*, the plaintiff was estopped from claiming infringement of characters he created, where he "never so much as voiced his discontent to [defendant] about its use of the Josie characters, or said anything to [defendant] regarding the existence of his alleged ownership rights or the alleged contractual obligations of [defendant] which he now asserts." 127 F. Supp. 2d at 510. Further, "[t]he fact that plaintiff never attempted to register or renew a copyright in any work that included any Josie character would indicate to [defendant] that plaintiff had no claim to the Josie characters, or at least never intended to pursue such a claim." *Id.* at 511. The court held the plaintiff's "failure ever to voice a complaint or make a competing claim in the face of numerous opportunities to do so…gave [defendant] the right to rely on his silence." *Id.*; *Field*, 412 F. Supp. 2d at 1117 (plaintiff estopped from infringement claim where he easily could have told defendant of lack of authorization but "[i]nstead…chose to remain silent knowing that [defendant] would automatically interpret that silence as permission"). The same applies to Gray.

The court in *Buckward Digital Servs., Inc v. Millar Instruments* similarly found estoppel based on the plaintiff's "silence and inaction" amid the defendants' belief they could use the disputed videotapes. 2006 WL 1118003, at *3-4 (S.D. Tex. Apr. 26, 2006). There, a manufacturer hired a consulting company "to produce a training video to be distributed to purchasers of [manufacturer's] products," and the consultant, "in turn, engaged [plaintiff] to perform the videography." *Id.* at *1. The plaintiff created the training video (and several interim video images) and sent it to the consultant, which then passed along the video to the manufacturer. After the consultant failed to pay the plaintiff for his services, the plaintiff sued the consultant and the manufacturer for copyright infringement. *Id.* But the plaintiff was estopped: It knew "when it delivered first the raw images and then the finished videotapes to [consultant], that Defendants would believe that they were entitled to copy and distribute the tapes," and failed to say anything to the contrary. *Id.* at *4. Similarly, Gray knew when he delivered the "Gray Scenes" to Singer for inclusion in the Singer Draft that Paramount would believe it was entitled to copy and distribute them, and he did nothing to disabuse Paramount of that belief (and instead contributed to it).

And in *Slate*, the plaintiff was estopped from claiming infringement of film footage he created in affiliation with third-party PCC, where he (together with PCC's principal) "(1) led [defendants] reasonably to believe that they were purchasing work product from the PCC, and (2) the defendants detrimentally relied upon those representations by spending a significant amount of money to purchase the PCC's work product." 941 F. Supp. 2d at 41. The plaintiff there had participated in representations suggesting he was an agent of PCC and producing the footage in that capacity, so he could not later claim that he personally, rather than PCC, held the copyright in the footage delivered to the defendants. *Id.* at 41-46. In like fashion, Gray led Paramount reasonably to believe that it was purchasing Singer's sole work product (for which Paramount had

contracted), and he cannot now be heard to claim that he actually owns the copyright in portions of it. Gray went even further than the *Slate* plaintiff, in that he hid not just the capacity in which he claims to have made contributions (i.e., not as an employee-for-hire), but his very involvement.

### 3. Paramount Was Ignorant Of The True Facts.

Paramount believed that it owned all copyrights in the Singer Draft (and in *Maverick*'s final screenplay) as work for hire and that the Singer Draft was written solely by Singer. SMF 96-97. Paramount was not aware Gray claimed to have written any part of the Singer Draft until Gray's January 2023 statement, much less that he claimed *Maverick* infringed his copyrights. SMF 98.

Paramount also had no reason to believe otherwise: Paramount contracted with Singer (and only Singer) to prepare the Singer Draft; Singer represented and warranted in his contract that the Singer Draft would be written solely by him; the Singer Draft credited Singer as writer (along with Paramount's prior work-made-for-hire screenwriters) but made no mention of Gray; the WGA arbitration yielded a screenwriting credit for Singer, while Gray did not so much as submit a claim; Gray concealed his purported role from Paramount until long after *Maverick* was released; and no one told Paramount at any previous point that Gray claimed to have made writing contributions to *Maverick*'s screenplay. SMF 18, 99-112. A plaintiff cannot concoct a plan to hide his purported authorship from a defendant, and then complain when that plan works.

Paramount anticipates Gray nonetheless will try to dodge estoppel by claiming Singer and Kosinski were its agents and imputing their knowledge to Paramount. He cannot. *First*, neither had authority to task Gray with writing scenes for *Maverick* or to accept such work for inclusion in *Maverick* absent a contract between Gray and Paramount. SMF 100, 114-17. Singer represented and warranted to Paramount that his draft would be "solely written by [Singer]" and "wholly original with [Singer]," and that it would "not infringe upon the copyright…of any person." SMF 100. Similarly, Kosinski represented and warranted in his contract with Paramount that the results

and proceeds of his services would be "wholly original with [Kosinski]" or "in the public domain" and would "not infringe upon or violate any copyright of…any person." SMF 114. Paramount, Singer, and Kosinski all understood that no such authority existed. SMF 115-17. Moreover, even if Singer *were* Paramount's agent, his knowledge would not be imputed to Paramount under the "adverse interest" exception: According to Gray, Singer "defrauded" Paramount, SMF 118, and "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985). And even if Kosinski *were* Paramount's agent, Gray admits he never told Kosinski that Paramount was not authorized to use his purported contributions in *Maverick*. SMF 113.

The doctrine of "apparent authority" does not help Gray either. "Apparent authority will only be found where words or conduct of the principal—not the agent—are communicated to a third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue." *Hudson & Broad, Inc. v. J.C. Penney Corp.*, 2013 WL 3203742, at \*4 (S.D.N.Y. June 18, 2013), *aff'd*, 553 F. App'x 37 (2d Cir. 2014). Here, *Paramount* communicated nothing to Gray that would lead him to believe Singer or Kosinski could unilaterally give him a screenwriting role. SMF 119. Paramount did not communicate with Gray at all, since Gray worked in secret. SMF 119. That alone precludes apparent authority. Moreover, Gray knew that Paramount was in the dark about his purported writing role and that the proper course of action would have been to negotiate a contract with Paramount at the outset as a writing team with Singer—though Gray opted instead to ask for "forgiveness" later. SMF 120-21. Gray thus knew all along that his work on *Maverick* was unauthorized by Paramount.

