**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHAUN GRAY, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation; and DOES 1-10,<br><br>    Defendants. | Civil Action No. 1:25-cv-3484 |
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation;<br><br>    Counterclaim-Plaintiff,<br><br>vs.<br><br>SHAUN GRAY, an individual,<br><br>    Counterclaim-Defendant, | |

**DECLARATION OF JOSEPH KOSINSKI IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I, Joseph Kosinski, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the director of the film *Top Gun: Maverick*. I submit this declaration in support of Defendants' Motion for Summary Judgment based on my personal knowledge of the facts set forth below. If called and sworn as a witness, I could and would testify competently thereto.

2. Broadly speaking, the director for a movie is in charge of the creative aspects of a movie, and I performed this role with respect to *Top Gun: Maverick*. I was thus closely involved in the development of the screenplay of *Top Gun: Maverick* and the production, including filming, of the movie.

3. On June 12, 2017, I entered into a contract with Paramount to direct a sequel to its 1986 *Top Gun* film on a work-for-hire basis. That sequel is the film we now know as *Top Gun: Maverick*.

4. I was not authorized by Paramount to hire any screenwriters to help write the screenplay for *Top Gun: Maverick*. I understood that any screenwriters would have to be approved by and contract directly with Paramount. Nor was I authorized to task anyone other than a screenwriter hired by Paramount with writing scenes for *Top Gun: Maverick* or to accept such work for inclusion in *Top Gun: Maverick*.

5. I was not authorized by Paramount to work with any screenwriters who were not already hired by Paramount.

6. I was not authorized by Paramount to license or assign any of Paramount's intellectual property.

7. I was authorized to use copyrighted material from Paramount's original *Top Gun* film and the previous written work product for the *Top Gun* sequel that Paramount provided to me,

but only to the extent I was using that material to develop the *Top Gun* sequel as work made for hire for Paramount.

8. I did not ask Shaun Gray to write or co-write a screenplay draft for *Top Gun: Maverick*.

9. I did not ask Shaun Gray to write scenes for *Top Gun: Maverick.*

10. I also did not tell Eric Singer that I wanted Shaun Gray to be involved in preparing the screenplay for *Top Gun: Maverick.*

11. I understood Shaun Gray to be an assistant to screenwriter Eric Singer.

12. I am not aware of Shaun Gray himself writing scenes for *Top Gun: Maverick*.

13. Shaun Gray never told me that he believed Paramount (or I) did not have the right to freely use all of the material contained in Eric Singer's November 3, 2017 screenplay draft (or any previous draft) in making *Top Gun: Maverick*.

14. Shaun Gray never told me that he believed he should have been credited as a writer on *Top Gun: Maverick*.

15. I prepared a pitch to be hired on the sequel to *Top Gun* and, in connection therewith, wrote a treatment that developed the narrative arc for the *Top Gun* sequel. Attached hereto as **Exhibit A** is a true and correct copy of that May 16, 2017 treatment, which I produced in this litigation with the Bates range KOSINSKI-GRAY-0014442–0014444, and which I understand Paramount also produced in this litigation with the Bates range PPC-GRAY-0005747–0005749.

16. The *Top Gun* sequel was intended to carry over the feel of the original *Top Gun* film (in addition to other features, like characters, that the two films share).

17. The team that developed and produced *Top Gun: Maverick* tried to create a film that was as realistic as possible. To that end, we worked closely with naval consultants,

interviewed naval aviators, visited naval air bases, and filmed using real Navy planes. In developing the screenplay and production for the film, I worked especially closely with Capt. J.J. "Yank" Cummings and Capt. Brian "Ferg" Ferguson, who received "Naval Aviation Advisor" and "Naval Aviation Technical Advisor/Aerial Coordinator" credits, respectively.

18. The collaboration with the Navy was intentional and continuous – and important. Among other reasons, we wanted the Navy's help to ensure that we got things right. These efforts to ensure accuracy and realism pervaded the development and production process and ranged from topics such as Navy life to the Top Gun program to Naval aviation and combat to mechanical aspects of fighter jets.

19. For example, we developed the parameters for the film's closing mission in consultation with naval experts to be the most harrowing but doable mission possible; depicted real military flight maneuvers in the training sequences; and developed the test plane sequence to mirror the mechanics of what a real scramjet flight would look like (from the air traffic controller's wind readout before takeoff, to the way the engine would sound, to the way the plane would transition to scramjet engines). We also depicted the real-life dangers of flight, like the extreme pressure of g-forces on pilots' bodies and the risk posed by bird strikes. Likewise, the features of the Navy equipment used in the film, including technical aspects such as displays, wing functions, and afterburners, are real (aside from a few changes we were required to make to avoid revealing classified information). The actors portraying the pilots were filmed during real flights, capturing the strain on their bodies and the real-life experience of flight in a fighter plane. We also infused the script with real military jargon, for example, "bogeys" for enemy planes; "hops" for air combat maneuvers; and "How do you read? Loud and clear" for a radio check.

20. As part of the development and production process, I visited a number of United States Navy air stations, including Naval Air Station Fallon in Fallon, Nevada (the current location of the Top Gun school), Naval Air Station North Island in San Diego, California (where we set Top Gun in the movie), and Naval Air Station Lemoore in Fresno, California. (Eric Singer, Ehren Kruger, and Christopher McQuarrie – the credited screenwriters with whom I worked – joined me on some of these visits). I also visited one of the Navy's aircraft carriers and spent several days with Navy personnel on that ship.

21. On November 3, 2017, I emailed Eric Singer's screenplay draft to Elizabeth Raposo, who was Paramount's President of Production at the time. In that email, I explained that "Eric [Singer] and I have worked very closely with our Navy advisors to make sure all of the aerial sequences are authentic and the dialog[ue] in those scenes reflects that." Attached hereto as **Exhibit B** is a true and correct copy of that November 2017 email exchange, which I produced in this litigation with the Bates number KOSINSKI-GRAY-0014425.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 4, 2025.

By: _____

Joseph Kosinski