UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAUN GRAY, an individual,<br><br>                    Plaintiff,<br><br>vs.<br><br>PARAMOUNT GLOBAL, a Delaware corporation; PARAMOUNT PICTURES CORPORATION, a Delaware corporation; PARAMOUNT STREAMING SERVICES INC., a Delaware corporation; and DOES 1-10,<br><br>                    Defendants. | Civil Action No. 1:25-cv-3484 |
| PARAMOUNT PICTURES CORPORATION, a Delaware corporation;<br><br>                    Counterclaim-Plaintiff,<br><br>vs.<br><br>SHAUN GRAY, an individual,<br><br>                    Counterclaim-Defendant, | |

**DECLARATION OF ERIC WARREN SINGER IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

I, Eric Warren Singer, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am one of the screenwriters who worked on Paramount's 2022 film *Top Gun: Maverick*. I submit this declaration in support of Defendants' Motion for Summary Judgment based on my personal knowledge of the facts set forth below. If called and sworn as a witness, I could and would testify competently thereto.

## My Contract with Paramount

2. On June 6, 2017, I entered into a screenwriting contract with Paramount to prepare a draft screenplay for a *Top Gun* sequel on a work-for-hire basis. That sequel came to be *Top Gun: Maverick* ("*Maverick*").

3. As source material for my draft screenplay, I was provided with previous screenplay drafts that had been written by Peter Craig and Justin Marks, respectively. I was also provided with director Joseph Kosinski's written pitch document, which laid out the narrative for the screenplay iteration that I was to draft. Of course, the screenplay was also supposed to be based on the 1986 *Top Gun* film itself.

4. Paramount did not authorize me to hire any other screenwriters to help write the *Maverick* screenplay.

5. Paramount did not authorize me to work with any screenwriters who were not already hired by Paramount.

6. Paramount did not authorize me to incorporate anyone else's written work product other than my own in my screenplay draft for *Maverick* (except for the agreed-up source material).

7. Paramount did not give me authority to license or assign any of Paramount's intellectual property, including with respect to *Top Gun* and *Maverick*.

8. I was allowed to use Paramount's copyrighted materials—specifically, the agreed-upon source materials—but only for the purpose of preparing a screenplay for *Maverick* as work made for hire for Paramount pursuant to my contract.

### My Screenplay Draft for *Maverick*

9. A number of written documents were created as part of the submission of a draft screenplay to Paramount. I address some, but not, all of these documents below.

10. I prepared an initial detailed outline of my screenplay draft on July 16, 2017. Attached hereto as **Exhibit A** is a true and correct copy of that initial detailed outline, which I understand was produced by Paramount in this litigation with the Bates range PPC-GRAY-0005750–0005769.

11. I prepared another detailed outline on August 8, 2017. Christian Donovan, one of my writing assistants at the time, sent me an email with the August 8 outline later that day. Attached hereto as **Exhibit B** is a true and correct copy of Donovan's August 8 email, which I produced in this litigation with the Bates number SINGER-GRAY-0039281. Attached hereto as **Exhibit C** is a true and correct copy of the August 8 detailed outline, as attached to Donovan's email, which I produced in this litigation with the Bates range SINGER-GRAY-0039282–0039313.

12. I also prepared a series of interim screenplay drafts for *Maverick* between the August 8 outline and my submission of a final draft screenplay to Paramount. Attached hereto as **Exhibit D** is a true and correct copy of the opening scene for one early draft of the screenplay, saved under the file name "OLDS – 8.15.17," which I produced in this litigation with the Bates range SINGER-GRAY-0010575–0010576.

13. I prepared one of these detailed outlines on August 26, 2017. Attached hereto as **Exhibit E** is a true and correct copy of the August 26, 2017 outline, which I produced in this litigation with the Bates range SINGER-GRAY-0036278–0036293.

14. I prepared another detailed outline on September 5, 2017. Christian Donovan then sent me an email with the September 5 outline. Attached hereto as **Exhibit F** is a true and correct copy of Donovan's email, which I produced in this litigation with the Bates number SINGER-GRAY-0036024. Attached hereto as **Exhibit G** is a true and correct copy of the September 5 detailed outline, as attached to Donovan's email, which I produced in this litigation with the Bates range SINGER-GRAY-0036025–0036070.

15. I submitted my final draft screenplay (the "Singer Draft") on November 3, 2017. Attached hereto as **Exhibit H** is a true and correct copy of that final screenplay draft, which I understand was produced by Paramount in this litigation with the Bates range PPC-GRAY-0000534–0000655.

