# EXHIBIT E

## MEMORANDUM OF AGREEMENT
### (Writing Services – Loanout)

A.  **DATE.**  As of June 6, 2017.

B.  **PRODUCER.**  PARAMOUNT PICTURES CORPORATION ("Company").

C.  **LENDER.**  BULLSH!T ARTISTS, INC. ("Lender"), a California corporation (Federal ID No. 95-4549081), furnishing the writing services of Writer.

D.  **WRITER.**  ERIC WARREN SINGER ("Writer"), a citizen of the United States of America, with a principal place of residence in Los Angeles, California.

E.  **PICTURE.**  "TOP GUN 2" ("Picture").

The work to be done by Writer under this Agreement is based upon the theatrical motion picture entitled "TOP GUN" owned by Company (the "Original Picture") and screenplay material based thereon written by Peter Craig and by Justin Marks, which shall be deemed to be assigned material ("Assigned Material"). The parties acknowledge that: (i) prior writers (other than Peter Craig and Justin Marks) have written screenplay material in connection with a prior, different sequel project based upon the Original Picture, and (ii) neither Lender nor Writer have been provided a copy of the writing done by such prior writers.

1.  **CONDITIONS PRECEDENT.** Company shall have no obligation under this Agreement unless and until Company has obtained:

    1.1  A fully signed copy of this Agreement and all exhibits thereto, including, without limitation, the Certificate of Authorship attached to this Agreement, in form and substance satisfactory to Company.

    1.2  A completed Form W-9 confirming both Writer's social security number and Lender's Federal ID number and any other documentation required for Company to pay Lender.

    1.3  All chain-of-title documentation for the Picture and has approved such chain-of-title documentation in its sole discretion.

1

CONFIDENTIAL                                                    PPC-GRAY-0000174

1.4    A fully signed copy of the Memorandum of Agreement between Company and Joseph Kosinski for his services as director in connection with the Picture, in form and substance satisfactory to Company.

2.    SERVICES AND COMPENSATION.    Lender shall furnish the services of Writer who shall render for Company all services customarily rendered by writers in the motion picture industry and as reasonably required by Company for the Picture. During all writing periods, Writer's services shall be exclusive to Company (it being understood that Company's instructions regarding matters of artistic taste and judgment are, per se, reasonable).    During all reading periods, Writer's services may be non-exclusive, provided that Writer's services for third parties or on Lender's or Writer's own behalf shall not materially interfere with Writer's services under this Agreement.

2.1    Guaranteed Step(s).    Lender shall furnish the services of Writer who shall be engaged by Company to write a first rewrite based on the Assigned Material ("First Rewrite") for Eight Hundred Twenty-Five Thousand Dollars ($825,000), which sum shall accrue and be payable upon satisfaction of the Conditions Precedent, as follows:

2.1.1    Four Hundred Twelve Thousand Five Hundred Dollars ($412,500) on start of writing services.

2.1.2    Four Hundred Twelve Thousand Five Hundred Dollars ($412,500) on delivery to Company of the completed First Rewrite.

2.2    First Optional Step.    Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a second rewrite ("Second Rewrite"), exercisable within four (4) weeks following delivery of the prior writing step.    If Company exercises the option for Writer's services, Lender shall be entitled to Four Hundred Twenty-Five Thousand Dollars ($425,000), which sum shall accrue and be payable as follows:

2.2.1    Two Hundred Twelve Thousand Five Hundred Dollars ($212,500) on start of the Second Rewrite.

2.2.2    Two Hundred Twelve Thousand Five Hundred Dollars ($212,500) on delivery to Company of the completed Second Rewrite.

2

CONFIDENTIAL                                                                    PPC-GRAY-0000175

2.3   Second Optional Step.   Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a third rewrite ("Third Rewrite"), exercisable within four (4) weeks following delivery of the prior writing step.  If Company exercises the option for Writer's services, Lender shall be entitled to Four Hundred Thousand Dollars ($400,000), which sum shall accrue and be payable as follows:

2.3.1 Two Hundred Thousand Dollars ($200,000) on start of the Third Rewrite.

2.3.2 Two Hundred Thousand Dollars ($200,000) on delivery to Company of the completed Third Rewrite.

2.4   Third Optional Step.  Company shall have an exclusive and irrevocable option to engage Lender to provide the services of Writer to write a polish ("Polish"), exercisable within four (4) weeks following delivery of the prior writing step.  If Company exercises the option for Writer's services, Lender shall be entitled to Two Hundred Thousand Dollars ($200,000), which sum shall accrue and be payable as follows:

2.4.1   One Hundred Thousand Dollars ($100,000) on start of the Polish.

2.4.2   One Hundred Thousand Dollars ($100,000) on delivery to Company of the completed Polish.

2.5   Bonus and Contingent Compensation.  If the Picture is produced as a feature-length, English-language, theatrical motion picture, and Writer receives "screenplay by" or "written by" credit as determined by the Writers Guild of America ("WGA") under the Writer's Guild of America - Alliance of Motion Picture and Television Producers Theatrical and Television Basic Agreement ("WGA Agreement"), but not Article 7 of Theatrical Schedule A thereto ("Final Credit Determination"), Lender shall be entitled to:

2.5.1   Bonus Compensation.

2.5.1.1 Sole Credit Bonus.  If sole "screenplay by" or sole "written by" credit, Two Million Eight Hundred Thousand Dollars ($2,800,000) less all sums paid pursuant to Paragraphs 2.1 through 2.4 above; or

2.5.1.2 Shared Credit Bonus.  If shared "screenplay by" or shared "written by" credit, the flat sum of Four Hundred

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 ( MPL-010577 v 4.0 ).docx

CONFIDENTIAL                                        PPC-GRAY-0000176

Seventy-Five Thousand Dollars ($475,000).

Said bonus shall be payable promptly following Company's receipt of Final Credit Determination.  Lender shall not be entitled to any bonus payment if Writer does not receive any screenplay credit.

2.5.2    Contingent Compensation.

2.5.2.1 If sole "screenplay by" or sole "written by" credit upon Final Credit Determination, a sum equal to five percent (5%) of one hundred percent (100%) of the Defined Proceeds, if any, of the Picture; or

2.5.2.2 If shared "screenplay by" or shared "written by" credit upon Final Credit Determination, a sum equal to two and one-half percent (2.5%) of one hundred percent (100%) of the Defined Proceeds, if any, of the Picture.

Lender shall not be entitled to any sums measured by the Defined Proceeds of the Picture if Writer does not receive any "screenplay by" or "written by" credit.    "Defined Proceeds" shall be defined, computed, and reported in accordance with Company's Exhibit "DP" and the Rider thereto, both of which are attached hereto and incorporated herein by this reference.

2.5.3 No Crediting.  Overscale payments for writing services and/or any Contingent Compensation paid to Lender shall not be credited against residuals that may become due.

3.    DELIVERY SCHEDULE.

3.1    Delivery schedule.

3.1.1    First Rewrite.

| | |
|---|---|
| Start of Services: | As designated by Company, but no sooner than satisfaction of the Conditions Precedent. |
| Writing Period: | 6 weeks |
| Reading Period: | 4 weeks |

4

CONFIDENTIAL

PPC-GRAY-0000177

3.1.2    Second Rewrite.

Writing Period:              6 weeks
Reading Period:             4 weeks

3.1.3    Third Rewrite.

Writing Period:              6 weeks
Reading Period:             4 weeks

3.1.4    Polish.

Writing Period:              3 weeks

Time is of the essence with respect to the aforesaid writing/delivery periods.

3.2    Exercise of Optional Steps.  Company shall have the right to exercise any optional writing step only in the order set forth above, the option for such writing step to be exercisable within four (4) weeks following delivery of the prior writing step.

3.3    Postponement of Services.  Company may postpone Writer's services on any guaranteed or optional writing step to any time up to the start of principal photography and may postpone the Polish to any time up to completion of principal photography; provided, that if Company elects to postpone Writer's services and thereafter Writer is not available on the date designated by Company for commencement of the postponed writing step due to Writer's professional commitments, the Writing Period for the applicable postponed step shall commence on Writer's first professional availability thereafter (provided further that Writer shall use reasonable, good faith efforts to be available to render such services as, when and where requested by Company). If Company postpones any services in accordance with the foregoing, the applicable payments specified above for such postponed services shall be made to Lender as if such services were timely ordered and the applicable literary material was timely delivered. Any and all postponements pursuant to this Paragraph 3.3 shall not exceed eighteen (18) months in the aggregate.

3.4    Delivery.  Delivery of all literary material under this Agreement by Writer shall be made only to Marc Evans and/or Elizabeth Raposo and/or their designee at 5555 Melrose Avenue, Hollywood, California 90038.  Marc Evans and/or Elizabeth Raposo and/or their designee shall be authorized to commence Writer and request any additional writing steps as required under

5

CONFIDENTIAL                                                                      PPC-GRAY-0000178

this Agreement. All literary material delivered to Company under this Agreement shall comply with the terms of Company's Schedule "S" Script Formatting Policy, attached hereto and incorporated herein by this reference.

4.    CREDIT. Credit shall be accorded pursuant to the terms of the WGA Agreement.

5.    NOVELIZATION (if applicable). Novelization terms shall be as set forth in the WGA Agreement. If monies are paid to Writer or Lender under this Agreement by the publisher of the novelization of the Picture or Company, then no publication monies derived by Company shall be included in the Gross Receipts of the Picture for purposes of computing any deferred or contingent compensation which may be due or payable to Lender pursuant to this Agreement.

6.    TRANSPORTATION AND EXPENSES. If Writer is required by Company to render services at an overnight location away from any place where Writer maintains a residence ("Location"), Lender shall receive the following:

6.1    Expenses and Transportation.



6.1.1    Living Expenses. An all-inclusive allowance, in lieu of all living and incidental expenses, of ▮▮▮ ▮▮ ▮▮▮ in major metropolitan cities such as Los Angeles, New York and London (to the extent such city is a Location for purposes of this Agreement), ▮▮▮ ▮▮▮ ▮ in other metropolitan cities, and ▮ elsewhere (the foregoing pro-rated at 1/7th thereof per day). If Lender demonstrates that the foregoing expenses are insufficient to meet Writer's reasonable, actual, out-of-pocket expenses, then Company shall give good faith consideration to increasing the amounts provided, with Company's decision final.

6.1.2    Transportation. One (1) business-class (if available) round-trip transportation (by air, if appropriate), if used for this purpose.

6.1.3    Ground Transportation. Company shall provide Writer with non-exclusive ground transportation (shared only with above-the-line personnel) between airport and hotel accommodations or Writer's residence, as applicable, and between hotel accommodations and the set; provided, such ground transportation between Writer's residence and the airport shall be exclusive.

6

CONFIDENTIAL                                    PPC-GRAY-0000179

6.1.4  Additional Transportation.  If Writer is required under this Agreement to render services on Location during principal photography for more than fourteen (14) consecutive days, then with respect to one (1) such Location Lender shall be entitled, on a one-time only basis, to one (1) additional business-class (if available) round-trip transportation for use by Writer's non-business related companion, if used for this purpose.

6.1.5  Rental Car.  While Writer is rendering services under this Agreement at a Location (other than New York City, London, Tokyo, Mexico City, or other locations at which Company deems a rental car economically unfeasible or otherwise inadvisable), Company shall provide Writer with a mid-sized insured domestic rental car.

6.2  Travel Arrangements.  All travel arrangements, including, without limitation, the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department unless prior written approval is obtained from a Company Business Affairs executive.

6.3  Other Expenses.  Company shall not be responsible for any other expenses or perquisites of Lender or Writer.

7.  SEQUEL, PREQUEL, REMAKE, TV SERIES, MINI-SERIES, DTHE MOVIE, MOW.  If, but only if, Writer becomes entitled to sole separation of rights pursuant to the WGA Agreement, it being recognized and acknowledged by Writer that Writer's work hereunder, as aforesaid, is based upon the Assigned Material described above, and if Writer is not engaged to write for any of the Productions described below, and provided that neither Lender nor Writer is in material default under this Agreement, then Lender shall be entitled to the payments set forth below; provided, however, that if Writer is entitled to shared separation of rights under the WGA Agreement, Lender shall be entitled to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ for the applicable use.  The payments under this Agreement shall be deemed in lieu of any minimum compensation to which Lender or Writer may be entitled under the WGA Agreement.

7.1  Theatrical Sequel (including Prequel).  ▮▮▮▮▮▮▮▮ of the cash compensation actually paid to Lender pursuant to Paragraphs 2.1 through 2.5.1 above (payable on commencement of principal photography); plus, as contingent compensation, a percentage of Defined Proceeds (if any) of such sequel or prequel, which percentage shall be equal to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for screenplay credit on the Picture pursuant to Paragraph 2.5.2 above.

7

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                    PPC-GRAY-0000180

7.2    Theatrical Remake. ███████████ of the cash compensation actually paid to Lender pursuant to Paragraphs 2.1 through 2.5.1 above (payable on commencement of principal photography); plus, as contingent compensation, a percentage of Defined Proceeds (if any) of such remake, which percentage shall be equal to ████████ █ ███████████ ███████████ for screenplay credit on the Picture pursuant to Paragraph 2.5.2 above.

