# EXHIBIT 43

MEMORANDUM OF AGREEMENT

"SHANTARAM"
Shaun Gray – Staff Writer

Set forth below are the terms of the agreement (the "Agreement"), dated as of April 22, 2019, between Paramount Television, a division of Paramount Pictures Corporation ("Producer") and Shaun Gray ("Artist") in connection with the one (1) hour episodic series currently entitled "Shantaram" (the "Series").

In consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1.     <u>INITIAL ENGAGEMENT; FIRST CONTRACT YEAR</u>. Producer hereby engages Artist, and Artist agrees, to render staff writer services on all working weeks (or any portion thereof) required by Producer (with a minimum of ten [10] weeks) for the first production year of the Series. Artist's services on the first production year of the Series will commence on or about April 15, 2019. The fee for Artist's staff writer services on the first production year of the Series will be the applicable minimum weekly Article 13 scale (i.e., $4,862 per week) compensation pursuant to the Writer's Guild of America ("WGA") Theatrical and Television Basic Agreement ("WGA Agreement").

2.     <u>OPTIONS</u>.

    (a)     <u>Second Contract Year</u>. If Producer has employed Artist on the Series in connection with the first production year of the Series, Producer shall have the option to engage Artist, and Artist agrees, to render story editor services on all working weeks (or any portion thereof) required by Producer (with a minimum of twenty [20] weeks) for the second production year of the Series, commencing on such date as Producer designates in its sole discretion. Such option is exercisable on or before the date that is the earlier of (i) twelve (12) months following Producer's final payment to Artist for services on the preceding production year, or (ii) nine (9) months following delivery of the last episode of the preceding production year to the Series licensee. If Producer exercises such option, the fee for Artist's story editor services on the second production year of the Series will be the applicable minimum weekly Article 14 scale compensation pursuant to the WGA Agreement.

    (b)     <u>Third Contract Year</u>. If Producer has employed Artist on the Series in connection with the second production year of the Series, Producer shall have the option to engage Artist, and Artist agrees, to render executive story editor services on all working weeks (or any portion thereof) required by Producer (with a minimum of twenty [20] weeks) for the third production year of the Series, commencing on such date as Producer designates in its sole discretion. Such option is exercisable on or before the earlier of (i) twelve (12) months following Producer's final payment to Artist for services on the preceding production year, or (ii) nine (9) months following delivery of the last episode of the preceding production year to the Series licensee. If Producer exercises such option, the fee for Artist's executive story editor services on the third production year of the Series will be the applicable minimum weekly Article 14 scale compensation plus five percent (5%) pursuant to the WGA Agreement.

3.     <u>TERM</u>. The term of this Agreement (the "Term") will commence on the date hereof and continue through the later of (a) the completion of Artist's services hereunder during any given production year or (b) the expiration of Producer's last option to engage Artist to render services hereunder for a subsequent production year. As used herein, the term "working week" means a week during which Artist is not on vacation or hiatus and during which Artist actually renders services hereunder. The scheduling and duration of any vacation or hiatus period during the Term will be determined by Producer in its sole discretion.

4.     <u>CREDIT</u>.

    (a)     <u>WGA Credit</u>. Producer will accord Artist writing credit pursuant to the WGA Agreement, as applicable and required.

Gray – Staff Writer– v3.052919.DG
120518

"Shantaram"
Shaun Gray – Staff Writer
As of 04/22/19
Page 2 of 7

    **(b)**    <u>Story Editor.</u> Producer will accord Artist on screen credit, on a separate card, as a story editor in the end titles of each episode of the Series produced on which Artist is engaged to render, and actually completes, story editor services.

    **(c)**    <u>Executive Story Editor.</u> Producer will accord Artist on screen credit, on a separate card, as an executive story editor, in the end titles of each episode of the Series produced on which Artist is engaged to render, and actually completes, executive story editor services.

    **(d)**    Artist's story editor and executive story editor credits (as applicable) shall be in a size of type (i.e., height) not less than one hundred percent (100%) of the size of type of any other individual with the same credit as Artist, and shall be grouped among credits given to other individuals with the same credit as Artist. All of the provisions of this Paragraph entitled "Credit" and other provisions in this Agreement relating to credit shall be subject to the terms of any applicable guild or union collective bargaining agreement and applicable network/exhibitor policies, restrictions and approvals.

**5.**    <u>EXCLUSIVITY</u>. Artist's services hereunder will be exclusive to Producer in all episodic series media in accordance with the Paragraph entitled "Exclusivity" in the Standard Terms, except that Artist may, following Artist's rendering and completion of applicable services for the first production year of the Series, engage in television development (i.e., write scripts or supervise the writing of scripts for and television pilots, movies-for-television and television miniseries projects), provided that the conditions set forth in subparagraphs 2(i)-(iii) of the Standard Terms are complied with, and further provided that Artist shall give Producer a ten (10) business day first look and a thirty (30) day right of first negotiation for any such television projects written by Artist during the Term.

**6.**    <u>GENERAL TERMS.</u>

    **(a)**    <u>Payment Conditions / Schedule</u>.

        **(i)**    All compensation set forth hereunder is payable to Artist on the conditions that: (A) Artist executes and delivers to Producer this Agreement; (B) Artist renders and fully completes Artist's exclusive services hereunder; (C) Artist is not in Default or otherwise in breach hereof; and (D) Artist complies with the Form I-9 verification prerequisites set forth below. If Artist is to be paid episodically, Artist's compensation will be payable in weekly installments over Producer's estimated production schedule (from commencement through completion of Artist's services hereunder), as such may change from time to time in Producer's sole discretion; provided, however, that Artist's final weekly installment in connection with each applicable production year will be payable promptly following the later of Artist's execution and delivery to Producer of this Agreement or completion of Artist's services hereunder.

        **(ii)**    Producer shall be entitled to the maximum rights with respect to exclusivity and option periods permitted pursuant to Article 67 of the WGA Agreement, in accordance with Paragraph 3(e) of the Standard Terms.

    **(b)**    <u>WGA Compensation and Episodic Writing Services.</u> In the event Producer (in its sole discretion) requires Artist to render episodic writing services for the Series, Artist agrees to execute Producer's standard Freelance Television Writer Agreement ("FTWA") in connection with such writing that will provide for the applicable minimum scale compensation pursuant to the WGA Agreement. During the period in which Artist is rendering

Gray – Staff Writer– v3.052919.DG
120518

CONFIDENTIAL

"Shantaram"
Shaun Gray – Staff Writer
As of 04/22/19
Page 3 of 7

services hereunder as a staff writer, episodic script fees, if any, shall be credited against Artist's staff writer compensation and vice-versa.

(c)    **Compensation as Consideration for Rights Granted.** Compensation payable hereunder is in full consideration of: (i) all services rendered by Artist; (ii) all rights now or hereafter to be granted to or otherwise acquired by Producer; (iii) all of the representations, warranties and agreements of Artist hereunder; and (iv) any and all uses of the Series and all episodes and elements thereof in any and all media, whether now known or hereafter developed, in perpetuity throughout the universe, in all versions (including without limitation digitized versions), in all languages, and for any and all purposes.

(d)    **Fees Applicable to Dramatic Television.** Notwithstanding any other provision of this Agreement, Artist's compensation set forth herein is applicable only to Artist's services in connection with wholly live-action scripted programs of at least sixty (60) minutes in length produced for a budget that is no less than the customary minimum for such television programming. If Artist is engaged hereunder to perform services in connection with (a) programs of any other length or nature, or (b) produced for a budget that is less than the customary minimum for such television programming, then the parties shall negotiate adjustments to Artist's compensation hereunder in good faith.

7.    **ARTIST'S RIGHT TO CURE.** Artist will have the right, on a one (1)-time-only basis during the Term of this Agreement, to cure one (1) event of Default which is curable and unintentional, within twenty-four (24) hours of the occurrence of such event of Default, it being understood and agreed that if Artist cures such event of Default within said time period to Producer's complete satisfaction, in Producer's sole discretion, Producer will not have the right to terminate this Agreement, but Producer will be entitled to exercise any of its other rights and remedies hereunder and/or at law and in equity with respect to such event of Default.

8.    **INSURANCE.** If permitted by Producer's insurance company, Producer's applicable errors and omissions and general liability insurance policies pertaining to the Series episodes produced hereunder will cover Artist (and Artist's loan-out company, if applicable) as an additional insured party during customary periods of development, production and distribution of the Series episodes, subject to the limitations, restrictions and terms of such applicable policies. The provisions of this Paragraph will not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Artist in connection with this Agreement.

9.    **SALARY HISTORY INFORMATION.** Artist acknowledges that: (i) neither Producer nor any of its representatives or agents has requested or otherwise sought any information relating to Artist's salary history, including without limitation Artist's current or prior wages, benefits, and other compensation ("Salary History Information"); and (ii) if Artist or Artist's representatives or agents disclosed Salary History Information to Producer or any of its representatives or agents, such Salary History Information was disclosed voluntarily, with Artist's authorization, and without prompting by Producer or its representatives or agents.

10.    **NOTICES.** Producer's and Artist's respective addresses for notice purposes, which shall be provided pursuant to the Standard Terms, are set forth below:

| | |
|---|---|
| **To Producer:** | Paramount Television, a division of Paramount Pictures Corporation<br>5555 Melrose Avenue<br>Los Angeles, California 90038 |

Gray – Staff Writer– v3.052919.DG
120518

CONFIDENTIAL

"Shantaram"
Shaun Gray – Staff Writer
As of 04/22/19
Page 4 of 7

Attention: Legal, Television Group

**To Artist:**            c/o Law Offices of Matthew Saver
                          269 S. Beverly Drive, Suite 330
                          Beverly Hills, CA 90212
                          Attention: Matthew Saver
                          Phone: 310-888-1801
                          Email: matt@saverco.com

11.        **STANDARD TERMS AND CONDITIONS.** Producer's Standard Terms and Conditions attached hereto as Exhibit "STC" ("Standard Terms") are by this reference deemed incorporated herein and defined terms used in this Agreement that are not otherwise defined in this Agreement shall have the meanings ascribed to such terms in Exhibit "STC". In the event of any conflict between the provisions of this Agreement and the provisions of the Standard Terms, the provisions of this Agreement will govern.