*Second*, Gray himself repeatedly acknowledged that "Paramount didn't know" of his role. SMF 121.  If Gray genuinely believed that Paramount knew of his purported writing role through his collaboration with Singer or Kosinski (who both refute Gray's claims), then Gray would not have asserted that "[i]n late October 2017, as we neared completion of the [Singer Draft]," Gray "believed it was time to notify the Studio" of his role; or that he felt the need to continually "nag[] and pester[] [Singer] about notifying Paramount"; or that, around the time of the 2020 credit arbitration, he doubted Singer's "intentions to ever notify the [Writers] Guild and Studio that I was his co-writer."  SMF 122-24.  If either Singer or Kosinski were actually a stand-in for Paramount, there would be no need for Paramount to be notified of anything—though Gray contradictorily asserts that "notify[ing] Paramount" was one of Singer's obligations under their agreement.  SMF 125.  Indeed, Gray spoke of conspiring with Singer to hide his purported writing role *from Paramount*, contradicting any newfound claim of agency.  SMF 120.

### 4. Paramount Relied On Gray's Conduct To Its Detriment.

To state the obvious, Paramount would not knowingly produce a film based on a screenplay that it did not have the rights to use.  SMF 126-29.  If Gray had not hid his intention to contribute to the Singer Draft, Paramount would have either (a) prevented Gray from making such writing contributions, whether by directly admonishing Singer that Gray could not be involved or by contracting with a different screenwriter altogether; (b) required Gray to confirm that any work he created was owned by Singer and/or Singer's loan-out company, and thus subject to Paramount's contract with Singer; or (c) required Gray to enter into a work-made-for-hire agreement deeming Gray's contributions to be authored and owned by Paramount.[3]  SMF 135.  Paramount required

---

[3] That Paramount did not enter into such an agreement with Gray *after* his 2023 statement has no import.  First, a retroactive work-for-hire agreement (over 5 years late) likely would be ineffective. *Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 77-79 (2d Cir. 2019).  Second, it would send a perverse message to reward Gray for misleading the studio and attempting to hold it hostage.

such work-for-hire agreements from every one of its *Maverick* screenwriters, and generally in its course of business. SMF 130-34. This litigation and any infringement would have been avoided.

And of course, had Gray not furnished the "Gray Scenes" to Singer for inclusion in the Singer Draft, which Gray constructively delivered to Paramount, Paramount never would have included their content in *Maverick* (though Paramount disputes any actual overlap). This is not a case where Paramount simply happened to come across the "Gray Scenes."

Moreover, had Gray not passed off the "Gray Scenes" as Singer's work product and concealed his claim of authorship from Paramount, Paramount would not have believed it was entitled to freely use them in *Maverick.* In that case, Paramount either would have excised Gray's contributions from the Singer Draft before providing it to the next screenwriters, or it would not have provided the Singer Draft to the next screenwriters at all—who instead could have prepared rewrites using the Craig and Marks drafts, together with Kosinski's treatment, just as Singer had done. SMF 136. Or at the very least, Paramount would have entered into a written assignment or license agreement with Gray that would have ensured Paramount's clear chain of title. SMF 136. Instead, Paramount was left with tainted screenplay drafts, into which it poured time and financial resources, and which in turn tainted *Maverick* and Paramount's further investment in it. SMF 140.

Even later on (but before *Maverick*'s release), had Paramount known of Gray's purported contributions, Paramount could have excised any elements that were first introduced in the "Gray Scenes" from the screenplay and ultimately the film. SMF 137. But Gray's continued concealment prevented Paramount from taking any remedial action. And upon *Maverick*'s release, and throughout its theatrical run, potential infringement damages skyrocketed.

Finally, setting aside these downstream impacts, Paramount detrimentally relied on Gray's conduct when it paid Singer significant sums of money for the Singer Draft under the reasonable

assumption it would constitute Singer's sole work product and be owned in its entirety by Paramount. SMF 138-39. Yet what Paramount actually received, if Gray is correct, was a screenplay to which it held only partial copyright rights and in fact *could not lawfully exploit*. It takes no great leap of the imagination to appreciate that Paramount would not pay over a million dollars for a screenplay (and *hundreds of millions* for a film) it lacked the right to use. SMF 138, 140.

Courts routinely find this estoppel element satisfied by any one of these reliance theories. For example, in *Slate*, a contributor to film footage misled the defendants into believing he was working as an agent of the third party that was contracted to produce the footage, leading the defendants to believe only the third party held any copyright interest. 941 F. Supp. 2d at 41-46. The court explained that "detrimental reliance in a case like the instant one, in which a defendant believes it is hiring an outside organization to create a copyrighted work, is the act of substantially compensating the organization in exchange for the work." *Id.* at 44. Although the *Slate* plaintiff informed the defendants of his purported copyright interest before they actually aired the disputed broadcast, the earlier third-party compensation nonetheless sufficed to establish reliance and, with it, estoppel: "The detrimental nature of the defendants' reliance had manifested itself well before the plaintiff decided to speak up about his alleged independent ownership of the [] footage because the defendants had already 'paid tens of thousands of dollars and dedicated substantial employee time and resources to help create and obtain [the] footage.'" *Id.* at 45.

In the more common estoppel case—where, as here, the plaintiff asserts a claim of copyright ownership only after the defendant uses the disputed material—"detrimental reliance is the allegedly infringing use of the material itself." *Id.* at 43. Thus, the court in *Interscope Records v. Time Warner, Inc*. found reliance satisfied by the defendants' pleading that "had they known Plaintiffs objected to their use of the recordings, Defendants would have stopped using the

recordings or obtained a license, thereby limiting or eliminating their liability."  2010 WL 11505708, at *11 (C.D. Cal. June 28, 2010).  The same in *Buckward*, where the court found detrimental reliance because the defendants used the allegedly infringing videotapes based on "their initial understanding of the situation," i.e., their belief they "were entitled to copy and distribute the tapes," which "now places them in peril of a finding of copyright liability."  2006 WL 1118003, at *4.  Similarly, in *Field*, the court found detrimental reliance where, had the plaintiff disclosed his objection, the defendant would not have engaged in the infringing use and "the parties would have avoided the present lawsuit entirely."  412 F. Supp. 2d at 1117.

Finally, reliance can arise from the plaintiff's permission, or non-objection, to use of the disputed material at times preceding the claimed infringement, where the defendant "become[s] dependent upon it" during that time.  *Carson*, 344 F.3d at 454 (citing with approval *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998)).  That applies equally to a period of permissive use during employment while the employer integrates the plaintiff's work into its operations, as in *Carson* and *Quinn*, as to a period of permissive use or non-objection while a studio integrates the plaintiff's work into a broader expressive work like a screenplay or film, as here.  For all these reasons, estoppel precludes Gray's claim.

That is not to say that, if everything Gray says is true, he has no remedy.  Gray could have sued Singer, who is the real antagonist in his narrative.  But instead, Gray sought a windfall from Paramount and far more money that he ever would have been entitled under the agreement he claims to have had with Singer.  Gray's gambit in suing only Paramount simply does not pay off.