16. In preparing a screenplay draft, I set out to make my writing as realistic as possible based on consultation with the Navy, site visits, and other research. I worked hard to understand the jet weapons and radar systems—how they worked—so that my scenes were credible to actual experienced pilots. For instance, I recall a number of conversations with pilots about the very real and physical impact that g-force has on their bodies and the incredibly demanding training that they must undertake to physically train their bodies to be able to withstand this incredible force. The training scenes in the movie reflect these conversations. I also spoke with pilots and asked them to describe the most difficult and terrifying mission that they could imagine. The final mission in the movie uses elements described to us by the Navy pilots, including flying at high-

speeds through canyons at low altitudes, facing anti-aircraft surface-to-air missiles, and having to battle superior aircraft in order to escape enemy territory.

17. In the Singer Draft, the depictions of planes and flight, the classroom sessions and training and mission parameters, the pilots' dialogue and manner of speaking, and all other facets of naval aviation are written to mirror real life, to the extent possible. Given that the film centers on Navy aviation, shots of planes on the ground, in the sky, and from the cockpit are to be expected. For example, I consulted naval experts on the real-life process that would take place before takeoff for a flight like Maverick's test flight—pinning down real factual details ranging from the flight precheck process, to the radio dialogue between the cockpit and the air traffic controller providing a wind readout and takeoff clearance, to the look and sound of the engines igniting, to the process whereby the pilot would shut down the main engines to transition to scramjet engines. I also incorporated real aviation jargon and manner of speech, like the codes used to communicate via radio, the way flight clearances would be conveyed over radio ("You are cleared above flight level six zero zero"), and the standard language for conducting a radio check itself ("How do you read?" "Loud and clear." —that is, if the radio is working well). I also tried to highlight other real-life facets of flight in the screenplay, especially the intensity of g-forces on pilots' bodies, and other real-life risks like the danger posed by bird strikes. And like in real life, pilots receive training and briefing in the classroom followed by practicing what they have been taught in aerial exercises.

18. Attached hereto as **Exhibit I** is a true and correct copy of an August 7, 2017 email from Christian Donovan attaching a transcription of conversations I had during a site visit to Naval Air Station Fallon, including conversations with Navy consultants "Yank" and "Sparky," which I produced in this litigation with the Bates number SINGER-GRAY-0038762. Attached hereto as **Exhibit J** is a true and correct copy of excerpts from an attachment to that email containing the

transcription, which I produced in this litigation with the Bates range SINGER-GRAY-0038945–0039133.  "Yank," who ultimately received a "Naval Aviation Advisor" credit on the film, was my "tour guide" at Fallon and provided a "backstage pass" look into the real lives of naval aviators that helped shape sequences that are now in the film.

### My Relationship with Gray

19. Shaun Gray ("Gray") was employed by me as my writing assistant for many years, including during my work on the *Maverick* screenplay.

20. In 2015, Gray signed a contract with me and my loan-out company, Bullsh t Artists, Inc. ("Bullsh t Artists").  The contract confirmed the terms of my employment relationship with Gray and I intended for this contract to last as long as Gray worked for me.  At no point did Gray tell me he was terminating this contract.  Attached hereto as **Exhibit K** is a true and correct copy of Gray's contract with me and Bullsh t Artists, which I understand Gray produced in this litigation with the Bates range GRAY10563–GRAY10565.

21. After I received the offer from Paramount to draft the *Maverick* screenplay, I asked Gray if he wanted to work on the *Top Gun* sequel, as my writing assistant.  On June 4, 2017, I texted Gray "Got offer on tg – gonna take it – wanna bring u on – u down for cause?"  Gray responded "Hell yes."  Attached hereto as **Exhibit L** is a true and correct copy of this text message conversation, which I understand Gray produced in this litigation with the Bates number GRAY0489.

22. As my writing assistant, Gray had access to each of the outlines and interim screenplay drafts I created in the process of finalizing my *Maverick* draft screenplay.  He also had access to everything else regarding *Maverick* including my research materials, notes, transcripts of my conversations with the Navy representatives, etc.

23. As my writing assistant, Gray also had access to the source material that Paramount provided me. Gray had access to Craig's screenplay draft, Marks' screenplay draft, and Kosinski's treatment (and of course, public materials including *Top Gun*). For example, attached hereto as **Exhibit M** is a true and correct copy of a June 5, 2017 email that I sent Gray, attaching a draft screenplay from Marks, instructing Gray to "breakdown [the script] into a scene by scene," which I produced in this litigation with the Bates number SINGER-GRAY-0050292 (Exhibit redacted to preserve the confidentiality of my personal email address). As another example, attached hereto as **Exhibit N** is a true and correct copy of a July 7, 2017 email that Gray prepared at my request outlining the similarities between my in-progress screenplay outline and Craig's screenplay draft, which I produced in this litigation with the Bates number SINGER-GRAY-0038121.