7.3    Television Network Series Royalties. The following royalties are payable for each episode of a U.S. primetime network television series based upon the Picture:

    30 minutes or less: ██████

    31-60 minutes: ██████

    61 minutes or more: ██████

7.4    U.S. Network Reruns. A sum equal to ████████████ of the applicable series royalty shall be payable not later than thirty (30) days after telecast for each of the first five (5) U.S. network reruns. No further sums shall be payable for any other runs of such episode.

7.5    DTHE Movie/MOW. For a DTHE Movie or U.S. MOW, ████████ ████████████ for the first two (2) hours; ████████ ████████ for each additional hour thereafter; pro rata for a partial hour.

7.6    Mini-Series. For a U.S. mini-series, ████████████ ████████ for the first two (2) hours; ████████████ for each additional hour thereafter; pro rata for a partial hour; up to an aggregate of ████████████████ for the entire mini-series.

7.7    Pay TV Series Royalties. If initially produced for a premium level cable service, then a one-time only royalty (i.e., no payments for reruns) equal to ████████████ of the applicable royalty for network series in Paragraph 7.3 above.

7.8    "Spinoff" TV Series Royalties. ████████████ of the royalties specified in Paragraph 7.3 above for the applicable length of the network "spinoff" series (or alternatively for non-network "spinoff" series, ██████ ████████████ if the "spinoff" series is "generic" (i.e., such "spinoff"

8

CONFIDENTIAL    PPC-GRAY-0000181

series uses a character created by Writer in the Picture as a main character); or ███████████████ of the royalties specified in Paragraph 7.3 above for network "spinoff" series (or alternatively for non-network "spinoff" series, ███████████████████ if the "spinoff" series is "planted" (i.e., such "spinoff" series does not use a character created by Writer as a main character but does use, as a main character, a character that appeared in the first TV series).

7.9    Non-Primetime Network TV Series and Non-Network Primetime TV Series and Basic Cable TV Series. If initially produced for syndication (i.e., non-network primetime U.S. television), U.S. basic cable, or non-primetime U.S. network television, then a one-time only royalty (i.e., no payments for reruns) equal to ██████████████ of the royalties specified in Paragraph 7.3 above for the applicable episode length.

7.10    Internet Series. If initially produced for (i) a made for subscription video on demand service ("MFSVOD") with comparable budgetary parameters as a U.S. primetime television network or pay cable series (e.g., Netflix, Amazon), then a one-time only royalty equal to ████ ███ ████ of the applicable television network royalty, which royalty shall be further pro-rated if the running time of such MFSVOD production is less than thirty (30) minutes; (ii) MFSVOD with comparable budgetary parameters as a non-network U.S. television, U.S. basic cable, or non-primetime U.S. network television series (e.g., Hulu), then a one-time only royalty equal to ███ ██████████ of the applicable television network royalty, which royalty shall be further pro-rated if the running time of such MFSVOD production is less than thirty (30) minutes; or (iii) internet/online distribution or other method of distribution not otherwise specified herein, then ██████ ████████████ of the applicable network royalty, which royalty shall be further pro-rated if the running time of such internet or other production is less than thirty (30) minutes.

7.11    ████████ With respect to Paragraphs 7.5 and 7.6 above, if the applicable Production is placed in general theatrical release in the United States and/or abroad after its initial television broadcast, then Writer shall be entitled to an additional one-time only royalty equal to ████████ ████ of the royalty originally paid for such Production if such Production is so released in Company's customary domestic territory, and an additional one-time only royalty equal to ████████████ of the royalty originally paid for such Production if such Production is so released outside Company's customary domestic territory.    If the applicable Production is theatrically released in Company's customary domestic territory prior to telecast, then Writer shall be entitled to a ███████████████████



9

CONFIDENTIAL                                                                      PPC-GRAY-0000182

███████████ of the applicable royalty otherwise payable pursuant to Paragraphs 7.5 and 7.6, as applicable, for such Production. However, in no event shall Writer be entitled to more than a sum equal to ██████████ ██████████ of the applicable royalty for the theatrical release, if any, of the applicable Production.

7.12  Payment of Above Obligations.  Payment pursuant to Paragraphs 7.3 and 7.5 through 7.10 shall be made not later than thirty (30) days following the completion of post-production of each such Production or individual episode thereof.

8.    PREMIERE. Provided neither Lender nor Writer is in material default, and Writer receives sole or shared "screenplay by" or "written by" credit for the Picture on Final Credit Determination, Company shall invite Writer and Writer's non-business related companion to attend one (1) United States celebrity premiere, if any, of the Picture, at a location selected by Company. If Writer attends such premiere and such premiere is at a Location (as defined in Paragraph 6 above), Lender shall be entitled to an expense allowance for Writer in accordance with Paragraph 6.1 above and to reasonable round-trip transportation and to ground transportation to and from airports for Writer and Writer's non-business-related companion.

9.    DVD. Subject to Writer's full performance of all material services hereunder and Writer receives sole or shared "screenplay by" or "written by" credit for the Picture on Final Credit Determination, then, upon Writer's written request, if and when DVDs of the Picture are commercially available for release to the general public, Company shall furnish one (1) DVD (or, if DVDs are no longer generally available, whatever format is the basic home entertainment technology at the time) to Writer for Writer's personal home use only.

10.   OTHER PROVISIONS.

10.1    Standard Terms.  The balance of the terms of this Agreement shall be Company's Schedule "I" Additional Terms and Conditions and the Rider thereto, both of which are attached hereto and incorporated herein by this reference.

10.2    Notices.  Notices under this Agreement shall be in writing and shall be addressed:

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                    PPC-GRAY-0000183

| | |
|---|---|
| To Company: | 5555 Melrose Avenue<br>Hollywood, CA 90038<br>Attn: Motion Picture Group, Legal |
| To Lender and Writer: | c/o CAA<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: John Campisi |
| With a courtesy copy to: | c/o Gochman Law Group, PC<br>9100 Wilshire Blvd., Suite 312E<br>Beverly Hills, CA 90212<br>Attn: Mark Gochman |

or to such other address subsequently provided by notice.

Any notice under this Agreement shall be given by personal delivery, express mail courier or certified mail with written receipt confirming delivery. The date of the giving of such notice shall be the date of such personal delivery, one (1) business day after mailing by express mail courier, or three (3) business days after mailing by certified mail; provided that in the event of conflict with the date of the written receipt, then the date that the receipt was signed shall control.

For purposes of this Agreement, "business day" shall mean any day other than a Saturday, Sunday, national holiday, the period between Christmas and New Year's Day, or any other day on which either party is closed for business.

10.3    Payments.    Any statements and payments required under this Agreement shall be sent to Company at the address listed in the immediately preceding subparagraph. Any payments required under this Agreement shall be sent to Lender at the physical address listed below. Any statements required under this Agreement shall be sent to Lender (via e-mail or U.S. mail, at Company's election) at the applicable physical or e-mail address as follows:

| | |
|---|---|
| To Lender: | c/o CAA<br>2000 Avenue of the Stars<br>Los Angeles, CA 90067<br>Attn: John Campisi<br><br>jcampisi@caa.com |

SINGER · EXECUTION COPY · Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL    PPC-GRAY-0000184

(E-mail address for delivery of
statements)

10.4    Confidentiality/Non-Disclosure.    Lender and Writer shall keep
confidential all matters relating to the Picture including, without limitation,
the script, the plot, or any elements thereof, any set design, props and
effects, activities of the cast and crew, and Company's business and
production activities. Neither Writer nor Lender shall disclose or disseminate
any material written or prepared by Writer under this Agreement to any
person or entity other than the individuals authorized to accept delivery
under Paragraph 3.4 above.

10.5    Dispute Resolution.    All claims, controversies or disputes arising out
of, in connection with, or relating to this Agreement, the performance or
breach thereof or default under this Agreement, whether based on contract,
tort or statute, including, without limitation, any claim that this Agreement
was induced by fraud ("Covered Claims"), shall be resolved by binding
arbitration in Los Angeles, California, in accordance with Exhibit "ARB" and
the Rider thereto, both of which are attached hereto and incorporated herein
by this reference.

10.6    Cross Breach.    Any breach of this Agreement by Lender and/or
Writer shall be deemed, at Company's sole election, a breach of any other
agreement between Lender and/or Writer and Company relating to the
Picture. A breach by Lender and/or Writer of such other agreement may be
deemed, in Company's sole election, a breach of this Agreement. The failure
by Company and Lender and/or Writer to consummate any agreement for
Writer's other services in connection with the Picture shall not in any way
affect Company's ownership of the results and proceeds of Writer's services
under this Agreement.

10.7    No Duplication of Benefits.    For the avoidance of doubt, there shall
be no duplication of the rights or benefits provided under this Agreement
(e.g., invitations to premieres, DVDs, transportation, travel expenses and
other perquisites), and those provided under any other agreement between
Company and Lender and/or Writer in connection with the Picture.

10.8    Annotation Guide.    To the extent any material written under this
Agreement is based in whole or in part on any actual individual, whether
living or dead, or on any "real life" incident, Writer shall annotate the
material written under this Agreement in accordance with the guidelines
provided in Exhibit "AG" Annotation Guide attached hereto and incorporated
herein by this reference and shall provide such annotations concurrently with

12

SINGER · EXECUTION COPY · Writer · Main Agreement · TOP GUN 2 (2011) · Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

PPC-GRAY-0000185

Writer's delivery of material to Company. Writer shall also accurately provide such other information as may be reasonably required by Company for the purpose of permitting Company to evaluate the utilization of the materials supplied by Writer.

//
//

[Remainder of page intentionally blank. Signature page follows.]

13

CONFIDENTIAL

PPC-GRAY-0000186

IN WITNESS WHEREOF, the parties hereto have signed and delivered this Agreement as of the date first above written.

PARAMOUNT PICTURES CORPORATION

By: _____

Title: _____
Karen Magid
Executive Vice President

ACCEPTED AND AGREED TO, including, without limitation, Exhibit "ARB":

BULLSH!T ARTISTS, INC.,
a California corporation

By: _____

Title: _____President_____

By countersigning this Agreement, Writer confirms all grants made by Lender and agrees to perform the services herein provided for in accordance with the terms hereof, and Writer will look solely to Lender for any and all compensation under this Agreement.

_____
ERIC WARREN SINGER

14

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ] docx

CONFIDENTIAL

PPC-GRAY-0000187

## CERTIFICATE OF AUTHORSHIP

### "TOP GUN 2"

I hereby certify that I am writing (or collaborating in the writing of) the Work (as defined below) as an employee of BULLSH!T ARTISTS, INC., a California corporation ("Lender"), pursuant to a valid employment agreement ("Employment Agreement") with Lender and an agreement between Lender and PARAMOUNT PICTURES CORPORATION ("Company"), dated as of June 6, 2017 ("Agreement"), pursuant to which Lender has loaned my services to Company in connection with the proposed feature-length theatrical motion picture now entitled "TOP GUN 2" ("Picture"), in performance of my duties under the Agreement and in the regular course of my employment; that any and all literary or other materials, works, writings and ideas written, submitted, furnished and/or contributed by me pursuant to the Employment Agreement with Lender in connection with the Picture and/or the Agreement and all other results and proceeds of my services under the Agreement, together with all other materials of every kind whatsoever created by me at any time relating to the Picture (collectively, "Work") were created by me as a "work made for hire" and thereafter assigned to Company with Company as the sole author of the Work and the owner of all rights of every kind or nature in and to the Work (including, but not limited to, all copyrights and all extensions and renewals of copyrights, and the right to make such changes in the Work and such uses thereof as Company may determine as such author and owner), throughout the universe (including France) in perpetuity.

IN WITNESS WHEREOF, I have hereto set my hand this 6th day of June, 2017.

_____
ERIC WARREN SINGER

The undersigned confirms that it has assigned and by these presents does hereby assign to PARAMOUNT PICTURES CORPORATION all rights without reservation in and to all work made for hire heretofore and hereafter written by ERIC WARREN SINGER pursuant to the aforesaid Employment Agreement as the employee for hire of the undersigned.

BULLSH!T ARTISTS, INC.

By: _____
Its Authorized Signatory

1

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 | MPL-010577 v 4.0 1.docx

CONFIDENTIAL

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
COUNTY OF _Los Angeles_ )

On _8/14/17_ , 20 1? before me, _Sumner L. Schooler_ , a Notary Public, personally appeared _Eric Singer_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SUMNER L. SCHOOLER
Commission # 2080614
Notary Public - California
Los Angeles County
My Comm. Expires Oct 2, 2015

_Signature_
Signature of Notary Public

Place Notary Seal Above

---

### OPTIONAL

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document:**

Title or Type of Document: _Certificate of Authorship_

Document Date: _____     Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed By Signer(s):** _____

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| Individual | Individual |
| Corporate Officer(s) -- Title(s): _____ | Corporate Officer(s) -- Title(s): _____ |
| Partner -- Limited  General | Partner -- Limited  General |
| Attorney-in-fact | Attorney-in-fact |
| Trustee | Trustee |
| Guardian or Conservator | Guardian or Conservator |
| Other: _____ | Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

2

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

SCHEDULE "S"

SCRIPT FORMATTING POLICY

1.    **Submission**.  A hard copy and a digital copy (e.g., an Adobe [.pdf], Final Draft or Movie Magic file) of each draft of the screenplay shall be delivered to Company.