        By their signature below, the parties acknowledge that they have executed this Agreement as of the date first above written. This Agreement may be signed in counterparts and transmitted via electronic means, and such counterparts (including digital copies thereof) taken together shall constitute an original binding agreement.

**ACCEPTED AND AGREED:**
**including without limitation,**
**Exhibit "ARB":**

                                          PARAMOUNT TELEVISION, a division of
                                          Paramount Pictures Corporation

                                          By: _____

                                          Its: _____
                                                 Karen Magid
                                                 Executive Vice President

**ACCEPTED AND AGREED:**

Artist: _____
         SHAUN GRAY

Gray – Staff Writer– v3.052919.DG
120518

CONFIDENTIAL                                                      PPC-GRAY-0000857

"Shantaram"
Shaun Gray -- Staff Writer
As of 04/22/19
Page 5 of 7

## EXHIBIT "ARB"

### ARBITRATION PROVISION

1.    Commencement of Arbitration.

    1.1.    Arbitration Procedure. Except as otherwise provided herein, the arbitrator shall administer the arbitration proceedings in accordance with the Comprehensive Arbitration Rules and Procedures of JAMS then in effect. If any conflict exists between the procedures set forth herein and the Rules of JAMS, the procedures set forth herein shall be followed.

    1.2.    Notice of Arbitration. The initiating party must serve a written notice of intention to arbitrate (the "Notice of Arbitration") on the respondent, and shall file a copy with the Los Angeles office of JAMS, along with any required fee.

    1.3.    Selection of Arbitrator. Within fifteen (15) days of service of the Notice of Arbitration on the respondent, the parties shall jointly select the arbitrator. In the event of a deadlock within the allotted time, the arbitrator shall be appointed by JAMS in accordance with its rules. No person may serve as an arbitrator unless he or she is either a retired state or federal judge, or a practicing lawyer with at least twenty (20) years of experience, including at least ten (10) years of experience in entertainment law. The Covered Claim(s) shall be heard by the arbitrator (the "Arbitrator"), and all procedural matters and the final decision and award shall be decided by the Arbitrator.

    1.4.    Arbitration Schedule. Within ten (10) days of the selection of the Arbitrator, the Arbitrator shall confer with the parties to set the arbitration schedule. Except for good cause, the arbitration hearing shall be within ninety (90) days of the selection of the Arbitrator.

2.    Discovery. Discovery will be handled expeditiously, according to the following terms and conditions:

    2.1.    Depositions. Depositions shall not be taken by any party.

    2.2.    Documents. Each party shall be entitled to limited document discovery. Only documents that are directly relevant to the disputed issues and refer or relate directly to the film or films which are the subject of this Agreement may be requested. Any document request shall be narrowly tailored to cause the least possible expense, burden, disclosure of confidential information and inconvenience to the parties on which they are served. If financial data is sought, only documents sufficient to establish the contested issue shall be required to be produced. The schedule for propounding and responding to document requests shall be determined by the Arbitrator. Should disagreement arise with respect to the scope of any document request, the Arbitrator shall resolve such disagreement, in conformity with this Agreement.

    2.3.    Written Interrogatories. The parties agree that no interrogatories shall be propounded by any party.

    2.4.    Requests for Admission. The parties agree that no requests for admission shall be propounded by any party.

Gray -- Staff Writer-- v3.0S2919.0G
120518

2.5.   Subpoenas. The parties agree that the Arbitrator shall, to the fullest extent permitted by law, have the power to issue subpoenas to third parties to compel testimony at the arbitration hearing or the production of documents prior to or at the arbitration hearing, subject to the same limitations on document discovery set forth in Section 2.2 hereof.

3.   Dispositive Motions. The Arbitrator shall have the discretion to hear and determine at any time prior to the arbitration hearing any issue of law asserted by any party to be dispositive of any claim, in whole or in part, in accordance with such procedure as the Arbitrator may deem appropriate.

4.   Hearing Memoranda. Pre-hearing memoranda shall be permitted at the discretion of the Arbitrator. Each party shall be permitted to submit a post-hearing memorandum within fifteen (15) days following the completion of the arbitration hearing. Rebuttal memoranda, if any, shall be submitted twenty-one (21) days following the completion of the arbitration hearing.

5.   Witness Lists. Ten (10) days before the arbitration hearing, each party shall serve a witness list identifying the name, address, occupation, work experience, and relationship to the party, if any, of each witness on its direct case and describing the subject matter and substance of that witness's anticipated testimony.

6.   Arbitration Hearing. During the arbitration hearing, the Arbitrator shall hear the oral testimony and cross-examination of each party's witnesses. Rebuttal witnesses may be heard to directly refute the testimony of any such witness. A full stenographic record shall be taken of these proceedings, and the Federal Rules of Evidence shall apply.

7.   Governing Law. The Arbitrator's decision shall be made pursuant to the substantive law of the State of California without regard to its choice of law rules.

8.   Written Decision and Award. The Arbitrator shall issue a written decision and award (the "Decision and Award") within forty-five (45) days of the submission of the final, post-hearing memoranda. This Decision and Award shall be signed and dated by the Arbitrator and shall set forth the Arbitrator's reasoning in support of each issue necessary to their decision.

8.1.   Remedies. Except as expressly limited herein, the Arbitrator shall have the power to grant any remedy or relief they deem just and equitable, including, but not limited to, injunctive relief, whether interim and/or final, and any provisional measures ordered by the Arbitrator may be specifically enforced by any court of competent jurisdiction. Notwithstanding the foregoing, the Arbitrator shall not have the power to award punitive or exemplary damages of any kind, and any limitation on the availability of injunctive relief contained in this Agreement shall be binding on the Arbitrator.

8.2.   Fees, Costs and Attorneys' Fees. All fees and costs relating to the Arbitrator will be paid by the parties in equal shares, except that the Arbitrator may award such fees and costs to the prevailing party. Each party's attorneys' fees and costs shall be borne by that party, except that if the Arbitrator determines a party's position on the Covered Claim(s) to be without substantial justification, they shall award attorneys' fees and costs to the other party.

8.3.   Final and Binding. The parties agree that the Decision and Award shall be final and binding.

"Shantaram"
Shaun Gray — Staff Writer
As of 04/22/19
Page 7 of 7

9.    <u>Enforcement of Arbitrator's Award</u>. Following the issuance of the Arbitrator's Decision and Award, either party may petition any court of competent jurisdiction in the County of Los Angeles to confirm the Decision and Award.

10.    <u>Arbitration Appeal Procedure</u>. By executing this Exhibit ARB, the parties hereby agree that any arbitration conducted hereunder shall be governed by and subject to JAMS Optional Arbitration Appeal Procedure.

11.    <u>Confidentiality</u>. All aspects of the arbitration proceedings, including, but not limited to, any testimony, all documents, and the culminating Decision and Award, shall be completely confidential, except that confidential information may be disclosed, as necessary, to the parties' legal counsel and financial or tax advisors. For purposes of any judicial proceedings on the Decision and Award, including, without limitation, confirmation proceedings, the parties stipulate and agree to request a court order or orders requiring that all records of the arbitration proceedings, including, without limitation, the Decision and Award and all court filings disclosing any aspect of the arbitration proceedings ("Confidential Records"), be filed under seal. Pending a ruling on any such request, the parties agree to file all Confidential Records conditionally under seal.

\*\*\*

Gray — Staff Writer – v3 052919.0G
120518

CONFIDENTIAL

EXHIBIT "STC"

STANDARD TERMS AND CONDITIONS

1.    <u>DEFINITIONS.</u>  As used in this Agreement:

(a)    **"Artist's likeness"** means and includes Artist's name, actual or simulated likeness, photograph, non-photographic artistic rendering, sobriquet, voice, biography, personal characteristics, signature and/or other personal identification.

(b)    **"First Contract Year"** means the period of time commencing on the first day upon which Artist renders services under this Agreement in connection with an episode of the Series (other than the Prototype) and continuing for a period of twelve (12) months or, if Artist has not then completed all services under the Agreement in connection with the first production year of the Series, through the date upon which Artist completes such services. The First Contract Year and each subsequent twelve (12) month period may each be referred to herein as a "Contract Year". Each Contract Year following the First Contract Year will commence upon the expiration of the preceding Contract Year; provided, however, that Producer will have the right, in its sole discretion, to accelerate commencement of the second or any subsequent Contract Year to any date during the preceding Contract Year (and terminate said preceding Contract Year on the day before said date) and/or to extend the termination date of any such Contract Year if such extension is for the purpose of completing the applicable order for production of episodes of the Series during such Contract Year. Any accelerated Contract Year will continue until either, at Producer's election, the original end date of such Contract Year, or for a period of twelve (12) months, unless extended pursuant to any provision of this Agreement. Extension of any Contract Year will delay the commencement and, at Producer's election, the termination of any succeeding Contract Year by a period lesser than, or, in Producer's sole discretion, equal to the period of such extension and will also extend the date(s) for Producer's exercise of any option by a period equal to the period of such extension. Producer's right to extend any Contract Year pursuant to this subparagraph 1(b) will not limit any other right of extension provided to Producer under this Agreement.

(c)    **"Material"** means any and all results and proceeds of Artist's services hereunder including, without limitation, any and all literary, dramatic and musical material such as writings, written dialogue, characters, ideas, plots, outlines, stories or parts of the foregoing, teleplays, scripts, sketches, designs, drafts, redrafts, revisions, treatments, formats, narrations, adaptations, routines, music, lyrics, gags and titles and subtitles, composed, prepared, conceived, submitted, added, created or interpolated by Artist in whatever stage of completion.

(d)    **"Person"** means any natural person, firm, corporation, or other entity.

(e)    **"Prototype"** means a television pilot, presentation, television motion picture, movie-for-television, or any other initial program in any form of episodic series media, if any, for which Artist is engaged to render services under this Agreement.