## B.  Gray's Infringement Claim Is Alternatively Barred Because Paramount Had A License, Express Or Implied, To Use The "Gray Scenes" In *Maverick*.

Gray's infringement claim is also barred because Paramount had a license to use the "Gray Scenes" in *Maverick*.  "A license is a complete defense to a claim for copyright infringement."

*Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 661 (S.D.N.Y. 2014).

Gray asserts he had a "good faith verbal agreement" with Singer concerning his work on *Maverick*. SMF 141-43, 148. According to Gray, the terms of that agreement were: (1) Gray would "develop and write the screenplay for 'Top Gun: Maverick' with [Singer] as a writing team," with Singer to deliver that screenplay to Paramount for use in *Maverick*; and (2) in return, Singer would (a) credit Gray as a writer and (b) give Gray a 40-percent cut of Singer's back-end compensation. SMF 141-45. Thus, according to Gray himself, Gray and Singer entered into an express license agreement permitting Gray's contributions to be used in the Singer Draft, delivered to Paramount, and ultimately used by Paramount in *Maverick*, with Paramount as the intended beneficiary of that agreement. Gray claims Singer violated their agreement, but any such violation gives rise to *contract* remedies, not infringement—and those remedies lie against Singer, not Paramount.

In the alternative, Paramount at minimum had an implied license to use the "Gray Scenes" in *Maverick*. Courts will find an implied license "[w]hen an owner's conduct clearly manifests a consent to use of copyrighted material." *MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1216 (11th Cir. 2021) (cleaned up). A litigant cannot refute an implied license by retrospectively asserting a subjective intent not to grant one; "[t]he focus is on the licensor's objective intent at the time of creation and delivery of the copyrighted work as manifested by the parties' conduct." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings*, 399 F. Supp. 3d 120, 142 (S.D.N.Y. 2019) (cleaned up); *see also Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010).

Courts have developed two alternative tests as proxies for that objective intent, both of which are satisfied here. One is a "narrow test," whereby courts will "find[] an implied license only where [i] one party created a work at the other's request and [ii] handed it over, [iii] intending that the other copy and distribute it." *ABKCO Music*, 50 F.4th at 320 (cleaned up). The other is a

"more permissive test" whereby "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id*. (cleaned up).

The facts here easily satisfy even the narrower of these two tests. First, Gray undisputedly made his purported contributions to the Singer Draft at Singer's request—and Singer, in turn, was preparing the Singer Draft at Paramount's request (of which Gray was well aware). Gray admits that Singer asked him to help "develop and write the screenplay for 'Top Gun: Maverick,'" as Singer lined up a screenwriting gig on *Maverick* with Paramount. SMF 141-42. Second, Gray admits that he emailed the "Gray Scenes" to Singer, thereby "hand[ing] [them] over." SMF 151-52. And he did so understanding that the Singer Draft would be submitted to Paramount; in fact, Gray describes the Singer Draft as "the draft *we* delivered to the Studio." SMF 153-54. Third, Gray clearly intended that Singer, and in turn Paramount, would "copy and distribute" Gray's contributions, including specifically using them in the Singer Draft and ultimately in *Maverick*. After all, that was Gray's entire purpose in making those contributions: He "was trying to write scenes for a movie called 'Top Gun: Maverick,'" and "hoped that they would be" included in the film.[4] SMF 156-57. *Cf. Fontana v. Harra*, 2013 WL 990014, at *8 (C.D. Cal. Mar. 12, 2013).

Because the "narrow test" is satisfied, the "more permissive test" is necessarily satisfied too. *ABKCO Music*, 50 F.4th at 320. Silence in the face of an otherwise-infringing use can suffice to manifest consent. *Id.*; *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 121 (S.D.N.Y. 2012) (collecting cases). Gray wrote the "Gray Scenes" specifically for inclusion in the Singer

---

[4] Paramount submits that an indirect implied license, with the direct parties being Singer and Gray, with Paramount as a third-party beneficiary, best encapsulates the agreement at issue. However, both implied-license tests would also be satisfied on an implied license theory with Paramount as a direct party. A request that goes through an intermediary is no less of a request, and delivery back to that intermediary constitutes constructive delivery to the original requestor. *E.g.*, *Latimer*, 601 F.3d at 1235-36; *Buckward*, 2006 WL 1118003, at *1, *3; *Carano v. Vina Concha y Toro*, 288 F. Supp. 2d 397, 399-403 (S.D.N.Y. 2003).

Draft, with the intent that they later be incorporated in *Maverick*. SMF 141-43, 149-57. Gray consented to use of those scenes in the ultimate work product—it was his entire purpose in creating them. And when those "scenes" allegedly made it into the Singer Draft and then into *Maverick*, Gray did not protest that use, again manifesting his consent. SMF 158-59; *see* Section III.A., *supra*.

Gray will likely argue, as he has before, that he did not license use of the "Gray Scenes" for no credit or compensation in return. To be clear, Gray *was* compensated by Singer as part of this arrangement—and his perjured testimony that he received no payment for his work on *Maverick* despite evidence of a $20,000 check from Singer to Gray, which Gray endorsed and cashed years before raising his claims, with the words "Top Gun" in the memo line, does not suffice to create a *genuine* dispute. SMF 160-65. *Fam. Fashions, Inc. v. Sterling Jewelers, Inc*., 2022 WL 4109720, at *8 n.7 (S.D.N.Y. Sept. 8, 2022) (noting "self-serving deposition testimony is not sufficient to create a genuine issue of material fact" amid conflicting documentary evidence and collecting cases); *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (summary judgment appropriate where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony"). In fact, Gray acknowledged Singer's payment for his work on *Maverick* as recently as 2023 in correspondence with the WGA, albeit in the context of complaining that the payment was late. SMF 165.

Regardless, Gray's contention that he was not credited or paid goes to the potential *breach* of a license, not its existence.[5] *See Fontana*, 2013 WL 990014, at *5-6 (rejecting "plaintiff's argument that intent to license is not present because plaintiff has not received full payment, and did not intend to allow defendants to use the screenplay unless plaintiff received full payment,"

---

[5] To the extent Gray and Singer may dispute the nature of the consideration they agreed upon for Gray's services, that too is immaterial. They agree that they reached an agreement, and for purposes of this Motion, Paramount has adopted *Gray*'s narrative of that agreement.

and finding instead that "plaintiff's proper course of action for seeking full payment is a breach of contract case, not a copyright infringement case").  Gray's payment and credit terms are covenants, not conditions, of the license, meaning that their violation (if true) does not negate a license and "is enforceable only as a contractual obligation." *Latour*, 12 F. Supp. 3d at 663; *see also Graham v. James*, 144 F.3d 229, 236-37 (2d Cir. 1998); *Psihoyos*, 855 F. Supp. 2d at 124.