24. I was born with an eye condition – strabismic amblyopia. As a result, when I look at computer screens for an extended period of time or I am fatigued, I have double vision. As a consequence, instead of typing my screenplays myself, I have made it a practice to either write in longhand and dictate this to my writing assistants, or simply orally dictate scenes to all of my writing assistants, such as Gray on *Maverick*. My writing assistants would then, like Gray did with *Maverick*, input my dictated scenes into screenplay software programs that I used. My condition was complicated in around 2014, when I developed glaucoma.

25. As part of my process in drafting screenplays including *Maverick*, I often dictate scenes to my writing assistants or write out scenes in longhand (on pen and paper) and read those pages to them. The writing assistants—in 2017, either Gray or Christian Donovan—would type them up on the computer and email them back to me or input them into the working screenplay document. I used this process with both Gray and Donovan while drafting the *Maverick* screenplay.

26. On August 16, 2017, at 3:31 pm PT (10:31 pm UTC), I sent Gray an email with the first few lines of a scene for *Maverick*'s test plane sequence. Attached hereto as **Exhibit O** is a true and correct copy of this email, which I produced in this litigation with the Bates number SINGER-GRAY-0040724.

27. Gray did not author any portion of the screenplay I submitted to Paramount on November 3, 2017.

28. I never told anyone at Paramount that Gray was a writer on *Maverick*, because he was not one. I likewise never told anyone at Paramount that Gray wrote scenes for the Singer Draft, because he did not. In fact, prior to January 23, 2023, I did not have any communications with anyone at Paramount regarding Gray

29. In 2019 and 2020, there was a Writers Guild of America ("WGA") credit arbitration for who would receive a writing credit on *Maverick*.

30. On November 16, 2019, I texted Gray that "Arbitration takes a week" and "It will happen in the next month or so." I also texted him that "I feel 97% confident I will get credit." Attached hereto as **Exhibit P** is a true and correct copy of this text message conversation, which I produced in this litigation with the Bates number SINGER-GRAY-0015319.

31. On November 19, 2019, Gray asked me about a potential "end credit submission" for himself and proposed that he receive the following credit: "Development Exec[utive] to Eric Singer." I told him "Lemme see what happens with arbitration" first. He replied "Yeah obviously there's no 'x to Eric Singer' if you're name isn't on the movie." Attached hereto as **Exhibit Q** is a true and correct copy of this text message conversation, which I produced in this litigation with the Bates range SINGER-GRAY-0015320–0015321.

32. Prior to January 2023, Gray and I never discussed him receiving a writing credit for himself on *Maverick*. He never raised the issue with me. If he had, I would have been shocked because he did not write any portion of *Maverick*.

33. On March 9, 2020, Gray texted me "What's new? Any update on TG arbitration process?" I replied the next day and told him "just sent my letter in – will take 2-3 weeks to get verdict – fingers crossed – will let you know." Attached hereto as **Exhibit R** is a true and correct copy of this text message conversation, which I produced in this litigation with the Bates range SINGER-GRAY-0015324–0015325.

34. As promised, I texted Gray on April 1, 2020, to tell him that the "[a]rbitration verdict came down this week" and that I "got credit." Attached hereto as **Exhibit S** is a true and correct copy of this text message conversation, which I produced in this litigation with the Bates number SINGER-GRAY-0015326. After receiving my text, Gray did not ask about or mention anything about receiving a writing credit.

35. I paid Gray for his writing assistant work in connection with *Maverick* through periodic checks between 2017 and 2020, either directly or through Bullsh t Artists. Per my arrangement with Gray, the plan was for me to continue paying Gray through monthly checks until the WGA credit arbitration finished, at which point I would pay Gray's remaining balance for his 2017 assistant work in one lump sum.

36. I explained this to Gray in a text message conversation on November 9, 2019. On that day, Gray texted me "You have been promising for three months to give me a payment schedule and to get my remaining 2017 salary paid by the end of this year. It's now November…what is the plan?" I responded that the "Plan will be to continue monthly checks – and then when arbitration is over, I will pay entire balance in one lump sum." Attached hereto as

**Exhibit T** is a true and correct copy of this text message conversation, which I produced in this litigation with the Bates number SINGER-GRAY-0015318.

37. On August 8, 2020, after the WGA credit arbitration was over, I issued a check for a $20,000 lump-sum payment to Gray with "Top Gun" written on the memo line. As the memo line indicates, this check was for Gray's work for me on *Top Gun: Maverick*. Gray endorsed and cashed the check. Attached hereto as **Exhibit U** is a true and correct copy of this check, which I produced in this litigation with the Bates number SINGER-GRAY-000026.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 5, 2025.

By: /s/ Eric Warren Singer

Eric Warren Singer