2.    **Page Limit**.  Screenplay drafts delivered to Company shall not exceed 130 pages in length.

3.    **Formatting Standards**.  All screenplay drafts delivered to Company shall conform to the following formatting standards:

- **Font**
  - Courier                          12 point

- **Page Layout**
  - Top Margin:                   1"
  - Bottom Margin:              1"

- **Action Format**
  - Left Margin:                   1.5"
  - Right End point:              7.5"
  - Single spaced

- **Dialogue Format**
  - Left Margin:                   2.5"
  - Right end point:              6"
  - Single spaced

- **Character Format**
  - Left Margin:                   3.5"
  - Right Margin:                  7.25"
  - Single spaced
  - One (1) blank space above the Character Name

- **Scene Heading Format**
  - Two (2) blank spaces above Scene Headings separating it from preceding action and dialogue.
  - One (1) blank space below scene headings separating them from the action or Character Names that follow.

1

CONFIDENTIAL                                                    PPC-GRAY-0000190

EXHIBIT "AG"

ANNOTATION GUIDE

For each script element, whether such element is an event, character, setting or section of dialogue within a scene, marginal notes should provide the following complete, true and accurate information:

1.     Whether the element presents or portrays:

    1.1    Fact, in which case the note should indicate whether the name of the person portrayed is real, whether (s)he is alive and whether (s)he has signed a release.

    1.2    Fiction, but a product of inference from fact; or

    1.3    Fiction, not based on fact.

2.     Source material for the element:

    2.1    Book; or

    2.2    Newspaper or magazine article; or

    2.3    Recorded interview; or

    2.4    Trial or deposition transcript; or

    2.5    Any other source or combination of the above.

When identifying the source material, include the name of the source (e.g., *The Los Angeles Times* article), page reference (if any) and date. To the extent possible, identify multiple sources for each element. Retain copies of all materials used in the creation of the script, preferably cross-indexed by reference to script page and scene numbers. Source coding may be useful to avoid repeated, lengthy references.

Descriptive annotation notes are especially helpful (i.e., the setting is a farm because Jack/Jill usually had meetings at a farm – *The Los Angeles Times*; page 8, January 11, 1985).

1

CONFIDENTIAL                                                                 PPC-GRAY-0000191

## RIDER TO EXHIBIT "ARB"

This Rider to Exhibit "ARB" is attached to and made part of the Agreement dated as of June 6, 2017, between PARAMOUNT PICTURES CORPORATION and BULLSH!T ARTISTS, INC. for the services of ERIC WARREN SINGER in connection with the motion picture project currently entitled "TOP GUN 2".

1.    Exhibit "ARB" shall be subject to the terms of the WGA Basic Agreement.

2.    Paragraph 1.3: In line 4, delete "ten (10) days", and replace it with: "ten (10) business days".

3.    Paragraph 1.4: In line 1, delete "ten (10) days", and replace it with: "ten (10) business days".

4.    Paragraph 2.1: Delete the current sentence, and replace it with: "Up to three (3) depositions may be taken by each party to the arbitration."

5.    Paragraph 2.2: In the second sentence after the word "films," add: "or the calculations"; and delete "this Agreement" and replace it with: "the arbitration".

6.    Paragraph 2.3: Delete the current sentence, and replace it with: "Up to ten (10) interrogatories (inclusive of any subparts) may be propounded by each party to the arbitration."

7.    Paragraph 3: In line 3, between "claim" and ", in whole", add: "or defense".

8.    Paragraph 6: In line 3, delete "directly".

9.    Paragraph 8.2: The words "reasonable outside" are inserted after the word "award" and before the word "attorney's" in the penultimate line.

10.   Paragraph 11: The words "or as required by law" are inserted at the end of the first sentence following the word "advisors".

* * *

1

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 | MPL-010577 v 4.0 ].docx

CONFIDENTIAL

## EXHIBIT "ARB"

## ARBITRATION PROVISION

1.    Commencement of Arbitration.

1.1.    Arbitration Procedure.    Except as otherwise provided herein, the arbitrators shall administer the arbitration proceedings in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS then in effect.  If any conflict exists between the procedures set forth herein and the Rules of JAMS, the procedures set forth herein shall be followed.

1.2.    Notice of Arbitration.  The initiating party must serve a written notice of intention to arbitrate (the "Notice of Arbitration") on the respondent, and shall file a copy with the Los Angeles office of JAMS, along with any required fee.

1.3.    Selection of Arbitrator.  Within fifteen (15) days of service of the Notice of Arbitration on the respondent, the parties shall jointly select three (3) neutral arbitrators.  In the event of a deadlock within the allotted time, each of the parties shall select one arbitrator and, within ten (10) days of their appointment, the two party-appointed arbitrators shall appoint a third arbitrator, who shall be the chair. If the party-appointed arbitrators are unable or fail to agree on the third arbitrator within the allotted time, the third arbitrator shall be appointed by JAMS in accordance with its rules. No person may serve as an arbitrator unless he or she is either a retired state or federal judge, or a practicing lawyer with at least twenty (20) years of experience, including at least ten (10) years of experience in entertainment law.  The Covered Claim(s) shall be heard by all three (3) arbitrators (the "Arbitrators"), and all procedural matters and the final decision and award shall be decided by a majority of them.

1.4.    Arbitration Schedule.  Within ten (10) days of the selection of the Arbitrators, the Arbitrators shall confer with the parties to set the arbitration schedule.  Except for good cause, the arbitration hearing shall be within ninety (90) days of the selection of the Arbitrators.

2.    Discovery.    Discovery will be handled expeditiously, according to the following terms and conditions:

2.1.    Depositions. Depositions shall not be taken by any party.

1

CONFIDENTIAL                                                                                                          PPC-GRAY-0000193

2.2.  Documents.  Each party shall be entitled to limited document discovery.  Only documents that are directly relevant to the disputed issues and refer or relate directly to the film or films which are the subject of this Agreement may be requested.  Any document request shall be narrowly tailored to cause the least possible expense, burden, disclosure of confidential information and inconvenience to the parties on which they are served.  If financial data is sought, only documents sufficient to establish the contested issue shall be required to be produced.  The schedule for propounding and responding to document requests shall be determined by the Arbitrators.  Should disagreement arise with respect to the scope of any document request, the Arbitrators shall resolve such disagreement, in conformity with this Agreement.

2.3.  Written Interrogatories.  The parties agree that no interrogatories shall be propounded by any party.

2.4.  Requests for Admission.  The parties agree that no requests for admission shall be propounded by any party.

2.5.  Subpoenas.  The parties agree that the Arbitrators shall, to the fullest extent permitted by law, have the power to issue subpoenas to third parties to compel testimony at the arbitration hearing or the production of documents prior to or at the arbitration hearing, subject to the same limitations on document discovery set forth in Section 2.2 hereof.

3.  Dispositive Motions.  The Arbitrators shall have the discretion to hear and determine at any time prior to the arbitration hearing any issue of law asserted by any party to be dispositive of any claim, in whole or in part, in accordance with such procedure as the Arbitrators may deem appropriate.

4.  Hearing Memoranda.  Pre-hearing memoranda shall be permitted at the discretion of the Arbitrators.  Each party shall be permitted to submit a post-hearing memorandum within fifteen (15) days following the completion of the arbitration hearing.  Rebuttal memoranda, if any, shall be submitted twenty-one (21) days following the completion of the arbitration hearing.

5.  Witness Lists.  Ten (10) days before the arbitration hearing, each party shall serve a witness list identifying the name, address, occupation, work experience, and relationship to the party, if any, of each witness on its direct case and describing the subject matter and substance of that witness's anticipated testimony.

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                                                      PPC-GRAY-0000194

6.    <u>Arbitration Hearing</u>. During the arbitration hearing, the Arbitrators shall hear the oral testimony and cross-examination of each party's witnesses. Rebuttal witnesses may be heard to directly refute the testimony of any such witness. A full stenographic record shall be taken of these proceedings, and the Federal Rules of Evidence shall apply.

7.    <u>Governing Law</u>. The Arbitrators' decision shall be made pursuant to the substantive law of the State of California without regard to its choice of law rules.

8.    <u>Written Decision and Award</u>. The Arbitrators shall issue a written decision and award (the "Decision and Award") within forty-five (45) days of the submission of the final, post-hearing memoranda. This Decision and Award shall be signed and dated by the Arbitrators and shall set forth the Arbitrators' reasoning in support of each issue necessary to their decision.

    8.1.   <u>Remedies</u>. Except as expressly limited herein, the Arbitrators shall have the power to grant any remedy or relief they deem just and equitable, including, but not limited to, injunctive relief, whether interim and/or final, and any provisional measures ordered by the Arbitrators may be specifically enforced by any court of competent jurisdiction. Notwithstanding the foregoing, the Arbitrators shall not have the power to award punitive or exemplary damages of any kind, and any limitation on the availability of injunctive relief contained in this Agreement shall be binding on the Arbitrators.

    8.2.   <u>Fees, Costs and Attorneys' Fees</u>. All fees and costs relating to the Arbitrators will be paid by the parties in equal shares, except that the Arbitrators may award such fees and costs to the prevailing party. Each party's attorneys' fees and costs shall be borne by that party, except that if the Arbitrators determine a party's position on the Covered Claim(s) to be without substantial justification, they shall award attorneys' fees and costs to the other party.

    8.3.   <u>Final and Binding</u>. The parties agree that the Decision and Award shall be final and binding.

9.    <u>Enforcement of Arbitrators' Award</u>. Following the issuance of the Arbitrators' Decision and Award, either party may petition any court of competent jurisdiction in the County of Los Angeles to confirm the Decision and Award.

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

PPC-GRAY-0000195

10.  <u>Arbitration Appeal Procedure</u>.  By executing this Exhibit ARB, the parties hereby agree that any arbitration conducted hereunder shall be governed by and subject to JAMS Optional Arbitration Appeal Procedure.

11.  <u>Confidentiality</u>.  All aspects of the arbitration proceedings, including, but not limited to, any testimony, all documents, and the culminating Decision and Award, shall be completely confidential, except that confidential information may be disclosed, as necessary, to the parties' legal counsel and financial or tax advisors.  For purposes of any judicial proceedings on the Decision and Award, including, without limitation, confirmation proceedings, the parties stipulate and agree to request a court order or orders requiring that all records of the arbitration proceedings, including, without limitation, the Decision and Award and all court filings disclosing any aspect of the arbitration proceedings ("Confidential Records"), be filed under seal.  Pending a ruling on any such request, the parties agree to file all Confidential Records conditionally under seal.

* * *

4

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL

PPC-GRAY-0000196

RIDER TO SCHEDULE "I"

ADDITIONAL TERMS AND CONDITIONS (LOANOUT)

Attached to the Memorandum of Agreement dated as of June 6, 2017 (the "Agreement"), between PARAMOUNT PICTURES CORPORATION ("Company") and BULLSH!T ARTISTS, INC. ("Lender") for the writing services of ERIC WARREN SINGER ("Writer") relating to the motion picture currently entitled "TOP GUN 2" ("Picture").

In the event of any inconsistency between the provisions of Schedule "I" Additional Terms and Conditions ("Additional Terms") or the Rider thereto and the provisions of the Agreement to which the Additional Terms are attached, the provisions of the Agreement shall control.



1

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4 0 ].docx

CONFIDENTIAL



2

CONFIDENTIAL

PPC-GRAY-0000198



Paragraph G (Ownership; Representations and Warranties; Further Documents):

Paragraph G shall be subject to Article 28 of the WGA Agreement.

In the first sentence of subparagraph (ii), after the phrase "original with Writer," insert: "other than incidental material in the public domain."

In the first sentence of subparagraph (ii), after the phrase "shall not infringe upon the copyright or," insert: "to the best of Writer's knowledge after the exercise of reasonable prudence and due diligence,".

Notwithstanding anything to the contrary contained in Paragraph G, Writer and Lender make no warranty with respect to any material not furnished by Writer or Lender to Company.

In the first sentence of subparagraph (iii), insert the words "consistent herewith" after the word "instruments" and before the words "in form."

At the beginning of the second sentence of subparagraph (iii), insert: "Company shall first request that Lender and Writer execute and deliver such documents, but if Lender and/or Writer do not execute and deliver the same to Company within five (5) business days (or three (3) business days in cases of exigent circumstances) after Company's request for such documents,".

At the end of the subparagraph (iii), add: "Upon Lender's and/or Writer's request therefor, Company shall provide Writer with a copy of any document executed by Company pursuant to this power of attorney, provided that any failure by Company to provide such copy(ies) shall not be deemed a breach hereunder or affect the validity of such document."

3

CONFIDENTIAL                    PPC-GRAY-0000199



4

CONFIDENTIAL

PPC-GRAY-0000200



5

CONFIDENTIAL

PPC-GRAY-0000201



6

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL



7

CONFIDENTIAL



\* \* \*

8

SINGER - EXECUTION COPY - Writer · Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                                PPC-GRAY-0000204

## SCHEDULE "1"

## ADDITIONAL TERMS AND CONDITIONS (LOANOUT)

Attached to the Memorandum of Agreement dated as of June 6, 2017 (the "Agreement"), between PARAMOUNT PICTURES CORPORATION ("Company") and BULLSH!T ARTISTS, INC. ("Lender") for the writing services of ERIC WARREN SINGER ("Writer") relating to the motion picture project currently entitled "TOP GUN 2" (the "Picture").