(f)    **"Series"** means an episodic series in any form of media, if any, for which Artist is engaged to render services under this Agreement. If this Agreement provides for Artist to render services on the Prototype on which the Series is substantially based, Artist's engagement in connection with the Prototype will be deemed separate and distinct from Artist's engagement in connection with the Series or any episode(s) of the Series. Any reference in this Agreement to the "Series" or to "any episode of the Series" will be deemed also to refer and apply to (unless specifically excluded) the Prototype.

(g)    **"Sponsor"** means any then-current sponsor of the Series or of any episode of the Series and will also include any future sponsor with whom there exists a binding commitment or option for such sponsorship.

Apple Non-Performer Exhibit STC – Cut through v2.052119.DG
A071918

1

CONFIDENTIAL

(h)    **"Audio-Visual" or "audio visual"** means all systems for transmitting audio-visual content in any format (e.g., analog or digital, standard definition or high definition) intended primarily for personal or home use (but which need not necessarily be received in a home) by any means or service now known or hereinafter devised (including, without limitation, free, commercial, "over-the-air" subscription, satellite, microwave, basic and pay cable and other wired systems, pay-per-view and video-on-demand systems, interactive, subscription-video-on-demand services and other internet-based exhibition platforms (or similar technologies), streaming, "webcasting" and home entertainment playback devices to any devices capable of receiving such transmitted content (including, without limitation, television equipment or monitors, set-top boxes, home entertainment playback devices, personal computers, smartphones, handheld or mobile devices and tablets), except as may be otherwise expressly set forth in the main Agreement to which this Exhibit "STC" is attached.

(i)    **"Term"** means (if not otherwise defined in the main Agreement to which this Exhibit "STC" is attached) the period of time commencing on the first day upon which Artist renders services under this Agreement and continuing through the later of (i) the completion of Artist's services hereunder during any given engagement period or (ii) the expiration of Producer's last option to engage Artist to render services hereunder for a subsequent engagement period.

2.    **EXCLUSIVITY.** At all times during the Term when the Prototype or any episode of the Series for which Artist is engaged to render services is in preproduction, production or postproduction (including production hiatus periods), or when Artist is otherwise required by Producer to render services under this Agreement (e.g., script writing or other development services for the Prototype), or when Artist is being compensated by Producer, Artist will render services exclusively to Producer and will not render any services whatsoever to any other Person or on Artist's own behalf (except as may be otherwise expressly set forth in the main Agreement to which this Exhibit "STC" is attached). During any other period during the Term (e.g., during any period when Producer has an option to engage Artist to render services hereunder), Artist may render services to any other Person or on Artist's own behalf, provided that: (i) prior to any such rendition of any such services, Artist will notify and consult with Producer with respect to such proposed services, (ii) Artist will not render any services to any other Person or on Artist's own behalf, or grant any services in any field or medium whatsoever, or otherwise enter into any agreement or commitment, that will or might conflict with the rights granted to Producer hereunder or materially interfere with the rendition of Artist's services hereunder (which determination of material interference or noninterference shall be made by Producer in its good faith business judgment), and (iii) each of Artist's commitments to any other Person or on Artist's own behalf for the rendition of Artist's services permitted hereunder will be made expressly subject and subordinate to all of the terms and conditions of this Agreement and Artist's obligations to Producer hereunder. Notwithstanding anything else contained in this Agreement, Artist's exclusivity obligations to Producer under this Paragraph 2 shall remain in effect whether or not Producer elects to "pay-or-play" Artist pursuant to Paragraph 7 below.

3.    **ARTIST'S SERVICES.**

(a)    Artist agrees to render services under this Agreement as, when and where reasonably required by Producer (provided Artist may not refuse to render or complete services on the grounds that Artist believes such services to be unreasonable from a creative standpoint), all of which services will be rendered conscientiously to the full extent of Artist's ability and subject in all respects to the supervision, control and direction of Producer. Artist agrees that Producer's judgment will be final and controlling in all matters. Subject to the provisions of subparagraph 3(b) below, the services to be rendered by Artist under this Agreement will include, all preproduction, production, postproduction and publicity services customarily rendered by Persons engaged in the same capacity or in a similar capacity in the television industry or in other media producing episodic series. No additional compensation will become payable to Artist under this Agreement by reason of Artist's rendition of any services provided for under this Agreement at night, on Saturdays, Sundays or holidays, after the expiration of any particular number of hours of service during any one (1) day, any particular number of days of service during any week, or any particular number of weeks during the

2

Term, or otherwise, except as may be required under any applicable CBA (as defined in Paragraph 15 below). Artist agrees to keep Producer advised of Artist's whereabouts and telephone number provided that casual or inadvertent failure to do so shall not constitute a breach hereunder.

      **(b)**      Unless Artist is specifically engaged to render writing services under this Agreement or under a separate written agreement between Producer and Artist, Artist will not render any writing services that would subject Artist and/or Producer to the provisions of the then-current Writers Guild of America Theatrical and Television Basic Agreement (as such may be supplemented or amended from time to time) (the **"WGA Agreement"**).

      **(c)**      In the event that the Material furnished by Artist under this Agreement is subject to the provisions of Article 16.B. of the WGA Agreement and Producer has not purchased from Artist the Separated Rights in the Material in a separate negotiation memorialized in a Separation of Rights Agreement, then the following shall apply:

      **(i)**      Artist understands and agrees that the rights specified in Article 16.B.3. of the WGA Agreement are among the rights acquired or to be acquired by Producer under this Agreement with respect to such Material. Accordingly, should it be finally determined that Artist is entitled to separation of rights with respect to such Material and Producer has not exercised the option provided for in subparagraph 3(d)(ii) below, or Producer has exercised such option but the exercise of such option and/or the provisions of any Separation of Rights Agreement is/are for any reason ineffective to transfer the rights sought to be transferred by such agreement, then upon the occurrence of the event(s) giving rise to a monetary obligation as measured by the applicable provisions of Article 16.B.3. (or in the event Producer has exercised the option provided for in subparagraph 3(d)(ii) below and any attempted transfer pursuant to the option is finally determined to be ineffective to transfer the rights, and/or the provision(s) of any Separation of Rights Agreement is/are for any reason ineffective to transfer the rights sought to be transferred by such agreement, then at such time following the occurrence of the relevant event(s) specified in Article 16.B.3. as such final determination of the ineffectiveness of such transfer is made), then Producer and Artist will be deemed to have negotiated in good faith with respect to Producer's acquisition of all Artist's rights in such Material specified in Article 16.B.3 and Producer will be deemed to have acquired exclusively all of such rights and, in consideration thereof, will pay to Artist and Artist will accept the applicable minimum amounts required by the WGA Agreement for theatrical motion picture, remake, sequel, publication, merchandising, and interactive rights or any other right specified in Article 16.B.3. There will be no crediting of the compensation payable under this Agreement against the payments described in the previous sentence.

      **(ii)**      In the event, however, that it is contemplated that the writing services rendered by Artist under this Agreement are such that separated rights will or may attach to such Material in accordance with the provisions of Article 16.B. of the WGA Agreement, then, if Producer should desire to purchase all rights reserved or otherwise retained by the Artist in such Material pursuant to Article 16.B. of the WGA Agreement (including, without limitation, the rights specified in subparagraph 3(d)(i) above), such separate negotiation and purchase will be conducted with Artist and/or Artist's representative subsequent to an agreement to pay the applicable minimum upset price set forth in Article 16.B. of the WGA Agreement. That negotiation will be memorialized in the separate Separation of Rights Agreement entered into between Artist and Producer at the conclusion of that negotiation and purchase.

      **(iii)**      Except as expressly provided to the contrary in subparagraph 3(d)(i) above, Producer may, if and to the extent permissible under the WGA Agreement, credit any and all sums paid or payable to Artist pursuant to this Agreement in excess of the applicable minimum scale compensation (i.e., overscale) against any and all amounts (other than the amounts agreed to in the Separation of Rights Agreement referred to in subparagraph 3(d)(ii) above) due Artist pursuant to Article 16 by reason of Artist's entitlement to Separation of Rights, including, without limitation, the minimum sequel payments required under Article 16.B. (if any).

3

Apple Non-Performer Exhibit STC – Cut through v2.05.21.19 DG
A032719

PPC-GRAY-0000863

(d)    If Article 16.A. of the WGA Agreement is applicable, then Producer's rights shall include all rights not required by Article 16.A. to be exclusively licensed back to Artist.

(e)    In the event Producer has any option(s) under this Agreement for Artist's services for any additional Contract Year(s) and such services are subject to the WGA Agreement, then the following shall apply:

(i)    Except as otherwise expressly set forth in the main Agreement to which this Exhibit "STC" is attached, Producer shall be entitled to the maximum rights with respect to exclusivity and option periods permitted pursuant to Article 67 of the WGA Agreement. Artist agrees that Producer may, by mutual agreement with Artist, engage Artist for other writing and/or producing assignments and the compensation paid to Artist for such assignments shall be deemed to satisfy the payment required, if any, by the second full paragraph of Article 67.B.2. of the WGA Agreement to the maximum extent permitted thereunder.

(ii)    In the event that Artist's total aggregate compensation guaranteed or earned in a Contract Year (or the last twelve (12) months of such Contract Year, if such Contract Year is extended to a period longer than twelve (12) months) is less than the applicable amount set forth in Article 67.A. or Article 67.B.3. of the WGA Agreement, then Producer shall have the following options: (A) the option to remain in "first position" by paying Artist one-third (⅓) of the current applicable minimum weekly compensation rate under Article 14.K. of the WGA Agreement plus pension and health contributions thereon for each week after the expiration of the ninety (90) day option period set forth in Article 67.B.2. of the WGA Agreement (or in the event that Producer exercised the option before the end of such 90-day option period, but Artist, for reasons other than incapacity or unwillingness, has not commenced writing services within fourteen (14) days after such period, then for each week after the expiration of such 14-day period) until (I) Artist commences services if the option is exercised or (II) Producer provides Artist with written notice releasing Artist from Artist's obligations hereunder; or (B) the option, exercisable in writing in Producer's sole discretion, at any time prior to (or as part of) the last payment to Artist in a Contract Year (or the last twelve (12) months thereof), to pay Artist the difference between Artist's total aggregate compensation in the then-current Contract Year (or the last twelve (12) months thereof) and the applicable amount set forth in Article 67.A. or Article 67.B.3. of the WGA Agreement, and in either such case set forth in subparts (A) and (B) above Artist acknowledges and agrees that the provisions of Article 67.B.1. and Article 67.B.2. of the WGA Agreement shall not be applicable during the then-current Contract Year.