Terms of a contract, including an implied license, are presumed to be covenants rather than conditions precedent.  *Graham*, 144 F.3d at 237; *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990).  Moreover, "contract obligations that are to be performed after partial performance by the other party are not treated as conditions." *Graham*, 144 F.3d at 237.  According to Gray, Gray was supposed to receive a share of Singer's back-end compensation, which definitionally would not be received until after *Maverick*'s release.  SMF 144, 147.  Singer also was supposed to notify Paramount of Gray's writing role, but this would not occur before Gray finished his work.  Gray testified there was a "caveat" to this "agreement" that Gray would "ha[ve] to wait until we turned in the script" before Singer would "notify [Paramount] that [Gray] was his co-writer"; or in a different recounting, that Singer agreed to inform Paramount of Gray's role "if and when the film went into production."  SMF 145-47.[6]  Moreover, if a condition precedent to their deal had not occurred, there would be no deal at all, yet Gray repeatedly spoke about a live "deal" or "contract" or "agreement" with Singer in the years thereafter that he says Singer was violating.  SMF 168.  At minimum, Gray would have waived any credit "condition" by repeatedly

---

[6] Gray testified repeatedly that the "credit" he agreed to with Singer involved being credited *on the script* that Singer turned in to Paramount.  SMF 143.  To the extent Gray attempts to recast the agreement as requiring that he be credited *on the film*, this is facially implausible, since the WGA, not Singer or Paramount, determined writing credits on *Maverick*.  SMF 162, 166.  In any case, any promise that Gray be credited on the film would remain a covenant, not a condition, for the reasons set forth above.  Indeed, writing credits were not determined for years after the Singer Draft was completed (and *could not* be determined until there was a final screenplay).  SMF 162, 166-67.

-20-

affirming the "agreement" remained in place, even after Singer told Gray that he would be submitting the Singer Draft to Paramount without Gray's name on it.  SMF 168-69.

Finally, Paramount anticipates that Gray will again assert any implied license was revocable for lack of consideration—based on his verifiably false statement he was never paid in connection with *Maverick*—and that he revoked his license by filing this action.  His argument is doubly wrong.  First, the Court should not credit Gray's litigation position that directly contradicts the contemporaneous evidence of payment from Singer to Gray for work on *Maverick*.  *See supra* page 19.  Second, even if there were a genuine factual dispute, it would not be a material one: Gray simply misapprehends the standard for contract consideration and, in turn, revocability.

For a contract to be supported by consideration, money need not actually change hands.  Rather, "[u]nder the contemporary definition of consideration, 'it is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him' or her."  *Keller-Wala v. Coello*, 206 N.Y.S.3d 347, 349 (N.Y. App. Div. 2024); *see also Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 306 (S.D.N.Y. 2022) (consideration is "defined simply as 'a bargained-for exchange of promises or performance'").  Consideration is not a high bar; it sets apart a binding contract from a gratuitous promise, where the promisor expects nothing in return for his performance.  Thus, courts in the implied-license context have found an irrevocable implied license based on an exchange of promises, even where one was an unfulfilled promise to pay.  *E.g.*, *Buckward*, 2006 WL 1118003, at *1; *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 971 (E.D. Mich. 2016).

According to Gray himself, Singer promised to pay him 40 percent of Singer's backend compensation in exchange for Gray's contemplated work on the screenplay.  SMF 143-44, 147.  That exchange of promises was sufficient consideration to form a binding, irrevocable contract.

Whether Singer in fact paid Gray goes to the question of breach, not contract formation.

**C.  The "Gray Scenes" Are Not Substantially Similar To *Maverick* As A Matter Of Law.**

Gray's infringement claim also fails because *Maverick* is not substantially similar to the original expression in any "Gray Scene."  Even if copying is proven, an infringement plaintiff must show "the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work."  *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020).  For this analysis, courts compare the works' "total concept and feel, theme, characters, plot, sequence, pace, and setting."  *Id.*  Where, as here, a work incorporates both protectible and unprotectible elements, courts "apply a 'more discerning' observer test, which requires substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed work."  *Id.*; *see also Wozniak v. Warner Bros. Ent. Inc.*, 726 F. Supp. 3d 213, 241 (S.D.N.Y. 2024) (filtering out those elements that came from defendant's prior works).

Gray not only vastly overstates the actual overlap between the "Gray Scenes" and *Maverick*, but also ignores that most of his claimed similarities are attributable to (a) preexisting works owned by Paramount; and (b) other unprotectible elements like general ideas, facts, stock elements, and *scenes-a-faire*.  *Abdin*, 971 F.3d at 67, 71 (no copyright protection for facts, ideas, "generic and generalized character traits," "stock themes," or scènes à faire, i.e., "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic").  What remains after that filtration process is hardly similar.

First, the "Gray Scenes" are not original works.  They largely repurpose *preexisting* works, of which Gray does not and could not claim infringement.  Perhaps most obviously, Gray cannot base an infringement claim on elements he copied from *Top Gun*.  The "Gray Scenes" take key characters and their backstories from *Top Gun*—not surprising since they were written for a *Top Gun* sequel—including Maverick himself and Bradley Bradshaw, the son of Maverick's late

wingman Goose.  SMF 861-63, 873-77.  Gray viewed his task as "expand[ing] the 'Top Gun' universe," and he generally copied *Top Gun*'s concept and feel—including the premise of elite yet overconfident fighter pilots training at Top Gun; its adrenaline-filled aerial dogfight sequences; its rapid and frequent shifts in perspective between cockpit interiors and external perspectives; its serious and intense mood, interspersed with lighthearted interludes; and its stories of bonding, loss, and redemption. SMF 907-09, 1004. These unoriginal elements must be filtered out of the analysis.