A.    Work. The material to be delivered to Company under the Agreement shall be suitable for reproduction as a motion picture of feature length, the photographing of which sound, including spoken words, dialogue, songs and music, may be synchronously recorded by any electrical, digital or mechanical means that may be employed therefor.  Writer's services shall be rendered for and as directed by Company at its studios in Hollywood, California, and at such other places and on such locations as Company may from time to time designate.

B.    Employment. Lender hereby accepts said employment and agrees that Writer shall be exclusive to the extent provided in the Agreement; and that Writer will devote Writer's best time, attention, talents and abilities to the service of Company pursuant to the Agreement; and Writer will comply with all written and/or oral instructions given to Writer by Company.  Lender warrants Lender is free to enter into the Agreement and not subject to any conflicting obligations or any disability which will or might prevent or interfere with the execution and performance of the Agreement by Lender and Writer.

C.    Delivery. The material, as delivered to Company, shall be full and complete in substance and in form and shall conform to the requirements of the Agreement. Lender shall cause Writer to execute and deliver to Company a certificate in the form attached to the Agreement prior to commencement of services under the Agreement and, if requested by Company, with respect to each delivery of material thereafter.  No submission or purported delivery to Company of any material shall be deemed an actual delivery under the Agreement unless and until said material shall fully comply with the foregoing provisions.  Should Writer fail for any reason whatsoever to complete and deliver any material within the time and in the manner herein specified, Company may, at its election, either:  (i)  terminate and cancel in its entirety, Lender's engagement to furnish Writer's services under the Agreement, in which event Company shall be released and discharged of and from all further obligations to Lender and Writer under the Agreement or otherwise, including but not limited to the obligation to make any further payments to Lender, and Lender shall thereupon be obligated to repay and shall repay to Company the

1

CONFIDENTIAL                                                                      PPC-GRAY-0000205

gross amount of all sums that have previously been paid to Lender under the provisions of the Agreement; or (ii) specify a new date on or before which Writer shall complete and deliver such material to Company.

Should Writer fail for any reason whatsoever to complete and deliver such material on or before any such new date, Company shall again have the same election as hereinabove provided and may repeat such election either until Company shall have elected to terminate Writer's services under the Agreement as aforesaid or until Writer shall have completed and delivered such material to Company. Time is of the essence in the performance of the Agreement by Lender and Writer.

D.   Payments.   All payments to be made to Lender under the Agreement are subject to the full and faithful performance and observance by Lender and Writer of Writer's services and the other obligations of Lender and Writer under the Agreement. With respect to each payment to be made by Company to Lender under the Agreement, it is expressly understood and agreed that should Company for any reason whatever fail to make such payment as herein provided, then Company shall not be deemed in default under the Agreement unless and until following such failure Lender shall have given Company written notice demanding such payment and Company shall have failed to make such payment within five (5) business days after Company's receipt of said notice. In any event Company's liability for any such default and Lender's and Writer's rights and remedies therefor shall be limited to the recovery of money only, not exceeding the amount of such payment, and in no event shall any of the rights acquired or to be acquired by Company under the Agreement be affected or impaired. Lender hereby authorizes Company to deduct and withhold from any payments under the Agreement any telephone, restaurant or other fixed amounts owed to Company by Lender and/or Writer.

E.   No Obligation To Use.   Failure of Company to actually utilize the services of Writer, in whole or in part, shall not be deemed a breach of the Agreement by Company, and in any such event neither Writer nor Lender shall be entitled to any damages by reason thereof; provided, however, that if Lender and Writer shall fully and faithfully perform and observe all the terms and conditions of the Agreement, such failure shall not relieve Company of its obligation to pay Lender compensation as provided in the Agreement, subject, however, to any other provisions of the Agreement relieving Company of its obligation to pay compensation under the Agreement. Without limiting the foregoing, it is understood that Company shall have the unqualified right at all times to engage further writer(s) to work on the material delivered under the Agreement and/or the assigned material upon which said material is based.

SINGER · EXECUTION COPY · Writer · Main Agreement · TOP GUN 2 (2011) · Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                        PPC-GRAY-0000206

F.    Transportation and Expenses.    If not specifically provided for in the Agreement, whenever Writer is required by Company to travel to an overnight location away from any place where Writer maintains a residence to perform services under the Agreement, Company agrees to provide Writer with reasonable transportation and to furnish and pay for the reasonable lodging and reasonable living expenses of Writer. Any specified living allowance or reimbursement paid under the Agreement may be withheld upon and reported by Company to the IRS if it is required by law.

G.    Ownership; Representations and Warranties; Further Documents.

(i)    Lender and Writer agree and warrant that all results and proceeds of every kind of the services heretofore and hereafter rendered by Writer in connection with the Picture, including without limitation any and all literary and other materials and all ideas, themes, stories, plots, characterizations, dialogue, lyrics, music, illustrations, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter written, conceived, submitted, and/or contributed by Writer and/or Lender pursuant to Writer's employment agreement with Lender in connection with the Picture and/or pursuant to the Agreement, or otherwise if relating to the Picture, (collectively "Material"), either alone or in collaboration with others, shall be encompassed within the provisions of the Agreement and are and shall be a "work made for hire" within the meaning of the copyright laws of the United States or any similar or analogous law or statute of any other jurisdiction. If, or to the extent for any reason in any country, any or all such Material is not recognized to be a "work made for hire," then Lender and Writer hereby irrevocably and absolutely assign to Company all of Lender's and Writer's respective rights in the Material, whether copyrights or otherwise and whether now or hereafter known, and including all renewals and extensions of such rights as may now or hereafter exist, and accordingly for this purpose Company shall be deemed the author of the Material and the sole and exclusive owner of the Material and all rights therein for all purposes, in all media and by all means now or hereafter known or devised, throughout the universe in perpetuity. Company, as author, shall own the copyright in the Material forever with the right to make such changes therein and such uses thereof, including, but not limited to derivative works, as Company may determine as author, and Writer hereby waives the "moral rights" of authors as said term is commonly understood throughout the world. For the avoidance of doubt, it is the intention of the parties that any and all illustrations, lyrics and/or music as may be submitted by Writer for and/or in conjunction with the Picture shall be deemed submitted separately from the screenplay even if physical delivery is made via insertion in the screenplay.

3

CONFIDENTIAL                                                                PPC-GRAY-0000207

(ii)    The Material shall be solely written by Writer and shall be wholly original with Writer and shall not infringe upon the copyright or violate the right of privacy of or constitute a libel or slander against or violate any common law rights or any other rights of any person or entity. The same agreements and warranties are made by Lender and Writer with reference to any and all Material of any kind which Writer may add to or interpolate in any material assigned to Writer by Company, but are not made with respect to violations or infringements contained in the material so assigned to Writer by Company, unless such assigned material is written or conceived by Writer.

(iii)    Lender and Writer agree to execute and deliver to Company such assignment(s) of the Material and/or rights therein and such other instruments in form reasonably satisfactory to Company as may be necessary for Company to confirm Company's ownership of the results and proceeds of Writer's services pursuant to the Agreement. Lender and Writer each hereby appoint Company, or its nominee, as Lender's and Writer's irrevocable attorney-in-fact, with the right, but not the obligation, to execute the same in Lender's and/or Writer's name, or obtain execution thereof by others, and record or register the same in the United States Copyright Office or elsewhere as Company sees fit.

H.    Publicity.  Lender hereby grants to Company the right to use the name of Writer in connection with the Material and the Picture and in advertising, exploiting and exhibiting the same. Company shall have the exclusive right to issue publicity concerning the Picture and Writer's engagement in connection with the Picture, and Lender and Writer shall not, without Company's prior written approval in each instance, issue or authorize the dissemination of any information or publicity relating to the Picture, Company, or Writer's engagement pursuant to the Agreement. Nothing contained in this paragraph shall be construed to prevent the use by Writer of Writer's name in connection with any literary material written by Writer in connection with any project outside of this engagement.

I.    Suspension and Termination.  Company shall have the right to suspend Writer's engagement and the payment of compensation under the Agreement during all periods that:  (i) Writer does not render services thereunder because of illness, physical or mental incapacity, default or similar matters; (ii) development and/or production of the Picture is prevented or interrupted because of an event of force majeure or any other event which prevents or interferes with the development and/or production of the Picture or interferes with Company's normal business operations, including without limitation any labor dispute, strike, fire, war or governmental action, or any disruptive event beyond Company's control; or

4

CONFIDENTIAL                                                                                    PPC-GRAY-0000208

(iii) production of the Picture is prevented, interrupted or delayed by reason of the death, illness or incapacity of a principal member of the cast, the director or the director of photography, except that suspension under this Subdivision (iii) shall not exceed two (2) continuous weeks in connection with such interruption. Unless the Agreement is terminated, the period of the parties' obligations provided for in the Agreement shall be deemed extended by a period equivalent to all such periods of suspension, plus, in an event of force majeure, an additional period of four (4) weeks to enable Company to commence or recommence development or production of the Picture or to resume Company's normal business operations. If any matter referred to in Subdivision (i) above, other than default, continues for longer than seven (7) consecutive days or for an aggregate of ten (10) days, or if any matter referred to in Subdivision (ii) above continues for more than eight (8) consecutive weeks (or has an impact that, at the time of onset, can reasonably be expected to continue for not less than eight [8] consecutive weeks), or if any matter referred to in Subdivision (iii) above continues for more than two (2) weeks (or has an impact that, at the time of onset, can reasonably be expected to continue for not less than two [2] weeks), or in the event of any material default on the part of Writer, Company may terminate Writer's services under the Agreement. If Lender does not receive compensation for the maximum suspension periods under Subdivisions (ii) and (iii) above, Lender may terminate Writer's services under the Agreement unless compensation is resumed within one (1) week after Lender gives Company written notice requiring such resumption. If Writer's services under the Agreement are terminated prior to Writer's delivery to Company of any writing step on which Writer is then working, Lender shall immediately deliver to Company all of the writing for the Picture by Writer then completed or in progress at whatever stage of completion it may be and all other Picture-related materials in Writer's possession. The provisions of this paragraph are in addition to and not exclusive of or in limitation of any other rights and remedies of Company under the Agreement or at law or in equity.

During any period of suspension due to incapacity or default, Writer shall not render any services in the entertainment industry for others or on Lender's or Writer's own behalf. During any suspension due to an event of force majeure, Lender may furnish Writer's services to any other person or entity or cause Writer to render services on Lender's or Writer's own behalf; provided, that Company shall have the right to recall Writer to render services under the Agreement, and Lender shall cause Writer to resume rendering services to Company on two (2) days oral or written notice.

J.     Remedies. Writer and Lender hereby expressly agree that in the event of any breach of the Agreement by Company, Writer's and Lender's remedy, if any, shall be limited to an action at law for actual damages, if any, and in no event shall Writer or Lender be entitled to terminate the Agreement or to seek to enjoin the

SINGER · EXECUTION COPY · Writer · Main Agreement · TOP GUN 2 (2011) · Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL                                                                                          PPC-GRAY-0000209

exploitation of the rights granted herein (including but not limited to the exhibition, distribution, advertising, and promotion of works created pursuant to the Agreement) or to any other equitable relief. No waiver by either party of any breach hereof shall be deemed a waiver of any prior or subsequent breach hereof. Company shall not be liable for any breach of the Agreement unless it has received written notice from Lender of such breach and has not, within a reasonable time after receipt of such notice, cured such breach. All remedies shall be cumulative, and the pursuit of one remedy shall not be deemed a waiver of any other remedy. In no event shall either party be liable for any special, incidental, consequential, exemplary or punitive damages, or any claim for loss of profits, lost business or lost business opportunities, even if the other party has been advised of the possibility of such damages.

K.      Credit.  During the term of the current Writer's Guild of America – Alliance of Motion Picture and Television Producers Theatrical and Television Basic Agreement ("WGA Agreement"), as it now is or as it may hereafter be amended, modified or extended, and during the term of any new contract which may hereafter be entered into between Company and the WGA, the provisions of Schedule A of the WGA Agreement or the then current provisions, if any, for credits set forth in any amendment, modification or extension of the WGA Agreement or in any such new contract, shall govern the determination of such credits, if any, as Company shall accord Writer under the Agreement in connection with feature length motion pictures. If contingent or other compensation of any kind payable under the Agreement is conditioned upon Writer's entitlement to a particular credit, the following shall be applicable: (i) If Writer receives such credit as the result of a unanimous agreement among the participating writers pursuant to Paragraph 7 of Schedule A of the aforesaid WGA Agreement, such credit shall not govern for the purpose of determining whether such contingent or other compensation based on credit shall be payable; but the determination as to whether such contingent or other compensation based on credit shall be payable shall be determined solely on the basis of Writer's contribution to the final screenplay; (ii) If Writer receives such credit as a result of either (x) Writer being designated for such credit in the notice of tentative credits, which tentative credits become final within the time period specified in the WGA Agreement, or (y) a WGA determination through its arbitration committee, then, in either such event, such contingent or other compensation based on credit shall be payable under the Agreement.    Subject to the foregoing, Company shall determine the size and placement of Writer's credit in its sole election. No inadvertent failure to comply with any provisions of this paragraph shall be deemed a breach of the Agreement by Company. Writer and Lender hereby expressly recognize that in the event of a failure or omission constituting a breach of the provisions of this paragraph, the damage, if any, caused Writer or Lender thereby is not irreparable or sufficient to entitle Writer or Lender to injunctive or other equitable relief. Consequently,

6

CONFIDENTIAL

PPC-GRAY-0000210

Writer's and Lender's rights and remedies in the event of such breach shall be limited to their rights, if any, to recover damages in an action at law.