(f)    To the extent that Artist renders services in California, the sums payable under this Agreement include payment in full for three (3) paid sick days that may be taken by Artist during each year of the engagement for any purpose permitted under California Labor Code Section 246.5(a). Unused sick days shall not carry over from year to year.

(g)    To the extent that Artist is entitled to residuals under the WGA Agreement or any other applicable guild or union agreement for the services rendered hereunder, such residuals shall not be credited against amounts in excess of the applicable minimum scale compensation (i.e., overscale), if any, payable to Artist hereunder, or vice-versa.

4.    **CREDIT.** All matters relating to credit not expressly addressed in this Agreement shall be determined by Producer in its sole discretion. Producer will have no obligation to accord Artist credit except as expressly provided in the Agreement. No casual, inadvertent or unintentional failure to comply with any provisions of this Paragraph 4 or other provisions of this Agreement relating to credit, nor any failure by any third party to comply with such provisions, will constitute a breach by Producer of this Agreement. Following written notice to Producer from Artist specifying in reasonable detail any material failure by Producer to comply with any credit provision hereof, Producer agrees to use reasonable efforts to cure prospectively any actual failure to comply; provided, however, nothing contained herein shall require Producer to cease using, or to replace prints, negatives or any other materials then in existence (except as otherwise required under any applicable CBA). Producer shall take reasonable steps to advise third party distributors

4

with whom Producer is in direct privity of contract of the credit obligations under this Agreement. If payment of any compensation is conditioned on Artist's receipt of a particular writing credit pursuant to the WGA Agreement, such payment of compensation shall be based on either (a) the credit provided for in the notice of tentative credits, if such tentative credits become final in accordance with the WGA Agreement, or (b) by credit arbitration under the WGA Agreement. For the avoidance of doubt, any agreement relating to credit between or among Artist and any other Person(s) involved in the Series shall not be binding on Producer for any purpose whatsoever. All of the provisions of this Paragraph 4 and other provisions in this Agreement relating to credit shall be subject to the terms of any applicable guild or union collective bargaining agreement and applicable network/exhibitor (i.e. Apple Inc. and its subsidiaries) policies, restrictions and approvals (which approvals Producer will use good faith efforts to obtain, it being understood and agreed that no failure by Producer to obtain such approvals will be deemed a breach of this Agreement by Producer).

5.    · MANNER OF PRODUCTION AND OWNERSHIP OF SERIES.

    (a)    Artist acknowledges and agrees that the Series, any episode thereof, or other work which is based on the results and proceeds of Artist's services under this Agreement may contain variations, alterations, and/or adaptations of such results and proceeds and Producer will have the right, in Producer's sole discretion, to edit, modify, add to and revise in any manner the Material and such results and proceeds and any element(s) of the foregoing. To the full extent permitted by applicable law, Artist irrevocably assigns to Producer (or irrevocably waives, in the event assignment is not permissible) any and all benefits of any provision of law known as "droit moral," "moral rights," or any similar law in any and all countries of the world. Without limiting the foregoing, Artist agrees not to institute, support, maintain, or authorize any action or lawsuit based, in whole or in part, on any purported violation of any such law. Producer may produce the Series and any episode of the Series in whatever manner it chooses and will at all times have complete control over the production of the Series and any episode thereof including, without limitation, all creative, personnel and business decisions related thereto.

    (b)    The Series, any episode thereof, and all Material pertaining thereto (including all Material owned and controlled by Artist which is incorporated or used in connection with the Series), all results and proceeds of Artist's services under this Agreement (which Artist acknowledges may be rendered in collaboration with others) and all copyrights pertaining to the foregoing and extensions and renewals of the foregoing, are and will be the sole and exclusive property of Producer in perpetuity and in all languages throughout the universe and will constitute a "work made for hire" specially ordered or commissioned by Producer within the meaning of the copyright laws of the United States or any similar or analogous law or statute of any other jurisdiction. To the extent any such results and proceeds are ever determined by a court of competent jurisdiction not to be a "work made for hire," Artist hereby irrevocably and exclusively assigns to Producer, in consideration for the compensation provided under this Agreement, all right, title and interest in and to such results and proceeds including, without limitation, all exclusive exploitation rights and copyright and associated rights in the foregoing and all extensions and renewals of the foregoing throughout the universe in perpetuity. Producer will exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to the Series or any portion or element of the foregoing (either alone or combined with other Material), and any sequel, prequel, remake or spin-off of the foregoing including, without limitation, the copyrights therein and any renewals or extensions of the foregoing, for all now known or hereafter existing uses, media, forms, means and methods of any kind whatsoever and all allied, ancillary and subsidiary rights and uses of the foregoing. Artist agrees to execute and deliver to Producer any and all documents consistent herewith that Producer deems in its interest to effectuate the preceding assignments. Artist further agrees that Artist will not seek to challenge through the courts, administrative governmental bodies, private organizations, or in any other manner the rights of Producer to exploit Artist's results and proceeds hereunder by any means whatsoever or to thwart, hinder or subvert the intent of the preceding assignments to Producer and/or the collection by Producer of any proceeds relating to the rights assigned hereunder. Producer shall have the right, without additional compensation to Artist, to: (i) use, combine and grant others the right to use and combine the Series or any element thereof, as a part of, or otherwise in

5

CONFIDENTIAL

connection with, any episode of the Series or other audio-visual program or series or with any other Material of any nature whatsoever; (ii) use and reuse any portion of the Series in or as a trailer or spot advertisement in any medium to advertise, promote or publicize the Series or any other program or series of which any episode or any element thereof may be a part; and (iii) use any element of the Series in connection with audience tests. All rights granted or agreed to be granted to Producer hereunder will vest in Producer immediately and irrevocably and will remain perpetually vested in Producer, its successors or assigns, whether this Agreement expires in its normal course or is terminated for any reason whatsoever.

6.    __ARTIST'S LIKENESS.__

(a)    Producer will have the irrevocable and exclusive right in perpetuity throughout the universe to use and to grant others the right to use Artist's likeness, without payment of additional compensation, in and in connection with advertising, promoting, publicizing or otherwise exploiting:

(i)    Artist's services under this Agreement, the Series or any episode of the Series (including any episode for which Artist did not render services), any other series of which any such episode may be a part, and any rights granted to Producer under this Agreement (including, without limitation, in connection with so-called "behind-the-scenes" or "making of" footage);

(ii)    the name, product or services of Producer and any exhibitor, platform or station over which the Series or any episode of the Series is exhibited;

(iii)    the music or recordings written for and/or performed in the Series and/or any episode of the Series; and

(iv)    any literary Materials derived from or related to the Series or any episode thereof.

(b)    Whenever Artist is rendering or is obligated to render services under this Agreement, and thereafter subject to Artist's professional availability at such time or times as Producer may require, Artist will, without additional compensation, cooperate with Producer at such times and in such manner as Producer may require for the purpose of advertising, promoting, publicizing or otherwise exploiting: the Series and any episode of the Series (including, without limitation, appearing in so-called "behind-the-scenes" or "making of" footage, posing for publicity pictures and appearing for such interviews as Producer may designate); the name, products or services of any exhibitor or Sponsor of the Series; and, any rights granted to Producer under this Agreement.

(c)    Notwithstanding any provision to the contrary in this Agreement, Producer agrees not to use or authorize the use of Artist's likeness as a direct, express, personal, testimonial-like endorsement of a product or service (except for the Series and episodes thereof) without obtaining Artist's consent with respect thereto. Further, notwithstanding any provision to the contrary in this Agreement, Producer agrees not to use or authorize the use of Artist's likeness in connection with any merchandising or commercial tie-ins (but Producer may use Artist's name as part of a billing block in connection with merchandising and commercial tie-ins).

(d)    Artist may provide Producer with an approved complete, factual and accurate biography of Artist to be used in connection with Producer's publicity for the Series (which may be edited for length and accuracy). If biographical material is requested, Artist shall supply such biography within two (2) business days of Producer's request (or by the next business day, if Producer advises Artist that time exigencies exist as Producer determines in its sole discretion). In no event shall Producer be prohibited from using Artist's prior industry credits as part of Artist's biography. In the event that Artist fails to provide Producer with such biographical material as and when requested, Producer shall be free to use

6

CONFIDENTIAL                                                                          PPC-GRAY-0000866

biographical material of its choice. No casual or inadvertent failure by Producer to comply with the aforesaid provisions relating to biographical material shall be a breach of this Agreement.

7.   **NO OBLIGATION TO PRODUCE OR RELEASE; DEFINITION OF "PAY-OR-PLAY".** Artist's engagement under this Agreement is on a "pay-or-play" basis, meaning Producer will have no obligation to utilize Artist's services or any of the results and proceeds thereof, or to produce, distribute or otherwise exploit the Series or any of the rights granted to Producer under this Agreement; and if Producer elects to cease utilizing Artist's services (i.e., elects to "pay-or-play" Artist), Producer's obligations to Artist hereunder will be fully performed by the payment to Artist of (i) the applicable fixed compensation provided for hereunder with respect to any episode of the Series or working weeks, as the case may be, for which Producer has guaranteed Artist compensation, and (ii) the contingent compensation, if any, vested at the time Producer elects to "pay-or-play" Artist, each of which shall be subject to all of Producer's rights under this Agreement, including, without limitation, Producer's rights under Paragraph 11 below. In the event Producer elects to "pay-or-play" Artist, the insurance and indemnification obligations of each of the parties shall remain in full force and effect. In the event that Producer elects to "pay-or-play" Artist, Artist will use best efforts to mitigate Producer's payment of any guaranteed compensation hereunder and any compensation Artist earns during the period that Artist would have rendered services hereunder if Producer had not elected to "pay-or-play" Artist will offset such guaranteed compensation or any other compensation payable hereunder.