The "Gray Scenes" also copy from Craig's and Marks' screenplay drafts, Kosinski's treatment, and the detailed outlines for the Singer Draft—all of which Paramount owns.[7]  The content of the "Gray Scenes" was already predetermined from these prior materials, with the "Gray Scenes" taking characters, plot points, and even verbatim dialogue from these earlier iterations. SMF 170-912.  For example, the test plane sequence embodied in "Gray Scenes" 1 and 2 comes from Kosinski's treatment, as further fleshed out in Singer's outlines.  SMF 177-81, 201-06.  Act 1 of Kosinski's treatment opens with Maverick as the test pilot of a top-secret hypersonic aircraft who, after being told the program has been cancelled, thinks the aircraft "might have one more record breaking run in her and suits up."  SMF 180, 204.  Maverick takes flight, as the angry base captain watches from the tower, and breaks another speed record when Maverick experiences an engine failure and the plane breaks apart, forcing Maverick to eject.  SMF 204.  Singer's outlines add details like "[c]ockpit ALARMS flash and BUZZ" as the plane pushes past its limits, and the scene suddenly "CUT[S] TO BLACK" as the plane breaks apart, leaving the viewer in suspense. SMF 205.  Not only do the "Gray Scenes" copy these elements, but Gray remarkably points to

---

[7] During Gray's deposition, Gray suggested he believes the outlines were jointly authored with Singer and Kosinski.  Paramount disputes Gray has any authorship, but even if he did, that would not change the facts that the outlines are discrete works not subject to this litigation, and that Paramount could not infringe them anyway (as it would be an author through Singer and Kosinski).

them as "similarities" with *Maverick* underpinning *his* infringement claim.  SMF 206, 270-76.

In fact, *most* of the elements of which Gray claims infringement in his chart of similarities are attributable to these prior works, and not to the "Gray Scenes" at all.  *See generally* SMF 170-912.  In another example, Gray claims as a shared plot point that the basic fighter maneuver (i.e., dogfighting) training sequence "culminates in a showdown between Maverick and Bradley Bradshaw."  SMF 293.  But Singer's outline already established that, at the close of the dogfight training sequence, "Mav and Bradley engage in a gnarly dogfight," and Bradley "outmaneuvers Mav, and gets a missile lock on him, but cancels the missile lock, moves in closer, and scores his kill with guns, embarrassing Mav."  SMF 295-96.  That is *exactly* what happens in "Gray Scene 4" (yet not something that ever happens in *Maverick*).  SMF 297-301.  Similarly, Gray claims as a shared plot point that there is a "[s]cene depicting a 'pop-up strike' as a central feature of the mission."  SMF 380.  But Singer's outline already established that the final mission would be "a precision pop-up bombing maneuver," and included a "training sequence" dedicated to "pop-up bombing" to prepare for that mission.  SMF 381-82.  Gray lays claim to other unprotected elements too, like general ideas or tropes (e.g., the theme of "profound kinship that emerges through shared military experience"[8]), facts (e.g., the sound an engine makes, or the military jargon "How do you read?" to perform a radio check), and *scenes-a-faire* (e.g., featuring planes flying in the sky, scenes in control or training rooms on the ground, and scenes aboard an aircraft carrier, in a film about a naval aviation school).  *E.g.*, SMF 230, 235, 634, 637, 699, 705, 711, 855-56.

Second, once that unprotectible material is filtered out, the "Gray Scenes" are not similar to *Maverick* at all, much less "substantially."  The only real similarity between the "Gray Scenes" and *Maverick* is that they both depict the storyline for a *Top Gun* sequel that is laid out in the

---

[8] This theme is also factual and a *scene-a-faire* of a film about naval aviators.

preexisting *Maverick* work product. *See generally* SMF 170-912. The further delineation of that storyline in the "Gray Scenes" largely *diverges* from what is depicted in *Maverick*, apart from those elements that are intrinsic to the premise. *Id.* That is why Gray's best-case chart of similarities contains several fabrications to conjure similarities where none exist, *e.g.*, SMF 198-99, 642-46, many more that counsel simply use similar words to describe, *e.g.*, SMF 246-50, 712-17, and some that facially are not similar, SMF 653-62. To the extent Gray is able to point to a few minor lines of shared dialogue,[9] those "instances of literal similarity…are *de minimis*" (not to mention generic) and do not establish substantial similarity. *Nobile v. Watts*, 747 F. App'x 879, 882 (2d Cir. 2018). Gray's claim is particularly egregious as to "Gray Scenes" 3 and 5, which Gray admitted in deposition testimony and in email correspondence (sent long before he filed this action pleading the opposite) have *no* analogue in *Maverick*. SMF 280-86, 302-03.

**D. Gray's Infringement Claim Fails Because He Has No Valid Copyright In The "Gray Scenes" For Paramount To Infringe.**

**1. No Presumption Of Copyright Validity Applies Here (And Any Would Be Rebutted).**

"[W]hile a copyright registration may constitute prima facie evidence of ownership, where there are conflicting and adverse copyright registrations, the Copyright Office does not resolve the competing claims, and courts are called upon to make an independent determination of copyright ownership." *Trump v. Simon & Schuster, Inc.*, 791 F. Supp. 3d 470, 491 (S.D.N.Y. 2025). In such cases, as here, no presumption of copyright validity attaches. *Id.*; *see also Peterson v. Kolodin*, 2013 WL 5226114, at *5 (S.D.N.Y. Sept. 10, 2013) (Rakoff, J.). Although Gray ultimately

---

[9] The extent of the shared dialogue, which consists of military jargon and unoriginal phrases, is: (1) from Gray Scene 1: "Ground to cockpit, how do you read? Loud and clear." / from *Maverick*: "Control, this is Darkstar, how do you read? Darkstar, Control. Loud and clear."; (2) from Gray Scene 2: "You are cleared above flight level six zero zero, accelerate to Mach 3.5." / from *Maverick*: "You are cleared above six-zero-zero. Increase to Mach 3.5."; (3) the phrase "fastest man alive"; and (4) the phrase "just be cool." SMF 633; *see also* SMF 620-72.

obtained a copyright registration in the "Gray Scenes," Paramount obtained a competing copyright registration in *Maverick* two years earlier. SMF 913-15; *see also* SMF 918-20.

Even if a presumption attached, it is rebuttable. Paramount has done so here.

### 2. Gray Made Any Contributions As Work For Hire For Eric Singer/Bullsh!t Artists.

Gray cannot have a copyright in the "Gray Scenes" because he performed any work on the Singer Draft as work for hire for Singer and/or Singer's loan-out company, Bullsh!t Artists. 17 U.S.C. §§ 101, 201(b). Gray had an employment contract with Singer and Bullsh!t Artists dating back to 2015. SMF 921-23. That contract provided that Gray "acknowledge[s] and agree[s] that [he] will not acquire any rights of any kind or nature in or to any materials of any kind or nature that [he] assist[s] Singer/Bullsh!t Artists with, including without limitation all concepts, ideas, treatments, screenplays or other materials or creative projects or any kind or nature ('Materials'), whether verbal or written." SMF 922. It also provided that Gray "acknowledge[s] and agree[s] that Singer/Bullsh!t Artists shall be t[he] sole and exclusive owner of any and all such Materials." SMF 922. No "talismanic words" are required to establish a binding work-for-hire contract, *Warren v. Fox Fam. Worldwide, Inc*., 328 F.3d 1136, 1141 (9th Cir. 2003), and it is sufficient for a contract to make clear, as here, that the hiring party will be the owner of the work created. *Logicom Inclusive, Inc. v. W.P. Stewart & Co*., 2004 WL 1781009, at *10-11 (S.D.N.Y. Aug. 10, 2004).