L.    Indemnity.

(i)    Lender and Writer hereby agree to indemnify and hold harmless Company, its successors, licensees, officers, directors, employees, and assigns (each an "Indemnified Party") from and against any losses, damages, costs, charges, reasonable attorneys' fees, recoveries, actions, judgments, penalties, expenses, and any other loss ("Losses") that may be obtained against, imposed upon, or suffered by Company or any other Indemnified Party, arising out of any claim or action which if true would constitute a breach of Lender's and/or Writer's representations, warranties, and/or agreements under the Agreement or tortious conduct by Lender and/or Writer ("Claim"). If any Claim is asserted or filed by a third party against any Indemnified Party, Company shall give Lender and Writer prompt written notice thereof, and Company may, at Lender's expense, defend against any such Claim with counsel selected and retained by Company. Company may compromise or settle such Claim upon such terms that Company may deem reasonable.

(ii)    Except to the extent that Lender and/or Writer are in material breach hereunder (and such breach contributed to the event in question) or have tortiously contributed in an intentional or grossly negligent manner to the event in question, Company shall indemnify and hold harmless Lender and Writer against any liability, costs and/or damages which Lender and/or Writer may incur in connection with any claim or action or liability arising out of the development, production, distribution, release and/or ancillary and subsidiary exploitation of the Picture or any element thereof and shall provide Lender and Writer with a defense, subject to subparagraph (iii) below.

(iii)    The indemnified party shall cooperate fully with the indemnifying party. Notwithstanding the foregoing, Lender and Writer hereby agree to fully cooperate with Company in defending against any claim brought against the Picture. If Lender and Writer fail to so cooperate, Lender and Writer shall indemnify Company and/or any Indemnified Party from and against any Losses that may be obtained against, imposed upon, or suffered by Company or any other Indemnified Party, arising out of such Claim.

(iv)    Lender and Writer shall be covered under Company's policies of errors and omissions insurance and general liability insurance for the Picture,

7

CONFIDENTIAL                                                    PPC-GRAY-0000211

subject to all the terms and conditions thereof including without limitation the exclusions and limitations set forth in such policies.

M.   Severability.  Nothing contained in the Agreement shall be construed so as to require the commission of any act contrary to law, and the parties acknowledge that the Agreement is subject to applicable provisions of Federal, State, and local laws and governmental regulations and the provisions of any collective bargaining agreement affecting the rights and/or services of Writer under the Agreement and that the provisions thereof shall supersede the provisions of the Agreement to the extent that they are inconsistent therewith, but in such event any provision of the Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within such requirements.

N.   Services Unique.  It is mutually understood and agreed that Writer's services are special, unique, unusual, extraordinary and of an intellectual character, giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that in the event of any breach by Lender or Writer, Company shall be entitled to equitable relief by way of injunction or otherwise.

O.   Guild Membership.

    (i)   Lender agrees that Writer is now (or, if not, then forthwith upon the execution hereof Writer will become) a member in good standing of the WGA, and that during the entire term of the Agreement during such period or periods as it may be lawful for Company to require Writer so to do, Writer will remain or become and remain a member in good standing of the properly designated labor organization or organizations (as defined and determined under the applicable law) representing persons performing services of the type and character that are required to be performed by Writer under the Agreement.

    (ii)   If Writer should cease to be a member in good standing of such guild or organization by reason of failure to pay any dues or assessments, and if Writer should fail to pay such dues or assessments and such failure to pay shall not be cured within five (5) days after written notice from such guild or organization, Company shall have the right, at its election, to deduct the amount thereof from any compensation then or thereafter payable to Lender under the Agreement and to pay such amount to such guild or organization on behalf of Writer.  Company shall be entitled to rely upon any facts, figures and other information furnished by such guild or organization with respect to any such failure or default on the part of Writer and shall not be liable to Lender or Writer for any payment or overpayment to such guild or

8

CONFIDENTIAL                                                                 PPC-GRAY-0000212

organization based upon such facts, figures or other information, nor shall Company be under any obligation to take any steps whatever to reclaim or recover such payment or overpayment from such guild or organization. Nothing herein contained, however, shall be construed to prevent Writer from taking any such steps on Writer's own behalf.

P.   Assignment.  The Agreement, at the election of Company, shall also inure to the benefit of Company's successors, assigns, licensees, grantees and associated, affiliated and subsidiary companies, and Lender agrees that Company and any subsequent assign may freely assign the Agreement and grant its rights under the Agreement, in whole or in part, to any person or entity.

Q.   Governmental Limitations.  If the compensation provided by the Agreement shall exceed the amount permitted by any present or future law or governmental order or regulation, such stated compensation shall be reduced while such limitation is in effect to the amount that is so permitted; and the payment of such reduced compensation shall be deemed to constitute full performance by Company of its obligations under the Agreement with respect to compensation for such period.

R.   Notices.  In the event that the last day on which the parties hereto are empowered to give notice pursuant to any provision of the Agreement or to perform any other act which the parties are required or may desire to perform under or in connection with the Agreement, should fall on a Saturday, Sunday, national holiday, the period between Christmas and New Year's Day, or other day on which either party is closed for business ("Closed Day(s)"), then, in that event, the parties shall have until the end of the first full business day following such Closed Day(s) within which to give such notice or to perform such act. If any date established by any notice for the commencement of any period or the performance of any other act shall fall on a Closed Day, then such commencement date for such period or such date for the performance of any such act shall be extended until the close of the first full business day following such Closed Day(s).

S.   Entire Agreement; Modifications; Contract Interpretation.  The Agreement contains the entire agreement between the parties with reference to the subject matter of the Agreement, supersedes all prior agreements and understandings, whether written or oral, pertaining to such subject matter, and may not be modified or amended unless by a written instrument executed by each of the parties hereto. Lender and Writer acknowledge that no representation or promise not expressly contained in the Agreement (including the attachments) has been made by Company or any of its agents, employees or representatives. The Agreement shall be deemed to have been drafted by all the parties hereto, since all parties were assisted by their counsel in reviewing and agreeing thereto, and no

9

CONFIDENTIAL

PPC-GRAY-0000213

ambiguity shall be resolved against any party by virtue of its participation in the drafting of the Agreement. Paragraph headings are for convenience only and shall not be given any legal effect. The Agreement may be signed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

T.    **APPLICABLE LAW. THE AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE IN AND WHOLLY TO BE PERFORMED IN THAT JURISDICTION, AND THE PARTIES HERETO SUBMIT AND CONSENT TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA IN ANY ACTION BROUGHT TO ENFORCE (OR OTHERWISE RELATING TO) THE AGREEMENT.**

U.    Fringe Benefits.    To the extent required by Section 17.A. of the WGA Agreement, Company agrees to pay on behalf of Lender directly to the proper authority concerned all applicable WGA union pension and health fund contributions; provided, however, in no event shall the aggregate amount of such payments exceed the total of all similar payments which Company would be required to make had Company employed Writer directly. Any such payments will be treated by Company for United States Federal, State and local tax purposes as additional income paid by Company to Lender and as if Lender had made such payment to the proper authority concerned.

V.    Corporate Representations and Warranties.    Lender represents and warrants that Lender is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing in good standing under the laws of Lender's state or country of incorporation; that Lender is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Writer; that Writer is under an exclusive written contract of employment with Lender for a term extending at least until the completion of all services required of Writer under the Agreement, which contract gives Lender the right to direct the Writer as to when and how Writer performs Writer's services, and to loan or furnish the services of Writer to Company, as herein provided; that, if Lender was incorporated outside the United States of America, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States as this term is defined in the Tax Treaty between the United States and the country of incorporation and will provide Company with a properly executed Form W-8BEN; and that it does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on behalf of Lender. Lender further acknowledges that the foregoing representations and warranties will be relied upon by Company for the purpose of determining whether or not it is necessary to make withholdings for United States Federal,

10

CONFIDENTIAL                                                                                                    PPC-GRAY-0000214

State or local taxes from monies being paid to Lender under the Agreement, and Lender agrees that if withholdings are not made from said payments, and if thereafter it is determined that such withholdings were legally required, Lender and Writer will indemnify Company against all loss, costs, damages and expenses relating thereto (including but not limited to penalties, interest, and reasonable attorneys fees and costs in the defense and disposition of such matters). Notwithstanding the foregoing, Company may make United States Federal, State or local tax withholdings if, in Company's good faith business judgment, it is required by law.

\* \* \*

11

CONFIDENTIAL                                                    PPC-GRAY-0000215

## RIDER TO EXHIBIT "DP"

This Rider to Exhibit "DP" is attached to and made part of the Memorandum of Agreement dated as of June 6, 2017, between PARAMOUNT PICTURES CORPORATION ("PPC") and BULLSHIT ARTISTS, INC. ("Participant") in connection with the motion picture project currently entitled "TOP GUN 2" (the "Picture").



1

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

CONFIDENTIAL



2

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

PPC-GRAY-0000217



3

CONFIDENTIAL



4

SINGER - EXECUTION COPY - Writer - Main Agreement - TOP GUN 2 (2011) - Jun 6, 2017 [ MPL-010577 v 4.0 ].docx

PPC-GRAY-0000219



5

CONFIDENTIAL

PPC-GRAY-0000220



\* \* \*

6

CONFIDENTIAL

## EXHIBIT "DP"

This Exhibit is attached to and made part of the Memorandum of Agreement dated as of June 6, 2017, between PARAMOUNT PICTURES CORPORATION (therein "Company" and herein "PPC") and BULLSHIT ARTISTS, INC. (therein "Lender" and herein "Participant"), relating to the motion picture project currently entitled "TOP GUN 2" (the "Picture").

1

CONFIDENTIAL                                                                                                       PPC-GRAY-0000222

EXHIBIT "DP"

EXHIBIT DP
1-6-2015

CONFIDENTIAL

EXHIBIT "DP"

TABLE OF CONTENTS

| | | | |
|---|---|---|---:|
| I. | | APPLICATION OF GROSS RECEIPTS | 6 |
| | A. | Fees | 6 |
| | B. | Expenses | 6 |
| | C. | Other Participations | 6 |
| | D. | Negative Cost | 6 |
| | E. | Deferments | 6 |
| | F. | Defined Proceeds | 7 |
| II. | | GROSS RECEIPTS | 7 |
| | A. | Gross Receipts Sources | 7 |
| | B. | Gross Receipts Exclusions | 7 |
| III. | | DISTRIBUTION FEES | 8 |
| | A. | Theatrical | 8 |
| | B. | Non-Theatrical | 9 |
| | C. | Free TV | 9 |
| | D. | All Other | 9 |
| | E. | Fee Computation | 9 |
| IV. | | DISTRIBUTION COSTS | 9 |
| | A. | Conversion | 9 |
| | B. | Checking | 9 |
| | C. | Collections | 10 |
| | D. | Licenses | 10 |

2

CONFIDENTIAL

PPC-GRAY-0000224

|      | E. | Taxes                                  | 10 |
|      | F. | Residuals                              | 10 |
|      | G. | Trade Dues                             | 11 |
|      | H. | Ad Costs                               | 11 |
|      | I. | Prints                                 | 11 |
|      | J. | Transportation                         | 12 |
|      | K. | Claims                                 | 12 |
|      | L. | Copyright, Trademark, and Patent Costs | 12 |
|      | M. | Other Versions                         | 12 |
|      | N. | Insurance                              | 12 |
|      | O. | General                                | 12 |
| V.   |    | NEGATIVE COST                          | 13 |
|      | A. | Cost of Production                     | 13 |
|      | B. | Administrative Charge                  | 13 |
|      | C. | Finance Charge                         | 14 |
|      | D. | Overbudget Add-On                      | 14 |
| VI.  |    | REPORTING                              | 14 |
|      | A. | General                                | 14 |
|      | B. | Books                                  | 15 |
|      | C. | Withholdings                           | 15 |
|      | D. | Statements                             | 15 |
|      | E. | Incontestability                       | 16 |
|      | F. | Address                                | 16 |

3

EXHIBIT DP
1-6-2015

PPC-GRAY-0000225

| | G. | Reserves | 16 |
| | H. | Tax Credits | 17 |
| | I. | Creditor - Debtor | 17 |
| VII. | | MISCELLANEOUS | 17 |
| | A. | No Representation | 17 |
| | B. | Control of Distribution and Marketing | 18 |
| | C. | Sale of All Rights | 18 |
| | D. | Assignment by Participant | 19 |
| | E. | Third Party Beneficiary | 20 |
| | F. | Headings | 20 |
| | G. | No Partnership/Joint Venture | 20 |
| | H. | Dispute Resolution | 20 |
| VIII. | | DEFINITIONS | 21 |
| | A. | Applicable Distribution Fees | 21 |
| | B. | Conversion | 22 |
| | C. | Film Rental | 22 |
| | D. | Gross Receipts | 22 |
| | E. | Here | 23 |
| | F. | Home Versions | 23 |
| | G. | Includes | 23 |
| | H. | Non-Theatrical Licensee | 23 |
| | I. | Or | 23 |
| | J. | Participant | 23 |

4

EXHIBIT DP
1-6-2015

PPC-GRAY-0000226

K.    Person                          23

L.    PPC                             24

M.    Restricted Funds                24

N.    Royalties                       25

O.    Subdistributor                  25

P.    Territory                       25

Q.    This Agreement                  25

SCHEDULE A                            26

5

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                    PPC-GRAY-0000227

I.    APPLICATION OF GROSS RECEIPTS.

Gross Receipts* shall be applied to the following categories on a continuing basis and in the following order of priority:

A.    Fees.

PPC distribution fees (set forth in Paragraph III below).