8.   **MAIL.** Producer, any Sponsor, exhibitor, platform or station which is or was licensed to exhibit the Series, may open and answer mail (including, without limitation, electronic mail) addressed to Artist which is delivered to Producer or any such entity in connection with the Series and/or any services rendered by Artist hereunder. Producer agrees to use reasonable efforts to deliver to Artist any personal mail (i.e., not fan mail) that is actually received by Producer, but Producer's failure to do so will in no case be deemed a breach hereof, and no liability whatsoever will attach to Producer for failure to deliver to Artist any such personal mail.

9.   **ARTIST'S REPRESENTATIONS AND WARRANTIES.** Subject to Article 28 of the WGA Agreement (to the extent applicable to Artist's services), Artist represents, warrants and agrees that: (a) Artist is free to enter into this Agreement and no rights of any Persons are or will be violated by Artist entering into or performing this Agreement; (b) Artist is not subject to any conflicting obligation or any disability that would prevent Artist's performance hereunder and cannot be reasonably accommodated, and, to the best of Artist's knowledge (including that which Artist should have known in the exercise of reasonable prudence and due diligence), Artist has not made and will not hereafter make any agreement with any third party which could conflict with the rights granted to Producer hereunder or materially interfere with the full performance of Artist's obligations and services hereunder (which determination of material interference or noninterference shall be made by Producer in its good faith business judgment); (c) all Material furnished by Artist in connection with Artist's services hereunder is and will be wholly original with Artist except for matters in the public domain (provided that all of the material cannot be in the public domain and Artist shall inform Producer of any material that is in the public domain) or material furnished to Artist by Producer or on behalf of Producer at Producer's request and direction (except to the extent that Artist modifies or adds to such material) and, to the best of Artist's knowledge (including that which Artist should have known in the exercise of reasonable prudence and due diligence), such Material will not violate or infringe upon any right of any kind or nature whatsoever of any Person, including, without limitation, any right of privacy or publicity of any Person; (d) no rights in the Material have been granted to others or impaired by Artist, and there are and will be no encumbrances, liens, conditions or restrictions whatsoever upon or affecting the Material; (e) no part of the Material has been registered for copyright, published or otherwise exploited or agreed to be published or otherwise exploited, or is in the public domain; (f) to the best of Artist's knowledge (including that which Artist should have known in the exercise of reasonable prudence and due diligence) there is no pending or threatened claim or litigation in connection with the Material or the rights granted to Producer hereunder; (g) this Agreement is not and will not be subject to any claim against Producer for fees or commissions by any agent or representative of Artist or any other Person; (h) Artist has obtained and will maintain at all times during the Term any and all work permits,

7

immigration clearances (including the completion of Immigration Reform Act Form I-9) and any other work clearances, whether foreign or domestic, necessary to enable Artist to perform Artist's services hereunder (Artist acknowledges that any offer to be engaged hereunder is conditioned upon compliance with this subpart (h)); (i) Artist is familiar with the provisions of Section 508 of the Federal Communications Act, as amended (47 U.S.C. Section 508), (requiring full on-air disclosure of any payment or consideration made to talent in exchange for an agreement or mention or other exposure of any Material, including a brand name, product or service), is aware that the violation of this statute constitutes a criminal offense, has not accepted or agreed to accept, and will not accept or agree to accept, any payment or consideration in exchange for promotional mention or exposure, and has not done and will not do any other act that would require disclosure pursuant to this statute; and (j) to the best of Artist's knowledge (including that which Artist should have known in the exercise of reasonable prudence and due diligence), Artist is in sound physical condition and is in good health with respect to Artist's full performance of all of Artist's services hereunder.

10.    <u>INDEMNITIES.</u>  Subject to Article 28 of the WGA Agreement (to the extent applicable to Artist's services), Artist agrees to indemnify and hold harmless Producer and Producer's parent, subsidiary and affiliate companies, licensees and assigns, and the officers, directors, shareholders, employees, representatives and agents of each of the foregoing, from and against any liabilities or losses to third parties and any third party claims, demands, costs and expenses (including, without limitation, reasonable outside attorneys' fees and reasonable out of pocket costs of defense) arising in connection with: (a) any breach or alleged breach of any representation, warranty or agreement of Artist hereunder (excluding nuisance or frivolous claims as determined by Producer in its reasonable discretion); (b) any third party's claim to an amount payable hereunder; or (c) any gross negligence or willful, unlawful misconduct and/or other intentional tortious act or omission of Artist and/or any agent, employee, guest or invitee of Artist that results in or contributes to any damage to property or injuries to or the death of Artist or any other Person. Producer agrees to defend (provided that Artist cooperate with Producer and follow Producer's reasonable instructions in connection with such defense), indemnify and hold harmless Artist from and against any liabilities or losses to third parties and any third party claims, demands, costs and expenses arising in connection with: (i) Artist's use pursuant hereto of any material furnished to Artist by Producer or on behalf of Producer at Producer's request and direction; (ii) claims arising out of the development, production, distribution and exploitation of the Series (or any element thereof); and (iii) Producer's material breach of any of its representations, warranties and/or covenants made herein; but only to the extent that Artist's indemnities hereunder are not applicable and subject to the limitations, restrictions, terms and conditions of the Agreement. The provisions of this Paragraph will not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Artist in connection with this Agreement. Producer will have the absolute right to control the defense, litigation or other resolution of any claim, demand or action to which any indemnity under this Paragraph 10 applies. Artist shall have a reasonable right to consult with Producer regarding such defense, litigation and/or resolution, and may have Artist's own counsel, at Artist's sole expense, provided that such counsel cooperates fully with Producer. The parties' obligations pursuant to this Paragraph 10 will survive the expiration or earlier termination of this Agreement. Each party hereto will, upon receipt of the presentation of any claim or notification of the filing of any action that might require indemnification hereunder, promptly notify the other party of such claim or filing; provided, however, any failure to so notify shall not waive, limit or prejudice any right of indemnification hereunder except only in the event and only to the extent that such failure waives, limits or otherwise prejudices any defense or counterclaim to such claim or institution of action.

11.    <u>DEFAULT, INCAPACITY AND FORCE MAJEURE.</u>

        (a)    <u>Default.</u>

                (i)    <u>Definition.</u>  A default will be deemed to exist if, at any time in Producer's opinion: (A) Artist breaches any provision hereof; (B) Artist fails, refuses or neglects (except solely by reason of Artist's Incapacity or a Force Majeure as defined below), or Producer is notified that Artist intends to fail, refuse or neglect to render and fully

8

CONFIDENTIAL                                                                          PPC-GRAY-0000868

complete Artist's services to the full extent of Artist's ability as, when or where reasonably required by Producer hereunder, or to comply fully with Artist's obligations as reasonably required by Producer hereunder (provided Artist may not refuse to render or complete services on the grounds that Artist believes such services to be unreasonable from a creative standpoint); (C) Artist fails to confirm in writing within twenty-four (24) hours following Producer's request for such confirmation, that Artist will perform fully Artist's obligations hereunder; (D) Artist violates any Producer policy or policies of its licensees (including but not limited to Producer's Sexual Harassment Policy and Code of Conduct and any applicable security policies); (E) Lender and/or Artist at any time, prior to or during the term or thereafter: (1) commits any act or omission constituting a felony, a misdemeanor or other violation of criminal law, an intentional tort, reckless conduct, gross negligence or other malfeasance or (2) refuses or neglects to govern Artist's conduct with due regard to social conventions and public morals; any of which (i) brings Lender and/or Artist into public disrepute, (ii) reflects unfavorably upon Lender and/Artist, Viacom, Producer, or exhibitor of the Series, (iii) causes Viacom, Producer, or exhibitor of the Series to incur public disrepute or humiliation, contempt, scandal, or ridicule, (iv) insults or offends the community or any substantial group thereof, or (v) otherwise constitutes good cause ("**Default**"). If any of the above conditions occur, then Producer may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event, and further, Producer may, with or without terminating this Agreement, delete any credit theretofore given to Artist in connection with the Series and may thereafter disregard any credit obligations of this Agreement, subject in each case to the applicable guild agreement(s), if any. Any occurrence that otherwise would be deemed an Incapacity will instead be deemed a Default if such occurrence is a result of Artist's current use of alcohol or any drug or controlled substance (excluding any prescription medications prescribed to Artist by a licensed health care provider that Artist is properly using for the purposes prescribed and in accordance with the prescribing health care provider's instructions).

        (ii)    <u>Suspension</u>.  If a Default occurs at any time during Artist's engagement hereunder, then notwithstanding anything to the contrary contained herein, such engagement may, at Producer's election, be automatically suspended, it being understood and agreed that Producer will undertake reasonable efforts to confirm any such suspension in writing, but in no event will the effectiveness of such suspension be subject to Producer actually sending any such written confirmation, or to Artist's receipt of said written confirmation nor will Producer's failure to send any such written confirmation constitute a breach by Producer of this Agreement. Such suspension will continue until such date as Producer designates in its sole discretion.

        (A)    <u>Artist's Compensation and Services</u>.  No compensation will accrue during a suspension. Producer's payment of any compensation to Artist during a suspension will not be deemed a waiver by Producer of any of its rights hereunder, and Producer may apply any such payment against compensation that accrues prior to or following the expiration of a suspension. Regardless of whether Artist is compensated hereunder on a per-week, per-episode or other basis, Producer may, at its election, reduce payment to Artist by the number of weeks, or portions thereof, or episodes affected by such Default. During any period of suspension, Artist will not render services for any other Person or on Artist's own behalf. Artist will resume rendering services upon such date as Producer designates in its sole discretion following the lifting of any suspension upon forty-eight (48) hours' notice.