### 3. The "Gray Scenes" Are Not Independently Copyrightable Works Of Authorship.

Gray also has no copyright in the "Gray Scenes" because they are not independently copyrightable. The Copyright Act confers copyright protection only on "works of authorship." 17 U.S.C. § 102. Copyright does not subsist in *contributions* to a unitary work; such contributions are instead protected by the copyright in the work as a whole. *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 256-59 (2d Cir. 2015). Thus, "while originality and fixation are necessary prerequisites to obtaining copyright protection, they are not alone sufficient: Authors are not entitled to

copyright protection except for the 'works of authorship' they create and fix." *Id.* at 258.

In a copyright dispute like this one, a court confronts two independent tasks: the first is to define the relevant "work of authorship," and the second is determine who owns it. Here, if Gray could satisfy the Second Circuit's mutual-intent test for joint authorship with Paramount, there would be no dispute that the "work of authorship" exists at the level of the *Singer Draft* rather than its constituent scenes, with both authors being entitled to undivided rights in the whole, including the scenes the other drafted. But Gray has not laid claim to the Singer Draft in this action, and any attempt to do so would fail for the same reasons this Court rejected Gray's bid for joint authorship of *Maverick* and its final screenplay. *See* ECF No. 40. Nor would doing so help him, as an infringement claim cannot not lie between joint authors. *Newsome v. Brown*, 209 F. App'x 11, 12 (2d Cir. 2006) ("co-authors cannot be liable to one another for copyright infringement").

When the Second Circuit's joint-authorship intent test is not satisfied, the result is not to splice the copyright into smaller pieces so that each putative co-author owns his own contributions. The "work of authorship" does not change at all. Instead, the question becomes which of the putative joint authors is entitled to the unitary copyright in that work. That question is answered by the "dominant author" test, with the dominant author owning the entire copyright and the secondary author taking only whatever non-copyright rights he may be entitled to. *Casa Duse*, 791 F.3d at 260. In other words, "[w]here two or more parties each contribute the requisite degree of expression to a work but do not mutually intend to be co-authors (and thus do not qualify as such), the 'dominant' author of the work is deemed the work's sole author." *Webber v. Dash*, 2021 WL 3862704, at *9 (S.D.N.Y. Aug. 30, 2021). This test inherently contemplates that a non-dominant author will have contributed copyrightable expression over which he holds no copyright.

The Second Circuit explained this conclusion was the only one that made sense amid the

Copyright Act's broader structure.  For example, "[t]he Act's definition of 'joint work,' a work prepared by multiple authors 'with the intention that their *contributions* be merged into inseparable or interdependent parts of a unitary whole,' suggests that such inseparable contributions are not themselves 'works of authorship.'"  *Casa Duse*, 791 F.3d at 257.  Similarly, "[c]opyright may subsist in contributions to a collective work, … but only when such contributions constitute 'separate and independent' works," which "indicates that inseparable contributions integrated into a single work cannot separately obtain such protection."  *Id.*  And perhaps most importantly:

> A conclusion other than the one we adopt would grant contributors like [Gray] greater rights than joint authors, who, as we have noted, have no right to interfere with a co-author's use of the copyrighted work.… We doubt that Congress intended for contributors who are not joint authors to have greater rights enabling them to hamstring authors' use of copyrighted works.…

*Id.* at 259.

The Second Circuit's rationale was not unique to its fact pattern, there, a director's contributions to a film.  It did not concern the copyrightability requirements of originality and fixation—which admittedly are closer questions for a director than a purported screenwriter—but presumed those prerequisites to be satisfied.  *See id.* at 258.  And it did not concern the amount or significance of a claimant's contributions (beyond being "non-*de minimis*"); rather, the Second Circuit pointed out that a director could be one of a film's "most important authors," and that a director could "be the sole or joint author of that film" in appropriate cases.  *Id.* at 256, 258-59.  It focused instead on the nature of the overarching work (as here, a unified film) and on the Copyright Act's text and history.  There is no principled basis to find its holding does not apply here.

Indeed, another court in this District recently applied *Casa Duse* to reject a copyrightable interest in an interviewee's contributions to "more than eight hours of 'raw' interviews" with him that were published "as an audiobook," even as the court "acknowledge[d] that a series of

interviews are quite different from the film at issue in <u>16 Casa Duse</u>." *Trump*, 791 F. Supp. 3d at 477-78, 500. It "nonetheless view[ed] the question and answer interview format as something that – like the film in <u>16 Casa Duse</u> – must be viewed as a 'unified work, rather than [as a series of] individual statements.' Stripping out the answers from an interviewer's questions is not only inconsistent with the animating principles of the Copyright Act; it also ignores the fundamental reality that an interview is a unified, integrated work and not a collection of disjointed and unrelated random thoughts and phrases." *Id.* at 500.

If Gray were correct that individual scenes for a film are copyrightable as standalone works, then a film necessarily would be a collective work. But a film is a prototypical example of what "[a] collective work is not," as is "a novel consisting of multiple chapters," or by analogy, a screenplay consisting of multiple scenes. U.S. Copyright Office, Circular 34: Multiple Works (Mar. 2021), accessible at https://www.copyright.gov/circs/circ34.pdf. What sets apart collective works is that "individuals' contributions 'remain unintegrated and disparate'" rather than part of "a unified whole." *Casa Duse*, 791 F.3d at 257. But in nearly all cases, a film is a unified whole that is comprised of many integrated, interdependent scenes telling a cohesive narrative. This is also borne out in the Copyright Act's legislative history, which explains that "a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film," H.R. Rep. No. 94-1476, at 120 (1976), and in *Casa Duse* itself, 791 F.3d at 257. Exceptions exist—*e.g.*, an anthology film that is a collection of shorter films—but nothing about *Maverick* deviates from the typical mold of a film as a unified whole. *Maverick* tells a single unified story, as did the screenplays leading up to it, and Gray cannot colorably argue that the "Gray Scenes" were "unintegrated and disparate" from the broader screenplay of which they were a part.