B.    Expenses.

PPC Distribution Costs (set forth in Paragraph IV below).

C.    Other Participations.

Contingent compensation and other amounts that PPC may be contractually obligated to pay to any Person, including Participant, for rights or services in connection with Picture and which are not included in the computation of the Negative Cost; provided, however, no sums payable as a share of Defined Proceeds shall be deductible under this Paragraph I.C. The amounts set forth in this Paragraph I.C shall be deductible pursuant to this Agreement if, when, and to the extent that PPC's obligation to pay it accrues, whether or not such payment has then become due or been made.

D.    Negative Cost.

Negative Cost (as set forth in Paragraph V below), provided that Interest (as set forth in Paragraph V.C) shall be recoupable before the Cost of Production (as set forth in Paragraph V.A) and Overhead (as set forth in Paragraph V.B).

E.    Deferments.

All amounts payable pursuant to a contract approved in writing by PPC to any Person entitled to such amounts payable out of first Defined Proceeds or immediately prior to there being such Defined Proceeds, unless there is a different order of payment specified under this Agreement.

* Capitalized terms used in this Exhibit "DP", which are defined in Paragraph VIII below and elsewhere, have the specific meaning given to them in this Exhibit "DP".

6

CONFIDENTIAL    PPC-GRAY-0000228

F.    Defined Proceeds.

"Defined Proceeds" pursuant to this Agreement shall mean the Gross Receipts, if any, remaining after deduction of the items specified in Paragraphs I.A through I.E inclusive.

II.   GROSS RECEIPTS.

A.    Gross Receipts Sources.

As used in this Exhibit "DP", Gross Receipts means all receipts received by PPC on behalf of the Picture as:

(1)    Film Rental.

(2)    Net amounts from Non-Theatrical Licensees.

(3)    Receipts from Flat Sale(s).

(4)    Receipts (less all costs) from copyright-infringement or similar claims.

(5)    Receipts from theatre box offices for so-called "four-wall" or "road show" exhibitions (as such terms are customarily understood in the motion picture industry), to the extent receipts from all such engagements taken as a whole exceed the costs incurred for all such engagements. (Ownership, operation, or control of a theater by PPC shall not be deemed a four-wall or road show exhibition.)

(6)    Subsidies or prizes, provided that if use of such amounts is a condition to receiving them, then such amounts are not included until actually used.

(7)    Royalties computed in accordance with Schedule A attached to this Exhibit "DP".

If the costs relating to Paragraphs II.A.(4) or (5) above, as applicable, and applicable distribution fees (if any) exceed receipts from Paragraphs II.A.(4) or (5)above, as applicable, such excess amount shall be deductible as a Distribution Cost.

B.    Gross Receipts Exclusions.

The following are specifically excluded from Gross Receipts:

7

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                     PPC-GRAY-0000229

(1)    Box office receipts, concession receipts, entrance or ride receipts, and any other receipts of any theatre or other exhibitor (except as specified in Paragraph I.A.(5) of this Exhibit "DP") or any amusement/theme park; and receipts of: broadcasters and other transmitters, including radio and television broadcasters/transmitters (such as "free", "pay", "basic cable", and "pay-per-view") that are broadcasting and/or transmitting by any means or devices whether now known or hereafter devised, including over-the-air, cable, closed circuit, satellite, microwave, laser, and the like; book or music publishers; wholesale or retail distributors, licensors, or sellers of Home Versions; record or tape producers, distributors, or stores; and merchandisers or any other similar users. The receipts of each such entity are excluded whether or not such entity is owned, operated, or controlled by PPC.

(2)    Amounts collected as taxes or for payment of taxes, such as admission, sales, use, or value added taxes.

(3)    Film rental contributed to charitable organizations, including by waiving revenues generated by charity ticket sales at a premiere.

(4)    Receipts from remakes, sequels, TV series, or other derivative uses of Picture other than as specified in Paragraph II.A of this Exhibit "DP".

(5)    Salvage value or receipts derived from the sale or other disposal of print stocks, stock footage, stills, props, sets, wardrobe, or other items related to the production of the Picture.

III.    <u>DISTRIBUTION FEES</u>.

PPC shall retain as its distribution fee for the Picture the following percentages of Gross Receipts:

A.    <u>Theatrical</u>.

30% U.S. and Canada

35% U.K.

40% Non-U.S., Non-Canada, Non-U.K.

15% Flat Sales

8

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                   PPC-GRAY-0000230

B.    Non-Theatrical.

15% Worldwide

C.    Free TV.

25% U.S. Network (a network is defined as ABC, CBS, NBC, or Fox)

35% U.S. Syndication and Canada

40% Non-U.S., Non-Canada

D.    All Other.

The theatrical fee for the applicable Territory shall be applicable except no such fee shall be applied against infringement recoveries, subsidies, or Schedule A royalties included in Gross Receipts.

E.    Fee Computation.

For purposes of computing PPC's distribution fee Gross Receipts excludes all items specified in Paragraph II.A.(4), (6) and (7) of this Exhibit "DP".

IV.    DISTRIBUTION COSTS.

PPC shall deduct from Gross Receipts the aggregate of the following costs, expenses, and charges paid or incurred by PPC or a Subdistributor (collectively, the "Distribution Costs"):

A.    Conversion.

Costs, discounts, and expenses incurred in the Conversion and remittance of revenue from outside the U.S. to the U.S., including costs of contesting imposition of restricted funds.

B.    Checking.

Costs of checking theatre attendance, subscribers, and receipts and of investigating unauthorized usage of the Picture, whether services are performed or invoiced by PPC employees or other Persons.

9

EXHIBIT DP
1-6-2015

CONFIDENTIAL

PPC-GRAY-0000231

C.    Collections.

Costs incurred in connection with collection of Gross Receipts, including attorney and auditor fees, and costs and liabilities incurred in connection therewith.

D.    Licenses.

All licenses, duties, fees, or any other amounts required to permit exploitation of the Picture, including exploitation of the Picture as formatted and exhibited in premium, special or enhanced non-standard cinema auditoriums or venues (e.g., IMAX, 4DX, D-Box, Escape, etc.) by any methods, means, technologies, systems or processes whether now known or hereafter devised.

E.    Taxes.

Taxes and governmental fees of any nature and however characterized (other than PPC or Subdistributor corporate income taxes), including the costs of contesting the imposition of such taxes and fees, and the interest and penalties that may be imposed thereon, whether imposed directly or indirectly on the Picture or any part thereof (including the employer's share of payroll taxes with respect to deferred or contingent compensation) or on the Gross Receipts or the license, distribution, or exhibition of Picture, or on the collection, conversion, or remittance of monies connected with the Picture.

F.    Residuals.

Costs incurred and payments computed in accordance with collective bargaining agreements by reason of or as a condition to use or to exhibit the Picture. To the extent such payments are made to or on behalf of Participant, such payments shall be deemed a credit against any contingent compensation payable to Participant under this Agreement to the extent not prohibited by the applicable collective bargaining agreement. Any contingent compensation payments made to Participant under this Agreement prior to payment of residuals are deemed a credit against such residuals to the extent not prohibited by the applicable collective bargaining agreement. In neither event may any such credit, when applicable, be deducted a second time against Participant.

10

EXHIBIT DP
1-6-2015

CONFIDENTIAL

PPC-GRAY-0000232

G.  Trade Dues.

An allocable portion of dues and assessments, including legal fees, costs, and contributions, to the MPAA, the AMPTP, or similar organizations throughout the world.

H.  Ad Costs.

The costs of advertising, promoting, exploiting, and publicizing the Picture (collectively "Ad Costs"), including the costs of ad space, ad time, physical material used for production of or broadcasting ads and commercials, shipping, integrating, and monitoring of ads and commercials, and preparation and distribution of ad and promotional material; travel and business expenses of PPC advertising and marketing executives and employees in connection with the Picture and personalities connected to Picture; salaries and/or fees and travel and business expenses of advertising personnel, publicists, press representatives, and field exploitation persons appropriately allocated to the Picture; previews; screenings; premieres; entertainment of press and personalities; research and tests of ad concepts and effectiveness; press books and kits, trailers, stills, and other accessories and publicity releases; advertising allowances to theatres or other exhibitors regardless of how effected; other advertising and publicity costs whether directed to the consumer or the exhibitor; institutional costs; and an administrative charge (so-called "Ad Overhead") equal to 10% of all such costs under this Paragraph IV.H. PPC advertising facilities and advertising employees (including field publicists and creative advertising personnel) shall be used to the extent they reasonably meet advertising requirements, and all charges for the applicable facilities or services shall be included as an advertising cost in accordance with the PPC facilities and service charges in effect at the time of use.

There shall be included in such Ad Overhead the salaries of any executive officer or administrative employee of PPC.

Any rebates, refunds, discounts, or other sums paid back to PPC directly in connection with such advertising costs shall be credited back to such advertising costs.

I.  Prints.

Costs of prints and audiovisual cassettes, discs, or any similar devices embodying copies of the Picture (which, for clarity, includes so-called virtual print fees), including the laboratory costs and the costs of labor, service and materials, titles, discs, dubbing, subtitling, gauge

11

CONFIDENTIAL

reductions, inspection, repair, shipping, storage, delivery, and insurance thereon.

J.    Transportation.

The costs of transportation, shipping, reels, and containers, and related charges, to the extent not covered under Paragraph IV.H or Paragraph IV.M.

K.    Claims.

Costs of claims and litigation (such as infringement, unfair competition, anti-trust, privacy, and defamation) arising out of distribution of the Picture, including attorney and auditor fees.

L.    Copyright, Trademark, and Patent Costs.

Copyright, trademark, and patent costs in connection with the Picture and the protection of such copyrights, trademarks, and patents, including royalties payable to manufacturers of sound recording and reproduction equipment, to the extent not included in the Cost of Production.

M.    Other Versions.

Costs to make, deliver, and use Foreign audiovisual cassettes, discs, or any similar devices, or any other media versions of the Picture, or the titles thereof, or to make changes required by censorship or rating considerations, to the extent not included in the Cost of Production.

N.    Insurance.

Costs of insurance coverage for any risk of loss with respect to the Picture, to the extent not included in the Cost of Production.

O.    General.

All other costs customarily incurred in connection with the distribution and exploitation of motion pictures or customarily treated as a cost of distribution, and which are not included in the Cost of Production.

12

EXHIBIT DP
1-6-2015

CONFIDENTIAL

PPC-GRAY-0000234

V.    <u>NEGATIVE COST</u>.  "Negative Cost" shall mean all of the following:

A.    <u>Cost of Production</u>.

(1)    The "Cost of Production" is the aggregate of all costs, charges, claims, and expenses paid or incurred in connection with the development, production, and delivery of the Picture and its trailer, including payments required to be made at a later date following production of the Picture, determined in the customary manner PPC accounts for production costs at the time the Picture is produced.  All charges in connection with the use of PPC Studio facilities shall be included in the Cost of Production in accordance with the PPC facilities and fringe charges in effect at the time of production.  Insurance recoveries related to items in the Cost of Production shall be credited to the Cost of Production.  Any tax credits, rebates, or other production-based or location-based incentives (net of costs), received by PPC that relate solely to the Picture (and for which the Picture qualifies) shall be credited to the Cost of Production, subject to any claims of tax authorities or taxpayers involved in claiming such production-based and/or location-based tax credits or incentives.

(2)    Participations in Gross Receipts shall be deemed included in the Cost of Production regardless of whether the obligation is fixed or dependent upon Gross Receipts, provided that participations in Gross Receipts shall be included in the Cost of Production only to the extent that the PPC obligation to pay said participation accrues before any Defined Proceeds are payable pursuant to this Exhibit.

(3)    There shall be no double deductions; i.e., any item in the Cost of Production cannot again be charged as a Distribution Cost and vice versa.

B.    <u>Administrative Charge</u>.

A PPC administrative charge (so-called "Overhead") in an amount equal to fifteen percent (15%) of the aggregate of the amounts set forth in Paragraphs V.A.(1) and (2) above shall accrue and be included in the Cost of Production concurrently with the incurring of the respective items of direct cost included in the Cost of Production of the Picture.