        (B)    <u>Extension/Reduction of Time Periods</u>.  Producer will have the right to extend or reduce any time period hereunder including, without limitation, the Term, any Contract Year and any date for the exercise of any option or any right hereunder, by a period of time not to exceed the aggregate length of the suspension(s). If a suspension includes a start date for Artist's services that was designated by Producer prior to the suspension, then Producer may postpone the start date for any length of time up to the aggregate length of the suspension(s), or, in its sole discretion, cancel such start date.

        (iii)    <u>Termination</u>.  At any time during or following a Default, regardless of whether or not Producer has exercised its right of suspension, Producer may terminate Artist's engagement hereunder by written notice to Artist.

9

CONFIDENTIAL

If Artist's engagement is terminated, Artist will immediately reimburse Producer for all paid but unearned sums and Producer will be relieved of any and all further obligations to Artist; provided that nothing in this Paragraph shall be deemed to relieve Producer of the obligation to pay Artist the fixed and/or contingent compensation earned and vested hereunder, if any, as of the date of such termination for services actually rendered by Artist, and the insurance and indemnification obligations of each of the parties shall survive the termination of Artist's services under this Paragraph.

      **(b)**      <u>Incapacity</u>.

            **(i)**      <u>Definition</u>. An incapacity will be deemed to exist if Artist is unable to perform or is prevented from performing hereunder by reason of: (A) Artist's physical or mental illness, other disability (that cannot be reasonably accommodated) or death; (B) any labor controversy (including, without limitation, any lockout, walkout, strike or threat thereof (**"Labor Controversy"**) involving a CBA governing any of Artist's services hereunder; or (C) Artist's failure to comply with any obligation hereunder by reason of any cause rendering such non-compliance excusable at law (**"Incapacity"**). Any occurrence that otherwise would be deemed an Incapacity will instead be deemed a Default if such occurrence is a result of Artist's current use of alcohol or of any drug or controlled substance (excluding any prescription medications prescribed to Artist by a licensed health care provider that Artist is properly using for the purposes prescribed and in accordance with the prescribing health care provider's instructions). If Producer or Artist at any time alleges that Artist is, or if Artist actually is, incapacitated by illness, other disability, or a Default of the kind described in the preceding sentence, then Producer may, at Producer's expense, require Artist to submit to medical examination(s) to be conducted by such physician(s) as may be designated by Producer. Artist may have his or her own health care provider present at any such examination(s) at Artist's sole expense, provided that the presence of such health care provider does not delay or interfere with such examination(s).

            **(ii)**      <u>Suspension</u>. If an Incapacity occurs at any time during Artist's engagement hereunder, then notwithstanding anything to the contrary contained herein, such engagement may, at Producer's election, be automatically suspended, it being understood and agreed that Producer will undertake reasonable efforts to confirm any such suspension in writing, but in no event will the effectiveness of such suspension be subject to Producer actually sending any such written confirmation, or to Artist's receipt of said written confirmation nor will Producer's failure to send any such written confirmation constitute a breach by Producer of this Agreement. Such suspension will continue until such date as Producer designates in its sole discretion.

            **(A)**      <u>Artist's Compensation and Services</u>. No compensation will accrue during a suspension. However, Artist shall be entitled to receive compensation that accrued prior to the suspension (e.g., fees for completed services on completed episodes). Producer's payment of any compensation to Artist during a suspension will not be deemed a waiver by Producer of any of its rights hereunder, and Producer may apply any such payment against compensation that accrues prior to or following the expiration of a suspension. Regardless of whether Artist is compensated hereunder on a per-week, per-episode or other basis, Producer may, at its election, reduce payment to Artist by the number of weeks, or portions thereof, or episodes affected by such Incapacity. During any period of suspension, Artist will not render services for any other Person or on Artist's own behalf. If during a suspension for incapacity Artist has the opportunity to render services for Producer that are significantly different from those required under this Agreement and that are not affected by the incapacity, then Artist may render such different services during such suspension for incapacity, and Producer shall discuss in good faith with Artist allocating a portion of the episodic fee payable hereunder as compensation for such services. Artist will resume rendering services upon the date that Producer designates in its sole discretion following the lifting of any suspension upon twenty-four (24) hours' notice.

            **(B)**      <u>Extension/Reduction of Time Periods</u>. Producer will have the right to extend or reduce any time period hereunder including, without limitation, the Term, any Contract Year and any date for the exercise of any option or any right hereunder, by a period of time not to exceed the aggregate length of the suspension(s). If a

10

CONFIDENTIAL

suspension includes a start date for Artist's services that was designated by Producer prior to the suspension, then Producer may postpone the start date for any length of time up to the aggregate length of the suspension(s), or, in its sole discretion, cancel such start date.

(iii)    **Termination.**  At any time during or following an Incapacity, regardless of whether or not Producer has exercised its right of suspension, Producer may terminate Artist's services hereunder by written notice to Artist. Such termination may occur at any time (A) before commencement of Artist's services hereunder during the First Contract Year, or (B) at any time after the continuance of such Incapacity for at least ten (10) consecutive days during periods of preproduction, production and/or postproduction or twenty-one (21) consecutive or aggregate days during any other period during any Contract Year. If Artist's engagement is terminated, Artist will immediately reimburse Producer for all paid but unearned sums and Producer will be relieved of any and all further obligations to Artist; provided that nothing in this Paragraph shall be deemed to relieve Producer of the obligation to pay Artist the fixed and/or contingent compensation earned and vested hereunder, if any, as of the date of such termination and the insurance and indemnification obligations of each of the parties shall survive the termination of Artist's services under this Paragraph.

(c)    Force Majeure.

(i)    **Definition.**  An event of force majeure will exist if, in Producer's opinion, the development, production or exhibition of the Series or any episode thereof, is interfered with, hampered, prevented or discontinued (including, without limitation, instances where an exhibitor, financier or Sponsor refuses to accept delivery of the Series or any episodes thereof) (**"Force Majeure"**). In addition to the customary causes of force majeure (e.g., acts of God, war, epidemic), a Force Majeure may result from a Labor Controversy (excluding any Labor Controversy that is deemed an incapacity because it involves a CBA governing any of Artist's services hereunder), governmental order or regulation, judicial order or judgment, failure of any key production personnel or any member of the cast to perform for any reason, reduction of the Series order, or failure or substantial impairment of technical facilities or in obtaining adequate resources, all as determined in Producer's sole discretion.

(ii)    **Suspension.**  Subject to the terms of any applicable CBA, if a Force Majeure occurs at any time during Artist's engagement hereunder, then notwithstanding anything to the contrary contained herein, such engagement may, at Producer's election, be automatically suspended, it being understood and agreed that Producer will undertake reasonable efforts to confirm any such suspension in writing, but in no event will the effectiveness of such suspension be subject to Producer actually sending any such written confirmation, or to Artist's receipt of said written confirmation, nor will Producer's failure to send any such written confirmation constitute a breach by Producer of this Agreement. Such suspension will continue until such date as Producer designates in its sole discretion; provided, however, Artist shall have the right to elect to terminate engagement hereunder in the event that a suspension lasts for a period in excess of six (6) weeks, consecutively, during a Contract Year. Producer shall not suspend Artist more than once for any continuing event of Force Majeure; provided, however, that Producer may re-suspend Artist for a reoccurrence of any event of Force Majeure.

(A)    Artist's Compensation and Services.  Subject to the terms of any applicable CBA, no compensation will accrue during a suspension. Artist retains, however, the right to receive compensation that accrued (e.g., fees for completed services on completed episodes) prior to the commencement of a suspension. Producer's payment of any compensation to Artist during a suspension will not be deemed a waiver by Producer of any of its rights hereunder, and Producer may apply any such payment against compensation that accrues prior to or following the expiration of a suspension. Regardless of whether Artist is compensated hereunder on a per-week, per-episode or other basis, Producer may, at its election, reduce payment to Artist by the number of weeks, or portions thereof, or episodes affected by such Force Majeure. Provided Artist is not in Default and Producer is not compensating Artist hereunder,

11

CONFIDENTIAL

then during a suspension for Force Majeure, Artist may render services for third parties or on Artist's own behalf, however Artist must be available to resume services in accordance with this Agreement within forty-eight (48) hours, which shall be reduced to twenty-four (24) hours in the event of production exigencies.

        **(B)**   **Extension/Reduction of Time Periods.** Producer will have the right to extend or reduce any time period hereunder including, without limitation, the Term, any Contract Year and any date for the exercise of any option or any right hereunder, by a period of time not to exceed the aggregate length of the suspension(s). If a suspension includes a start date for Artist's services that was designated by Producer prior to the suspension, then Producer may postpone the start date for any length of time up to the aggregate length of the suspension(s), or, in its sole discretion, cancel such start date.

        **(iii)**   **Termination.** At any time during or following a Force Majeure, regardless of whether or not Producer has exercised its right of suspension, Producer may terminate Artist's engagement hereunder by written notice to Artist. If Artist's engagement is terminated, Artist will immediately reimburse Producer for all paid but unearned sums and Producer will be relieved of any and all further obligations to Artist; provided that nothing in this Paragraph shall be deemed to relieve Producer of the obligation to pay Artist any fixed and, if applicable, contingent compensation earned and vested hereunder, if any, as of the date of such termination and the insurance and indemnification obligations of each of the parties shall survive the termination of Artist's services under this Paragraph. Producer further agrees that in the event of any termination of Artist's engagement for Force Majeure, any credit obligations that vested prior to such termination shall remain in full force and effect.

    **(d)**   **General Terms.**

        **(i)**   Subject to the terms of any applicable CBA, no suspension or termination hereunder of Artist's engagement will affect any right Producer may have to recover damages from Artist or to pursue any other rights or remedies at law, in equity or otherwise, nor will any such suspension or termination of Artist's engagement relieve Artist of any obligations pursuant to any representation, warranty or agreement of Artist.