Gray himself always envisioned the "Gray Scenes" as interdependent parts of a unitary

whole—the screenplay draft he was preparing with Singer—and not as freestanding works.  In this litigation, Gray expressly "[a]dmitted that the work Plaintiff did in co-writing the screenplay for [*Maverick*] with Eric Singer was intended by Plaintiff…to be merged into inseparable or interdependent parts of the unitary screenplay."  SMF 925.  That admission is conclusive.

Gray's testimony is consistent.  For example, he testified that, in preparing the "Gray Scenes," he "was trying to write scenes for a movie called 'Top Gun: Maverick.'"  SMF 926.  Gray testified that he and Singer worked as a "writing team" on *Maverick* and "divided up the screenplay," with "[a]ll the action sequences and sequences that involved discussions of military, the planning of the mission, those kinds of things" being Gray's responsibility.  SMF 928-29.  Those were the "Gray Scenes."  SMF 929.  And once those scenes were written, Gray "would either send them to Eric [Singer] to put into the script or Eric [Singer] would send me the sort of current version of the script and I would insert my sequences into it."  SMF 930.  In sum, Gray and Singer "broke story together, divided up scenes to write individually[,] and then reconvened to assemble, edit and revise the final script."  SMF 931.  Between the portions Gray drafted and the portions Singer drafted, they "were trying to tell an overall narrative" that was "reflective of the story that [they] developed together" and "would come together to be a cohesive whole."  SMF 932.

The "Gray Scenes" obtain their primary meaning in the context of the overarching screenplay—none alone tells a remotely complete story.  That makes perfect sense given the process for their creation: As Gray described it, "[w]e [] spent two months developing all of these ideas into an outline at which point we take an outline and turn it into a screenplay."  SMF 927.  As shown in the accompanying Statement of Material Facts, SMF 935-91, a review of the "scenes" themselves confirms they were never meant to be standalone works and indeed could not function as such.  Gray himself acknowledged they "were broken down by [his] litigators for the copyright

-30-

office and they don't reflect necessarily sequences in the film in their entirety."  SMF ¶¶ 33-34.

In sum, each of these "scenes" tells part of a broader, cohesive story—a story embodied by the screenplay draft into which each fits and the outline from which each derives—and loses much of its meaning when stripped of that context.  Many are not even complete scenes or sequences, but rather start or stop midway through one.  Because the "Gray Scenes" are inseparable or interdependent parts of a unitary whole, rather than independent freestanding works, they are not discrete "works of authorship" under copyright law and thus not independently copyrightable.

### 4.  If Prepared By Gray As Discrete Works, The "Gray Scenes" Are Infringing Derivative Works Not Entitled To Copyright Protection.

Even if the Court believed the "Gray Scenes" could constitute discrete works of authorship, Gray would nonetheless lack a valid copyright in them because they pervasively exploit Paramount's preexisting copyrighted material without permission.  The Copyright Act endows authors with "the exclusive rights to prepare derivative works based upon the copyrighted work." *Keeling v. Hars*, 809 F.3d 43, 48 (2d Cir. 2015) (cleaned up).  "Thus, *unauthorized* derivative works are typically afforded no copyright protection because they unlawfully infringe the exclusive rights of the original author." *Id.*

### a.  The "Gray Scenes" Are Derivative Of Paramount's Copyrighted Material.

The "Gray Scenes" are undisputedly derivative of *Top Gun*, which Paramount solely owns. It takes no detective work to conclude as much: Gray expressly set out to write for a sequel to *Top Gun*; he took the protagonist (Maverick) from *Top Gun* and wrote scenes that revolve around him as the protagonist of the sequel; he borrowed and expanded on secondary characters from *Top Gun* like Bradley Bradshaw (son of Maverick's late wingman Goose); he coopted central events from *Top Gun* as the characters' backstories (most notably, the training accident with Maverick piloting that killed Goose); he broadly viewed the sequel as "expand[ing] the 'Top Gun' universe"; and he

generally copied *Top Gun*'s concept and feel (including the premise of elite yet overconfident pilots training at Top Gun; its adrenaline-filled aerial dogfight sequences; its rapid and frequent shifts in perspective between cockpit interiors and external viewpoints; and its stories of bonding, loss, and redemption). SMF 993-1007. In admitting he was creating scenes for a *Top Gun* sequel, Gray "all but admits that [they are] a derivative work—'a work based upon one or more preexisting works' that 'recast[s], transform[s], or adapt[s]' the preexisting work." *Wozniak*, 726 F. Supp. 3d at 238 (quoting 17 U.S.C. § 101). Indeed, Gray's "bodily appropriation" of *Top Gun*'s protagonist—Maverick was "lifted lock, stock, and barrel from the prior [] movie[]"—on its own would dictate that conclusion. *Anderson v. Stallone*, 1989 WL 206431, at *8 (C.D. Cal. Apr. 25, 1989).

The "Gray Scenes" also are derivative of Craig's screenplay draft, Marks' screenplay draft, Kosinski's treatment, and Singer's detailed outline for *Maverick*, which Paramount owns as work made for hire (or via belt-and-suspenders assignments). SMF 1008. Most significantly, the "Gray Scenes" copy their plot and key character development from these prior works and borrow large swaths of narration and dialogue from them with little to no alteration, as laid out in SMF 1009-49. That is hardly surprising for scenes that were directly developed from those prior works—including the detailed outline that Gray allegedly "turn[ed] [] into" the "Gray Scenes." SMF 1049.

**b. Gray's Use Of Paramount's Copyrighted Material Was Unauthorized.**

Paramount did not authorize Gray to use its copyrighted expression. Indeed, Gray was hiding his purported authorial role from Paramount at the time; neither requested nor received permission from Paramount to use *Top Gun* or any of the draft materials for *Maverick*; and had no contact with Paramount about any part of the *Top Gun* franchise until long after Gray's infringing activity. SMF 1052-57. Paramount contractually authorized its work-made-for-hire screenwriters to use Paramount's preexisting material—after all, their proceeds would be treated as authored and owned by Paramount—but Gray dodged any above-board contracting with Paramount. SMF

1050-53. By circumventing any such contracting process, Gray made himself an infringer.

Paramount expects that Gray will try to avoid this clear result by again trying to cast Singer and Kosinski as its agents and claiming he received an unwritten license from one or both of them. No such agency relationship existed. As far as actual authority, neither Singer nor Kosinski was authorized to deal in Paramount's intellectual property interests—or, for that matter, to hire or collaborate on *Maverick* with a writer that Paramount had not approved and contracted. SMF 1058-61. As work-made-for-hire contributors for Paramount, Singer and Kosinski did not have the right to license their own work product, much less works with which they had no involvement such as the original *Top Gun* film or the Craig and Marks drafts. SMF 1061-62. Moreover, their permissive use of Paramount's copyrighted material was contingent on and limited to their preparation of work for hire for Paramount, of which Paramount would be deemed author and owner. SMF 1063. Singer and Kosinski could not license a use to which even they would not be entitled. That limitation is logical: Paramount had no incentive to gratuitously license its property to permit a third party to create a work Paramount would not own.