13

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                   PPC-GRAY-0000235

C.    Finance Charge.

   (1)    A finance charge (so-called "Interest") on the aggregate of the amounts set forth in Paragraphs V.A and V.B above, which shall be deemed to be at an annual rate equal to 125% of U.S. prime rate of JP Morgan Chase Bank, as the same may vary from time to time, such Interest commencing from the respective dates on which amounts chargeable to the Cost of Production are incurred or paid and continuing until the mid-point of the reporting period with respect to which said amounts are recouped as herein provided.

   (2)    If any principal photography of the Picture occurs outside of the U.S., then in lieu of the rate specified above the rate of Interest with respect to funds expended in any country outside the U.S. shall be at an annual rate equal to 125% of the prime rate, or equivalent thereof, charged by the principal bank in the applicable country, as the same may vary from time to time.

D.    Overbudget Add-On.

   The amount by which the Cost of Production pursuant to Paragraph V.A above (and from which is excluded any financing fees, bond fees, and contingency) is greater than the aggregate of: (i) $300,000 and (ii) the Picture's -approved budget (and from which is excluded any financing fees, bond fees, and contingency) shall be added again as a part of the Cost of Production.  Such excess amount shall not itself bear Interest. Costs incurred due to force majeure, written direction from PPC, and retroactive increases to scale personnel under collective bargaining agreements are excluded from this overbudget computation.

VI.    REPORTING.

A.    General.

   PPC shall render statements to Participant showing in summary form the appropriate calculations relating to treatment of Gross Receipts. Such statements may be on a billing or collection basis as PPC may elect from time to time.  Whenever Gross Receipts are derived or costs are incurred in connection with transactions involving the Picture and other motion pictures, PPC shall allocate such costs and Gross Receipts based on its reasonable opinion.

14

CONFIDENTIAL                                    PPC-GRAY-0000236

B.    Books.

PPC shall keep books of account with respect to the distribution of the Picture.  Summary books of account shall be located at PPC's Los Angeles offices.  Books of account, to the extent they have not become incontestable or have not been previously examined, may be examined at Participant's expense in Los Angeles or wherever such records are customarily kept, once in each 12-month period (commencing from the issuance of the first statement to Participant) by a national firm of reputable CPA's, the selection of which is subject to PPC approval, not to be unreasonably withheld, and the signing of PPC's confidentiality agreement.  No such examination may continue beyond a period of sixty (60) days after commencement of the examination.  A copy of the report of such examination shall be delivered to PPC at such time it is made available to Participant.

C.    Withholdings.

All amounts payable to Participant under this Agreement shall be subject to all laws and regulations now or hereafter in existence requiring the reporting, deduction or withholding of payments for income or other taxes payable by or assessable against Participant or as otherwise provided by law. PPC shall have the right to make such deductions and withholdings.  The payment of deductions and/or withholdings to the applicable governmental agency (in accordance with PPC's good-faith determination of such laws and regulations) shall constitute payment of such amounts to Participant.  PPC shall not be liable to Participant for the making of such payments, reports, deductions, and/or withholdings; instead, Participant shall make and prosecute any and all claims with respect to such matters directly with the governmental agency having jurisdiction over the claims.

D.    Statements.

For the first two (2) years after the first general release of the Picture, as that date is established by PPC and reflected in its records in its usual fashion, PPC shall give Participant quarterly statements relating to the distribution of the Picture.  Such statements shall be for the applicable reporting period and shall be given within sixty (60) days after the end of the applicable reporting period.  Statements shall be given semi-annually for the next two (2) years thereafter, and then annually thereafter.  Such semi-annual and annual statements shall be given within one hundred twenty (120) days after the end of the applicable reporting period.  All statements shall be accompanied with payment of the amount, if any, shown due Participant.

15

CONFIDENTIAL                                                  PPC-GRAY-0000237

Notwithstanding the foregoing: (a) delivery of a statement may occur as late as January 15 for any statement that otherwise would be required to be delivered by a date during the period from the prior December 15 through January 8; and (b) if no compensation is due, then a statement shall be given only on Participant's written request, provided such request is made at least one (1) year after delivery of the last such statement.

If the Picture is generally re-issued in the U.S. theatrically, then PPC shall resume quarterly statements for one (1) year from the date of such re-issue. If the Picture is broadcast on prime-time network television in the U.S., PPC shall issue a statement relating to distribution of the Picture within sixty (60) days after the end of the applicable quarterly reporting period, accompanied by payment, if any, shown due Participant.

E.    Incontestability.

Statements shall be subject to correction or amendment at any time. PPC shall keep the books of account referred to in Paragraph B above for at least twenty-four (24) months after the last transaction reflected in a statement for the first time. Each statement shall be deemed conclusively correct and binding on Participant as to the transactions reflected therein for the first time on the expiration of a period of twenty-four (24) months after the date sent. The inclusion of any item from a prior statement on a subsequent statement shall not render such prior-appearing item contestable or recommence the running of the applicable 24-month period with respect thereto. If Participant serves written notice on PPC within the applicable 24-month period, objecting in specific detail to particular items and stating the nature of the objection, then insofar as such specified items are concerned, statements shall not be deemed conclusively correct and binding.

F.    Address.

All statements shall be deemed sent when mailed to Participant at the then-current address for notices under this Agreement.

G.    Reserves.

PPC shall have the right to establish appropriate reserves and adjust them from time to time for all Distribution Costs, uncollected accounts, or other items that PPC reasonably anticipates will be deductible from Gross Receipts hereunder. PPC agrees to liquidate any reserves hereunder within a reasonable period of time.

16

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                      PPC-GRAY-0000238

H.    Tax Credits.

PPC and/or its parent company (Viacom Inc.) shall have the sole right to take the full amount of whatever credits (including investment tax credits), deductions, or other benefits that may be available to them throughout the world, with respect to taxes and excises payable with respect to the Picture or any activity related thereto, without any reporting, credit, or payment obligation to Participant.

I.    Creditor - Debtor.

There is a Creditor-Debtor relationship between PPC and Participant with respect to payment of amounts due Participant under this Agreement, and nothing contained in this Agreement or otherwise shall be construed to create an agency, trust, or fiduciary obligation with respect to such amounts or to prevent PPC from commingling any such amounts with any other funds or to give Participant a lien on the Picture and Participant waives any right to claim to the contrary. PPC's obligation to pay Participant under this Agreement shall not bear interest nor entitle Participant to gains that may accrue to such funds prior to payment to Participant.

VII.    MISCELLANEOUS.

A.    No Representation.

Participant acknowledges that PPC has no obligation to distribute Picture.  If it does so, Participant acknowledges that PPC has not made any representations with respect to the amount of Gross Receipts, deferments, or Defined Proceeds, if any, that will or may be derived from distribution of the Picture.

However, subject to PPC's policies and practices regarding release of motion pictures, PPC agrees to give full consideration to distribution of the Picture in all territories throughout the world as soon as reasonably practicable, further subject to the requirements of censorship boards or other authorities or bodies that can affect such distribution and to contingencies beyond PPC's control that may restrict, prohibit, or postpone release or distribution of the Picture.

17

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                                                                PPC-GRAY-0000239

B.    Control of Distribution and Marketing.

    (1)    PPC shall have exclusive and perpetual control of the distribution, marketing, advertising, publicizing, exploitation, sale, or other disposition of the Picture. PPC may distribute, exhibit, or otherwise exploit the Picture or refrain from doing so at its absolute discretion; if PPC elects to distribute, exhibit or otherwise exploit the Picture, the manner in which it does so shall not subject it to any liability to Participant of any kind or nature. PPC may distribute the Picture with other motion pictures whether or not PPC has any ownership interest or participation in such other motion pictures.

    (2)    PPC owns all rights to the Picture and the copyrights thereof and to Gross Receipts and Defined Proceeds including the right to hypothecate them and Participant shall have no right, title, or interest therein, except that nothing specified in this Paragraph VII.B.(2) shall release PPC from making payments to Participant to the extent required under this Agreement.

    (3)    PPC can make percentage sales or Flat Sales and grant others rights to distribute the Picture on terms determined by PPC, and may make and cancel contracts, adjust and settle disputes, and give allowances and rebates to distributors, licensees, exhibitors, or other Persons, whether or not any such Persons are owned, operated, or controlled by PPC.

    (4)    PPC shall have complete discretion in determining the extent, if any, to which it will audit or check payments to PPC or press claims for amounts that, if collected, would become Gross Receipts.

C.    Sale of All Rights.

    (1)    If PPC sells all its right, title and interest in Picture (other than through merger or consolidation), Participant may elect that:

        (a)    the net sum received by PPC shall constitute Gross Receipts, but the further income of the purchaser would not be included in Gross Receipts, or,

        (b)    the sum received by PPC shall not be included in Gross Receipts, and all revenues and expenses of the purchaser relating to the Picture (other than purchase price paid PPC) shall be treated, for purposes of reporting to Participant, as though they were revenues and expenses

18

CONFIDENTIAL                                                    PPC-GRAY-0000240

of PPC, provided that upon assumption by the purchaser of such obligation, the sale shall be deemed a novation and PPC shall thereafter have no obligation of any kind to Participant, provided, however, that PPC is not relieved of its obligations for a period of two (2) years after the sale unless such sale is made to a major U.S. distributor or the sale is made three (3) years or more after the U.S. initial release of the Picture.

(2)  Such election shall be made within seven (7) days after PPC notifies Participant in writing that it proposes to make such sale and identifies the purchaser and purchase price. Participant shall be deemed to have elected alternative (a) above, unless PPC receives written notice of Participant's election of alternative (b) above within seven (7) days after issuance of PPC's notice. If a price change subsequently occurs and it is substantial and adversely affects the elected alternative, the above procedure shall be repeated.

D.  Assignment by Participant.

Participant may assign Participant's right to receive percentage compensation under this Agreement, at any time after the release of the Picture. However, PPC shall only be obligated to honor one such assignment, and then only if it is an assignment of all (as distinguished from part) of Participant's right to receive such percentage compensation thereafter. Nothing herein contained shall be deemed to preclude Participant from making a partial assignment or to preclude the first assignee (of all of Participant's said right) from making a subsequent complete or partial assignment; however, PPC shall not be obligated to pay in accordance with any such partial or subsequent assignment unless a single Person is designated as a disbursing agent, to whom PPC may make all such payments thereafter, regardless of any further assignment(s). PPC's obligation to pay in accordance with any such assignment, or designation of a disbursing agent, shall be further conditioned on PPC's receipt of written notice thereof, in form satisfactory to PPC. PPC's payment in accordance with any such assignment or designation shall be deemed to be the equivalent of payment to Participant hereunder. Participant's rights to examine PPC's books of account shall not be assignable without PPC's prior written consent. PPC shall have first refusal with respect to any proposed assignment of Participant's right to receive percentage compensation hereunder and Participant shall notify PPC of the terms of any such proposed assignment and PPC shall have seven (7) days within which to elect to accept such terms. Participant shall make no change in said terms adverse to Participant's own interest without

19

CONFIDENTIAL

giving PPC the opportunity to accept such other terms. The preceding two sentences shall not apply to family gifts or transfers by operation of law.

E.    Third Party Beneficiary.

Nothing herein contained shall be deemed to create a third-party beneficiary agreement.

F.    Headings.

Headings are for convenience only and are of no effect in construing contents of this Agreement.

G.    No Partnership/Joint Venture.

PPC shall not be considered a trustee, pledgeholder, fiduciary, or agent of Participant. Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Paragraph VII.G and neither party shall become liable by any representation, act or omission of the other contrary to the provisions hereof. The use of terms such as "Gross Receipts" or "Participant" are used solely as a convenience to describe the results of the computations set forth in this Exhibit "DP" and are not intended to create an inference of any relationship other than creditor/debtor with respect to payments, if any, pursuant to such computations or definitions.

H.    Dispute Resolution.

All claims, controversies, or disputes arising out of, in connection with, or relating to this Exhibit "DP" or any reporting or payment relating to the Picture ("Covered Claims") shall be resolved by binding arbitration in Los Angeles, California, in accordance with the provisions of Exhibit "ARB" attached to this Agreement. Any such arbitration shall be limited to the claims, controversies, or disputes with Participant individually. To the full extent permitted by law, (1) no arbitration shall be joined with any other; (2) there is no right or authority for any claims, controversies, or disputes to be arbitrated on a class action-basis or to utilize class action procedures; and (3) there is no right or authority for any claims, controversies, or disputes to be brought in a purported representative capacity on behalf of the general public or any other persons. Participant may bring claims only in an individual capacity, and not as a plaintiff or class member in any purported class representative proceeding. Further, the arbitrator may

20

EXHIBIT DP
1-6-2015

CONFIDENTIAL

not consolidate more than one person's claims and may not otherwise preside over any form of a representative or class proceeding.

VIII.   DEFINITIONS.

A.   Applicable Distribution Fees.

The following applies for purposes of determining distribution fees under Paragraphs III.A, B, C, and D of this Exhibit "DP":

(1)   Theatrical.

"Theatrical Exhibition" shall mean exhibition in theatres; on airlines and other forms of transportation; armed forces, V.A., Red Cross and similar institutional use; pay, cable, and subscription television; audio visual cassettes, discs, or similar devices other than Home Versions; and for the transmission of the Picture's audio and visual image by any means or media, whether now known or hereafter devised.