        **(ii)**   Without limiting any rights and remedies hereunder, Artist authorizes Producer to withhold and deduct from any sums due to Artist under this or any other agreement between Producer and Artist any amounts for damage, loss or expense caused to Producer by Artist and Artist will remain liable to Producer for the full amount of said damage, loss or expense to the extent such withheld or deducted compensation or other payment is insufficient to satisfy said amount.

        **(iii)**   If a Force Majeure or an Incapacity is based upon a Labor Controversy, then provided Producer lifts or otherwise alters the scope of a suspension, Producer may require Artist (at any time following twenty-four (24) hours' notice to Artist) to resume any portion of Artist's services not covered by the CBA serving as the basis of the Labor Controversy.

        **(iv)**   In the event Producer suspends or terminates Artist's services hereunder, and Artist has rendered material services on any episode of the Series for which production has not been completed at the time of such suspension or termination, Producer shall consider in good faith paying a portion of the applicable fixed episodic fee that would have been payable had production of such episode been completed.

**12.**   **INSURANCE.** Producer will have the right to apply for and take out any form and amount of insurance covering Artist that Producer deems necessary to protect Producer's interest, and Artist will have no right, title or interest in or to any such insurance. Artist will assist Producer in obtaining such insurance by submitting to customary medical and other examinations and by signing such applications, statements and other instruments as may be reasonably required by any

Apple Non-Performer Exhibit STC – Cut through v2.052119.OG
A032719

CONFIDENTIAL

insurance company (which documents Artist agrees to complete fully and truthfully). Artist may have a personal health care provider present at such examinations at Artist's expense, provided that no delay or interference with such examinations results therefrom. If Artist fails or is unable to qualify for such insurance at Producer's customary rates for the then-current Contract Year, Producer will have the right to terminate this Agreement; provided, however, that Producer's right to terminate this Agreement by reason of such failure or inability will be exercised, if at all, no later than 10 business days following Producer's receipt of notification from the insurance company or insurance agent of such failure or inability.  Producer will not have the right to terminate this Agreement for any such failure or inability if such insurance can be obtained for an amount in excess of Producer's customary rates if Artist agrees to pay the incremental cost and agrees to be financially liable, in a manner satisfactory to Producer, for increased deductibles and other increased expenses. During Artist's engagement hereunder, unless pre-approved in writing by Producer, Artist will not: (a) travel on any chartered or other unscheduled plane, (b) engage in any conduct prohibited by any insurance policy obtained by Producer in accordance with this Paragraph, or (c) engage in any hazardous activity without the prior written consent of Producer.

13.    **RIGHT TO EQUITABLE RELIEF.**

        **(a)**    Artist acknowledges that the services Artist renders hereunder are of a special, unique, unusual, extraordinary and/or intellectual character that gives them a peculiar value, the loss of which Producer cannot be reasonably or adequately compensated for in damages, and that a breach by Artist of any provision hereunder will cause Producer irreparable injury. Artist expressly agrees that Producer will be entitled to injunctive and other equitable relief to prevent a breach of this Agreement and to secure its enforcement. Notwithstanding the foregoing, Producer acknowledges that injunctive relief is not automatically granted, but may only be awarded by a court or arbitrator of appropriate jurisdiction. Artist acknowledges that Producer has complied with the minimum compensation requirements of Civil Code Section 3423 and Code of Civil Procedure Section 526 with respect to such injunctive relief.

        **(b)**    Artist acknowledges that, in the event of any breach hereunder by Producer or any negligent or willful act of any third party, the damage, if any, caused to Artist will not be irreparable or otherwise sufficient to entitle Artist to seek injunctive or other equitable relief, unless and only to the extent that Artist is otherwise entitled under any applicable CBA. Artist acknowledges that Artist's rights and remedies in any such event will be strictly limited to the right, if any, to recover damages, and Artist will not have the right to: (i) rescind this Agreement or any of Producer's rights hereunder, (ii) enjoin the production, exhibition, marketing or other exploitation of the Series, any episode thereof, any subsidiary or allied rights, or any other results and proceeds of Artist's services hereunder, or (iii) terminate Artist's services or obligations hereunder due to such breach. No act or omission of Producer which would otherwise constitute a breach of this Agreement will be so deemed unless Artist notifies Producer in writing setting forth the basis for such alleged breach and Producer fails to commence reasonable efforts to cure such alleged breach within thirty (30) days of Producer's receipt of such notice.

14.    **ASSIGNMENT.**  Producer may assign this Agreement and/or any of its rights or obligations hereunder to any third party, and this Agreement may be reassigned by any assignee thereof, it being agreed that Producer will be released from any obligations so assigned. Producer shall remain primarily liable to Artist for its obligations hereunder; provided, however, if such assignee is a network, major or "mini-major" studio or production company, cable company, satellite company, or other financially responsible party, and such assignee assumes in writing the obligations of Producer hereunder, Producer shall be relieved and discharged from its obligations hereunder. If Producer assigns this Agreement or any of Producer's rights or obligations hereunder, then references in the applicable provisions so assigned throughout this Agreement to "Producer" will be deemed to be references to Producer's assignee. Artist may not assign or otherwise transfer this Agreement or any of Artist's rights or obligations hereunder. Any attempted or purported assignment or transfer in violation of the terms set forth in this paragraph will be null and void and of no force or effect.

13

CONFIDENTIAL

15.    <u>COLLECTIVE BARGAINING AGREEMENT</u>.

(a)    During Artist's engagement hereunder, Artist shall be a member in good standing of any applicable union having jurisdiction over Persons rendering services of the type required of Artist hereunder. If Artist fails to meet such requirement, Producer may, at its election, terminate this Agreement, or pay, on Artist's behalf, any required dues, fees or other payments to such union. In the event of any such payment, Artist authorizes Producer to withhold and deduct the amounts paid (including any applicable administrative costs incurred) from any sums payable to Artist pursuant to this Agreement. Artist will have the right, on a one (1)-time-only basis during the Term of this Agreement, to cure such requirement which is curable and unintentional, within twenty-four (24) hours of the occurrence of such requirement lapsing or notice thereof, it being understood and agreed that if Artist cures such requirement within said time period to Producer's complete satisfaction, in Producer's sole discretion, Producer will not have the right to terminate this Agreement and withhold and deduct the amounts paid from sums payable to Artist hereunder.

(b)    In the event any guild or union collective bargaining agreement ("**CBA**") is applicable to Artist's services rendered hereunder and binding upon Producer, then said services will be rendered pursuant to the terms and conditions of such CBA. Except as expressly provided to the contrary herein, Producer will be entitled to the maximum benefits and acquire the maximum rights provided for in such CBA. Further, except as expressly provided to the contrary herein, any amounts required by the CBA to be paid to Artist will be paid at the minimum applicable CBA rates and, to the full extent permitted under such CBA, credited toward and applied against any amounts payable to Artist pursuant to this Agreement, and vice-versa. Producer shall make all pension, health, and welfare contributions as may be required under such CBA resulting from any services of Artist hereunder covered by such CBA. If any provision(s) of this Agreement conflict(s) with the mandatory provisions of any such CBA, the CBA will prevail, and the provision(s) of this Agreement so affected will be limited only to the extent necessary to permit compliance with the minimum mandatory provisions of such CBA. To the extent Artist is not exempt from the provisions of Article 14.K.2. of the WGA Agreement, then in the event that Artist's total aggregate compensation received in a contract Year is less than the applicable amount set forth in Article 14.K.2. of the WGA Agreement, Producer shall have the right, exercisable in writing (which may be via e-mail) in Producer's sole discretion, at any time prior to expiration of the applicable span period (i.e., 2.4 weeks times the number of episodes produced in the contract Year), to pay or guarantee Artist the difference between Artist's total aggregate compensation (excluding episodic script fees) in the then-current Contract Year and the applicable amount set forth in Article 14.K.2. of the WGA Agreement.  Artist acknowledges and agrees that upon such notice from Producer, Artist shall be exempt from the provisions of Article 14.K.2. of the WGA Agreement.

16.    <u>NOTICES</u>. All notices from Producer to Artist will be given to Artist in writing at Artist's address as indicated in this Agreement, or at such other address as may be designated in writing by Artist to Producer. Artist will keep Producer notified and advised as to where Artist may be reached by telephone without unreasonable delay. All notices from Artist will be given in writing to Producer at 5555 Melrose Avenue, Los Angeles, California 90038, Attention: Legal, Television Group, or to such other address as may be designated in writing by Producer to Artist. All such notices will be sufficiently given and deemed effective on the date such notice is (a) hand-delivered, (b) deposited, postage prepaid in the mail, or (c) sent by Federal Express; provided, however, that if a notice is sent by mail or only by Federal Express (i.e., not by hand-delivery), such notice shall be deemed received three (3) days after such notice is sent by mail or two (2) days after such notice is sent by Federal Express, unless a courtesy copy is also sent by e-mail to or from (as applicable) Producer's Business Affairs Department or Legal Affairs Department on or before the date such notice is sent by mail or Federal Express, in which case such notice shall be deemed given on the date sent by mail or Federal Express (i.e. not the date of the e-mail). In addition to the foregoing, subject to the WGA Agreement, if applicable, notices of tentative writing credit will be sufficiently given and deemed effective on the date such notice is emailed to Artist. Notwithstanding the foregoing, any notice from Producer which is actually received by Artist, Artist's agent or other designated representative will be deemed, at Producer's election, notice sufficiently given under this Agreement. Failure by

14

Apple Non-Performer Exhibit STC – Cut through v2.052119.DG
A032719

PPC-GRAY-0000874

Producer to provide a courtesy copy of a notice will not be deemed a breach of this Agreement, or cause such notice to be ineffective. In the event that a notice date would otherwise take effect on a Saturday, Sunday or national holiday, during the period between Christmas and New Year's Day, or on any other day on which either party is closed for business, said notice period will be extended without notice until the end of the next business day.

**17.    RELOCATION EXPENSES.**  Unless otherwise specifically provided herein, if the Series is produced on a continuing basis at a production location which is more than Seventy-Five (75) miles away from Artist's principal residence and Producer requires Artist to relocate in order to render Artist's ongoing services at such production location, Producer and Artist will negotiate in good faith a relocation package for Artist within Producer's customary parameters.