Gray cannot rely on apparent authority either. As discussed in Section III.A., *supra*, Singer and Kosinski lacked apparent authority to give Gray a screenwriting role on *Maverick*. Likewise, Paramount communicated nothing to Gray that would lead Gray to believe Singer or Kosinski could license his use of *Top Gun* and prior *Maverick* work product. SMF 1064-65. To the contrary, since Gray knew Paramount had not authorized his writing of the "Gray Scenes," he could have no reasonable belief that Paramount nonetheless approved of his use of its prior material in them.

### c. As Unauthorized Derivatives, The "Gray Scenes" Lack Copyright Protection.

Because the "Gray Scenes" are unauthorized derivative works, Gray has no valid copyright in them. An unlawful derivative work encroaches on "the *exclusive* right to prepare derivative works based upon the copyrighted work" and thus cannot obtain protection under the Copyright

Act. *Pickett v. Prince*, 207 F.3d 402, 405-06 (7th Cir. 2000); *Keeling*, 809 F.3d at 48; *Anderson*, 1989 WL 206431, at *10. An infringement plaintiff cannot sue based on "a copyright that [plaintiff] had no right to obtain, namely a copyright on a derivative work based on [defendant's] copyrighted [work]." *Pickett*, 207 F.3d at 406. At the very least, the Copyright Act "most certainly precludes the author of an unauthorized infringing derivative work from suing the author of the work which he has already infringed." *Anderson*, 1989 WL 206431, at *11. That is dispositive here.

Although some courts have suggested a more context-specific test for copyrightability of unauthorized derivative work, that too is easily satisfied here. Under that test, "if the pre-existing material used without permission 'tends to pervade the entire derivative work,' copyright protection is denied to the derivative work entirely." *Wozniak*, 726 F. Supp. 3d at 237; *see also Sobhani v. @Radical.Media Inc*., 257 F. Supp. 2d 1234, 1240 (C.D. Cal. 2003) (finding both tests satisfied). Where, as here, a copyrighted character is "integrated into and integral to" the unauthorized derivative work, that use of pre-existing material is routinely found to be "pervasive." *Sobhani*, 257 F. Supp. 2d at 1240; *Wozniak*, 726 F. Supp. 3d at 237. All the more so when accompanied by other central expression: Gray took not only the character of Maverick, but also the world of *Top Gun*, and many core plot points and other elements from Paramount's property along the way. The "Gray Scenes" cannot be disentangled from the Maverick character or his relationship with Bradley Bradshaw's late father or the broader "'Top Gun' universe"—much less the prior drafts and treatments for *Maverick* on which the "Gray Scenes" are based.

The *Wozniak* case is instructive: There, plaintiff Christopher Wozniak wrote a story that "depicts an 'aging' Batman working with police commissioner James Gordon to battle the Riddler" in "a 'decaying' and corrupt Gotham." 726 F. Supp. 3d at 223 (cleaned up). Wozniak "pitch[ed] [the story] as a basis for a future Batman film," and later sued Warner Brothers for copyright

infringement after seeing a Batman film he believed "copied major elements of his Story." *Id.* at 225-26. Warner Brothers moved for summary judgment, asserting he had no valid copyright in the story because of its unauthorized use of the Batman character and other elements of the Batman universe. *Id.* at 237. The court agreed, finding that DC Comics' preexisting material "pervades the entire Story" since "[t]he Story's entire premise and plot centers on Batman." *Id.* at 238.

The fact pattern in *Anderson* was largely the same and yielded the same result. There, "after viewing the movie Rocky III, [plaintiff] Timothy Anderson wrote a thirty-one page treatment entitled 'Rocky IV' that he hoped would be used by [Sylvester] Stallone and MGM…as a sequel to Rocky III." 1989 WL 206431, at *1. Typical for a sequel, Anderson's treatment "incorporated the characters" from the movies Rocky I, II, and III. *Id.* Anderson submitted his treatment to MGM and later requested compensation for it but was rebuffed. *Id.* Anderson believed the movie reflected "his story," and he sued Stallone and MGM for copyright infringement after the film's release. *Id.* The defendants moved for summary judgment on the basis that Anderson's treatment was an infringing derivative work not entitled to copyright protection, and the court agreed. *Id.* at *5-11. The court emphasized that Anderson had "bodily appropriated the Rocky characters" from the prior movies without authorization, and therefore he could not "gain copyright protection for any portion of his work." *Id.* at *8, *11; *see also, e.g.*, *Sobhani*, 257 F. Supp. 2d at 1240.

The same logic applies here too: Gray cannot obtain copyright rights in an unauthorized derivative work of Paramount's property—especially not where, as here, he appropriated the main character and other foundational story elements that necessarily pervade the new "works"—and he certainly cannot turn around and sue Paramount for infringing his infringing material.

## IV.  CONCLUSION

The Court should grant summary judgment in Paramount's favor on Gray's sole live claim for infringement on any and all of the independent grounds set forth in this Motion.

-35-

Dated:  November 7, 2025                    By: */s/ Molly M. Lens*
                                            _____

                                            O'MELVENY & MYERS LLP
                                            Molly M. Lens
                                            mlens@omm.com
                                            Samuel H.S. Donohue (admitted pro hac vice)
                                            sdonohue@omm.com
                                            1999 Avenue of the Stars, 8th Fl
                                            Los Angeles, California 90067
                                            Telephone: (310) 553-6700
                                            Facsimile: (310) 246-6779

                                            Danielle Feuer
                                            dfeuer@omm.com
                                            1301 Avenue of the Americas, Ste 1700
                                            New York, New York 10019
                                            Telephone: (212) 326-2000
                                            Facsimile: (212) 326-2061

                                            *Attorneys for Defendant and Counterclaim-*
                                            *Plaintiff Paramount Pictures Corporation and*
                                            *Defendants Paramount Global and Paramount*
                                            *Streaming Services Inc.*

## <u>CERTIFICATE OF WORD COUNT (L.R. 7.1(C))</u>

Pursuant to Local Rule 7.1(c), I hereby certify that, excluding the caption, table of contents, table of authorities, signature block, and this certificate, the foregoing Memorandum of Law is 35 double-spaced pages.  It therefore complies with the page limit set forth in this Court's October 24, 2025 Minute Order.

Dated:  November 7, 2025                    By: */s/ Molly M. Lens*

                                                          Molly M. Lens