(2)   Non-Theatrical.

"Non-theatrical Exhibition" shall mean exhibition in 16mm, 35mm gauge or lower in or by schools, hospitals, college campuses, prisons, individuals, oil companies, public libraries, railroads, private institutions, social clubs, churches, and similar usages, but excluding Theatrical Exhibitions.

(3)   Free TV.

(4)   Flat Sale.

"Flat Sale" shall mean a license by PPC to any Person for exploitation of the Picture, in any and all media, means, and manner, whether now known or hereafter devised, including theatrical, free TV, cable TV, pay TV, and audiovisual cassette, disc, or other similar device, for a period in excess of one (1) year for a territory or area in consideration of the payment of a specified amount rather than a percentage of receipts of such Person and without any obligation of such Person to account for or report to PPC the amount of any proceeds or expenses of such exploitation.

21

EXHIBIT DP
1-6-2015

CONFIDENTIAL

B.    Conversion.

"Conversion" shall mean the conversion of Foreign currency into U.S. dollars made at the average weighted rate of exchange utilized by PPC for all motion pictures for which remittances have been received by PPC in the U.S. during the applicable reporting period.

C.    Film Rental.

"Film Rental" shall mean amounts received by PPC or a Subdistributor for the license or privilege to exhibit the Picture (including trailers thereof) in any and all media, means, and manner, whether now known or hereafter devised, but excluding amounts received from Flat Sales, Non-Theatrical Licensee exhibitions, Royalties pursuant to Schedule A, advance payments or security deposits (unless earned by exhibition or broadcast or unless forfeited), and refunds, rebates, or adjustments granted other Persons by PPC or a Subdistributor.

D.    Gross Receipts.

"Gross Receipts" shall mean the amounts set forth in Paragraphs II.A.(1) through II.A.(7) above, subject to the exclusions set forth in Paragraph II.B above, and subject to the following:

(1)    Amounts are not deemed Gross Receipts or received unless paid in U.S. dollars in the U.S. or payable in a Foreign currency that is not restricted and could be remitted in U.S. dollars to the U.S., if PPC, in the exercise of reasonable discretion, elects to do so, it being agreed that if Restricted Funds are used by PPC in the Foreign territory involved, such sums shall be credited to the Gross Receipts of the Picture. Gross Receipts from armed forces exhibitions shall be subject to the applicable distribution fees in Paragraph III.A hereof with respect to the territories where such exhibitions shall occur. Gross Receipts from airlines and other transportation media exhibitions shall be subject to the applicable distribution fees in Paragraph III.A hereof with respect to the territories where the agreements relating to such exhibitions are entered into.

(2)    Gross Receipts from Non-Theatrical Licensee exhibition shall mean the net amount of receipts received by PPC from Non-Theatrical Licensees, and such net amount shall be subject to the distribution fees in Paragraph III.B hereof.

22

CONFIDENTIAL                                                      PPC-GRAY-0000244

E.    <u>Here</u>.

"Here" as prefix in words such as hereof and hereunder refers to this Agreement.

F.    <u>Home Versions</u>.

"Home Versions" shall mean audiovisual cassettes, discs, or any similar devices (including any functionally equivalent devices, means, or methods, in whatever form [such as VHS, DVD, and VOD], whether now known or hereafter devised, and however delivered, transmitted, or made available to the viewer) through which the Picture is available for viewing at a time or times selected by the individual viewer.

G.    <u>Includes</u>.

"Includes" (and equivalents "included" or "including" or "such as") are illustrative and not limitative.

H.    <u>Non-Theatrical Licensee</u>.

A "Non-Theatrical Licensee" shall mean a Person licensed by PPC (such as Films, Inc. or any similar organization) for non-theatrical exhibition.    Such Non-Theatrical Licensee shall not be deemed a Subdistributor, and the receipts and expenses of any such Non-Theatrical Licensee shall not be treated as though receipts and expenses of PPC.

I.    <u>Or</u>.

"Or" is not only disjunctive but also conjunctive.

J.    <u>Participant</u>.

A "Participant" shall mean a Person who has entered into this Agreement with PPC.

K.    <u>Person</u>.

A "Person" shall mean any corporation, partnership, or other business entity or a natural person.

23

EXHIBIT DP
1-6-2015

CONFIDENTIAL    PPC-GRAY-0000245

L.    PPC.

"PPC" shall mean Paramount Pictures Corporation, a Delaware corporation, and its divisions and owned or controlled subsidiaries, but in any event "PPC" shall not include exhibitors or others who may actually exhibit the Picture to the public (except for so-called "four wall" exhibition as provided in Paragraph II.A.(5) above); amusement/theme parks; radio or television broadcasters and other transmitters; cable operators; distributors or retailers of Home Versions (except for Paramount Home Entertainment); book or music publishers; phonograph record producers or distributors; merchandisers, etc. (whether or not any of the foregoing are subsidiaries, divisions, or affiliates of PPC).

M.    Restricted Funds.

(1)    "Restricted Funds" shall mean those amounts that would otherwise be included in Gross Receipts but are not because they are payable in Foreign currency, and shall not be deemed Gross Receipts hereunder for any purpose unless and until they have been received by PPC in U.S. dollars in the U.S. or unless used by PPC in the Foreign territory involved.

(2)    As and when percentage compensation becomes payable to Participant under this Agreement, Participant may notify PPC in writing that Participant elects to require settlement of Participant's share of Restricted Funds remaining in any Foreign country in the currency of such country. Such notice shall also include a designation of a bank or other representative in such country to whom payment may be made for Participant's account. Such payment shall be made to such representative as and when Participant has obtained any required permission. Such payment shall be made at Participant's expense and, to the extent thereof, be deemed the equivalent of the inclusion in Gross Receipts of the restricted funds of which such payment represents Participant's share, and shall satisfy PPC's obligations to Participant with respect to such Restricted Funds and Participant's share thereof.

(3)    On Participant's written request, PPC shall report to Participant the amount of Restricted Funds (if any) which under this Paragraph VIII.M have not yet been included in Gross Receipts as of the closing date of the most recent statement which has then been furnished to Participant under Paragraph VI.D hereof.

24

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                          PPC-GRAY-0000246

N.    Royalties.

"Royalties" shall mean the amounts set forth in Schedule A of this Exhibit "DP".

O.    Subdistributor.

A "Subdistributor" shall mean a Person licensed by PPC for the purpose of distributing the Picture for exhibition in theatres and for broadcasting over television stations in a specific area, with an obligation to report Gross Receipts and expenses to PPC. Subject to the provisions relating to Restricted Funds set forth in Paragraph VIII.M hereof, all such receipts and expenses shall be treated as though receipts and expenses of PPC when reported to PPC, and the licensing or other arrangements between PPC and each such Subdistributor shall be of no relevance hereunder. United International Pictures shall be deemed a Subdistributor.

P.    Territory.  "Territory" shall mean any or all of the following:

(1)    "U.S." shall mean the United States, together with any other countries that are licensed by or through the distributing organization(s) servicing the U.S. for PPC.

(2)    "Canada" shall mean Canada and any other countries licensed by or through PPC's Canadian distribution organization.

(3)    The "United Kingdom" ("U.K.") shall mean the United Kingdom of Great Britain and Northern Ireland, Republic of Ireland, Channel Islands, Isle of Man, Gibraltar, Malta, and ships and aircraft flying the British flag or Republic of Ireland's flag, and British camps wherever situated.

(4)    "Foreign" shall mean all countries other than the U.S., plus any other areas in the universe.

(5)    All of the foregoing references to countries include their territories, possessions, and political subdivisions.

Q.    This Agreement.

This "Agreement" shall mean the agreement to which this exhibit is attached, this exhibit, and any other attached amendments, exhibits, and schedules.

25

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                                PPC-GRAY-0000247

SCHEDULE A

ROYALTIES REFERRED TO IN II.A.(7) OF THIS EXHIBIT "DP"

1.    If Participant is not otherwise entitled to receive any composer's or lyricist's royalties or otherwise share in music publishing royalties, then, insofar as PPC shall acquire initially for or in connection with the Picture, any proprietary rights in musical compositions written for or previously unexploited musical compositions first used in or in connection with the Picture, PPC may license any or all of such rights to a music publishing company of its choosing, including a PPC subsidiary or affiliate company, provided that such license agreement shall require payment by said publishing company of the following royalties (to the extent such publishing company controls, as a result of its license with PPC, the particular rights for the country or countries involved), which shall be included in Gross Receipts of the Picture, without the application of distribution fees:

(a)    Piano or orchestration copies sold in U.S. and Canada - two cents (2¢) per copy;

(b)    Net receipts of publisher from performing fees, excluding U.S. and Canada - sixteen and two-thirds percent (16-2/3%); and

(c)    Net receipts of publisher worldwide from all sources other than the types listed in (a) and (b) - sixteen and two-thirds percent (16-2/3%).

2.    If Participant is not otherwise entitled to receive any royalties in respect of any of the Picture's music-oriented soundtrack phonograph records, then insofar as PPC shall have rights to the use and exploitation of such music-oriented phonograph records, PPC agrees that:

(a)    If PPC grants such phonograph record rights to any record company not subsidiary to or affiliated with PPC, PPC shall endeavor to obtain the best available royalties ("Overall Royalty") in good-faith negotiation with such non-affiliated record company.  No royalties shall be payable hereunder on any uses or copies of any such phonograph records for which a corresponding earned royalty is neither paid nor credited to PPC's account.  There shall be deducted from said Overall Royalty to PPC, any payments (other than mechanical royalty payments) required to be made with respect to any of the Picture's music-oriented soundtrack phonograph records and/or the recordings embodied thereon ("Direct Royalties").  The royalties remaining shall be subject to Paragraphs 2.(c) and 2.(d) below.

(b)    The following shall apply if PPC grants such music-oriented soundtrack phonograph record rights to any record company which is

26

EXHIBIT DP
1-6-2015

CONFIDENTIAL                                                          PPC-GRAY-0000248

a subsidiary or affiliate of PPC ("affiliated record company"). Subject to the remaining provisions hereof, with respect to U.S. net top-line, normal retail channel sales in standard compact disc ("CD") configuration of any music-oriented soundtrack album phonograph record authorized by PPC to be identified as a musical soundtrack album for the Picture, PPC shall obtain an Overall Royalty which shall be not less than: five percent (5%) of the retail-oriented royalty base price or an equivalent royalty based on an otherwise-oriented royalty base price (whichever method of computation is customarily used by the affiliated record company at the time involved, it being understood that for the purpose hereof, any royalty base price calculated using an "uplift factor" from a lower figure shall be deemed a retail-oriented royalty base price), less applicable taxes and packaging deductions. Such Overall Royalty shall be subject to the same computations, definitions, deductions, pro-rationing, reductions and shall be otherwise determined in accordance with the usual practices of the affiliated record company as of the date of PPC's agreement with the affiliated record company. No royalties shall be payable hereunder on any uses or any copies of any such phonograph records for which a corresponding earned royalty is neither paid nor credited to PPC's account. There shall be deducted from said Overall Royalty any Direct Royalties. The royalties remaining shall be subject to Paragraphs 2.(c) and 2.(d) below.

(c)    To the extent not already treated as Picture production costs or recouped from Direct Royalties, costs incurred by PPC and/or costs chargeable by the record company/affiliated record company against PPC in connection with any such phonograph record(s) shall be deducted from such royalties, if any, as would otherwise be included in the Gross Receipts of the Picture under this Paragraph 2.

(d)    After deduction of Direct Royalties from the Overall Royalty (per Paragraph 2.(a) or 2.(b), as applicable) and subject to 2.(c), the then remaining royalties to PPC shall be included in the Gross Receipts of the Picture without application of a distribution fee.

(e)    Whether a record company is a subsidiary or affiliate of PPC shall be determined as of the date of the applicable music-oriented soundtrack phonograph record agreement.

3.    If Participant is not otherwise entitled to share in receipts from Home Versions, then a royalty in an amount equal to twenty percent (20%) of sums received by PPC from the sale or license of Home Versions shall be included in the Gross Receipts of the Picture, and no Distribution Costs shall be charged against said royalty except for those costs described in Paragraphs IV.F and IV.G. of this Exhibit "DP".

27

EXHIBIT DP
1-6-2015

CONFIDENTIAL

4.   If Participant is not otherwise entitled to share in receipts from merchandising, then a royalty in an amount equal to fifty percent (50%) of the sums received by PPC from merchandising (including sale or license of souvenir programs and booklets) shall be included in the Gross Receipts of the Picture, and no costs shall be charged against said royalty except for out-of-pocket costs (including royalties to third parties) of such merchandising.

5.   If Participant is not otherwise entitled to share in receipts from PPC's exercise of book publication rights, then a royalty in an amount equal to eighty-five percent (85%) of the sums received by PPC from PPC's exercise of book publication rights, to the extent acquired, shall be included in the Gross Receipts of the Picture, and no costs shall be charged against said royalty except for out-of-pocket costs (including royalties to third parties) of such exercise of book publication rights.

* * *

28

EXHIBIT DP
1-6-2015

CONFIDENTIAL