**18.    GENERAL PROVISIONS.**

(a)    Nothing contained herein will constitute a partnership between or joint venture of Producer and Artist or establish either party as the agent of the other. Neither party will hold itself out contrary to the terms hereof, nor will either party become liable for the representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and will not be deemed to grant any right or remedy to any third party. Nothing contained herein will be construed so as to require the commission of any act contrary to law. If there is any conflict between any provision hereof and any law, order or regulation, the latter will prevail, and this Agreement will be limited only to the extent necessary to permit compliance with such law, order or regulation, and no other provision hereof will be affected by such conflict. All of Producer's remedies, rights, undertakings, obligations and agreements contained in this Agreement will be cumulative and none of them will be in limitation of any other remedy, right, undertaking, obligation or agreement of Producer.

(b)    Artist authorizes Producer to deduct and withhold from Artist's compensation under this or any other agreement the following: (i) telephone and restaurant charges and other expenses chargeable to Artist that are not incurred in connection with Artist's services hereunder and are owed by Artist to Producer; (ii) monies Producer pays Artist beyond that which Producer is obligated to pay hereunder or; and (iii) any and all taxes and other sums that Producer is permitted or required to deduct pursuant to applicable law.

(c)    This Agreement expresses the entire understanding of the parties hereto and replaces any and all former and contemporaneous agreements, understandings, representations or warranties relating to Artist's engagement hereunder. No modification, alteration or amendment of this Agreement will be valid or binding unless in writing and signed by the party to be charged. Artist acknowledges that Artist has not executed this Agreement in reliance upon any representation, warranty or agreement not expressly set forth herein. No waiver by either party of any term, condition or Default under this Agreement will be construed as a waiver by such party of any other term, condition or Default; nor will Producer's exercise of any option hereunder be deemed a waiver by Producer of any Default preceding such exercise.

(d)    **Multiple Parties.**  In the event more than one (1) Person executes this Agreement as "Artist," the word "Artist" whenever and wherever used herein shall be deemed to refer to all such individuals (**"Team"**), and all references throughout this Agreement to "Artist" shall be deemed references to all Team members individually and jointly. The liability of each Team member hereunder will be joint and several, and the breach of any representation, warranty, agreement, or obligation contained herein shall be deemed a breach by each and all Team members. All Team members hereby represent and warrant that they are a bona fide team (as "team" may be defined by any applicable CBA), have agreed with each other (and without Producer's suggestion or direction), prior to engagement by Producer, to collaborate as a team and have obtained any and all guild or union waivers required to permit the Team members to render services hereunder as a team. The compensation payable hereunder shall be paid to each Team member in equal shares, unless Producer is otherwise directed in a writing signed by all Team members. Any such unequal division of

15

Apple Non-Performer Exhibit STC – Cut through v2.052119.DG
A032719

compensation will be subject to Producer's prior written consent each Contract Year. No casual or inadvertent failure by Producer to divide such compensation correctly will be considered a breach of this Agreement by Producer. Producer may, at its election, treat any contingency set forth herein that occurs with respect to any Team member as though such contingency had occurred with respect to any other or all Team members. Without limiting the generality of the foregoing, where Producer is entitled hereunder to suspend or terminate Artist's engagement because of the occurrence of any such contingency, Producer may, at its election, do so with respect to all or less than all Team members, in which latter event Producer may continue to use the services of Team members not so suspended or terminated. In the event Producer uses the services of less than all Team members, the applicable pro rata share of Artist's compensation payable hereunder will be paid to each Team member rendering services, and such compensation will constitute full and complete compensation hereunder.

(e)     **Additional Documents.**  Artist will execute and deliver to Producer at Producer's request any further documents consistent herewith (including, without limitation, Artist's Certificate and Assignment) in the form Producer may reasonably prescribe; provided, however, that Artist's failure or refusal to do so shall not affect any of Producer's rights in the Material, the Series or any episode thereof, or any of Artist's representations or warranties herein. In the event that Artist fails or refuses to so execute or deliver, or cause to be executed and delivered, any such document after Artist has had a reasonable opportunity to review and negotiate same, then Artist hereby irrevocably appoints Producer as Artist's attorney-in-fact solely to execute any such documents in Artist's name and on Artist's behalf and to institute and prosecute such proceedings as Producer may deem necessary to secure, protect or enforce Producer's rights hereunder. Producer shall furnish to Artist a copy of all documents executed hereunder on Artist's behalf provided that any inadvertent failure by Producer to provide such copy shall not be deemed a breach under this Agreement or affect the validity of such document. Producer may sue in its own name or Artist's name, or may join Artist as party in any such proceeding.

(f)     **Full Performance.**  All payments due to Artist hereunder are subject to Artist's full and faithful performance of Artist's services, representations, warranties, agreements, and obligations hereunder. Artist will not make any commitment or agreement whereby Producer is required to pay any consideration or obligate Producer in any way to any third party without first obtaining Producer's express written consent.

(g)     **Headings.**  Paragraph headings as used herein are for convenience only and are not a part of, nor will they be used to interpret, any provision of this Agreement.

(h)     **Choice of Law.**  This Agreement will be governed by and construed under the laws of the State of California applicable to contracts wholly negotiated, executed and performed in the State of California.

(i)     **Dispute Resolution.**  Other than Producer's right to equitable relief set forth in subparagraph 13(a) above, all claims, controversies or disputes arising out of, in connection with, or relating to this Agreement, the performance or breach thereof or Default under this Agreement, whether based on contract, tort, statute or otherwise (**"Covered Claims"**), shall be resolved by binding arbitration in Los Angeles, California, in accordance with Exhibit "ARB" attached hereto and incorporated herein by this reference. This subparagraph 18(i) (and Exhibit "ARB" attached hereto) shall survive termination or rescission of this Agreement.

(j)     **Confidentiality.**  Artist agrees to keep confidential the terms of this Agreement (including, without limitation, compensation and episodic guarantees), business and creative materials (whether created by Artist or otherwise), practices and procedures of Producer and its parent, subsidiary and affiliate companies, and Producer's licensees and agents, and all confidential information relating to any project, Prototype or Series hereunder, including, but not limited to, any information about cast and crew members, upcoming episodes, plot lines, story arcs and season finales, and to refrain from revealing such terms to any third party and from issuing, authorizing or permitting the

16

Apple Non-Performer Exhibit STC – Cut through v2.052119.DG
A032719

PPC-GRAY-0000876

issuance of any press release or other information, in any media, revealing such terms, except for incidental, non-confidential and non-derogatory references relating primarily to Artist which are made for Artist's personal publicity after the issuance by Producer of the initial press release regarding Artist's engagement hereunder. Notwithstanding the foregoing Artist may disclose the terms hereof: (i) to Artist's authorized agents and other authorized representatives with a reasonable need to know the disclosed information (subject to confidentiality obligations consistent with this Agreement); or (ii) as may be required by any applicable law, or by order or decree of any court of competent jurisdiction. Further, Artist and Artist's representatives may disclose Artist's compensation and other negotiated terms of this Agreement (excluding terms identified herein as non-precedential, non-quotable and/or non-citable) to other prospective employers for verification purposes in negotiating deals with such prospective employers. Additionally, Artist represents and warrants that neither Artist nor Artist's representatives will issue or permit the issuance of any publicity, grant any interview or make any statement concerning Artist's services hereunder, Producer's production methods (including those of its parent, subsidiary and affiliate companies), or to discuss any of the terms hereof with the media without Producer's prior written consent. Artist understands that (i) confidential information does not include Artist's wages, hours, or working conditions; (ii) the foregoing shall in no way affect Artist's right to communicate directly with others regarding Artist's wages, hours, or working conditions, and/or the wages, hours or working conditions of others with whom Artist is communicating; (iii) nothing herein is intended to interfere with Artist's rights under federal, state, and local laws including the National Labor Relations Act; and (iv) the provisions of federal, state and local laws including the National Labor Relations Act shall control in the event that anything in this Agreement conflicts with the provisions of federal, state and local laws including the National Labor Relations Act.

19.    **LOANOUT COMPANY.**  If a company ("**Lender**") loans Artist's services to Producer in connection with services to be rendered hereunder, Producer, Lender and Artist hereby agree as follows: (a) Lender will cause Artist to render the services described herein and to comply with the terms and conditions hereof; (b) Lender and Artist will be jointly and severally liable for Artist's Default or failure to comply with all of Artist's obligations, representations, warranties and agreements hereunder; (c) all sums payable to Artist hereunder will be paid by Producer to Lender, and, provided Producer pays Lender, Artist will look solely to Lender for any and all compensation to which Artist may be entitled hereunder; (d) Lender will assume full responsibility for, and fully indemnify and hold Producer harmless from and against, the payment of all taxes, penalties and other similar sums (including, without limitation, reasonable outside attorneys' fees incurred in connection therewith) arising out of the compensation provided for hereunder; and (e) references in this Agreement to "Artist," and "Participant" in Exhibit "MAGR" (if any), will be deemed also to include, refer to and apply to "Lender." If Lender loans Artist's services, for purposes only of all workers' compensation statutes, laws, or regulations ("**Workers' Compensation Laws**"), Producer shall be considered Artist's special employer hereunder. Accordingly, Lender and Artist acknowledge that in the event of Artist's injury, illness, disability or death falling within the purview of Workers' Compensation, Artist's rights and remedies (and those of Artist's heirs, executors, administrators, successors and assigns) against Producer or Producer's affiliated companies and their respective officers, agents and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Producer or an affiliated company the services of any such other special employee) (the "**Producer Related Entities**") will be governed by and limited to those provided by such Workers' Compensation Laws, and Lender agrees not to assert any claim against Producer or the Producer-Related Entities by reason of any such injury, illness, disability or death.

END OF STANDARD TERMS AND CONDITIONS

17

Apple Non-Performer Exhibit STC – Cut through v2.0S2119.DG
A032719